UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CHRYSLER PACIFICA FIRE RECALL
PRODUCTS LIABILITY LITIGATION

Case Number 22-md-03040
Honorable David M. Lawson
Magistrate Judge Elizabeth S. Stafford

MDL No. 3040

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS CONSOLIDATED MASTER COMPLAINT

The plaintiffs in this multidistrict litigation have filed a Consolidated Master Complaint (CMC) against defendant FCA US LLC (known also as Chrysler or Chrysler Corporation), the manufacturer of the Chrysler Pacifica Plug-in Hybrid minivan, in which they assert that the vehicle is defective because it has been known to spontaneously combust. The defendant has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Court heard oral argument in open court on September 27, 2023. For the reasons discussed below, the motion will be granted in part and denied in part.

### I. Facts and Proceedings

The plaintiffs have alleged claims of deceptive practices and warranty breaches. They say that, either due to defects in their design or problems during the manufacturing process, the large battery plant incorporated into the powertrain of the vehicles has a tendency to enter a "thermal runaway" state without warning resulting in combustion or explosion of the vehicle. The spontaneous ignition of the batteries, the plaintiffs say, may occur unpredictably at any time, even when the vehicles are parked and the ignition is off. Due to the risk of spontaneous fires, the plaintiffs say that they are unable to drive or leave the vehicles unattended with peace of mind, and they are forced to seek parking locations far removed from structures or other vehicles, due to

the risk of damage to any nearby property if the vehicles suddenly burst into flames.  The plaintiffs acknowledge that defendant FCA conducted a voluntary recall of the class vehicles based on the fire risk, but they allege that the measures implemented by the recall are insufficient to cure the problem, because the recall remedy consists merely of a software patch intended to "monitor" the battery system for conditions that may lead to thermal runaway, and no repair or replacement of the battery pack is offered unless Chrysler deems it "necessary" after an inspection.  It appears that the defendant did not determine that replacement was a necessary measure for any of the plaintiffs' vehicles (or, apparently, for almost all of the other thousands of class vehicles currently in service).

### A.  Parties and Claims

The CMC is a massive pleading — 1,450-paragraphs spanning more than 430 pages, including attached exhibits.  It identifies 81 causes of action based on breaches of express and implied warranties and violations of various state laws governing consumer sales, deceptive marketing, and unfair trade practices.  In Counts II, III, and IV, the plaintiffs also attempt to plead all-embracing unitary causes of action for "common law" fraudulent concealment, fraudulent omission, and unjust enrichment on behalf of a "nationwide class" of "[a]ll persons or entities who purchased or leased one or more model year 2017-2018 Chrysler Pacifica Hybrid minivans (the 'Fire Risk Vehicles')."  CMC ¶ 227, PageID.378. The plaintiffs also indicate that they intend to seek certification of state-by-state subclasses for the numerous other counts pleaded explicitly under the laws of 31 states.

The CMC aggregates claims brought by individuals in 11 separately filed civil actions that have been centralized in this district and consolidated by the Joint Panel on Multidistrict Litigation (JPMDL) for all pretrial proceedings.  The consolidated actions presently include claims brought by 69 plaintiffs who hail from the following states:

- Arizona (James and Alicia Kappes)
- California (Veronica Bryan, Scott Carney, Sean Clancy, Elias and Michelle Ramirez, Kent Schumann, Alexander Shusta, David Lawrence, Monte and Marie Macias, Rodrigo Nieto Gomez, Robyn Reilman, Scott Olsen)
- Colorado (Andrew Berzanskis, Margaret Wilensky)
- Connecticut (Kelsey and Peter Keefe)
- Florida (John Latacki, Diahann Messeguer, James Quattropani)
- Georgia (John Spruance)
- Idaho (Michael Keeth)
- Illinois (Tim Ferguson, Owen Ryan, Devlin Su, Spence Voss)
- Indiana (Christine Winter)
- Iowa (Tim Banas)
- Kansas (Salyi Vu)
- Kentucky (Christopher Dorn)
- Maryland (Diane and David Davidson, Ruth Hoffman)
- Massachusetts (Alicia and David Maltz, Michael Natale, Javin T. Olson)
- Michigan (Jacob Kitzman, Lauren Huntington) (*)
- Minnesota (Elizabeth Niemioja)
- Missouri (R. Scott Perry)
- Nevada (Scott Lewandowski)
- New Hampshire (Matthew Bergantino, Nicole and Stephen Costa)
- New Jersey (Tracy Whitman Brace)
- North Carolina (Chad Fong)
- Ohio (Jared Gadomski Littleton, Ronan Murphy, Lauren Huntington) (*)
- Oregon (Michael Christie, Clea and Ladd Van Tol)
- Pennsylvania (Joseph Ohodnicki, Erika and James Bagley)
- Rhode Island (Helen Bartek)
- South Carolina (Michael Carbajales-Dale, Rolando Pedroza)
- Tennessee (Rickey Butler)
- Texas (Meagan and Cal Findeiss, Patricia Ransom, Shawn Sheehan)
- Virginia (Richard Golland, Andrew Ventura)
- Washington (Ami Benzur)
- Wisconsin (Tiffany Rodriguez)

One named plaintiff, Lauren Huntington, was identified as a lead plaintiff and class representative for claims and classes in more than one jurisdiction — both Michigan (where she bought her vehicle) and Ohio (where she claims citizenship).

### B. Plaintiffs' Experiences

The plaintiffs allege that they purchased class vehicles from the defendant's authorized dealers on various dates ranging from November 18, 2017, CMC ¶ 62, PageID.289, through May

2022, *id.* ¶ 118, PageID.336.  According to the CMC, the plaintiffs paid a price premium of approximately $6,000 over the cost of a conventional gas engine Pacifica minivan to obtain the advantages of the plug-in hybrid powertrain; however, the plaintiffs say that those advantages have been negated by the defendant's voluntary recall directives, which have instructed them not to charge their vehicles and not to park them inside or near any structure or other vehicles.  *Id.* ¶ 10, 135 PageID.259, 347.  The plaintiffs allege that they have incurred added costs and inconvenience or are unable to use their vehicles for certain purposes due to the need to park at remote distances from intended destinations (or being unable to park at all in available public parking facilities) and to avoid parking near any structure or vehicle; and some plaintiffs contend that they are unable to comply with the directive since they simply lack access to any available parking location removed from adjacent structures or vehicles.  *Id.* ¶ 10-11, PageID.259-60.

The plaintiffs also allege that one of the main selling points for the class vehicles was the defendant's claim that the cars could be driven for substantial distances in pure electric mode, thereby achieving superior gas mileage of up to 84 miles per gallon.  *Id.* ¶ 138-141, PageID.348-49.  The plaintiffs allege that, since they no longer can charge their vehicles from grid power, they have incurred additional expenses to purchase more gasoline than they would if able to operate the vehicles as touted using stored electric charge.  One plaintiff — Tim Ferguson (Illinois) — alleged that his class vehicle burst into flames while parked in his residential garage, and the resulting fire destroyed the vehicle and garage and damaged his home.  *Id.* ¶ 67, PageID.293-94.

### C. Thermal Runaway

This litigation concerns alleged defects in the hybrid battery system (a component of the vehicle powertrain) in the class vehicles.  According to the CMC, the class vehicles "contain a defect in the hybrid propulsion system that can cause vehicle fires and explosions, even when the

vehicles are parked with the ignition in the 'off' position (the 'Spontaneous Fire Risk')."  CMC ¶ 3, ECF No. 24, PageID.254.  The plaintiffs allege that the spontaneous fire risk "exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle catches fire while in operation or, perhaps more commonly, spontaneously ignites while the vehicle is parked at the class member's home, on a public street, or in a public parking lot." *Id.* ¶ 4, PageID.255.  They say that the fire risk "also exposes passengers, other drivers on the road, neighbors, owners of other cars parked near the Fire Risk Vehicles, and other bystanders to an unreasonable risk of accident, injury, death, [or] property damage." *Ibid.*  The complaint includes photographs allegedly depicting a class vehicle parked outside a residential garage, engulfed in flames, and the aftermath of the fire showing total destruction of the vehicle and significant damage to the adjacent structure. *Id.* at PageID.256-57.

According to the CMC, the "high-voltage lithium-ion battery packs in the Fire Risk Vehicles were made by LG Chem (now LG Energy Solution, or 'LGES')," and "LGES also made the allegedly defective batteries that caused fires in GM Bolt electric vehicles and Hyundai electric vehicles." CMC ¶ 8, PageID.258.  The plaintiffs allege that "[i]n connection with the Bolt recalls, LGES agreed to pay GM $1.9 billion dollars." *Ibid.*  The plaintiffs contend that "FCA now admits to having received reports of a dozen fires connected with the hybrid propulsion system since 2019," but, nevertheless, it waited until February 2022 to issue its initial voluntary recall.

The plaintiffs allege that abstaining from charging a plug-in hybrid vehicle and being unable to park the vehicle in or near any residence defeats one of the main advantages of the vehicle in ordinary usage, which is the ability to drive it for some distance using stored power from the hybrid battery. *Id.* ¶ 10, 12, PageID.259-60; *see* Wikipedia: Plug-in Hybrid (explaining that plug-in hybrid electric vehicles can be propelled in electric vehicle (EV) mode via a battery pack

recharged by plugging a cable into a charging source as well as by their onboard internal combustion engine-powered generator, and plug-in hybrid vehicles generally have larger battery packs than conventional hybrid vehicles), https://en.wikipedia.org/wiki/Plug-in_hybrid.

The plaintiffs allege that "FCA has yet to determine or disclose a root cause" for the battery failures and fires in class vehicles. However, they point to an October 2017 report produced by the National Highway Traffic Safety Administration (NHTSA), entitled "Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles." CMC: Ex. 2, ECF No. 24-3, PageID.695-955. The NHTSA report was produced at the conclusion of a comprehensive study aimed at "assess[ing] potential Li-ion battery vehicle safety issues and provid[ing] NHTSA information it can use to assess needs and prioritize its future research activities on Li-ion battery vehicles." *Id.* at PageID.711. The report discusses in exhaustive detail the agency's review of potential design problems with hybrid powerplants, risks that may arise from certain features in their design, and measures that may be taken to mitigate those risks. The report also includes as an appendix a survey of design features in numerous available hybrid and fully electric car models that use lithium-ion battery packs. Among other things, the report concluded that for each battery design, there is a temperature and operating voltage range "in which electrochemistry is dominated by intercalation mechanisms." Outside that operating range, exothermic reactions and electric shorts can occur, which "may be triggered by manufacturing defects, or mechanical, electrical, or thermal errors, misuse or abuse." If left unchecked, "these reactions or shorts can create conditions for self-heating within the cell; which grow to become uncontrolled increases in temperature and pressure (thermal runaway); and potentially end in venting or catastrophic failure of the cell." NHTSA Report, ECF No. 24-3, PageID.922.

The report stated that, among other potential causes for thermal runaway are "[e]rrors in design, manufacturing, operation, and maintenance, which induce electrical, mechanical, and thermal abuse causes." *Id.* at 923; *id.* at 902 ("The discussions in Chapters 2 and 3 of this report show that Li-ion battery components are variable and sensitive to manufacturing errors and deviations. Design and manufacturing errors are identified throughout the analysis as a likely contributor to failure.").   The report cites as sources numerous academic studies and other engineering literature published between 1994 and 2013 on the topics of electric and hybrid powertrain design. *Id.* at 750-53, 771-72, 808, 826-27, 845-47, 883-84, 902, 919-20.

The plaintiffs, for their part, allege one potential cause of the problem: the defendant's choice to use a small number of larger cells rather than a large number of smaller cells in the battery pack design, because a design using larger cells would be cheaper. CMC ¶ 13, PageID.260. The NHTSA report concluded that designs incorporating larger cells may pose distinct heating problems due to variations in the internal temperature of large cells, which make monitoring and heat dissipation more problematic. NHTSA Report at PageID.759 (explaining that "[t]he current distribution within a cell has been shown to be nonuniform during charging and to change as the charging cycle progresses" so that "one portion within the cell to be outside the bounds of proper operation while other parts are satisfactory"; and "the temperature can vary appreciably from one location to another" in large cells).

The plaintiffs allege that numerous safety measures are available to offset the increased risk of overheating in large battery packs, including monitoring cell temperatures, providing safety interrupts to disconnect problematic cells before they enter thermal runway, and providing adequate separation of cells with insulating materials, along with active cooling measures to dissipate heat.   CMC ¶¶ 181-88, PageID.363-365.   The plaintiffs allege, however, that the

defendant skimped on those measures — or that they were not implemented properly during manufacturing — in order to save costs and improve vehicle performance.

### D. Defendant's Knowledge

The plaintiffs allege that the defendant was aware of the fire risk in the class vehicle battery design based on several sources of information, including: (1) the awareness of the studies available before the vehicles were released to the market that described the fire risks mentioned in the NHTSA report of using cheaper larger cells instead of more reliable but more expensive smaller cells; (2) FCA's evident decision to save costs by omitting available safety technology in the Fire Risk Vehicles; (3) the likely pre-launch testing "that would have revealed the batteries' propensity to simultaneously combust"; (4) "the consumer complaints lodged with the National Highway Traffic Safety Administration ('NHTSA') and elsewhere online"; (5) FCA's own investigation of fires in the plug-in hybrid Pacificas; and (6) the similar fire problems that were encountered by manufacturers of other electric vehicles "with LGES lithium-ion battery packs." CMC ¶ 13, PageID.260-61.

On that last point, the plaintiffs point to widely published reports concerning recalls of lithium-ion batteries manufactured by LGES, which is the same manufacturer that made the battery packs for the class vehicles. They allege that FCA was aware of (1) problems with GM's model year 2017 through 2022 Bolt electric cars, which led to a recall and eventually to LGES paying GM more than $1.9 billion, (2) similar problems with LGES-made batteries used in 2017 through 2020 Hyundai electric cars, which led to a recall in February 2021, (3) 2017 and 2018 fire-related recalls of similar LGES lithium-ion batteries used in residential back-up power systems, and (4) a 2019 fire at a battery facility operated by the Arizona Public Service utility company, which was determined to have been caused by "an internal cell defect" in a battery pack made by LGES. The

plaintiffs also reference four complaints submitted to NHTSA by class vehicle owners from September 2018 through June 2020, which described class vehicles catching fire while driving or while plugged in and charging.   CMC ¶ 198, PageID.367-70.   Finally, the plaintiffs cite information in FCA's February 11, 2022 initial recall report, which stated that its Technical Safety and Regulatory Compliance division had begun investigating "a potential trend in fires" in the class vehicles on August 31, 2021, based on a dozen field reports of vehicle fires that FCA received between April 23, 2019 and December 14, 2021.  *Id.* ¶¶ 200-203, PageID.371.

## E. Limited Warranty

It is undisputed that the defendant issued a limited warranty covering all of the class vehicles.  The "basic limited warranty" states its coverage as follows:

> The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and Unwired headphones. You pay nothing for these repairs.

FCA Basic Limited Warranty, ECF No. 30-1, PageID.1230.  The warranty lasts for 36 months or for 36,000 miles, "whichever occurs first."  *Id.* at 1231. The warranty additionally provides extended coverage for 10 years and between 100,000 to 150,000 miles for "high voltage battery" components. *Id.* at 1236.  Further 10-year /100,000 mile coverage also is extended for the "hybrid charging system," "hybrid electric cooling system," and "hybrid power inverter system."  *Id.* at 1242.

## F. Voluntary Recall

The February 2022 initial recall notice, the plaintiffs say, did not propose a fix for the alleged battery defect at all.  Instead, it merely "advised owners of these hybrid vehicles to refrain from charging them, and to park them away from structures and other vehicles."  CMC ¶¶ 9-10, PageID.258-59.  The plaintiffs allege that the defendant issued a second recall notice in October

2022 in which it informed owners that they could present their vehicles to dealers who would "update the High Voltage Battery Pack Control Module (BPCM) software to monitor battery pack assembly operational status for conditions that could lead to a fire in the battery pack assembly." *Id.* ¶ 15, PageID.261; Ex. 3, ECF No. 24-4, PageID.957.  The October recall letter advised owners about the fire risk defect and further stated:

> FCA US has decided that a defect, which relates to motor vehicle safety, exists in certain 2017 Chrysler Pacifica vehicles.
>
> * * *
>
> Some of above Plug-in Hybrid Electric Vehicles (PHEV) may experience a fire potentially originating in the center of the vehicle underbody with the ignition in the "OFF" mode. A vehicle fire can result in increased risk of occupant injury and/or injury to persons outside the vehicle, as well as property damage.
>
> * * *
>
> **<u>FCA is advising owners of these hybrid vehicles to refrain from recharging the high voltage battery, and to park them away from structures and other vehicles until your vehicle is remedied.</u>**

Important Safety Recall Letter, ECF No. 24-4, PageID.957 (emphasis in original).  The plaintiffs allege, however, that the software patch remedy is inadequate because it merely operates to "detect" hazardous conditions, and it does nothing to prevent or halt thermal runaway conditions. *Id.* ¶ 16, PageID.262-63.  They further allege that the "warning" of hazardous conditions is ineffective for vehicles that are unattended when those conditions may develop (such as when parked). *Ibid.*  The October 2022 recall notice also indicated that the class vehicles would be inspected by FCA dealers, and the battery pack would be replaced "if necessary." *Ibid.*  However, the plaintiffs contend that even an entire replacement of the battery pack is an insufficient remedy if the same design or manufacturing defects afflict the replacement parts. *Ibid.*

### G.  Procedural History

This multidistrict litigation was initiated on August 3, 2022 by an order of the Judicial Panel on Multidistrict Litigation (JPML) transferring for pretrial proceedings four civil actions from various districts to this Court to be consolidated with three cases filed in this district. Subsequent orders by the JPML transferred more cases raising the same claims, which all together comprise 11 putative class actions and 69 named plaintiffs who have pleaded, cumulatively, more than 81 counts under the laws of 31 states.  On October 17, 2022, the Court consolidated the related cases and established initial deadlines for filing and challenging consolidated pleadings.  The plaintiff's consolidated master complaint (CMC) was filed on November 3, 2022.  On December 19, 2022, the defendant filed its motion under Federal Rule of Civil Procedure 12(b)(6) challenging the viability of all of the claims pleaded in the CMC.

## II.  Discussion

The standards that govern a motion to dismiss under Rule 12(b)(6) are well known to the parties: the purpose of the motion is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if the court accepts all the facts in the complaint.  *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)).  The complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff.  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  To survive the motion, the plaintiffs "must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief."  *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The main thrust of the defendant's arguments is that the facts pleaded cannot satisfy certain elements under the law of any state.  Alternatively, it contends that even if the claims are well pleaded, certain corollary rules of decision applicable in some jurisdictions (e.g., privity, statute of limitations, advance notice, etc.) nevertheless bar the claims.  The defendant does not cite or rely on any peculiarities in the elements of particular claims among the several states.

Notably, the plaintiffs have not pleaded any state-by-state fraud or concealment causes of action based on the common law.  Instead, they allege only counts for violations of consumer protection statutes in the various states.  They have, however charted a novel course by pleading purported "common law" claims of "fraudulent concealment," "fraudulent omission," and "unjust enrichment" as "nationwide" claims (Counts II, III, and IV), asserting in passing that such pleading in gross is proper because the common law elements of the causes are "virtually identical" among the many states.  They supplement those claims with statutory causes of action under the consumer laws of the several states.

### A.  Nationwide Claims

The plaintiffs have not identified in Counts II, III, and IV any source of law for the causes supposedly pleaded — either stemming from federal common law or the common law of the various states involved with the other claims.  They also have cited no legal authority for the proposition that any "nationwide" body of common law exists under which such causes of action could arise.  And they have not explained how plaintiffs with distinct state law claims could derive standing to represent each other on claims arising from the purchases of class vehicles in other states by other entirely separate plaintiffs.  This is problematic for several reasons.

First, there is "no federal general common law."  *See Matrix Distributors, Inc. v. Nat'l Ass'n of Bds of Pharmacy*, 34 F.4th 190, 197 (3d Cir. 2022) (quoting *Erie R.R. Co. v. Tompkins*,

304 U.S. 64, 78 (1938)).  Nor is there any common law that is universally accepted by all the states.  The elements of causes of action labeled "fraudulent concealment," "fraudulent omission," and "unjust enrichment" may overlap from state to state.  But to determine if Counts II, III, and IV of the CMC state viable claims, the Court must parse the elements of those claims under the common law of each state.  The plaintiffs have eschewed such an analysis by pleading their nationwide theories, which are untethered to any particular body of state-specific law.

Second, the plaintiffs have not explained how an individual plaintiff with a distinct claim under the law of a specific state could derive standing to represent other persons on claims arising from the purchases of class vehicles in other states by other entirely separate plaintiffs.  The mere congruence of a fact pattern suffered by a non-resident plaintiff is not sufficient to confer standing, even though the resident plaintiff of a particular state may assert the similarly-styled claim.  "What is needed — and what is missing here — is a connection between the forum and the specific claims at issue." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 264-65 (2017).  *See also In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 11552971, at *1 (E.D. Mich. Apr. 19, 2017).

Third, the Sixth Circuit has held that a nationwide class claim may not proceed when it incorporates the laws of several states.  *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1085 (6th Cir.1996).  Citing the venerable *Erie* doctrine, the court reminds us that federal courts sitting in diversity must apply the common law of the state in which the case would normally be tried rather than a general federal common law.  *Ibid.* (citing *Erie R.R.*, 304 U.S. at 78-80).  Nationwide class claims have been stricken following this basic principle.  *See Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 948 (6th Cir. 2011).

Also problematic in the context of this multidistrict litigation is the prospect of divining in what forum (or forums) Counts II, III, and IV eventually would be tried.  If those counts are construed — as they have been pleaded — as embracing claims of plaintiffs in the three cases filed originally in this district as well as the eight cases separately filed in other districts and transferred here by the JPML for pretrial proceedings, then the counts cannot be tried in this district, because doing so would amount to an improper self-assignment for trial by this MDL court of transferred cases that originated in other districts.  All of these transferred cases retain their distinct identities as separate lawsuits throughout this proceeding.  Cases consolidated by the JPML "retain their separate character.  Consolidation must not affect the parties' substantive rights, particularly where consolidated cases originating in different jurisdictions may require application of different rules of law.  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 340 F.R.D. 251, 254 (E.D. Mich. 2022) (citing *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998)).  Due to the same jurisdictional challenges discussed above, Counts II, III, and IV also could not be tried in any of the transferor districts, since they necessarily would involve claims by remote parties based on transactions that occurred in places far removed.  There is, therefore, no identifiable federal forum in which the peculiar counts as pleaded potentially could be tried.

The plaintiffs have not identified any source of law for their supposed "nationwide" common law claims, and entertaining the claims in the posture that they take in the consolidated pleading would pose insurmountable jurisdictional concerns, as well as irreconcilable case management problems when the constituent cases proceed to trial.

Moreover, certification of a "nationwide class" embracing causes of action brought peculiarly under the law of enumerated states presents decidedly different questions than the pleading of a "nationwide count" in a complaint purporting to assert a cause of action under the

laws of every state (or no state).  Because the common law claims here are left to some nationwide jurisprudence alone, this case differs from the decision in the *Bolt EV Battery Litigation*.  In that case, as demonstrated by the table of claims included in the decision, the plaintiffs pleaded both "nationwide" common law claims *and* individualized common law counts of their various causes of action for every state where such claims were raised.  *See In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 941-45 (E.D. Mich. 2022).  In this case, the CMC pleads no common law claims state by state, but instead pleads only the generalized "nationwide" claims untethered to the law of any state.

Questions about the scope of any class or classes that may be certified as this litigation proceeds are for another day.  But the question of how the causes of action must be framed in the complaint in order to facilitate orderly administration of this multidistrict litigation through its lifetime — eventually culminating either in trial or remand of every distinct constituent suit — is one that must be addressed now, and that task would be hopelessly confounded by allowing the "nationwide" claims to proceed as pleaded in gross.

The plaintiffs have not cited any authority endorsing the pleading in gross of common law claims spanning numerous jurisdictions, particularly in the context of a multidistrict litigation.  Counts II, III, and IV of the CMC, therefore, will be dismissed.

### B.  Statutory Consumer Protection Claims

The defendant argues that all of the claims based on consumer fraud statutes must be dismissed because the allegations of fraud are not pleaded with sufficient specificity, the facts pleaded do not establish the defendant's prior knowledge of a defect, the economic loss doctrine applicable in some of the states bars recovery, other states require a special relationship between the consumer and the manufacturer that is absent from the allegations, some of the claims are

untimely, some of the states prohibit consumer fraud claims to be presented as a class action, and the plaintiffs have not given pre-suit notice, as some states require.

## 1. Specificity

The defendant argues that all of the consumer fraud claims must be dismissed because the plaintiffs failed to plead facts demonstrating the defendant's pre-sale misrepresentations with the specificity mandated by Federal Rule of Civil Procedure 9(b). "As with any cause of action sounding in fraud, the pleader in federal court must comply with the heightened pleading requirements under Federal Rule of Civil Procedure 9(b)." *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 682 (E.D. Mich. 2020). Thus, a plaintiff pleading a consumer fraud claim based on a material omission must allege "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [the defendant] obtained as a consequence of the alleged fraud." *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). The pleading will "suffice under the [Rule 9(b)] standard if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect." *Wozniak v. Ford Motor Co.*, No. 17-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019) (citing *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751-52 (E.D. Mich. 2017)).

The allegations of the CMC are plain and specific. The plaintiffs identify the problematic vehicles as model year 2017 and 2018 Chrysler Pacifica Plug-In Hybrid minivans. The CMC alleges that the class vehicles have a defect (whether by design or manufacture allegedly is unknown), that can cause their hybrid powertrain battery packs spontaneously to enter a "thermal

runaway" state, resulting in catastrophic fires or explosions.  The existence of the defect was

admitted by the defendant in an October 2022 recall letter:

> FCA US has decided that a defect, which relates to motor vehicle safety, exists in certain 2017 Chrysler Pacifica vehicles.
>
> * * *
>
> Some of above Plug-in Hybrid Electric Vehicles (PHEV) may experience a fire potentially originating in the center of the vehicle underbody with the ignition in the "OFF" mode. A vehicle fire can result in increased risk of occupant injury and/or injury to persons outside the vehicle, as well as property damage.
>
> * * *
>
> **FCA is advising owners of these hybrid vehicles to refrain from recharging the high voltage battery, and to park them away from structures and other vehicles until your vehicle is remedied.**

Important Safety Recall Letter, ECF No. 24-4, PageID.957 (emphasis in original).  The plaintiffs,

unsurprisingly, do not profess to understand fully the root cause of the thermal runaway fires, but

it appears to be undisputed that the problematic battery pack design was installed in every class

vehicle, and FCA issued a recall implicating model year 2017 and 2018 class vehicles.

The plaintiffs plainly have alleged "who" knew about the defect: FCA. They also allege

"what" it knew, which is that the lithium-ion battery packs used in the class vehicles pose a

significant risk of thermal runaway overheating, potentially creating fires or explosions, and that

the design and production of the vehicles (either inherently or in the implementation) fails

adequately to mitigate the fire risk.  They back up that allegation with specific assertions that FCA

knew about the problems from (1) decades of widely published engineering academic literature

recognizing the serious risk of thermal runaway inherent to large, high-voltage battery packs used

in hybrid vehicle design, (2) complaints submitted through the defendant's dealer network and via

public authorities such as NHTSA about class vehicles spontaneously combusting, which began

to appear almost immediately upon their entry into the market, (3) multiple recalls of similar large

battery systems manufactured by LGES — the same maker that supplied batteries for the class vehicles — after other lithium-ion cells created fires or explosions due to manufacturing defects, and (4) the defendant's initiation of an internal safety investigation in August 2021, which ultimately resulted in the voluntary recall.  The plaintiffs further allege, on the basis of information and belief, that FCA's internal testing prior to market entry of the vehicles must have disclosed the tendency of the vehicles' hybrid batteries to overheat and catch fire.

The plaintiffs also specifically have alleged "what" was omitted from any public communication by the defendant about the class vehicles: all of FCA's knowledge about the extent and severity of the issue affecting the class vehicle models equipped with the problematic LGES battery packs.  They contend that, to this day, the full knowledge of what the root cause of the defect may be remains in the exclusive possession of FCA.

Finally, the plaintiffs also sufficiently allege "when" FCA failed to disclose material information about the defect, because they state that it never publicly did so before the voluntary recall notice was sent.  The plaintiffs uniformly allege that if information about the fire risk had been disclosed to them at the point of sale, or if they had been told that safe usage of the vehicles would require essentially not using the plug-in feature at all and never parking the vehicles in typical storage locations such as in a garage, driveway, or parking lot, then they would not have paid the $6,000 price premium for the hybrid configuration and would have bought conventional gasoline engine minivans instead.

The plaintiffs have satisfied the specificity requirements of Rule 9(b).

### 2. Pre-Sale Knowledge

The defendant argues that the plaintiffs have not pleaded adequately that it had knowledge of the defect before their class vehicles were purchased.  The information disclosed by the CMC

demonstrates otherwise.  Rule 9(b)'s fraud prescription does not set the standard for this element. Instead, that rule "permits general allegations about the defendant's knowledge to avoid a 12(b)(6) motion to dismiss." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 883 (6th Cir. 2021) Citing Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

The plaintiffs alleged that they purchased class vehicles from the defendant's authorized dealers on various dates ranging from November 18, 2017, CMC ¶ 62, PageID.289, through May 2022, *id.* ¶ 118, PageID.336.  They highlight complaints of vehicle fires that pre-dated many of the plaintiffs' purchases, including four complaints submitted to NHTSA by class vehicle owners from September 2018 through June 2020, which described class vehicles catching fire while driving or while plugged in and charging.  CMC ¶ 198, PageID.367-70.  The plaintiffs also point to information in FCA's February 11, 2022 initial recall report, which stated that its Technical Safety and Regulatory Compliance division had begun investigating "a potential trend in fires" in the class vehicles on August 31, 2021, which eventually collated field reports of vehicle fires that FCA received from April 23, 2019 through December 14, 2021.  *Id.* ¶¶ 200-203, PageID.371.

Based on the date range of reports from September 2018 through December 14, 2021, it is a fair inference that the initiation of the formal investigation was prompted by an accumulation of concerns that arose over time, perhaps even earlier than the documented reports cited in the complaint.  *See Francis*, 504 F. Supp. 3d at 684-85 (noting that the issuance of service bulletins "plausibly suggests that a defendant knew about a defect for some time preceding their promulgation, because it is reasonable to infer that such technical guidance would be prompted by 'an accretion of knowledge' that would take some time to gather persuasive weight, and more time necessarily would be taken up by investigating likely causes of a problem and formulating a

remedy") (citing *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014); *Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 900 (N.D. Cal. 2015)).

More significantly, the plaintiffs plainly allege that the defendant was aware, well before the vehicles went to market, of decades of academic engineering publications, surveyed in the comprehensive 2017 NHSTA Safety Report, which documented in exhaustive detail the potential for thermal runaway issues in hybrid powerplant designs. Although that background of industry awareness does not suffice by itself to establish FCA's knowledge of a specific defect in the class vehicles, it does aid in nudging their allegations of knowledge from the realm of the possible into the realm of the plausible. *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d at 956 (observing that general industry knowledge of lithium-ion batteries' fire risks alone may not establish knowledge of a defect, it does "make[] Plaintiffs' knowledge allegations somewhat more plausible").

The plaintiffs also allege that FCA was aware of problems in 2017 model year GM and Hyundai vehicles that also used battery packs made by LGES, and which also experienced spontaneous fire issues, eventually prompting voluntary recalls. The plaintiffs contend that, based on the history of problems in similar designs, the defendant knew full well based on years and decades of industry experience and publications about the peculiar risks of spontaneous combustion inherent in the class vehicles' battery pack design, which allegedly featured a "small number of large cells," as contrasted with safer designs using a "large number of small cells," and that it nevertheless failed to include adequate precautionary measures in the class vehicles, either through deficient design or by exercising insufficient care in manufacture and assembly. Allegations about a defendant's knowledge of problems with preceding materially similar designs extant in the industry has been held sufficient to support an inference of prior knowledge at the

pleading stage. *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1289 (E.D. Mich. Nov. 9, 2021) ("Although the public release of this [NHTSA safety investigation] information in February 2011 seems like the strongest indicator of a starting point for GM's knowledge, Plaintiffs also plausibly allege that GM engineers would have kept abreast of these kinds of developments even before then, through tracking of competitors and emerging safety or technical issues. . . . . Taking the totality of these allegations in the light most favorable to Plaintiffs, as soon as manufacturers began having issues with CP4 pumps that used American diesel it is not implausible that GM would have become aware of the defect.").

The allegations here leave room for considerable debate about precisely when FCA became aware of the fire risk, but pinning down the chronological threshold for liability is a task better taken up at the summary judgment stage, with the benefit of a fully developed record. *Bolt EV Battery Litig.*, 633 F. Supp. 3d at 958 ("While it is hard to pinpoint a precise moment when GM developed knowledge of the fire-risk defect, Plaintiffs have alleged enough facts to show that, at some point in the time period contemplated by the Complaint, it is plausible that GM was aware of the defect. . . . Facts clarifying when, if at all, GM and the other defendants had knowledge will emerge in discovery, and this question may be addressed again at summary judgment.").

### 3. Economic Loss Rule

The defendant argues that the consumer protection claims under the laws of California, Colorado, Florida, Georgia, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, Pennsylvania, New Hampshire, North Carolina, South Carolina, Tennessee, Texas, Virginia, and Wisconsin all are barred by the so-called "economic loss rule," which in general serves to bar recovery in tort for transactional losses deemed purely contractual. The doctrine draws a line between breach of contract claims arising from commercial transactions, where commercial and

contract law protect the parties' economic expectations, and tort actions intended to remedy unanticipated injuries as a result of conduct that violates a separate legal duty apart from the contract. *Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 521, 486 N.W.2d 612, 615 (1992).

The cases on point do not support the defendant's position, and the defendant has not cited any case law endorsing their invocation of the economic loss doctrine to bar consumer claims for statutory fair dealing violations and fraudulent inducement that are pleaded here. "As the plaintiffs point out, federal courts have recognized that significant public policy concerns weigh heavily against the overextension of this limiting doctrine." *Francis*, 504 F. Supp. 3d at 686-87 (citing *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 435-36 (S.D.N.Y. 2017) ("'[T]he economic loss doctrine is premised on the notion that parties to a contract may protect themselves from negligence or defective products by negotiating the liability terms of the contract. We believe that in both theory and practice, it is impracticable, if not impossible, for parties to negotiate terms regarding what happens if one of them is intentionally deceiving the other. . . . The notion that parties are free to allocate risks of negligence or defect fails when one party is intentionally deceiving the other.'") (quoting *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 278 (E.D. Pa. 2003))). It follows, then, "that in almost all of the jurisdictions in question, the evolution of the case law through the decisions on point has resulted in the doctrine being cabined to bar only actions sounding in negligence and other unintentional torts, not intentional fraud. And in other cases exceptions have been recognized where a defendant deliberately conceals information to induce the plaintiff to conclude a bargain, or to obfuscate product safety concerns." *Id.* at 687.

As this Court previously has observed upon surveying the relevant case law, "federal and state decisions on point have recognized that in . . . Kentucky, . . . North Carolina, and

Pennsylvania, the economic loss doctrine has not been extended beyond embracing specific causes of action that are not analogous to fraudulent omission, or relevant exceptions have been recognized for fraud in the nature of an inducement to enter into a contract (i.e., deceptively to persuade a customer to buy or overpay for a defective car), or in cases where the information withheld concerns a safety-related defect." *Ibid.* (citing *New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*, No. 12-91, 2019 WL 5107105, at *15 (E.D. Ky. June 26, 2019), *R&R adopted*, 2019 WL 4597500 (E.D. Ky. Sept. 23, 2019); *Nami Res. Co., LLC v. Asher Land & Mineral, Ltd.*, 554 S.W.3d 323, 335-36 (Ky. 2018); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d 582, 589-93 (E.D. Mich. 2018) (denying motion to dismiss consumer fraud claims under Michigan, New Jersey, and North Carolina law); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *18 (D.N.J. May 8, 2017) ("New Jersey, Florida, North Carolina, Pennsylvania, New Hampshire, and South Carolina law also do not apply the economic loss doctrine to fraud based claims when a plaintiff alleges fraudulent inducement or that the defendant violated an extrinsic duty."); *id.* at *23 ("[T]he economic loss doctrine does not bar Plaintiffs' fraud based claims.  Th[e] [inducement and safety] exceptions to the doctrine's applicability extend to statutory fraud and/or consumer protection claims as well.  Accordingly, based on this Court's analysis above, as well as the relevant case law, the Court concludes that the economic loss doctrine does not bar the Michigan, New Jersey, North Carolina, and Pennsylvania Plaintiffs' statutory fraud and/or violation of consumer protection law claims.")).  The case law in other states hews to similar principles.

After similar surveys of the case law, other federal courts have concluded that the economic loss doctrine does not bar consumer fraud or fraudulent concealment claims under Florida, Michigan, New Hampshire, and South Carolina law.  *In re Volkswagen Timing Chain Prod. Liab.*

*Litig.*, 92 UCC Rep. Serv. 2d 754, 2017 WL 1902160, at *17-18 (D.N.J. May 8, 2017) ("Florida, Michigan, New Hampshire, New Jersey, North Carolina, Ohio, Pennsylvania, and South Carolina all extend the economic loss doctrine to fraud based claims, such as those advanced by Plaintiffs here. However, each of these states also have exceptions to the general rule that permit all of Plaintiffs' claims to proceed. . . . New Jersey, Florida, North Carolina, Pennsylvania, New Hampshire, and South Carolina law also do not apply the economic loss doctrine to fraud based claims when a plaintiff alleges fraudulent inducement or that the defendant violated an extrinsic duty. . . . Similarly, Michigan and Ohio's economic loss doctrine does not bar fraud claims by consumers who are not in contractual privity with the defendant.") (collecting cases); *see also In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d at 591 ("Michigan's construction of the economic loss doctrine does not bar claims for fraudulent concealment premised on 'fraud in the inducement' or deceit intended to entice a party to engage in a transaction." (citing *Atlas Technologies, LLC v. Levine*, 268 F.Supp.3d 950, 963-64 (E.D. Mich. 2017)).

California's economic loss doctrine does not prevent tort recovery on claims where, as here, it is alleged that a plaintiff was induced fraudulently to enter into a sales transaction. *Driz v. FCA US, LLC*, No. 22-01605, 2022 WL 4348470, at *3 (N.D. Cal. Sept. 19, 2022) ("The California Supreme Court, however, has recognized certain contract cases where tort damages are nonetheless permitted, the most relevant of which are those 'where the contract was fraudulently induced.'") (quoting *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990, 102 P.3d 268, 273 (2004)).

Colorado's economic loss doctrine does not bar tort recovery arising from a contractual exchange where, as here, it is alleged that the defendant violated a duty to disclose that arose

independently of the contract.  *Spring Creek Exploration & Production Co., LLC v. Hess Bakken Investment, II, LLC*, 887 F.3d 1003, 1020 (10th Cir. 2018); *Town of Alma v. AZCO Construction, Inc.*, 10 P.3d 1256, 1264 (Colo. 2000); *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 608 (Colo. 2016).  "In this case, the plaintiffs allege that the defendant induced them to pay more than they otherwise would have to acquire the class vehicles by concealing known dangerous defects in the [battery pack design]. Those allegations of pre-purchase concealments are sufficient under the controlling case law to state a claim for fraudulent concealment premised on a breach of a duty that arises separately from any bill of sale or warranty."  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d at 590.

Georgia courts apply a similar rule.  *Hanover Ins. Co. v. Hermosa Const. Grp., LLC*, 57 F. Supp. 3d 1389, 1397-98 (N.D. Ga. 2014) ("Courts have repeatedly recognized that intentional misconduct in the course of a contractual relationship can give rise to a separate cause of action under tort law.") (collecting cases and rejecting motion to dismiss common law claims for conversion and unjust enrichment and statutory fraudulent transfer claim).

Similarly, Indiana courts reject the application of the economic loss rule to claims sounding in fraud.  *DMC Mach. Am. Corp. v. Heartland Mach. & Eng'g, LLC*, No. 11-00369, 2019 WL 175272, at *4 (S.D. Ind. Jan. 11, 2019) ("As for Count 2, fraudulent misrepresentation, or more simply fraud, the economic-loss rule presents no difficulty, for it does not apply to fraud claims.") (citations omitted).

Maryland courts "have recognized an exception where the plaintiff alleges the concealment or failure to warn of a defect giving rise to a 'serious risk of bodily harm.'"  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d at 590 (quoting *Lloyd v. General Motors Corp.*,

397 Md. 108, 916 A.2d 257, 275 (2007)). The fire risk defect in this case certainly qualifies under that rubric.

The defendant cited no authority for the application of the economic loss rule under Minnesota law. However, this Court has held that Minnesota's statutory enactment of the rule does not bar claims of intentional fraud. *Francis*, 504 F. Supp. 3d at 688-89 ("[Minnesota's] iteration of the economic loss rule has been codified by Minnesota Statutes § 604.101, which states: 'A buyer may not bring a common law misrepresentation claim against a seller relating to the goods sold or leased unless the misrepresentation was made intentionally or recklessly. The economic loss doctrine applies to claims only as stated in this section. This section does not alter the elements of a product defect tort claim or a common law claim for misrepresentation.' Minn. Stat. § 604.101(4), (5). Recent decisions on point have construed the plain language of this statute as exempting claims of intentional fraud from the doctrinal bar." (citing *Woods v. K.R. Komarek, Inc.*, No. 15-4155, 2017 WL 2312868, at *5 (D. Minn. May 26, 2017); *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1144-45 (D. Minn. 2016))).

The defendant cites no cases applying Missouri's iteration of the economic loss doctrine. Instead, it cites only *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 886 (8th Cir. 2000), which included an extensive discussion of Minnesota law. Moreover, as this Court has observed, the Missouri decisions on point are consistent with the reasoning of other states that reject the application of the doctrine to consumer fraud and fraudulent inducement claims. *Francis*, 504 F. Supp. 3d at 688 ("The decisions principally cited by the defendant applying New Jersey and Missouri law are inapposite because they involved claims of negligent misrepresentation, strict product liability (absent personal injury), and ordinary negligence, not, as pleaded here, intentional fraudulent omissions. Those decisions do not support the proposition that

the doctrine would be applied in those jurisdictions to bar statutory or common law consumer fraud claims.") (citing *Jacobson Warehouse Co., Inc. v. Schnuck Markets, Inc.*, No. 17-00764, 2017 WL 5885669, at *4 (E.D. Mo. Nov. 29, 2017) (concerning ordinary negligence)).

The lone Kansas case cited by the defendant did not consider application of the doctrine to consumer protection act claims, and, after extensive analysis, applied the doctrine narrowly only to bar recovery of punitive damages on claims where the compensatory tort damages sought are coextensive with available damages for breach of contract. *Louisburg Bldg. & Dev. Co. v. Albright*, 45 Kan. App. 2d 618, 660, 252 P.3d 597, 624 (2011) ("[W]e see no persuasive reason to impose punitive damages against a defendant who has failed to fulfill a contractual bargain when a claimed fraud has not caused any additional injury beyond the breach-of-contract damages. We see no reason to treat a fraudulent inducement that does not cause additional damage any differently."). Moreover, in the same decision the state court *affirmed* an award of civil penalties under the Kansas Consumer Protection Act, without any hint that such recovery might be barred by any limitation on economic loss recoveries. 45 Kan. App. 2d at 666, 252 P.3d at 627. That holding bolsters the view that the doctrine is inapplicable to consumer fraud claims.

Tennessee cases on point have observed that the state's supreme court has stopped short of applying the doctrine beyond the context of "sophisticated commercial relationships." *Preez v. Benchmark Maid, LLC*, No. 22-00144, 2022 WL 16842054, at *8 (M.D. Tenn. Nov. 9, 2022) ("Although the scope of the economic loss doctrine is uncertain, nothing in the Complaint suggests that Du Preez and Benchmark had the kind of sophisticated commercial relationship that would support applying even a somewhat expanded version of the doctrine in this case. Rather, all Du Preez describes is the relationship between a cleaning service and a client who, at least based on the information in the Complaint, cannot be assumed to be a sophisticated commercial actor. For

the economic loss doctrine to apply to such a situation, the Tennessee Supreme Court would be required not only to expand the doctrine beyond its currently acknowledged scope, but to expand it even more aggressively than it appears to be currently considering."). That hesitancy is consistent with the majority trend toward sparing application of the rule.

Texas authorities, consistent with other states noted above, reject the application of the rule in fraud cases. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) ("We too reject the application of *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991), to preclude tort damages in fraud cases. Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations. As a rule, a party is not bound by a contract procured by fraud."). The defendant has cited no Texas cases applying the doctrine to bar consumer fraud claims.

Virginia similarly recognizes an exception to the doctrine for fraudulent inducement claims. *4D-Enterprises, LLC v. Aalto Hyperbaric Oxygen, Inc.*, No. 19-01504, 2020 WL 13200492, at *3 (E.D. Va. May 22, 2020) ("The Supreme Court of Virginia has also made clear that the economic loss rule does not bar claims of fraud in the inducement."). The defendant has cited no Virginia decision barring a consumer fraud claims under this doctrine.

Finally, in keeping with the trend, Wisconsin courts also stop short of applying the rule against claims of fraudulent inducement. *Wickenhauser v. Lehtinen*, 302 Wis. 2d 41, 69, 734 N.W.2d 855, 869-70 (2007) ("[T]o promote truth and fair dealing, Lehtinen's misrepresentations to the Wickenhausers may be addressed by tort law because the fraud is extraneous to and not interwoven with the contract. Accordingly, this action is not precluded by the economic loss doctrine.").

4. Duty to Disclose

The crux of the plaintiffs' statutory fraud claims is not so much that the defendant made overt misrepresentations about its plug-in hybrids. Rather, the plaintiffs allege that the defendant concealed the defect from consumers. FCA counters that the plaintiffs have not pleaded sufficient facts that give rise to a duty to disclose, as required by the laws of the various states. First, FCA argues that under Colorado, Florida, Georgia, Nevada, New Hampshire, Oregon, Pennsylvania, South Carolina, Tennessee, and Texas law, a fraud plaintiff is required to allege that a "special relationship" giving rise to a species of trust such as fiduciary duty was created between the parties to a transaction in order to show that a duty of disclosure arose. Second, the defendant concedes that under Arizona, Iowa, Kansas, and Virginia law, it is sufficient for plaintiffs to allege that the defendant knew that the plaintiffs were mistaken about a material fact and would expect a complete disclosure of material additional details to be forthcoming before engaging in a deal, but the defendant contends that the CMC does not allege any facts suggesting that it was aware of any such mistake on the plaintiffs' part. Third, the defendant admits that under California, North Carolina, and Virginia law, affirmative acts of concealment by the defendant may support a finding that there was a duty to disclose, but it contends that no such affirmative acts are described in the pleadings.

Regardless of how the application of the above principles plays out under the applicable rules of decision, there are other circumstances recognized by the laws of those states that also may give rise to a duty to disclose. The plaintiffs' allegations are satisfactory under those various alternative rules of law in every contested jurisdiction to satisfy this element of their consumer fraud claims.

As this Court and others previously have recognized, after comprehensive surveys of the decisions among the various states, the principle is recognized nearly universally that a manufacturer has a duty to disclose product defects when (1) it has superior knowledge of the problem, or (2) the defect implicates product safety.   *Francis*, 504 F. Supp. 3d 659, 686 (E.D. Mich. 2020) ("The cases on point have held to the contrary, where the plaintiffs plausibly alleged that the defendant either had exclusive knowledge of a defect, or the defect allegedly implicates vehicle safety.") (citing *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1003 (applying Missouri, New York and Pennsylvania law); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *19-20 (D.N.J. May 8, 2017) ("[T]he Court concludes that the New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire, Maryland, North Carolina, Pennsylvania, Washington and Nevada Plaintiffs have sufficiently pled a duty to disclose [based on exclusive and superior knowledge of the defect] and the Court will not dismiss their common law fraud claims. The Court comes to the same conclusion as to the Georgia, Illinois, Ohio, South Carolina, and Texas Plaintiffs. In those jurisdictions, Defendant owed a duty to disclose safety defects."); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014) ("As for Ford's contention that a safety risk from a broken rearview camera is not that significant because there are many cars today and during the relevant period that do not have such camera, that argument is also unpersuasive.  Ford's position fails to take into account that a safety risk can arise by virtue of the fact that there is a safety feature in a product that a consumer comes to depend upon (or at least a reasonable jury could so find). Accordingly, for 12(b)(6) purposes, the Court concludes that a reasonable jury could find a safety concern here with respect to MFT that gives rise to a duty to disclose.") (applying California,

Alabama, Arizona, Colorado, Connecticut, Florida, New Jersey, New York, North Carolina, Ohio, Pennsylvania, and Texas law).

### 5. Superior and Exclusive Knowledge

The defendant concedes that under California, Idaho, Kentucky, Massachusetts, Minnesota, Missouri, North Carolina, Rhode Island, Virginia, and Washington law, a manufacturer has a duty to disclose the existence of a defect when it has superior and exclusive knowledge of the problem compared with buyers.  The plaintiffs have cited authorities holding that the same rule of decision also applies in Florida, Georgia, Kansas, Nevada, Pennsylvania, South Carolina, and Tennessee.  **Florida:** *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1291 (E.D. Mich. 2021) (citing *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 638 (E.D. Mich. 2019)); **Georgia:** *Persad v. Ford Motor Co.*, No. 17-12599, 2018 WL 3428690, at *3 (E.D. Mich. July 16, 2018) ("[B]oth Pennsylvania and Georgia recognize a duty to disclose where a defendant has exclusive and superior knowledge.") (citing *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014); *McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1368 (N.D. Ga. 2013)); **Kansas:** *Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F. Supp. 2d 1201, 1205 (D. Kan. 2001) ("Under Kansas law, a necessary element of fraud by silence is that the defendant was under an obligation to communicate material facts to the plaintiff [and] a contracting party who has superior knowledge, or knowledge that is not within the reasonable reach of the other party, has a legal duty to disclose information material to the bargain.") (citing *DuShane v. Union Nat'l Bank*, 223 Kan. 755, 760, 576 P.2d 674, 678-79 (1978); *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 345, 918 P.2d 1274, 1299 (1996); *Denison State Bank v. Madeira*, 230 Kan. 684, 691-93, 640 P.2d 1235, 1241-42 (1982)); **Nevada:** *Epperson v. Roloff*, 102 Nev. 206, 213, 719 P.2d 799, 804 (1986) ("[W]here the defendant alone has knowledge of material facts

which are not accessible to the plaintiff . . . . there is a duty of disclosure."); **Pennsylvania:** *Persad*, *supra.*; **South Carolina:** *Lawson v. Citizens & S. Nat. Bank of S.C.*, 259 S.C. 477, 485, 193 S.E.2d 124, 128 (1972) ("It is a practically universal rule that under circumstances which make it the duty of the seller to apprise the buyer of the defects in the subject matter of the sale known to the seller but not to the buyer, Suppressio veri is as much fraud as Suggestio falsi. Where material facts are accessible to the vendor only, and he knows them not to be within the reach of the diligent attention, observation and judgment of the purchaser, the vendor is bound to disclose such facts and make them known to the purchaser."); **Tennessee:** *Smith v. Pfizer Inc.*, 688 F. Supp. 2d 735, 752 (M.D. Tenn. 2010) ("'[A] manufacturer of a pharmaceutical has a duty to disclose to physicians and patients material facts about the risks of the drug . . . if it knows that the plaintiff and/or his prescriber does not know or cannot reasonably discover the undisclosed facts.'") (quoting *In re Neurontin Mktg., Sales Pracs. & Prod. Liab. Litig.*, 618 F. Supp. 2d 96, 110 (D. Mass. 2009)).   In this case, the CMC sufficiently pleads that the defendant had "superior" and "exclusive" knowledge of the fire risk defect, because (1) the knowledge allegedly was based substantially on proprietary details of the design and manufacturing process of the hybrid powertrain which certainly were not readily apparent to an ordinary buyer of the class vehicles, and (2) the defendant's alleged intimate understanding of the risks presented by the defect also is premised on comprehensive understanding of engineering principles, as surveyed in detail in the 2017 NHTSA report, which would not be within the general knowledge of ordinary car buyers. *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1291 (E.D. Mich. 2021) ("Plaintiffs' allegations regarding the latent nature of defect, which would make it difficult for them to uncover it on their own, are enough to allege GM's superior knowledge at this stage."); *Persad v. Ford Motor Co.*, No. 17-12599, 2018 WL 3428690, at *3 (E.D. Mich. July 16, 2018) ("Exclusive

knowledge can be established where, for example, the defendant knew of a defect while the plaintiffs did not and, 'given the nature of the defect, it was difficult to discover.'" (quoting *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014)). Under those alleged circumstances, and particularly where the alleged risk has serious implications for motor vehicle safety, a duty to disclose is recognized in the above jurisdictions, and the facts pleaded in the CMC are sufficient to establish those cirsumstances.

### 6. Partial Disclosures

The defendant further concedes that under Arizona, California, Connecticut, Idaho, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Virginia, and Washington law, a duty to disclose arises where a defendant voluntarily makes "partial disclosures" that are rendered false or misleading by the absence of additional material details. The plaintiffs have cited cases holding that the same rule applies in Colorado, New Hampshire, Oregon, and Texas. **Colorado:** *Renfro v. Champion Petfoods USA, Inc.*, 25 F.4th 1293, 1303 (10th Cir. 2022) ("Section 551 of the Restatement and the Colorado cases interpreting it demonstrate that [even] in the absence of a special relationship or custom requiring disclosure, a party is [] required to disclose material facts [if] he has done something to create a false impression."); **New Hampshire:** *Bergeron v. Dupont*, 116 N.H. 373, 374, 359 A.2d 627, 628 (1976) ("The master correctly ruled that a representation which was true when made could be fraudulent if the maker failed to disclose subsequent information which made the original representation false."); **Oregon:** *Unigestion Holding, S.A. v. UPM Tech., Inc.*, 160 F. Supp. 3d 1214, 1223 (D. Or. 2016) ("When fraud is based on silence or nondisclosure of a material fact, a party first must demonstrate that the defendant . . . assumed the obligation to make a full and fair disclosure of the whole truth by making a representation in the nature of a 'half-truth.'") (citing *Gregory v. Novak*, 121 Or. App. 651, 655, 855 P.2d 1142, 1144

(1993)); **Texas:** *Gordon v. Sig Sauer, Inc.*, No. 19-585, 2020 WL 6118466, at *5 (S.D. Tex. Oct. 16, 2020) ("Recently, the Texas Supreme Court recognized that a duty to disclose may exist absent a confidential or fiduciary relationship if the defendant: '(1) discovered new information that made its earlier representation untrue or misleading; (2) made a partial disclosure that created a false impression; or (3) voluntarily disclosed some information, creating a duty to disclose the whole truth.'") (quoting *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019)).  Here, the CMC plausibly alleges that the defendant made "partial disclosures" explicitly touting the superior performance and utility of the plug-in hybrid feature of the class vehicles, without disclosing information about the serious fire risk which allegedly renders the touted features and performance both essentially useless and unreasonably dangerous in ordinary usage.  In all of the above jurisdictions, those allegations are sufficient to establish a duty to disclose knowledge about the fire risk.

### 7. New Jersey Consumer Fraud Act

FCA argues that the plaintiffs' claims under the New Jersey Consumer Fraud Act must be dismissed because that statute "does not impose a duty to disclose" a defect on manufacturers where the alleged defect did not manifest within the period of the manufacturer's limited warranty, and the lone New Jersey plaintiff purchased her vehicle in September 2017, but did not file suit until March 2022, which was long after the basic three-year vehicle warranty expired.  As this Court previously has held, New Jersey law imposes a duty to disclose a defect implicating product safety.  *Francis*, 504 F. Supp. 3d at 686 (citing *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d at 960) ("[T]he Court concludes that a reasonable jury could find a safety concern here with respect to MFT that gives rise to a duty to disclose.") (applying New Jersey law)).  Moreover, as noted above, the limited warranty provides extended coverage up to 10 years and 100,000 miles

for components of the "powertrain" and "hybrid system" in the class vehicles. At this early stage of the case, where the "root cause" of the fire risk allegedly is indeterminate, it would be inappropriate to dismiss the defect claim on the basis of a warranty limitation period, since discovery may uncover facts showing that components subject to extended coverage may be responsible for the defective condition. That is especially true where the explicit allegations of the CMC focus on potential problems in both the powertrain and the hybrid battery pack systems.

### 8. Statutes of Limitations

The defendant argues that the consumer fraud claims under the laws of California, Idaho, Maryland, New Hampshire, Oregon, Tennessee, Texas, and Virginia all must be dismissed because they were filed beyond the applicable limitations periods in those jurisdictions, all of which run from the date of purchase of the class vehicles. However, as this Court previously has held, "it is well settled that, '[t]he statute of limitations is an affirmative defense, and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim.'" *Francis*, 504 F. Supp. 3d at 691 (quoting *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)) (citing Fed. R. Civ. P. 8(a), (c)). "Moreover, . . . adjudication of a limitations defense at the pleading stage is particularly inappropriate where, as here, factual issues relating to concealment of the defect by the defendant potentially could impact whether it is estopped from asserting the limitations defense, or whether other exceptions to the defense could apply." *Ibid.* (citing *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-02744, 2018 WL 4352702, at *7 (E.D. Mich. Sept. 12, 2018)).

### 9. Mere Omissions

The defendant contends that claims under the California False Advertising Law (CFAL), Ohio Consumer Sales Practices Act (OCSPA), and Wisconsin Deceptive Trade Practices Act

(WDTPA) must be dismissed because those statutes do not provide a cause of action for "mere omissions."  The plaintiffs accede to the dismissal of their Wisconsin statutory claim; therefore, the Court will dismiss Count LXXX of the CMC.  The plaintiffs also concede the dismissal of their claims under the OCSPA, and the Court likewise will dismiss Count LVIII of the CMC.  However, the California authorities on point endorse the view that "[w]hen the crux of a plaintiff's FAL claim is that the defendant did not make any statement at all about a subject, then a claim under the FAL may not advance," but, "[i]n contrast, a plaintiff may state a claim under the FAL if the defendant actually made a statement, but omitted information that undercuts the veracity of the statement."  *Hodsdon v. Mars, Inc.*, 162 F. Supp. 3d 1016, 1023 (N.D. Cal. 2016), *aff'd*, 891 F.3d 857 (9th Cir. 2018).  As discussed above, the plaintiffs present a plausible case at the pleading stage to make out the second type of misrepresentation consisting of partial disclosures lacking fully complete and accurate information about the safety hazards of the class vehicles.  Viewed thusly, the pleaded claims are viable under the FAL.

## 10. Extraterritorial Application

The defendant argues that the claim under the Texas Deceptive Trade Practices Act (TDTPA) is barred because the statute forbids "extraterritorial application" of its protections, and the Texas plaintiffs allege that they bought their class vehicle in South Carolina.  The case law on point, while lean, supports the defendant's position.  In a recent decision, *Thomas v. Kimpton Hotel & Restaurant Group, LLC*, No. 19-01860, 2020 WL 3544984, at *7 (N.D. Cal. June 30, 2020), the district court observed that "[u]nder Texas law, 'the presumption is that [a] statute is intended to have no extraterritorial effect,'" and that the "[p]laintiffs [did] not assert [that] such presumption, as applied to the TDTPA, can be rebutted."  *Id.* at *7 (quoting *Marmon v. Mustang Aviation, Inc.*, 430 S.W.2d 182, 187 (Tex. 1968)).  And in *Thomas*, like this case, the plaintiffs had not alleged

any facts tending to establish a connection between the transaction and the Texas forum. *Ibid.* ("Nor do Plaintiffs allege Thomas was in Texas when he made a reservation, that either [defendant] is a resident of Texas or engaged in any acts in Texas that induced Thomas to make a reservation, or that [the defendants'] reservation system is located in Texas."). Applying that same reasoning in the *Monostable Gearshift* case, this Court dismissed claims brought by 20 non-California plaintiffs on the ground that no facts were pleaded either to establish general personal jurisdiction over the defendant in California, or to demonstrate any transactional relationship between the remote purchases and the California forum. *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 11552971, at \*6 (E.D. Mich. Apr. 19, 2017). The plaintiffs have cited no legal authority rebutting those decisions, and their response fails to refute this point of law. The Court will dismiss the TDTPA claim in Count LXXII of the CMC.

### 11. State Law Class Action Bars

The defendant argues that statutory provisions in Colorado, Georgia, Kansas, Kentucky, Ohio, Tennessee, and Virginia law categorically bar plaintiffs from pursuing consumer fraud claims via class proceedings, and that under Iowa law prior approval from the state attorney general is required before a consumer class action may be filed. As noted above, the plaintiffs concede on other grounds the dismissal of their OCSPA claims.

Although the question is a close one, on balance the weight of authority tips in favor of the principle that Federal Rule of Civil Procedure 23 trumps state law bars on class actions that "govern[] only the manner and the means by which the litigants' rights are enforced." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d 582, 599-600 (E.D. Mich. 2018) (citing *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010); quoting *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 794 (6th Cir.

2016)).  Accordingly, this Court in the *Monostable Gearshift* case held that Georgia consumer protection claims could proceed on a class basis.  *Ibid.*

Similarly, this Court also previously has certified class claims under the Tennessee Consumer Protection Act (TCPA).  *Francis*, 504 F. Supp. 3d at 690 (citing *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1107 (S.D. Fla. 2019) ("[T]he Court finds that in this Circuit, Rule 23 permits Kirton to assert a class claim under the Tennessee Consumer Protection Act.")); *accord Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 657 (E.D. Mich. 2021) (acknowledging a split of authority in the district, but finding more persuasive the view that the Tennessee statutory bar is merely procedural).

Other courts in this district have joined the trend holding that class claims under Virginia's Consumer Protection Act are allowed under Rule 23.  *E.g.*, *Milisits v. FCA US LLC*, No. 20-11578, 2021 WL 3145704, at *12 (E.D. Mich. July 26, 2021) ("This Court joins the other federal district courts that have answered that question 'no' and that have allowed plaintiffs to pursue class claims under the VCPA.") (collecting cases).

Similarly, other federal decisions on point have held that class actions are not barred by the Colorado, Kansas, and Kentucky consumer protection statutes.  **Colorado:** *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-864, 2023 WL 4305901, at *49 (N.D. Ill. June 29, 2023) ("[T]he state class actions bars cited by [the defendant] are preempted by Rule 23 and do not apply here.") (denying motion for summary judgment on class claims under the Colorado Consumer Protection Act); **Kansas:** *Delcavo v. Tour Res. Consultants, LLC*, No. 21-2137, 2022 WL 1062269, at *8 (D. Kan. Apr. 8, 2022) ("[P]laintiff's complaint does not address the issue, [but] it appears that plaintiff has asserted his class claims under the [Kansas Consumer Protection Act] pursuant to Section 50-634(d), which provides that '[a] consumer who suffers loss as a result of a violation of this act may

bring a class action for the damages caused by [the violations].'" (quoting Kan. Stat. § 50-634(d)(1)); *Kempf v. Lumber Liquidators, Inc.*, No. 16-492, 2017 WL 4288903, at *3 (W.D. Ky. Sept. 27, 2017) ("[I]n the absence of legislative intent to the contrary, class actions are not prohibited by the [Kentucky Consumer Protection Act]." (citing Ky. Rev. Stat. § 367.220; *Brummett v. Skyline Corp.*, 38 Fed. R. Serv. 2d 1443, 1984 WL 262559, at *5 (W.D. Ky. 1984) (granting motion to certify class claims under KCPA)).

### 12. State Court Exclusive Jurisdiction

The defendant argues that the state law consumer protection claim under Rhode Island law must be dismissed because, according to the defendant, the statute vests jurisdiction over such claims exclusively in state and not federal courts.  However, the defendant cites no authority for the novel proposition that any state law can divest federal district courts of the subject matter jurisdiction expressly granted by Congress in 28 U.S.C. § 1332.  *See* 28 U.S.C. § 1332(6) ("In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.") (defining so-called "minimal diversity" jurisdiction under the Class Action Fairness Act (CAFA)); *Nessel ex rel. Michigan v. AmeriGas Partners, L.P.*, 954 F.3d 831, 834 (6th Cir. 2020) ("Under CAFA, a federal court has original jurisdiction over a class action when (1) there is minimal diversity of citizenship between the parties; (2) the aggregate amount in controversy exceeds $5 million; and (3) the proposed class contains at least 100 members.") (citing 28 U.S.C. § 1332(d)(2), (6)).  It is universally recognized as "[o]bvious[] [that] no state Legislature can regulate, limit, or control the jurisdiction of the federal courts, nor can the laws of any state preclude resort to the federal courts, nor confer exclusive jurisdiction upon a designated state court, in a class of cases of which the federal courts of equity have theretofore been accustomed to assume jurisdiction."

*McGarry v. Lentz*, 13 F.2d 51, 52 (6th Cir. 1926) (citing *Waterman v. Canal-Louisiana Bank Co.*, 215 U.S. 33, 43 (1909); *Chicot County v. Sherwood*, 148 U.S. 529, 534 (1893); Hyde v. Stone, 20 How. 170, 175 (1857)); *see also Dearden v. Titus*, No. 22-843, 2022 WL 3100748, at *6 (D. Md. Aug. 4, 2022) (collecting cases holding in accord).  The defendant has cited no legal authority rejecting that bedrock principle of federal legal supremacy that has been both anciently and universally recognized.

### 13. Pre-Suit Notice

The defendant contends that the consumer protection claims under California, Georgia, Indiana, and Massachusetts law must be dismissed because the plaintiffs from those jurisdictions conveyed "pre-suit notice" of their claims on the same day that their complaints were filed in federal court, and as a matter of law contemporaneous notice does not constitute the required "pre-suit notice" of their claims.  The plaintiffs uniformly have alleged that they supplied required pre-suit notices of their claims to the defendant via a letter sent from plaintiffs' counsel on March 8, 2022.  *See, e.g.*, CMC ¶ 329, ECF No. 24, PageID.409 ("On or about March 8, 2022, Plaintiffs' undersigned counsel provided FCA written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Fire Risk Vehicles."); *see also id.* ¶¶ 360, 382, 414, 431, 529, 692, 709, 787, 796, 979, 1072, 1132, 1177, 1223, 1253, 1313, 1321, 1372, 1421 (alleging similarly).  The case law on point and information evident from the record do not support the defendant's argument for dismissal based on the allegedly deficient or untimely notice.

As an initial matter, the record discloses that only one of the initiating pleadings in the consolidated cases — *Wilensky v. FCA US LLC*, No. 22-10508 (E.D. Mich.) (filed Mar. 8, 2022) — was docketed contemporaneously with the alleged transmittal of notice by plaintiffs' counsel. The plaintiffs in the *Wilensky* matter pleaded claims under Colorado, Florida, Idaho, New Jersey,

New York, Ohio, and Oregon law.  *See* Compl., ECF No. 1, PageID.36-37.  No claims in that case were advanced by plaintiffs from California, Georgia, Indiana, or Massachusetts.  Accordingly, the defendant's position that dismissal on the basis of "contemporaneous" notice of the claims under the law of those jurisdictions is not supported by the record.

All of the other consolidated cases were filed after the plaintiffs' written notice was sent, ranging from March 21, 2022 through August 3, 2022).  *See Olsen*, No. 22-11807 (C.D. Cal. 22-00368) (filed Mar. 21, 2022); *Gomez*, No. 22-11806 (N.D. Cal. 22-02171) (Apr. 6, 2022); *Schumann*, No. 22-10771 (E.D. Mich.) (Apr. 8, 2022); *Reilman*, No. 22-11804 (C.D. Cal. 22-00811) (Apr. 13, 2022); *Lawrence*, No. 22-11805 (N.D. Cal. 22-02372) (Apr. 15, 2022); *Findeiss*, No. 22-10850 (E.D. Mich.) (Apr. 21, 2022); *Bagley*, No. 22-11894 (E.D. Pa. 22-01797) (May 10, 2022); *Monte*, No. 22-11983 (C.D. Cal. 22-01250) (filed in state court May 24, 2022, removed to C.D. Cal. July 1, 2022); *Trovato*, No. 22-11892 (C.D. Cal. 22-01267) (filed in state court June 1, 2022, removed to C.D. Cal. July 19, 2022); *Do*, No. 22-12064 (N.D. Cal. 22-04997) (Aug. 3, 2022).  To the extent that the defendant challenges the claims pleaded under the law of any of the other jurisdictions involved in the related cases, its position that notice was not transmitted prior to the initiation of suit in those forums is contradicted by the record in the related cases.

Moreover, as this Court and others have held, "[o]rdinarily, '[w]here the buyer gives some notice of the breach, the issues of timeliness and sufficiency are questions of fact.'"  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 446 F. Supp. 3d 218, 227 (E.D. Mich. 2020) (quoting *Iron Bridge Tools, Inc. v. Meridian Int'l Co., USA*, No. 13-61289, 2016 WL 8716673, at *13 n.4 (S.D. Fla. Feb. 2, 2016)).  "The amended complaint . . . alleges facts suggesting that all of the named plaintiffs gave 'some notice' of the breach . . . and adjudication of the notice defense therefore is inappropriate at this early stage, without the benefit of a fuller record to show whether the notice

given was sufficient to alert the defendant to the problems with their particular vehicles." *Francis*, 504 F. Supp. 3d at 680. "Particularly in the absence of any showing by the defendant that it was not afforded a commercially reasonable opportunity to address the alleged defect, dismissal on the pleadings is disfavored." *Ibid.*; *accord In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d at 977; *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1279 (E.D. Mich. 2021).

The record here is distinguishable from those cases where claims have been dismissed because plaintiffs expressly conceded that they never made any effort to supply notice to the defendant before filing suit, in conformance with the decisions of jurisdictions that construe the notice requirement especially strictly. *E.g.*, *Won v. Gen. Motors, LLC*, 543 F. Supp. 3d 546, 551 (E.D. Mich. 2021) ("Where, as here, the plaintiff explicitly alleges that no notice or opportunity to repair was afforded, dismissal at the pleading stage is appropriate, since no set of facts then could be proven at trial to show otherwise that the defendant was afforded a commercially reasonable opportunity to redress the defect prior to the commencement of the litigation.") (South Dakota); *Francis*, 504 F. Supp. 3d at 680 ("Although, as noted above, the sufficiency of notice may be a question of fact where some notice was given, this Court previously has dismissed warranty claims where, as here, it is affirmatively alleged or admitted that no notice at all was given.") (Tennessee).

The defendant has not established that dismissal of any of the claims is appropriate at this early stage of the case on the basis of insufficient or untimely pre-suit notice.

## C. Implied Warranty Claims

FCA contends that the implied warranty claims must be dismissed for various reasons under the laws of the respective states. It contends that some of the claims are barred by statutes of limitations. Others cannot proceed, it says, because the plaintiffs were not in privity with the manufacturer. And still others are brought by plaintiffs who have driven their vehicles for months

or years without incident and therefore they cannot plausibly now contend that the vehicles were not merchantable at the time of sale.  Pointing to the allegations in the CMC, FCA also notes that only one plaintiff encountered a thermal runaway while the car was under warranty and therefore the others cannot contend that the defect manifested itself during the warranty period.  And FCA repeats its argument about the inadequacy of pre-suit notice.

### 1. Statutes of Limitations

FCA argues that the implied warranty claims under the laws of Arizona, California, Maryland, Michigan, New Hampshire, New Jersey, Pennsylvania, and Washington all must be dismissed because such claims accrued on the date of purchase, and the plaintiffs from those jurisdictions each allege that their vehicles were bought more than four years before their suits were filed.  However, for the same reasons discussed in section B.8, above, adjudication of this limitations defense at the pleading stage is inappropriate where the pleadings suggest that viable arguments for tolling may be presented after full discovery of the facts.

### 2. Privity

The defendant argues that the plaintiffs' implied warranty claims under Arizona, Colorado, Connecticut, Florida, Idaho, Illinois, Iowa, Kansas, Kentucky, Minnesota, Ohio, Oregon, South Carolina, Washington, and Wisconsin law all must be dismissed because the law of those states requires a plaintiff to be in privity with the manufacturer in order to sue for breach.

Several of the jurisdictions in question have abrogated the privity requirement for implied warranty claims.  **Colorado:** *Miller v. Ford Motor Co.*, 620 F. Supp. 3d 1045, 1064-65 (E.D. Cal. 2022) ("Privity is not a required element of a warranty claim in Colorado." (citing *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 989 (C.D. Cal. 2015), *aff'd*, 674 F. App'x 654 (9th Cir. 2017); *Hansen v. Mercy Hospital*, 40 Colo. App. 17, 570 P.2d 1309 (1977)); **Iowa:** *In re Smitty's/CAM2*

*303 Tractor Hydraulic Fluid Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 20-02936, 2022 WL 710192, at *15 (W.D. Mo. Mar. 9, 2022) ("Iowa 'has eliminated the privity requirement in products liability cases raising a breach-of-implied-warranty claim.'" (quoting *Speight v. Walters Dev. Co.*, 744 N.W.2d 108, 114 (Iowa 2008)); **Kansas:** *Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1246 (D. Kan. 2007) ("The Court finds that Section 50-639(b) of the KCPA has abolished any privity requirement in an action for breach of the implied warranty of merchantability involving a consumer transaction under Kansas law."); **Minnesota:** *In Powers v. Lycoming Engines*, 272 F.R.D. 414, 420 & n.13 (E.D. Pa. 2011) ("Thirty-one states. . . do not require privity of contract to recover for breach of the implied warranty of merchantability where only economic damages are involved."); **South Carolina:** *Hinkle v. Cont'l Motors, Inc.*, No. 16-3707, 2017 WL 4776992, at *3 (D.S.C. Oct. 20, 2017) ("Privity is not required to assert [an] [implied] warranty claim.") (citing S.C. Code § 36-2-318); **Texas:** *In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*, 601 F. Supp. 3d 625, 845 (C.D. Cal. 2022) ("Texas law does not require privity and permits implied warranty claims by a downstream purchaser directly against the remote manufacturer for economic damages." (citing *Integrated Marine Servs. v. Hoist Liftruck Mfg.*, No. 12-1379, 2012 WL 3779308, at *2 n.2 (S.D. Tex. Aug. 30, 2012)).

Other states excuse privity where the manufacturer issued an express warranty to consumers.  **Kentucky:** *Speerly v. Gen. Motors, LLC*, 343 F.R.D. 493, 541 ("Plaintiffs in U.C.C. warranty cases under Kentucky law generally must establish privity to prevail, but a plaintiff may sue a manufacturer absent privity 'where the manufacturer has expressly made warranties directly to the intended consumer of the product.'" (quoting *Garvin v. Ethicon, Inc.*, 616 F. Supp. 3d 658, 674 (W.D. Ky. July 22, 2022)); **Ohio:** *Francis*, 504 F. Supp. 3d at 677 ("In Ohio, privity may be established similarly upon proof of the issuance of an express limited warranty.") (citing *Roxy*

*Home Improvement, LLC v. Mercedes-Benz USA, LLC*, No. 17-01817, 2018 WL 1705800, at *5 (N.D. Ohio Apr. 9, 2018)).

Other states recognize various peculiar exceptions to the privity rule.

Connecticut recognizes an exception to the privity requirement where an agency relationship exists between the manufacturer and its dealership. *Napoli-Bosse v. Gen. Motors LLC*, No. 18-1720 (MPS), 2022 WL 3585769, at *7 (D. Conn. Aug. 22, 2022) ("Connecticut courts have allowed plaintiffs who are not in privity to recover from a manufacturer in some circumstances. For example, they have recognized an exception to the privity requirement where an agency relationship exists between the vehicle manufacturer and the dealer." (citing *Kahn v. Volkswagen of Am., Inc.*, 45 Conn. L. Rptr. 31, 2008 WL 590469, at *8 (Super. Ct. Feb. 13, 2008)). "[T]he three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. The existence of an agency relationship is a question of fact." *Wesley v. Schaller Subaru, Inc.*, 277 Conn. 526, 543, 893 A.2d 389, 400 (2006). This exception calls for a fact-intensive inquiry that cannot be resolved in a principled manner at the pleading stage.

Illinois recognizes an exception to the privity rule where, as here, it is alleged that a plaintiff presented the vehicle to an authorized dealer for repair, but the repair was ineffective. *Speerly*, 343 F.R.D. at 541 ("Illinois recognizes various exceptions to the privity requirement including the direct relationship exception, which applies when there are direct dealings between the manufacturer and the remote customer. That exception applies where a customer has presented a defective product to the defendant's dealer-agent for repair under the manufacturer's warranty,

and all attempts at warranty repairs have failed." (quoting *Elward v. Electrolux Home Prod., Inc.*, 214 F. Supp. 3d 701, 704-05 (N.D. Ill. 2016)).

Oregon recognizes an exception to the privity requirement where a product is purchased from the defendant's authorized dealer. *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d at 981 ("Oregon courts allow claims under an implied warranty to proceed by a person within 'the distributive chain' of a product. On that basis, the [federal courts have] declined to dismiss claims against a vehicle manufacturer where the plaintiff purchased his vehicle from the manufacturer's authorized dealer." (citing *Crawford v. FCA US LLC*, 2021 WL 3603342 at *7 (E.D. Mich. Aug. 13, 2021); *Torch v. Windsor Surry Co.*, 2019 WL 6709379, at *11 n.5 (D. Or. Dec. 9, 2019)).

Under Washington law, the privity rule is relaxed where it is shown that the ultimate buyer qualifies as a third-party beneficiary of a contract between a manufacturer and its dealer. *Bolt EV Battery Litig.*, 633 F. Supp. 3d at 981 (E.D. Mich. 2022) ("Under Washington law, lack of privity is a defense to claims for breach of warranty. But Washington recognizes a limited third-party beneficiary exception. As explained above, Plaintiffs have sufficiently alleged enough to meet the third-party beneficiary exception at this stage of the case.") (citing *Johnson v. Metro-Goldwyn-Mayer Studios Inc.*, 2017 WL 3313963 at *6 (W.D. Wash. Aug. 3, 2017); *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1276-78 (E.D. Mich. 2021))

However, the plaintiffs have not cited any authority recognizing relaxation of the privity rule in three states: Arizona, Idaho, and Wisconsin. This Court and other federal courts have held that implied warranty claims in those jurisdictions must be dismissed where privity has not been pleaded. **Arizona:** *Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 980 ("In Arizona, one who purchases a new vehicle from a dealership is not in privity with the vehicle's manufacturer, and cannot maintain an implied warranty claim." (citing *Francis*, 504 F. Supp. 3d at 678; *Chaurasia*

*v. Gen. Motors Corp.*, 212 Ariz. 18, 126 P.3d 165 (Ct. App. 2006)); **Idaho:** *Siqueiros v. Gen. Motors LLC*, No. 16-07244, 2021 WL 2115400, at *11 (N.D. Cal. May 25, 2021) ("In Idaho, '[p]rivity of contract is required in a contract action to recover economic loss for breach of implied warranty.'" (quoting *Am. W. Enterprises, Inc. v. CNH, LLC*, 155 Idaho 746, 752, 316 P.3d 662, 668 (2013) ("The district court did not err when it dismissed American West's breach of an implied warranty action against CNH on the basis of a lack of privity. The economic loss rule is applicable because American West only sustained economic losses.")); *accord Francis*, 504 F. Supp. at 678 ("Privity [] is an insurmountable bar in Idaho."); *Crawford v. FCA US LLC*, No. 20-12341, 2021 WL 3603342, at *7 (E.D. Mich. Aug. 13, 2021); *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 612 (E.D. Mich. 2017); **Wisconsin:** *Bolt EV Battery Litig.*, 633 F. Supp. 3d at 981 ("Wisconsin law requires privity of contract to sustain an implied warranty claim and courts applying Wisconsin law have, on that basis, dismissed similar claims against manufacturers where plaintiffs purchased vehicles from dealers, rather than from the manufacturer itself." (citing *Francis*, 504 F. Supp. 3d at 678); *Lamont v. Winnebago Indus., Inc.*, 569 F. Supp. 2d 806, 815-16 (E.D. Wis. 2008)).

The implied warranty claims under Arizona, Idaho, and Wisconsin law (Counts VI, XXIV, and LXXXI) will be dismissed.

### 3. Merchantability

The defendant argues that all of the implied warranty claims must be dismissed because the plaintiffs admittedly have driven their cars for years after buying them; only six out of 58 plaintiffs alleged that they stopped driving the vehicles despite alleged "concerns" about their safety; and the use of a product without incident for an extended period after sale precludes a

finding that the good was not merchantable at the time of sale.  That position, however, is belied by the circumstances alleged in the CMC.

This Court previously surveyed the law of dozens of states and found it to be a universally settled principle "that under the laws of the several states, the implied warranty cause of action (variously identified under other labels in some jurisdictions) requires the plaintiffs to prove that a product is not 'merchantable,' meaning that it is unsuitable for its ordinary or intended use." *Speerly*, 343 F.R.D. at 510 (collecting cases).  "The weight of authoritative commentary and contemporary court decisions from numerous jurisdictions hew consistently to the view that 'merchantability' of an automobile requires a showing that the vehicle operates in a 'safe condition' or provides 'safe transportation.'  The principle that a product must be reasonably safe for its ordinary or intended use also has been recognized expressly by decisions in the overriding majority of state jurisdictions where implied warranty claims were pleaded in this case."  *Id.* at 511 (collecting cases).  FCA has cited no decisions espousing a contrary rule.  Based on all of the facts discussed above — most notably the defendant's admission in the October 2022 recall notice that a defect exists in the class vehicles that may cause them spontaneously to burst into flames — and based on the plaintiffs' well-pleaded allegations suggesting that the voluntary recall has done nothing to mitigate or eliminate that risk, the plaintiffs sufficiently have alleged that the class vehicles pose a serious safety risk to class members who own them, as well as to members of the motoring public at large.

Moreover, even if the Court were to accept the defendant's cramped construction of the term "ordinary use" as meaning nothing more than "providing transportation," it is doubtful based on the facts alleged that the class vehicles are capable reliably of satisfying even that mundane standard of performance.  The plaintiffs allege — and the defendant admitted in its October 2022

recall letter — that the vehicles have a defect that creates a risk of spontaneous and destructive immolation.  The plaintiffs plausibly have pleaded that the risk is in no way foreclosed by a recall remedy that offers nothing more than either a "software patch" to "monitor" the battery system for conditions incipient to an impending catastrophe, or, at the defendant's sole discretion, a "replacement" of the battery system with allegedly equally defective components.  Based on those circumstances, a reasonably prudent owner in the plaintiffs' position has little choice other than to persist in adherence to the defendant's initial recall directives to (1) abstain entirely from charging the vehicles from grid power, and (2) never leave the vehicles unattended in any location proximate to any structure or other vehicles.

The defendant's position entirely ignores the fact that a major component of the class vehicles' "ordinary and intended use," as expressly advertised by the defendant, is the ability of the vehicle to drive entirely on stored electric charge for substantial distances, thereby achieving superior gas mileage.  That feature was marketed to buyers at a steep premium — allegedly $6,000 over the cost of the same model with a conventional non-hybrid powertrain.  The class members all alleged that they expected — and reasonably so — to make regular use of the plug-in charging system to realize significant savings in their fuel costs.  But that advantage that they reasonably expected to realize through the regular and intended use of the vehicles has been entirely foreclosed by the inability safely to charge them from grid power.  Defects that severely degrade the advertised capabilities of a vehicle may support a plausible pleading that they are unmerchantable, even if the plaintiffs continued to drive their vehicles over time, presumably in gas-powered mode. *See In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d at 979 ("Cutting the range of a vehicle by nearly half — particularly a vehicle that takes hours to recharge, rather than mere minutes at a

gas station and cannot be charged overnight due to the very defect in question — is enough to render a vehicle unmerchantable.").

Finally, reasonable drivers certainly and nearly universally would concur that a vehicle which is forbidden to park near any structure or other vehicle at any time is scarcely "useful" even in the ordinary sense of "getting from point A to point B," considering the multitude of public locations where it is likely to be difficult or impossible to access any available parking spots and still follow the defendant's restrictions. It is unsurprising, as some plaintiffs have alleged, that many drivers would find it impossible to abide by those restrictions even at their own residences, due to the unavailability of isolated parking anywhere near their homes. In short, a car that cannot be parked anywhere near many places that one wants to go plausibly can be viewed as one that fails to meet even the most generous view of "usability" held by the driving public.

### 4. Manifestation

The defendant argues that the implied warranty claims require the plaintiffs to demonstrate that the alleged defect "manifested" within the warranty period, and it asserts that only one plaintiff — Tim Ferguson, from Illinois — alleged that the "thermal runaway" defect manifested in his vehicle, when it burst into flames while parked in the garage at his house.

However, other courts sensibly have rejected such an absurd construction of the warranty guarantee, holding that "it would be perverse to require [the plaintiff] to be involved in an accident to prove that her car manifested the defect." *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 459 n.30 (S.D.N.Y. 2017) ("The airbag light coming on is precisely how the defect would manifest itself short of the airbags not deploying in an accident. . . . And it would be perverse to require Smith to be involved in an accident to prove that her car manifested the defect.") (citing *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1335 (S.D. Fla. 2016)

("Plaintiffs respond, inter alia, that the airbags have been defective since the very first day they were installed because the propellant used by Takata — but rejected by every other major airbag manufacturer in the industry — is prone to instability and explosions. . . . At this motion to dismiss stage, given Plaintiffs' allegations of ammonium nitrate's innate instability, the Court agrees with Plaintiffs' argument regarding manifestation. The crux of Plaintiffs' allegations is that the propellant used in the Takata airbags at issue is unstable. By definition, this alleged instability would mean that the airbags may not protect vehicle occupants, or it may, and it may create a more dangerous situation than having no airbag at all, or it may not.  Plaintiffs allege there is no way to know whether the airbags at issue would perform satisfactorily in an accident. If Takata had installed grenades in its airbags that may or may not explode on impact, a court would not require an explosion to demonstrate manifestation of a defect. Plaintiffs have alleged essentially this scenario, explaining that occupants of vehicles equipped with the allegedly defective airbags cannot know whether their airbags will expel metal shrapnel that may kill or maim them.") (cleaned up))).  Similarly in this case, just as in the *Takata Airbag* litigation, the plaintiffs plausibly allege a risk of catastrophic injury or property damage inherent in the allegedly unstable battery systems, which are prone to spontaneously enter "thermal runaway."

Moreover, as discussed above, the plaintiffs uniformly allege that they feel constrained to adhere to the initial recall restrictions that prohibit the effective use of the plug-in hybrid charge feature of their vehicles.  The allegedly indefinite and ongoing consignment to uselessness of such a primary operating capability, which was featured prominently in defendant's product literature as a major selling point of the cars, certainly constitutes "manifestation" of a problem by any reasonable construction of that term.  And that manifestation allegedly has occurred with all of the class vehicles at least within the extended powertrain warranty period.

5. Presentment

FCA contends that a claim for breach of an implied warranty requires that a plaintiff present the allegedly defective product for service within the warranty period, and it says that none of the plaintiffs alleged precisely when they sought (or received) repairs in the form of the free recall service, so it is impossible to know if presentment was accomplished within the warranty coverage period. However, as noted above, the primary components of the "powertrain" and "hybrid" systems are covered by warranty periods ranging up to 10 years and 100,000 miles, and all of the plaintiffs have alleged that they presented their vehicles for repair, at the latest, after receiving the October 2022 recall notice, which is well within the 10 year coverage period based on the dates of purchase alleged by all of the plaintiffs.

Furthermore, many of the plaintiffs alleged that they did present their vehicles to receive the recall remedy, but they contend that the defendant's attempted "repair" via installation of a software patch did nothing to cure the fire risk. *See, e.g.*, CMC ¶ 28 ("Soon after receiving notification from FCA that a 'repair' was available, Plaintiff presented the vehicle to the dealership. On information and belief, the dealership updated the software in the BPCM of Plaintiff's vehicle."); *see also id.* ¶¶ 30, 34, 36, 56, 59, 63, 65, 69, 77, 80, 82, 87, 89, 91, 93, 104, 107, 111, 116, 120, 122, 124. As the plaintiffs point out, it has been held that "where a plaintiff plausibly alleges that a defendant 'has not adequately repaired [the] vehicle,' the fact that the defendant has attempted repair does not absolve it from liability under its warranty." *Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 649 (E.D. Mich. 2021) (quoting *In re GM Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 631 (E.D. Mich. 2019)).

Moreover, it also has been held widely that presentment should be excused where, as here, it is alleged plausibly that presentment would be futile, based on a manufacturer's demonstrated

inability or refusal to make effective repairs. *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d at 976 ("The Court is persuaded that Plaintiffs have alleged enough to establish that it would have been futile to present their vehicles for repair. Plaintiffs have made the sort of representations the *Gregorio* court suggested would be sufficient: that there is a defect common to all class vehicles; that GM was consistently unable to fix the defect; and that any repairs or mitigation that GM offered were insufficient." (citing *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 289 (E.D. Mich. 2021)); *see also In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1010 (E.D. Mich. 2017) ("Looking to the allegations, discussed in detail above, describing the allegedly random and unreliable behavior of the monostable shifter, it is readily apparent that the plaintiffs here have alleged sufficiently that there is an 'item' on their vehicles that is defective in 'workmanship' or 'materials,' and that the defendant has failed or refused to fix it.") (denying motion to dismiss warranty claims); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1188-89 (C.D. Cal. 2010) ("Plaintiffs contend that compliance with the informal dispute settlement procedure is excused because, in light of Defendants' response to incidents of [spontaneous unintended acceleration] events, it would be futile. . . . At the pleadings stage, the Court cannot say whether attempts to comply with the informal dispute settlement procedure put in place by Toyota are futile.").

### 6. Pre-Suit Notice

The defendant contends that the warranty claims under the laws of Connecticut, Florida, Georgia, Idaho, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, North Carolina, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin all must be dismissed on the ground that the plaintiffs failed to convey adequate pre-suit notice of the claims. Its position is unavailing for the same reasons discussed earlier in section B.13.

D. Express Warranty Claims

FCA argues that the express warranty claims in the CMC must be dismissed because they allege only a design defect, whereas express warranty claims are confined to manufacturing defects.  FCA also contends that the express warranty does not guarantee a defect-free vehicle; it only promises to repair the defects.  The defendant contends that the statutes of limitation bar the claims under the laws of some states, and most of the states require pre-suit notice, which has not been satisfied merely by filing the complaints.

1. Design Defects

The defendant contends that its express limited vehicle warranty covers only "defects in material, workmanship, or factory preparation," and it says that the plaintiffs concede that the "thermal runaway" issue with the class vehicle batteries is caused by a defect in "design" rather than "manufacturing."  However, as a general rule, "[a]t the motion to dismiss stage, 'courts have rejected efforts to create an artificial distinction between design and materials/workmanship defects,'" and other federal courts have held, in accord with this Court's rulings in prior cases, that where "the facts [alleged] could be consistent with a defect in manufacturing or materials, [the plaintiffs] 'are not required to commit to a single theory of the origin of the [defect] at this [early stage].'"  *Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 499-500 (E.D. Mich. 2021) (quoting *Persad v. Ford Motor Co.*, 2018 WL 3428690, at *5 (E.D. Mich. July 16, 2018)); *see also Gregorio v. Ford Motor Company*, 522 F. Supp. 3d 264, 288 (E.D. Mich. Mar. 1, 2021)).  "At this early stage of the case, without the benefit of any factual development as to the cause and origin of the alleged defect, dismissal of the express warranty claims is not justified by a premature and uninformed classification of the alleged defect as being categorically in the realm of 'design' or 'manufacturing.'"  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1011;

- 54 -

*see also Volin v. Gen. Elec. Co.*, 189 F. Supp. 3d 411, 421 (D.N.J. 2016) ("[W]here the distinction between a defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives. It is unclear what may have caused the alleged Surface Knob and Ignition System Defects; a fortiori, it is not clear whether (assuming they exist) they should be classified as design defects or defects in materials or workmanship.  Such issues must await factual development.").

The defendant contends that the pleading of "class claims" necessarily implies reliance on a theory of defective "design" rather than irregularities in "manufacturing."  But that argument has been rejected as attempting to force an unsuitably narrow construction of the pleadings.  *Johnson*, 555 F. Supp. at 499-500 ("FCA counters that because [the plaintiffs] allege that the Panel Defect exists in all the Class Vehicles, i.e., it is alleged to exist in tens of thousands of vehicles of varying models and model-years, then [the plaintiffs] necessarily are pleading the existence of a design defect. But 'just because [the plaintiffs] plead allegations involving a class of vehicles does not preclude the possibility of a manufacturing defect,'" and "[i]ndeed, it is 'logically possible that either' the [defect] results from a flaw in the panel's design or that the panels 'were all badly built, even though well-patterned,'" (quoting *Gregorio*, 522 F. Supp. 3d at 288; *Francis*, 504 F. Supp. 3d at 673).  Here, as in *Francis*, "the plaintiffs do not suppose, but instead expressly disclaim, any attempt at 'root cause' diagnosis for the shifting issues, at least at the outset of their case."  504 F. Supp. at 673.  Dismissal of the express warranty claims on the basis of such an artificial distinction is not appropriate at this early stage.

## 2. Breach

The defendant argues that the limited vehicle warranty "does not warrant a defect-free vehicle," but instead merely "promises repair of certain defects," and none of the plaintiffs alleged that their vehicles were presented for repair within the warranty period and found to be "defective in material, workmanship, or factory preparation."  That position is belied by facts, discussed above, which plausibly suggest that a primary feature of the class vehicles' powertrain system, for which a substantial price premium was paid, is nearly or entirely useless in all of the class vehicles due to the serious fire hazard presented by its continued use.  The complete failure of a primary vehicle system expressly touted and sold at a premium price, which renders the vehicle unsuitable even for the purpose of routine transportation, certainly renders the vehicles "defective" by any sensible meaning of that term.

Furthermore, for reasons discussed above, the defendant's attempt to erect a distinction between "design" and "manufacturing" defects is unpersuasive as a basis for dismissal at the pleading stage.  If it is determined that the defect arises from deficiencies in "materials" or "workmanship," then the warranty expressly provides for repair or replacement of the defective components.  The academic literature surveyed in the 2017 NHTSA report substantiates the plaintiffs' allegations that the defect potentially could be caused by defects in either "design" or "manufacturing."  The report stated that among other potential causes for thermal runaway may be "[e]rrors in design, manufacturing, operation, and maintenance, which induce electrical, mechanical, and thermal abuse causes."  NHTSA Report, ECF No. 24-3, PageID.923; *id.* at 902 ("The discussions in Chapters 2 and 3 of this report show that Li-ion battery components are variable and sensitive to manufacturing errors and deviations. Design and manufacturing errors are identified throughout the analysis as a likely contributor to failure.").

Moreover, as noted above, some components of the "powertrain" and "hybrid" systems are covered by warranty periods ranging up to 10 years and 100,000 miles, and many of the plaintiffs alleged that they presented their vehicles for repair, at the latest, after receiving the October 2022 recall notice, which is well within the 10 year coverage period based on the dates of purchase alleged by all of the plaintiffs. As discussed above in section C.5, the requirement of presentment for repair may be excused where, as here, the plaintiffs plausibly have alleged facts demonstrating the defendant's history of refusal or inability to make effective repairs.

### 3. Statutes of Limitations

The defendant argues that the warranty claims by California and Michigan plaintiffs must be dismissed because, based on the alleged dates of purchase, the plaintiffs from those states filed suit after the applicable four-year limitations periods had expired. However, this position is unavailing for the reasons discussed above in section B.8.

### 4. Pre-Suit Notice

The defendant contends that the express warranty claims under the laws of every state except Colorado must be dismissed because those states all require "pre-suit notice," which the plaintiffs failed to convey, and which cannot be satisfied merely by the plaintiffs' filing of their complaint or the filing of third-party complaints. This position, however, is rebutted by the record for the reasons discussed above in section B.13.

### E. Unjust Enrichment

The defendant challenges the "nationwide claim" for unjust enrichment on several grounds, arguing that (1) every state except Arizona bars recovery via unjust enrichment where the parties' rights are governed by an express contract, which in this case is the limited warranty, (2) every state except Rhode Island bars recovery in equity where an adequate remedy at law exists, and the

plaintiffs failed to plead any facts demonstrating that they lack adequate legal remedies, and their pleading of numerous causes of action for fraud, consumer protection violations, and warranty breaches establishes that they have numerous available legal causes of action, (3) all states except Arizona, Illinois, Iowa, Kansas, and Nevada require the plaintiffs to plead that they conferred a benefit directly on the defendant when buying their vehicles, and none of the plaintiffs alleged that they engaged in any direct sale transaction with the defendant, (4) under Arizona, California, Maryland, Massachusetts, Michigan, New Hampshire, North Carolina, Oregon, Rhode Island, South Carolina, Texas, Virginia, and Washington law, based on the alleged dates of purchase, suit by the plaintiffs in those jurisdictions was filed beyond the applicable limitations periods, and (5) California, Massachusetts, New Hampshire, New Jersey, and Texas do not recognize unjust enrichment as a free standing cause of action.

Regardless of the merits of those arguments, as discussed above in section A, the unjust enrichment claim pleaded solely on a "nationwide" basis must be stricken because the plaintiffs have failed to identify any appropriate source of law for the claim, and because they have not cited any legal authority endorsing the pleading in gross of such a purported "national claim" under an unspecified body of common law.

### F. Magnuson-Moss Warranty Act Claims

Under the Magnuson-Moss Warranty Act, a manufacturer of a defective consumer product must "remedy such consumer product within a reasonable time and without charge." 15 U.S.C.A. § 2304(a)(1). The Act "creates a federal right of action for violation" of its terms, "as well as for breaches of warranty arising from state substantive law." *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 575 (6th Cir. 2013) (citing 15 U.S.C. § 2310(d)(1)). Because the warranty breach claims

under the Act are tied to state law, "the elements that a plaintiff must establish to pursue a cause of action . . . are the same as those required by" state law for a breach of warranty claim. *Ibid.*

Unlike the pleading of the "nationwide" common law claims, the pleading of the Magnuson-Moss Warranty Act claim is supported by adequately pleaded implied and express warranty claims under each of the relevant jurisdictions. That "nationwide" claim therefore survives the pleading challenge.

The defendant contends that all claims pleaded on behalf of any purported "nationwide class" should be stricken because (1) the plaintiffs have no standing to press claims under the law of states other than where they bought their vehicles, and (2) any supposed "nationwide class" would be unmanageable and unsuitable for certification under Rule 23 due to variations in state law for all of the various causes of action. However, questions concerning appropriate classes and the appointment of class representatives to advance them are matters for another day and do not justify the dismissal of the federal warranty claim at the pleading stage.

### III. Conclusion

The plaintiffs have not identified any source of law for their supposed "nationwide" common law claims in Counts II, III, and IV of the Consolidated Master Complaint, and entertaining the claims in the posture that they take in the consolidated pleading would pose jurisdictional concerns. The plaintiffs offer no opposition to the dismissal of the consumer protection claims under the Indiana Deceptive Consumer Sales Act (IDCSA) (Count XXIX), Ohio Consumer Sales Practices Act (OCSPA) (Count LVIII), and Wisconsin Deceptive Trade Practices Act (WDTPA) (Count LXXX). The plaintiffs have failed to plead privity with the manufacturer, which is a bar to implied warranty claims in Arizona, Idaho, and Wisconsin, and therefore Counts VI, XXIV, and LXXXI must be dismissed. The plaintiffs have offered no opposition to the

dismissal of their claim under the Texas Deceptive Trade Practices Act (Count LXXII).  The plaintiffs have stated viable causes of action on the other counts of the CMC.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss (ECF No. 30) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Counts II, III, IV, VI, XXIV, XXIX, LVIII, LXXII, LXXX , and LXXXI of the CMC are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the defendant's motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  December 11, 2023