# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**IN RE: CHRYSLER PACIFICA FIRE RECALL PRODUCTS LIABILITY LITIGATION**

**MDL No. 3040**

**Case No. 22-md-03040**

**Honorable David M Lawson**
**Magistrate Judge Elizabeth S Stafford**

*This Document Relates to: ALL ACTIONS*

**Expert Report of**
**Edward M. Stockton, M.S.**



3509 N. Campbell Avenue
Tucson, Arizona 85719
(520) 325-9800  Fax (520) 325-9847

**January 2024**

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN

## SOUTHERN DIVISION

| | |
|---|---|
| IN RE: CHRYSLER PACIFICA FIRE RECALL PRODUCTS LIABILITY LITIGATION<br><br>MDL No. 3040<br><br><br><br>*This Document Relates to: ALL ACTIONS* | Case No. 22-md-03040<br><br>Honorable David M Lawson<br>Magistrate Judge Elizabeth S Stafford |

## DECLARATION OF EDWARD M. STOCKTON

## TABLE OF CONTENTS

1.  Introduction ............................................................................................................... 2

2.  Qualifications ............................................................................................................. 4

3.  Structure Of Declaration ........................................................................................... 6

4.  Case Summary and Scope Of Work .......................................................................... 7

5.  Summary Of Opinions ............................................................................................... 9

    5.1.  Overpayment ...................................................................................................... 9
    5.2.  Idled Asset Period ............................................................................................ 10
6.  Existence Of Damages ............................................................................................ 11

7.  Overpayment ........................................................................................................... 12

8.  Application Of the Repair Cost Model .................................................................... 20

9.  Credit for Delivery of Competent Repair ................................................................ 24

10. Idled Asset Period ................................................................................................... 25

    10.1. Direct Method ................................................................................................. 27
        10.1.1.       Direct Method—Sensitivities ............................................................. 29
            10.1.1.1.   Market Values vs. Market Prices .............................................. 30
            10.1.1.2.   Unobserved Features ................................................................ 30
    10.2. Derived Method .............................................................................................. 32
    10.3. Hedonic Regression ........................................................................................ 34
11. Descriptions of Application and Allocation Methods ............................................. 38

    11.1. Allocation For Limitations or Among Multiple Owners ................................. 38
        11.1.1.       Beginning or Termination of Damage Period ..................................... 40
        11.1.2.       Credit For Out-Of-Network Migration ............................................... 42
        11.1.3.       Adjustment For Abnormal Resale Market Conditions ........................ 45
    11.2. Money Factors ................................................................................................ 45
12. Summary Of Findings ............................................................................................. 46

13. Compensation .......................................................................................................... 46

14. Data & Documents Relied On In Forming Opinions ............................................... 46

15. Limitations .............................................................................................................. 47

1.     **INTRODUCTION**

1.      I am the Vice President and Director of Economics Services of The Fontana Group, Inc. ("Fontana"), a consulting firm located at 3509 North Campbell Avenue, Tucson, Arizona 85719. I serve on the Board of Directors of Fontana and its parent company, Mathtech, Inc. Fontana provides economic consulting services and expert testimony throughout the United States, Canada, and other countries. Fontana has extensive experience assessing economic harm to consumers from alleged product defects and misconduct.

2.      This matter concerns efforts to obtain a remedy for Class Members who allegedly suffered economic harm because of a common defect in certain FCA ("Defendant") vehicles ("Class Vehicles").[1] Defendant allegedly marketed, sold, and leased to consumers Class Vehicles that possessed defects stemming from manufacturing, design, or material components. Consequences from the alleged Defect include the introduction of the incremental propensities to catch fire and explode spontaneously. Counsel for Plaintiffs ("Class Counsel") advises that the Defect was present at all times Plaintiffs and putative Class Members possessed the Class Vehicles, at least until the implementation of Defendant's recall, which Defendant claims repairs the Defect, but which is disputed by Plaintiffs, if not through the present. Class Counsel retained Fontana to (a) assess, under the assumption that Plaintiffs are substantially correct in their factual and legal allocations, whether Class Members have suffered economic damages and, if so, (b) to determine whether a feasible method exists, or feasible methods exist, to quantify any damages suffered on a Class-wide basis and (c) to describe the applicable methods.

---

[1] I understand that, as of writing this Declaration, that Class Vehicles include model year 2017 and 2018 Chrysler Pacifica Hybrid vehicles, but this definition may change to include subsequent years. Any such alteration in the definition of Class Vehicles is amenable to the models proposed herein. *See* Consolidated Master Complaint, November 4, 2022.

3.      It is my understanding that parties dispute whether FCA has made available a repair at FCA's expense that remedies the Defect ("competent repair"). FCA has deployed a recall remedy ("Recall Repair"). However, Plaintiffs do not consider the Recall Repair to be competent, in the sense that delivery of the repair removes the Defect. Rather, Plaintiffs will present evidence that multiple Class Vehicles had fires after receiving the Recall Repair. Similarly, I understand that Plaintiffs assert that the Recall Repair is not competent because a different repair is appropriate and necessary ("Proposed Repair").

4.      In light of what I understand to be technical disputes regarding the availability, effectiveness, and nature of any potential repair, I provide a framework to estimate economic harm that could accommodate different technical findings. Under the *Recall Repair* scenario, I assume that the Recall Repair provided by FCA is the competent repair, and, subject to validating repair data requested from FCA, assume that FCA has made the competent repair available to substantially all owners and lessees of Class Vehicles. Under the *Proposed Repair* scenario, I assume that the Recall Repair provided by FCA is not competent and that Class Vehicles retain the Defect. Furthermore, under this scenario, I assume that the competent repair is that proposed by Plaintiffs' technical expert, a repair that I understand to be replacement of the hybrid battery in each Class Vehicle.

5.      In each scenario, I estimate overpayment harm under a benefit of the bargain model, which estimates the amount of overpayment based on what would have been the cost to remedy the Defect at the time of acquisition. I also set forth a method to credit Defendant for the delivery of a competent repair at its own expense at some point during the Class Vehicles' useful lives. Under the *Recall Repair* scenario, it is my expectation that reliable data will be readily available to determine the dates at which the Recall Repair became available. Under the *Proposed Repair*

scenario, FCA has not made a competent repair available, but I present a model that can accommodate the delivery of a competent repair if one becomes available. The concepts underlying the credit for competent repairs are the same in either scenario.

6.      I understand that on February 25, 2022, FCA advised all Class Members to refrain from charging their Class Vehicles, effectively idling the hybrid capability of Class Vehicles until FCA could deliver the recall repair.[2] For this period of time ("Idled Asset Period"), Class Vehicles were no longer differentiated from gasoline versions of the same automobiles by the existence of the hybrid feature. However, as motor vehicles are generally depreciating assets, the value of the hybrid feature declined while owners were unable to benefit safely from the hybrid vehicle feature. I propose a method to estimate economic harm from the idling of the hybrid feature during this time period.

7.      Class Counsel advises that discovery is ongoing as of the time of drafting. As appropriate and allowable by the Court, I expect to supplement my findings with additional relevant evidence that becomes available.

## 2.      QUALIFICATIONS

8.      My curriculum vitae, which describes my education, experience, relevant assignments, and publications within the last ten years is attached as **Tab 1** to this report. I have a bachelor's degree in economics from Western Michigan University. I have a master's degree from the Department of Agricultural and Resource Economics at the University of Arizona. The concentration of this program was applied econometrics. I began my employment at Fontana in the Fall of 1998. My first position was as an analyst. Subsequent positions included Senior Analyst, Senior Financial

---

[2] See Part 573 Safety Recall Report, 22V-077: "[FCA] is advising owners of these hybrid vehicles to refrain from recharging them, and to park them away from structures and other vehicles."

Analyst, Case Manager, Director of Economics Services, and Vice President. I serve on the Board

of Directors for both Fontana and Mathtech, Inc., which is a Washington, DC and Princeton, NJ-

area consulting company and Fontana's parent company.

9.      My experience, and that of Fontana, are suited to the subject matter of this action. I have

consulted on economic questions across many industries and conducted rigorous data review and

managed and analyzed broad data sets on a variety of complex matters. These engagements include

many matters involving class-wide claims for relief. Examples include several product defect cases

in which I proposed to quantify overpayment harm at the point of purchase by way of a repair costs

model,[3] serving as the expert for seven classes of consumers in the Volkswagen Diesel Emissions

matters in the United States and Canada, where several courts cited to my analysis in decisions

supporting approval of class-wide settlements, and matters in the insurance industry relating to

total loss coverage.[4] Additionally, I served as the expert for the class of consumers who potentially

suffered credit injury in connection with the Wells Fargo unauthorized accounts litigation. In that

matter, my colleagues and I developed a model of damage payments based upon a matrix of

historical borrowing tiers, impact on FICO scores, loan amount and type, and other consumer-

specific characteristics. The court cited to this model in its approval of the class action settlement.[5]

---

[3] See, e.g., *Hays v. Nissan North America, Inc. et al.*, Missouri Western District, 4:2017-cv-00353, *Monteville Sloan, Jr. vs. General Motors, LLC*, CAND, 3:16-cv-07244, *Williams v. Toyota Australia*, NSD/12102019 and *Tershakovec, et. al. vs Ford Motor Company*, S.D. Fla., 1:2017-:cv-21087., *Federal Court of Australia-New South Wales Division, Siqueiros v. General Motors, LLC*, CAND 16-cv-07244-ECC.

[4] *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC). *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:15-md-02672-CRB (N.D. Cal.), Dkt. 2101. O*ption Consommateurs et Francois Grondin c. Volkswagen Group Canada Inc et al*., Province De Québec District De Montréal Cour Supérieure No: 500-06-000761-151. *Matthew Robert Quenneville, et al. v. Volkswagen Group Canada, Inc.*, et al., Ontario Superior Court of Justice Court File No.: CV-15-537029-00CP *Judith Anne Beckett v. Porsche Cars Canada Ltd.*, et al. Ontario Superior Court of Justice Court File No.: CV-15-543402-00CP.

[5] *Shahriar Jabbari and Kaylee Heffelfinger, on Behalf of Themselves and All Others Similarly Situated V. Wells Fargo & Company and Wells Fargo Bank, N.A.*, Case No. 15-cv-02159-vc p. 7.

Following the court's approval of the damage model, I gathered and managed extensive and diverse data in order to execute the damage calculations.

10.     I have presented before various groups of professionals including attorneys, motor vehicle dealers, CPAs, Chief Financial Officers of automotive dealer groups, and other industry professionals. A statistical study that I conducted regarding topics within the transportation industry was submitted to both houses of the United States Congress on behalf of a union that represents railroad track inspectors. I have been accepted as an expert in proceedings before state and federal courts, administrative courts, and arbitration panels. I have provided testimony on at least 80 occasions at depositions, hearings, and trials. A list of my prior testimony in the last four years appears in **Tab 2**.

**3.      STRUCTURE OF DECLARATION**

11.     Within this Declaration, I describe two methods for calculating two separate but additive sources of economic harm resulting from the Defect and then proceed to a description of how I would execute those calculations. It is my understanding that discovery is ongoing at this time and that it is not necessary at this time to provide empirical estimates of economic harm. The body of this Declaration describes the conceptual foundation of the proposed model, and appendices discuss underlying economic concepts in more detail. The narrative portion of this Declaration is structured as follows:

- **§4** describes the nature of the case and the scope of the tasks which Class Counsel has requested.

- **§5** includes a brief summary of the opinions presented in this Declaration.

- **§6** provides an explanation of the existence of damages.

- **§7** describes methods of measuring overpayment at the point of acquisition.

- **§8** describes how the methods described in the preceding section would be applied.

- **§9** provides a brief overview of how I propose to credit the Defendant for delivery of the competent repair.

- **§10** reports how I propose to estimate the value of the hybrid feature lost during the Idled Asset Period.

- **§11** contains descriptions of exemplar calculations showing how the models described may be applied.

- **§12** includes a summary of my findings.

- **§13** reports my firm's compensation for work in this matter.

- **§14** describes the data and documents that underlie my opinions.

- **§15** describes the limitations on use of this Declaration.

- **Appendix A** includes a more detailed discussion of expected utility theory.

- **Appendix B** proposes a method by which it would be possible to allocate harm among multiple individuals with economic interest in a single vehicle, to the extent that this exercise would be relevant in light of any class certification order.

- **Appendix C** proposes a method to credit Defendant with the value of delivery of a competent repair at its own expense, assuming this has occurred.

## 4.     CASE SUMMARY AND SCOPE OF WORK

12.     In this matter, Plaintiffs seek damages for alleged economic losses suffered by purchasers and lessees of certain FCA vehicles. Plaintiffs intend to seek certification of several statewide

classes comprising all purchasers and lessees of the Class Vehicles.[6] This report does not opine upon economic damages from physical injuries or other physical harm that may have been suffered by Class Members.

13.     Plaintiffs allege the following, which I assume to be true for purposes of this report: Defendant knowingly sold and leased FCA produced Chrysler Pacifica branded vehicles of model years 2017 and 2018 present with a defect rooted in the hybrid propulsion systems ("Defect").[7] Defendant did not, for at least some period of time, address the Defect in a systematic or otherwise acceptable manner in incumbent vehicles. As designed and manufactured, the defective componentry, design, or materials introduce an incremental risk of vehicle fires and explosions.[8] Additionally, during the Idled Asset Period, Class Members lost use of the hybrid feature of their Class Vehicles.

14.     I am not an engineer and do not offer technical opinions. I issue this Declaration for the purpose of setting forth a method to assess economic harm in the event that the Class Vehicles are found to be organically defective. If the Class Vehicles are found to be non-defective, the economic harm model proposed herein would not produce point of acquisition estimates of economic damage, since, as described in more detail herein, no repair would have been necessary at the point of acquisition to make the vehicles non-defective.

---

[6] Class states included in the operative complaint are as follows: Arizona, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, and Wisconsin.

[7] I understand that this definition may change; see footnote 1.

[8] Consolidated Master Complaint, November 4, 2022.

5.    **SUMMARY OF OPINIONS**

15.    Assuming the facts alleged by Plaintiffs to be true, Class Members suffered economic harm as a direct result of the Defect. A certain portion of that economic harm exists because Plaintiffs overpaid for the Class Vehicles at the point of acquisition and, for at least some period of time, were in possession of vehicles that were less valuable than reasonably expected and less valuable than the vehicle for which they bargained. It is possible to quantify economic harm from overpayment on a Class-wide basis.

16.    Class Members were also unable to benefit from safe use of the hybrid features of their Class Vehicles during the Idled Asset Period. Since the hybrid features of Class Vehicles are depreciating assets, Class Members participated in the loss of value of those features without benefiting from the expected use of those features. As a consequence, Class Members suffered economic harm during the Idled Asset period.

17.    Reasonable methods and accepted data exist to quantify economic harm on a class-wide basis.

**5.1.    Overpayment**

18.    I propose to estimate the amount by which Class Members overpaid for their Class Vehicles by way of a benefit of the bargain-based overpayment model. The overpayment amount at the time of acquisition is estimable by determining the additional cost that would have been necessary to remedy the Defect fully at the time of original sale.

19.    The objective of the benefit of the bargain model is to determine the amount of money necessary to place the injured party in a position as good as the position they would have occupied had the parties complied with their original agreement. Given the allegations that Defendant sold

the vehicles in a defective state and failed to remedy the Defect, the application of the benefit of the bargain model requires a prospective change to the defective as-delivered Class Vehicles.

20.     Using the cost of repair to estimate economic harm under a benefit of the bargain framework is a systematically conservative method. Class Members, in addition to acquiring vehicles that were less valuable at the time of acquisition because of the Defect, unwittingly assumed risk associated with the Defect and some economic costs that were necessary to address the Defect. The overpayment estimate based on cost of repair assumes a counterfactual with a timely disclosure of the presence of the Defect, which did not occur.

## 5.2.    Idled Asset Period

21.     Class Members suffered economic harm during the Idled Asset Period, during which FCA advised them to cease charging their Class Vehicles, and to avoid parking the vehicles close to buildings or structures or within garages. I understand that the use of Class Vehicles' hybrid feature requires the ability to charge the hybrid battery. Losing the ability to charge the hybrid battery prevents safe access to the hybrid feature of Class Vehicles such that they are no longer differentiated from their gasoline counterparts. I consider three methods by which one may form conservative estimates of the economic harm suffered by Class Members during the Idled Asset Period.

22.     The candidate methods I consider for the purpose of estimating harm suffered by Class Members during the Idled Asset Period only account for the loss of the hybrid functionality of the Class Vehicles. This is also conservative because I do not attempt to quantify economic harm caused by the additional parking restrictions applied to Class Vehicles during this time period. Class Members likely experienced other inconveniences and reduced utility from other assets, e.g.,

parking in a driveway, not a garage, on-street parking, etc. I do not quantify these additional types of harm.

### 5.3.  Credit for Competent Repair

23.    In the Recall Repair scenario, I assume that Defendant has executed or otherwise made available a competent repair for the Defect. Accordingly, to the extent that repairs or replacements provided at Defendant's expense restore Class Vehicles, at least for the remaining portions of their useful lives, to the condition that would have existed absent the Defect, I propose a method to credit Defendant for the delivery of those repairs. I describe that method in Appendix C attached to this Declaration and include examples of the calculations I expect to apply. The method described in Appendix C and referenced above would also apply to the Proposed Repair scenario, but in that scenario, I understand that Defendants have not provided a competent repair.

24.    None of the methods discussed herein intend to quantify the post-acquisition economic harm associated with the value of time spent acquiring repairs. The overpayment models I propose to apply tend to understate the overall amount of economic harm suffered from sales of products with the undisclosed presence of a material Defect and the loss of the associated features caused thereby.

25.    All of my opinions expressed herein are made within a reasonable degree of professional certainty as an economist and are grounded in well-established and understood economic principles.

### 6.  EXISTENCE OF DAMAGES

26.    According to Plaintiffs' allegations, Defendants failed to fulfill the bargain under which consumers agreed to purchase or lease the Class Vehicles, because the vehicles were less valuable

-11-

than those consumers reasonably expected to receive. In contrast, a party achieves the "benefit of the bargain" when it gains the advantages that it would have attained had the terms of an agreement been satisfied. In addition to purchasing less valuable Class Vehicles, Class Members lost the use of valuable, depreciating vehicle features during the Idled Asset Period because of the safety implications of the Defect.

27.      In this matter, the Class Vehicles that consumers acquired were defective at the time of acquisition. Plaintiffs advise that they intend to prove that Defect was sufficiently material to degrade Class Vehicles at the time of sale to a condition outside the tolerance for new vehicles sold in the United States. As a result, consumers overpaid for the products at the time of acquisition, because the Defect differentiated the Class Vehicles from the accepted quality and safety standards for new vehicles and relatedly, remedies that Defendant did not apply would be necessary to make the Class Vehicles conform to the typical new vehicle standard.

28.      In addition to overpayment at the point of acquisition, Class Members also suffered harm when the safety implications of the Defect caused them to refrain from charging their Class Vehicles and to avoiding park them near structures, e.g., in a garage or near Class Members' homes. During this Idled Asset Period, Class Members no longer received the benefit of the hybrid feature of their Class Vehicles, thereby negating the incremental benefits of the primary feature differentiating Class Vehicles from their gasoline counterparts. A conservative estimate of the loss of utility from the hybrid feature is the decline in the market value of this feature during the Idled Asset Period. I consider various methods to estimate this decline in value.

## 7.      OVERPAYMENT

29.      Although it is intuitively true that defective products are less valuable than their otherwise comparable non-defective counterparts, established fundamental economic theory describes an

accepted framework under which consumers value goods and services in the marketplace[9] and thereby provides a framework for assessing the structural reasons why undisclosed defects cause consumers to overvalue and overpay for goods assumed to be non-defective.

30.     This framework, presented herein, is particularly relevant for *durable goods*,[10] such as automobiles. Unlike goods and services expected to be consumed immediately, for which consumers consider the relatively immediate benefits that the good or service provides, consumers also consider how durable goods, which are expected to be used over a longer time frame, will perform in the future. I describe below the relevant economic framework that describes the general manner in which consumers value goods, particularly durable goods, and the manner in which an undisclosed defect disrupts that structure.

31.     Consumers decide which goods and services to purchase based upon their consideration of both the actual and expected attributes of those items and how those compare to the actual and expected attributes of competing goods and services.[11]

32.     With respect to goods consumed over a longer period of time, e.g., automobiles, a relevant consideration is that transactions occur in the present for goods and services that may be used in the present and the future. Accordingly, the consumer's decision process inherently values in the present the anticipated future performance of a product. For almost all goods and services, the value of the future performance of the product is uncertain. Therefore, consumers consider in the present both the expectation for the future performance of a good or service and the risk associated

---

[9] Aswath Damodaran, *Strategic Risk Taking: A Framework for Risk Management* (New York: FT Press, 2008); John Von Neumann and Oskar Morgenstern, *Theory of Games and Economic Behavior* (Princeton: Princeton University Press, 1953); Edgar K. Browning and Jacquelyn M. Browning, *Microeconomic Theory and Implications*, 2nd ed. (Boston: Little, Brown, 1986).

[10] Michael Waldman, "Durable Goods Theory for Real World Markets," *Journal of Economic Perspectives* 17, no. 1 (2003): 131-54.

[11] Von Neuman and Morgenstern, *Theory of Games and Economic Behavior.*

with different levels of performance.[12] In other words, consumers develop some expectation of the value that a given product will provide. That consideration inherently takes into account, whether sophisticated or not, the possibility that the product will perform differently, and the risk associated with different potential performance outcomes.

33.     The methods presented herein align with, although perhaps subtly, this process described in the prior paragraph. I do not propose to compare Class Vehicles to a counterfactual of a perfect vehicle, nor do I estimate economic harm for other inconveniences or problems associated with the Defect. In contrast, Plaintiffs allege that the Defect here differentiates Class Vehicles in a manner that is outside the tolerance of performance variation that both the market and the standard for new vehicles accepts.

34.     According to classical decision theory,[13] the consumer's objective is to maximize the expected value of the outcome of the decision-making process. Consumers rank-order potential outcomes and attempt to acquire outcomes that offer more perceived value than alternatives.[14] This is not to say that consumers have prescient knowledge about the future performance of their assets; rather, they choose options perceived at the time of acquisition to be preferable to alternatives, assuming discrete choices are available.

35.     Consumers' processes of maximizing expected benefits from transactions involve valuing positive expected outcomes of a transaction and discounting to account for negative expected

---

[12] Damodaran, *Strategic Risk Taking: A Framework for Risk Management*.

[13] Browning and Browning provides an accessible description of these elements of decision theory, although the concepts are broadly established in the field of economics, including other textbooks. Browning and Browning, *Microeconomic Theory and Implications*, 2nd ed.

[14] The underlying concept of rank-ordering of potential outcomes is that a rational consumer presented with two alternatives will prefer the one that is expected to provide higher benefits given the cost.

outcomes associated with the transaction.[15] For durable goods,[16] such as motor vehicles, consumers assess the perceived attributes and attractiveness at the time of acquisition but also consider the risk and uncertainty of that expected performance over time. For example, a vehicle with questionable reliability and resale value, all other things equal, presents less favorable prospects that the vehicle will perform in an acceptable state in the future. A vehicle with high expected reliability and resale value, all other things equal, presents more favorable prospects that the vehicle will perform acceptably in the future. Consumers balance the attributes of the vehicle and the expectation that those attributes will continue to perform in the future when evaluating transactions.

36.     Consumers "normalize," or balance these positive and negative expected utilities, across competing goods and services using price as the mechanism. Consumers are generally risk-averse, meaning that they tend to weigh the consequences of potentially negative outcomes, such as vehicle fire situations, more heavily than they weigh positive outcomes.[17] The more negative and severe the possible consequence, such as the Spontaneous Fire Risk described in the Consolidated Master Complaint, the more consumers tend to discount the overall value of the transaction in response.[18]

37.     While the depth and breadth of inquiry into an economic problem may vary depending upon the complexity of the change in circumstances, a common element of economic harm is that it flows from a disruption of events, where the affected party reasonably expected that the disruption would not occur. I clarify the concept of *disruption* by way of an illustrative example—

---

[15] Appendix A attached to this Declaration addresses the theory underlying this concept, which is known as expected utility theory.
[16] Waldman, "Durable Goods Theory for Real World Markets."
[17] Damodaran, *Strategic Risk Taking: A Framework for Risk Management*.
[18] Damodaran, *Strategic Risk Taking: A Framework for Risk Management*.

a rigged coin thought to be a fair coin. This example demonstrates the difference between probabilistic occurrences known at the time of transaction to be subject to some variability and what I describe as disruptions that, if known, would alter the perceived probabilistic outcomes— the chances that any given outcome may occur—and values associated with those outcomes if disclosed prior to the transaction.

38.     Imagine that a consumer transacts for a coin, assumed for this example to have use in wagers. The value of the hypothetical coin is its propensity to show the favorable outcome of "heads." By assumption, a *fair* coin is one that shows "heads" 50% of the time; a rigged coin is one with a different propensity to show "heads." In this hypothetical, the rigged coin is 40% likely to show "heads" and 60% likely to generate a negative outcome of "tails." It is self-evident that, at the point of acquisition, the consumer would consider the value of the fair coin higher than that of the rigged coin, as the beneficial purpose of the fair coin is higher than that of the rigged coin. However, how would one assess economic harm in the event that the rigged coin had been substituted for a fair coin without the consumer's knowledge?

39.     From an economic perspective, the question is evaluated in most cases from a prospective or *ex ante* position. Retrospective or *ex post* inquiries are often less conceptually appropriate for evaluating damages at the point of acquisition. For example, if a consumer who unknowingly purchases a rigged coin but pays for a fair coin, by chance, tosses five "heads" in ten trials, is this not the expected outcome from ten tosses of a fair coin? And if so, does this outcome not place the consumer in the same position as would have been expected from a fair coin? The answer is that it does not. The probability of tossing five or more heads in ten trials with a rigged coin is approximately 36.7%, which is lower than the probability of doing so with a fair coin, which is

approximately 62.3%.[19] Thus, while the consumer gained the possibility of tossing at least five "heads" by acquiring the rigged coin, the consumer could have gained those same prospects but paid less for them had the coin been disclosed as rigged prior to purchase. When the performance prospect of a good is known to be variable and to be conveyed to the owner of the good over time, the difference in willingness to pay that would have followed from pre-sale disclosure of the disruption, e.g., the rigging of the coin, generally represents the most reliable estimate of damages that occurred at that point in time. In other words, how would the revelation of the rigged coin incrementally change the expected outcomes from the coin's use versus that of a fair coin? The question is not whether the consumer obtained the beneficial outcomes expected; it is whether the disclosure of the defect prior to purchase would have made those less desirable expected benefits available at a lower price.

40.     In the hypothetical example above, the rigging of the coin introduces incrementally negative propensities for unfavorable outcomes by creating increased probabilities of showing "tails." This simplified illustration also applies to the alleged Defect here. Like the rigged coin, the Defect introduces incremental and undisclosed propensities for negative outcomes and related reduced propensities for favorable outcomes, although the bounds of unfavorable outcomes for a performance automobile clearly are not equivalent to the incrementally diminished propensity for favorable outcomes as in the rigged coin example.

---

[19] This is calculated from the binomial distribution as

$$\sum_{k=5}^{10} \binom{10}{k} 0.4^k 0.6^{10-k} \approx 0.366897$$

for the rigged coin, and as

$$\sum_{k=5}^{10} \binom{10}{k} 0.5^k 0.5^{10-k} \approx 0.6230469$$

for the fair coin. See George Casella and Roger L. Berger, *Statistical Inference*, 2nd ed. (Pacific Grove, CA: Wadsworth Group, 2002), 89-90.

41.     In my opinion, and as is consistent with economic concepts outlined in the following section of this report, it is appropriate to evaluate economic harm from an *ex ante* approach that assesses overpayment at the point of acquisition. This approach is necessary to incorporate the impact of disclosure of a product's true characteristics on the perceived market value of the products. Alternatively, *not* calculating economic harm at the point of acquisition inherently excludes from consideration undisclosed characteristics from potential consideration when assessing value or overpayment.

42.     Given the assumptions regarding the alleged Defect, an economic framework exists to assess how and to what degree this Defect would have changed the character of the purchase or lease transaction. This framework is based on modeling an economic remedy that would have restored the consumers to their negotiated positions had the Defect been disclosed at the time of purchase or lease. It also considers the ongoing link through use and ownership between characteristics of the vehicle actually delivered and the one for which consumers bargained.

43.     I refer to the model described below as a "repair cost model" or "RCM." However, at a higher level the model is one based on determining the amount of money necessary to realign the transactions for Class Vehicles to the typical conditions for the new vehicle market—one in which new vehicles are sold in a condition that is safe, reasonably reliable, free of material defects, and equipped with remedies in the event that the vehicles as delivered do not conform to that standard. Given my assumption that the Class Vehicles are reparable, the cost of repair provides a method to quantify economic harm under this model.

44.     The RCM evaluates the overpayment by Class Members who received defective vehicles instead of the vehicles for which they bargained. The RCM applies accepted economic theory and relevant market data to determine the amount of compensation that would restore Class Members

to positions equivalent to those they would have occupied had the Class Vehicles not possessed the Defect at the point of sale.[20] Specifically, the RCM calculates the amount of money that would need to be paid to consumers in order for the combination of compensation and their receipt of Class Vehicles as delivered to place them in an equally good position as that they would have occupied had the Class Vehicles not had the Defect. Another way to view the RCM is that it represents the cost at the point of acquisition necessary to mitigate the incremental risk introduced by the Defect, which Plaintiffs assert as a matter of law should not be present in the Class Vehicles.

45.     The RCM relies primarily upon central economic concepts of decision theory[21] to assess the manner in which the receipt of a product inferior to that bargained for leaves consumers in a position that is inferior in an economic sense to that which would have existed absent the Defect. Expected utility theory, which I address in detail in Appendix A, is a somewhat more sophisticated application of decision theory that explains why the existence of a defect deteriorates the value of a durable good at the point of purchase, even when the defect is not yet visible and future visible manifestation of the defect is uncertain. By integrating the elements of decision theory, including expected utility theory, it is possible to demonstrate how a competent repair—one that remedies the Defect—restores Class Members to the positions they would have occupied for the portion of the vehicle's expected life after the provision of the repair. The RCM applies relevant and targeted economic data in order to quantify the amount that the Defect reduced the value of the Class Vehicles at the point of purchase.

---

[20] This assumes that either that consumers are indifferent between competently repaired vehicles and vehicles that were never defective, and/or that the prompt delivery of a competent repair is a sufficient remedy. As a result, the RCM is conservative with respect to estimating the economic loss associated with the unwitting acquisition of a materially defective vehicle.

[21] Browning and Browning, *Microeconomic Theory and Implications*, 2nd ed.

46.     In Appendix A, I have included documents which describe some fundamental concepts worth considering with respect to application and understanding of the RCM. The appendix presents concise discussions of indifference curves and expected utility theory. I also include Appendix B, which discusses potential methods for allocating damages as measured by the RCM among multiple owners of Class Vehicles.

## 8.     APPLICATION OF THE REPAIR COST MODEL

48. Herein, I describe the repair cost model and how it would apply on a Class-wide basis. The inputs and data sources necessary to inform the RCM are as follows:

a)  Determination that Class Vehicles are materially defective;

b)  Determination that the Defect is organic;[22]

c)  Determination that a *competent repair* is available to remedy the Defect;[23]

d)  Class definition;

e)  Counts of Class Vehicles;

f)  Description of the competent repair, including approximate labor time and parts costs necessary to execute the repair, or data sufficient to describe repair overall repair costs.

49.     Items (a) through (c) are issues that are technical in nature. I provide no opinions on technical or engineering subject matter.

50.     Plaintiffs' Consolidated Master Complaint describes proposed Classes which include consumers of Class Vehicles nationwide and in the following states: Arizona, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Jersey,

---

[22] An "organic" defect is one that is present at all times during the vehicles' lives, at least until the point of repair.
[23] Here, a competent repair is one that mitigates or removes the incrementally negative/non-positive propensities introduced by the Defect and restores the Class Vehicles to a non-Defective state.

North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, and Wisconsin.

51.    At least three potential sources exist for determining the number of Class Vehicles. These include original equipment manufacturer ("OEM") records, original registration information, and customized market information. I describe these data sources below.

52.    OEM records of new vehicle sales are generally reliable, and several checks on that reliability are in play. I list some of those checks here. Dealerships submit retail delivery reports ("RDRs") to manufacturers following new vehicle sales. OEMs like Defendant generally seek to maintain accurate sales records for commercial and regulatory purposes such as recall information, sales reporting, and dealership monitoring. Lastly, Defendant cooperates with market data vendors, like S&P Global Mobility (formerly IHS Automotive),[24] to track vehicle sales and registration accuracy. This cooperation yields data estimates that align registrations recorded by state authorities with OEM records, and other market information.

53.    A second source is publicly available new vehicle registration data. A known source of these data is S&P Global Mobility ("S&P"), mentioned above. S&P is a recognized automotive information firm relied upon by multiple parties in the retail automotive industry. These parties include manufacturers, dealers, analysts, trade press, governmental entities, and others. S&P acquires registration information from state authorities and compiles and anonymizes the data. It then makes the data available within virtually any known geographic parameters.

54.    Although I understand that the approval of any defined Class occurs at a later date in the litigation, I include in **Tab 3** examples of the types of registration data available. I include on pages one and two in **Tab 3** counts of model year 2017 and 2018 Chrysler Pacifica Hybrid vehicles sold

---

[24] "Home | S&P Global Mobility," *S&P Global*, https://www.spglobal.com/mobility/en/index.html, accessed September 6, 2023.

new at retail by state: pages three and four of the tab show counts of Class Vehicles in operation, also by state.

55.    The third source of class count data is also through S&P but would be relevant only if necessary to align the class count data to specific, narrower class definitions. While I have no opinion on what any eventual class definition might be, I note that S&P makes available extensive customized reporting of market activity. Examples include currently registered vehicles, vehicle counts by selling dealer state, and vehicles sold used by Defendant (branded) dealerships. I have personal knowledge and experience regarding the development of very specific compilations of market registration activities from S&P.

56.    Item (f) is the description of the competent repair. As stated in the introductory section of this document, I consider two scenarios: one in which the Recall Repair is the competent repair, and one in which the Proposed Repair is the competent repair. While the parameters of the competent repair are technical subject matter on which I have no opinion, the topic is, nonetheless, economically relevant, as the cost of repair forms the basis for the estimated overpayment amount, and the question of whether and/or when FCA has delivered a competent repair determines whether a credit is economically appropriate.

57.    For a repair to align with the parameters of the RCM, that repair, generally, should have the following qualities. First, it should remedy the Defect such that, if applied, it restores the Class Vehicles to the typical standard for new vehicles. Second, it should be described as either standalone or necessary and contributory. A standalone repair is one that fully transforms the Class Vehicle from its original Defective state to a remedied state. A repair that is necessary and contributory is one that, if added to measures already undertaken by Defendant, completes the remedy of the Defect. A hypothetical example of this might be the replacement a vehicle's

defective master brake cylinder where the entire remedy of the hypothetical vehicle's braking system also required the replacement of brake calipers, which the manufacturer had already undertaken at its expense. Third, the competent repair should be substantially the same as that which would have been necessary at the point of acquisition. For example, if a hypothetical defect caused vibration that damages multiple engine elements over time whereas a timely remedy would have prevented the vibration and the expanded engine damage, repairs that repaired cumulative damage would capture different, additional economic harm than that suffered by way of overpayment at the point of acquisition. Lastly, the competent repair should be remedial, not enhancing. If the remedy of a hypothetical defect required a material upgrade of the vehicle's overall characteristics, then delivery of that repair at the point of acquisition would have placed the consumer in a position potentially more favorable than that represented by the benefit of the bargain.

58.    I understand that the Plaintiffs intend to establish whether the Recall Repair or the Proposed Repair is the competent repair.

59.    Once the nature of proper repair is established, it is possible to normalize repair cost estimates to the time of acquisition or the time of trial through standard inflation adjustment sources and data. If necessary, and depending upon any final class definition, it would also be possible to adjust labor rates observed in one state, e.g., California, to reflect cost differences relative to other states by way of comparing state-level labor rates from warranty data which automotive manufacturers, like FCA, regularly maintain in the ordinary course of business.

60.    For reference, **Tab 4** shows the repair cost model equation and the data sources for each input. The following page repeats this but includes an inflation adjustment factor. As noted earlier,

discovery is ongoing. It is my expectation that additional data and documents will inform the framework presented here.

## 9.    CREDIT FOR DELIVERY OF COMPETENT REPAIR

61.    I consider the possibility that Defendant has provided or will provide, at its own expense, a competent repair that aligns Class Vehicles, at least for the remaining portion of their lives, with the state they would have occupied but for the Defect. While I do not have an opinion regarding the legal relevance of the potential delivery of a competent repair, the provision of this repair would be relevant from an economic perspective. Appendix C describes the method by which I would propose to credit Defendants with the value of delivery of a competent repair.

62.    The intuition of this credit is as follows. Essentially, if the consumer is in possession of a vehicle that is defective for some portion of its useful life and non-defective (at least with respect to the Defect of interest) for the remaining portion, the credit proposed herein apportions the overpayment at the point of purchase over the time period during which the vehicle is defective. Rather than applying an assumed discrete vehicle life, such as ten years, I would evaluate the percentage of the vehicle's original value consumed during the time period prior to the availability of the competent repair and multiply original overpayment by that percentage. Demonstrating this method by way of a simple example, if the original price/market value of the vehicle were $30,000, and the competent repair became available when the resale market value of the vehicle was $24,000, then I would credit 80% of the value of the competent repair, which is equivalent to estimating net overpayment harm (after the credit) attributable to consumption of 20% of the vehicle's value. Market data to estimate this credit are readily available. For example, vehicle invoice prices (a conservative estimate of purchase price) are publicly available, as are resale market values, which multiple reputable and noted firms publish in the ordinary course of business.

10.      **IDLED ASSET PERIOD**

63.      In this section, I propose a method for measuring the economic harm suffered by Class Members because of the loss of use of the hybrid feature. On account of the Defect, FCA advised Class Members to avoid charging their Class Vehicles on February 25, 2022 (the "Notice"). For the period between this announcement and the delivery of a competent repair, the Defect differentiated Class Vehicles from their represented state by way of a notice that safe access to hybrid feature was unavailable.

64.      While not all Class Members may have heeded FCA's warning, those who utilized the hybrid feature during this time, regardless of advisement from FCA, have nonetheless suffered economic harm. Continued usage during this period, from an economic perspective, reflects Class Members' mitigation of the impact of the Defect by continuing to charge the vehicles. This does not imply that the economic harm caused by loss of safe access to the hybrid feature did not occur. FCA's warning itself rank-ordered for all vehicle owners idling of the hybrid feature over continued use of the feature.

65.      I propose to develop conservative estimates of economic harm during the Idled Asset period based on the following concept. At the time that FCA issued the Notice, the hybrid element of the vehicle had some incremental value, meaning that the presence of the hybrid-related feature added some incremental value to Class Vehicles over a comparable non-hybrid/gasoline counterpart. Between the time of the Notice and the time at which the Recall Repair became available, the value of the hybrid feature declined, which is typical behavior for a depreciating asset in a durable good and one that buyers of automobiles reasonably expect. However, during this Idled Asset Period, while Class Members participated in the diminishing value of the hybrid

feature, they could not safely access the hybrid features. A conservative estimate of economic harm during the Idled Asset Period is as follows:

$$Market\ Value\ of\ Hybrid\ Feature_{NoticeDate} - Market\ Value\ of\ Hybrid\ Feature_{RepairDate}$$
$$= Minimum\ Economic\ Harm\ during\ Idled\ Asset\ Period$$

66.      I describe this as the minimum amount of economic harm during the Idled Asset Period for at least two reasons. First, it is my understanding that the safety implications of the Defect did not begin at the Notice date. Rather, the Defect's safety implications were present from the time of acquisition. Second, consumers generally enjoy some level of consumer surplus in connection with their purchases. It is likely that the value of the utility gained during the Idled Asset Period (with a non-defective vehicle) would have been higher than the depreciation that occurred in that time period. Third, the Notice added restrictions prohibiting a number of parking solutions, further limiting the utility offered by the Class Vehicles. Nonetheless, I propose to evaluate economic harm in this directionally conservative manner.

67.      It is possible to determine with reasonable accuracy the market value of the hybrid feature. I consider three potential methods to do so. For ease of explanation, I call these methods a) the *Direct Method*, b) the *Derived Method*, and c) the *Hedonic Method*. I describe each method below and the types of data that would support each analysis.

68.      Each of the three methods shares a common objective of identifying the degree to which the hybrid feature contributes to the market price level of the Class Vehicles. The objective of the Direct Method is to identify a specific market price increment associated with the hybrid feature. In the simplest case, the hybrid feature would be a stand-alone option for at least some Class Vehicles. The Derived Method is conceptually similar to the Direct Method but requires some offsetting of the value of non-matched features on Class Vehicles and similar non-hybrid vehicles.

In a hypothetical example, if Class Vehicles include premium wheels that are unavailable on similar non-hybrid vehicles, then the difference in market value between a Class Vehicle and its non-hybrid counterpart would be attributable to the hybrid feature and the difference in value between the premium wheels and standard wheels. The Hedonic Method uses regression analysis to estimate, broadly, the contribution of the hybrid feature to market prices of vehicles. I describe the three potential models in more detail below.

### 10.1.   Direct Method

69.     The objective of this method is to determine contemporaneous market values of the hybrid feature at the beginning and the end of the Idled Asset Period and to use the difference between those two values as an estimate of economic harm to consumers. The change in the value of the hybrid feature during the Idled Asset Period represents the degree to which the durable good loses value during a time that the Class Member does not have the companion value of safe use. To be clear this is not a Diminished Value ("DV") or Excess Depreciation model that evaluates an *abnormal change* in the asset's value. Here, Class Members suffer harm even within the normal depreciation behavior of a durable good.

70.     Reliable and recognized resale market data sources are available to support this analysis. One prominent example is J.D. Power.[25] J.D. Power is a market analytics firm relied upon by manufacturers, dealerships, consumers, financial institutions, courts, insurance companies, and analysts in the retail automotive industry. J.D. Power has a public-facing website that provides current market values and a commercial interface that publishes customizable used vehicle values monthly over time.

---

[25]J.D. Power analyzes over 20 million vehicle transactions per year to determine vehicle prices, and is customizable by mileage, options, and transaction date. See https://www.jdpower.com/jd-power-pricing-and-values and https://www.jdpower.com/cars/2018/chrysler/pacifica/wagon-4d-limited-hybrid/optional-equipment.

71.     As stated above, J.D. Power values are customizable. One possible input is the vehicle's mileage at the time of valuation. J.D. Power's default mileage level is the typical mileage for a vehicle of that age at a given time. However, it is possible to retrieve J.D. Power's mileage adjustments to vehicle values by changing the mileage input. On a Class-wide basis, typical mileage is a reasonable and appropriate input into the model since aggregate damages reflect the overall characteristics of Class Vehicles, as does J.D. Power's estimate of typical mileage levels. However, J.D. Power values allow for testing of the range of value estimates that might underlie an aggregate calculation by way of repeating the analysis for particularly high-mileage or low-mileage vehicles.[26]

72.     As a general matter, most durable goods, including automobiles, lose value over time as a function of use, deterioration, and technical obsolescence. In a simple example applied to automobiles, a vehicle of equivalent age and features will be worth less/more, all other things equal, than a vehicle with materially higher/lower mileage accumulation. Likewise, a vehicle of equivalent mileage and features will be worth less/more at older/newer ages.[27]

73.     This phenomenon is relevant to the determination of economic harm during the Idled Asset Period. During this time period, it is likely that the value of the hybrid feature of Class Vehicles declined as a function of overall use and age of the vehicle. However, it is possible to isolate the effects of each of these factors by holding either vehicle age or mileage constant in various pairs of valuations. For example, if a typical 2018 vehicle had 55,000 miles as of the Notice date and 66,000 miles as of some assumed date that the Recall Repair became available, one could compare

---

[26] JD Power also allows for a vehicle condition input. In this Declaration I use the "Clean" condition category. "Average" and "Rough" are other options.

[27] Under normal conditions, vehicles exhibit continuous depreciation as a function of age/use. During covid-related supply chain shortages, the retail automotive market experienced generalized price inflation, although all other things equal, contemporaneous vehicle valuations still related to age and mileage according to typical relationships.

the value of the hybrid feature with a) the date/mileage inputs above, b) the dates above with 55,000 miles input into each valuation, or c) either of the dates above and pairs of mileage inputs (55,000 and 66,000). Option 'a' would evaluate typical change in value, while 'b' would evaluate the change in value attributable to time, and 'c' would evaluate change in value attributable to mileage alone.

74.     **Tabs 5 through 7** illustrate the mechanics of the Direct Method. **Tab 5** includes current valuations of the hybrid and non-hybrid Model Year 2018 Pacifica Touring-L models. In this case, the options that J.D. Power values ("selectable options") match across the two vehicles. This means that the hybrid option directly differentiates the J.D, Power values for the Class Vehicle and its non-hybrid counterpart. This exhibit shows that the market value of the hybrid trim is $2,700 or 17.7% higher than that of the non-hybrid trim. **Tab 6** includes contemporaneous J.D. Power values (February 2022 and February 2023) for the same vehicle. Page 1 uses typical mileage and valuation dates of February 2022 and February 2023. Page 2 uses the same valuation dates but holds the mileage constant.  Page three uses typical mileage but holds the valuation date constant. **Tab 7** repeats **Tab 6** for a low-mileage vehicle (30,000 below typical) and a high-mileage vehicle (30,000 above typical). In each case, vehicles with the hybrid feature have higher market values than non-hybrid counterparts.

### 10.1.1. Direct Method—Sensitivities

75.     I address next certain analytical considerations that arise in execution of the Direct Method.

-29-

### 10.1.1.1. Market Values vs. Market Prices

76.     J.D. Power uses actual transaction data to inform its market values and attempts to develop estimates of expected transaction prices.[28] However, market values and transaction prices are not necessarily the same. This distinction is unlikely to frustrate the estimation of the proposed model here, although it may be necessary to apply some conservative assumptions.

77.     At the beginning of the Idled Asset Period, used vehicle values were at or near historic highs, with little price negotiation occurring.[29] Used vehicle values began to normalize and used vehicle supply generally increased over the next year, softening the used vehicle market. The likely overall effect, if any, would be to increase the likelihood of divergence between market values and expected transaction prices over the course of the Idled Asset Period. In other words, to the extent that transaction prices diverged from estimated market values, any divergence (prices versus market values) would likely have become more negative in a softer resale market. Thus, even if one assumed that J.D. Power values don't account for the change in resale market conditions, the tendency would be for transaction prices to fall more than market values during the Idle Asset Period, growing the net amount of decrease in value. Thus, while it aligns with the nature of the data to compare market values at the beginning and end of the Idled Asset Period, it is potentially conservative to do so.

### 10.1.1.2. Unobserved Features

78.     It is possible that Class Vehicles and closely related non-hybrid counterparts have differences in features not captured by J.D. Power, i.e., non-selectable features. I consider this possibility and address it as follows. First, J.D., Power itself, has addressed this concern in

---

[28] See Footnote 25.
[29] See, e.g., "Inflation and the Auto Industry: When Will Car Prices Drop?" *J.P. Morgan Chase*, February 22, 2023, https://www.jpmorgan.com/insights/economy/economy/when-will-car-prices-drop

describing its own valuations. [30] J.D. Power reviews millions of vehicle transactions annually and is certainly aware that its valuation tools may not identify each vehicle component available in the market. Nonetheless, it develops market value estimates considered reliable by many parties.

79.     Second, any effect of the value of unobserved features is likely relatively small and fractional, at most. Consider the inherent controls that make this the case. An unobserved/unvalued feature would a) not be identified by J.D. Power as a selectable feature that contributes to value, b) appear on a vehicle of the same trim level, e.g., Touring L, c) contribute to value at the beginning of the Idled Asset Period, and d) contribute to value at the end of the Idled Asset Period. Controls 'a' and 'b' above suggest that any hypothetical feature would likely play a minor role in the determination of a vehicle's resale market value and that it likely would be small enough to be presented across two vehicles that share the same marketing name (Touring L). Controls 'c' and 'd' indicate that any meaningful variation created by such hypothetical features would be limited to changes in the value contribution of the feature(s) between the beginning and end of the Idled Asset Period. For example, even if some unobserved feature had a value of $1,000 at the beginning of the Idled Asset Period, its potential effect on estimates derived from the Direct Method would be limited to the change in the feature's value, e.g., $1,000 to $800, or $200, not the value of the feature itself.

80.     Nonetheless, I include in **Tab 8** detailed listings of vehicle features for various Class Vehicles and their closely related non-hybrid counterparts. The source of the data is iseecars.com,[31] a recognized automotive search engine and research firm, which I have relied upon in the past for its vehicle features research and publications. In each case, the large majority of standard features are common across both vehicles in the pair. Other differences may relate to the parameters of the

---

[30] See Appendix, pages 1 – 2.
[31] See https://www.iseecars.com/ and https://www.iseecars.com/research.

hybrid feature. Examples of differences in features that relate to what I understand to be parameters of the hybrid feature are the Regenerative braking system and "Tuned suspension: heavy duty." Others appear to be at least partially offsetting, such as the sizes of the infotainment screen and the instrument cluster screen.

81.     In any case, the impact of unobserved features on estimates developed using the Direct Method are likely to be minor. The analysis in **Tab 9** demonstrates why this is likely the case. In this tab, I identify all J.D. Power selectable options for both the Pacifica (all trims) and the Dodge Grand Caravan. Some options are additive to value, while some reduce value if not included with a vehicle. The first column shows the estimated value of the feature as of February 2022. The second column shows the estimated value as of February 2023. The sum row calculates the aggregate value of the options if all were assumed to be additive. The difference in the summed values at the two time periods for the Pacifica is $250 - $450. This amount is the aggregate estimated value change for all options that JD Power determines to affect vehicle value. It is a reasonable inference that the net value change in non-selectable options is likely minimal.

82.     Additionally, I have asked Class Counsel to serve requests to Defendants for Option/Order Guides that identify invoice prices (prices charged to dealerships) for various OEM-installed vehicle features, such as those identified in **Tab 8**. I have reviewed and received these reports in other matters and relied on them for the purpose of establishing vehicle valuations.

## 10.2.   Derived Method

83.     The Derived Method is conceptually similar to the Direct Method. The Derived Method would become necessary in the event that the contribution of the hybrid feature to market values is relatively less distinct than in the Direct Method example described above. I illustrate this through a simple hypothetical example. Imagine that a Class Vehicle is available with 20-inch

-32-

wheels (assumed to be a premium feature attributable to the larger wheel size), and that its closest non-hybrid counterpart has options of 19-inch wheels and 21-inch wheels. By assumption, the market value increment between 19-inch wheels and 20-inch wheels is not observable. In this hypothetical example, I assume that the difference in wheels is the only material non-valuable feature.

84.     In the example above, I would value the hybrid feature using two methods. The first would be to apply the lower/lowest of dollar or percentage values derived from the Direct Method. The second would be to determine a lower bound of the value of the hybrid feature by identifying the nearest higher-value feature with an observable value. In the hypothetical case, I would apply the observed value of the upgrade from the 19-inch wheels to the 21-inch wheels as a proxy for the value of the upgrade to the 20-inch wheels on the hybrid vehicle. I would then deduct this value from the overall difference between Class Vehicles and their closely related non-hybrid counterparts.

85.     The analysis of features, such as that presented in **Tab 8**, J.D. Power's valuation of features, and the proposed request for Option/Order Guides described above would assist in this analysis. Also, controls 'c' and 'd' discussed in the "Sensitivities Section" above indicate that disproportionate changes in unobserved feature prices during the Idled Asset Period is the source of any meaningful error rate in the analysis. **Tab 10** includes an illustration of this method.

86.     The sensitivities of the Derived Method are conceptually the same as those described in connection with the Direct Method. With respect to the Derived Method, I note that estimates from the Direct Method will be available. There is no a priori basis to assume that the magnitude of the contribution to market value of the hybrid feature, which I understand to be physically equivalent within each model year's vehicles, would vary meaningfully in a manner that correlates with

whether J.D. Power separately evaluates varying features across the trims of Class Vehicles and other Pacifica vehicles within the same model year. Thus, it would be reasonable to apply those estimated contributions of the hybrid features estimated using the Direct Method across broader groups of Class Vehicles.

### 10.3.   Hedonic Regression

87.     The value of the hybrid feature may be estimated using hedonic regression. Using a hedonic regression analysis, one can determine the amount paid for Class Vehicles beyond their gasoline counterparts while controlling for other features which may differentiate Class Vehicles from their gasoline counterparts beyond the inclusion of the hybrid feature. A hedonic regression analysis estimates the degree that hybrid features contribute to the prices of Class Vehicles by considering the degree to which consumers value the positive attributes associated with hybrid vehicles. This value can be estimated both at the start and end of the Idled Asset Period. The difference between these two values acts as a measure of the value that Class Members lost without safe participation in the hybrid attributes of the Class Vehicles.

88.     Regression analysis evaluates the tendency of variables to correlate with each other and provides frameworks for assessing the reliability of any observed correlation. Regression analysis can also be used to quantify trends within the observed correlation. As a statistical tool, regression analysis is commonly applied within economics generally and econometrics specifically.[32]

> Regression analysis is concerned with the study of the dependence of one variable, the dependent variable, on one or more other variables, the explanatory variables, with a view to estimating and/or predicting the (population) mean or average value

---

[32] Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in *The Reference Guide on Scientific Evidence*, 3rd ed. (Washington DC: National Academies Press, 2011).

of the former in terms of the known or fixed (in repeated sampling) values of the latter.[33]

89.     Below, I discuss certain observed correlations between variables according to concepts that are commonly applied within statistics and econometrics.[34] In general, these relate to how closely the variables correlate with each other, the direction of that correlation (positive or negative), the magnitude of that correlation, and some judgement of whether that correlation is meaningful or the result of chance. Standard tools and conventions exist to assess the results that the analysis yields.

90.     In most cases, regression analysis assumes that dependent and explanatory variables are unrelated or "independent" of each other. Generally, this beginning assumption, or "null hypothesis," holds unless sufficient evidence of dependence exists to reject the null hypothesis. In most cases, an analyst rejects the null hypothesis when the relationship observed is sufficiently strong such that a very low probability exists (five percent in many cases, by convention) that equally strong or stronger dependence could occur by chance. The p-value associated with a coefficient is, in practice, a test statistic used for this purpose; when a p-value is less than 0.05, the result is considered "significant" or "statistically significant."[35] When the analyst fails to reject the null hypothesis, the two variables are assumed to be independent of each other.[36]

91.     Hedonic regression models, also sometimes called hedonic pricing models, are quantitative tools used to estimate the effects that specific component parts of transactions have upon overall

---

[33] Damodar N. Gujarati and Dawn C. Porter, *Basic Econometrics*, 5th ed. (New York: McGraw-Hill Higher Education, 2009), 15.
[34] Gujarati and Porter, *Basic Econometrics*, 5th ed.
[35] While a p-value less than 0.05 is conventional in most economic matters, other commonly seen options include 0.1 and 0.01.
[36] This is not meant to imply that p = 0.05 is universal significance level, or that the p-value is the only way to test for statistical significance. For example, medical testing may apply a stricter standard. Moreover, observed correlation can be more or less likely to occur by chance, given that the p-value can take on any value between one and zero. See Gujarati and Porter, *Basic Econometrics*, 5th ed.

purchase prices. Hedonic regression models have been used in the automotive industry since the 1930s, when economist Andrew Court developed pricing models for the Automobile Manufacturers' Association in Detroit, Michigan.[37] Hedonic regression models assess variation across data sets, such as variation in price across many vehicles, and use standardized methods to determine the portion of the observed variation that correlates with other variables, such as brand name, horsepower, etc., and what portion of the variation is unexplained or random. When the regression model explains variation effectively, frameworks exist to determine whether that explanation of variation, or observed correlation, is strong enough to be considered statistically significant. The variation that a hedonic regression model seeks to explain is the amount that various product characteristics contribute to the overall price of the good or service in question.

92.     As a form of regression analysis, hedonic regression models are replicable and falsifiable. Just as is the case with other regression models, this means that parties can review the inputs to the regression analysis, test other assumptions, or modify the regression model to test the conclusions reached. Furthermore, analytical methods, like regression analysis, which rely upon established scientific techniques for determining statistical significance, error rates, and model selection criteria are, by design, transparent in their assumptions and suitable for testing alternative assumptions. Hedonic regression models are appropriate for testing consumer preferences for vehicle performance or marketing elements, such as acceleration, horsepower, or brand name. The final output of these models is an estimate of the effects that various product inputs have on the price of the overall product—in this case, the value of the hybrid attributes of the Class Vehicles.

93.     Data are available to execute the hedonic regression. Ward's Automotive, MSN Autos, and IseeCars are firms that publish vehicle characteristics for each new vehicle model in the United

---

[37] Allen Goodman, "Andrew Court and the Invention of Hedonic Price Analysis," *Journal of Urban Economics* 44, no. 2, (September 1998): 291-8.

States. Also, S&P Global publishes used vehicle registrations by series/trim level. These data can be combined with vehicle values from J.D. Power. By regressing vehicle values from J.D. Power against vehicle characteristics from Ward's Automotive or others, one can estimate the additional value provided by various vehicle characteristics, e.g., the hybrid feature.

94. I identify in **Tab 11** the types of variables that I am likely to consider in my analysis. I have presented and relied upon hedonic regression models in past matters. The data fields identified in the tab are those that I have found to have meaningful explanatory influence on vehicle price levels. However, it would be my intent to confirm the suitability of any variables considered in this matter.

95. In the used vehicle market, it is possible to apply weights to various values observed by including the volume of used vehicle sales that occurred during a given time period. **Tab 12** identifies by trim level the number of used model year 2017 and 2018 vehicle registrations deemed competitive with Chrysler vehicles that occurred in the US between February 2022 and February 2023. The data come from S&P Global.

96. Hedonic regression analysis of the type contemplated here requires extensive data licensing and cooperation with the vendor. While its methods and concepts, as well as the nature of the underlying data, can be explained readily here, a fulsome illustration, in my experience, generally occurs later in the discovery process because of the time and cost demands of the model.

**10.4. IDLED ASSET PERIOD METHODS SUMMARY**

97. It is my expectation that the Direct Method would provide reasonable and reliable estimates of the amount by which the hybrid features declined in value during the Idled Asset Period. It would also be reasonable to apply findings from the Direct Method more broadly in order to estimate the contributions of the hybrid feature when more differences exist between a Class Vehicle and its non-hybrid counterpart.

98.     The Derived Method would allow for the development of conservative estimates of the contribution of the hybrid features. In support of this method, I have asked Class Counsel to seek data from FCA that describe costs of various features that may differ across different Pacifica Models. Based on JD Power Data, no differences in selectable features indicate that the Derived Method would be necessary. In any case, the findings in **Tab 9** indicate the magnitude of any impact from non-valued features would be minimal.

99.     Lastly, hedonic regression analysis is an accepted method to estimate the contribution to price of various product features. I have used hedonic regression for the purpose of estimating the price contribution of automotive features in other matters. However, given the suitability of the Direct Method, the minimal sensitivity of estimates derived from the Direct Method, the availability of the Derived Method if determined to be necessary, the hedonic regression approach may not be necessary to execute, given the time and data licensing demands inherent it its use.

## 11.     DESCRIPTIONS OF APPLICATION AND ALLOCATION METHODS

100.    Under the liability assumptions provided and set forth herein, the cost of repair represents a reliable estimate of point of acquisition overpayment harm associated with the sale of a vehicle impaired by a reparable material defect. However, I understand that as a legal matter, multiple parties could both (i) participate in that overpayment harm and (ii) hold some standing to recover damages for that harm. Thus, it may be necessary to conform the vehicle-level estimates of overpayment harm, described here, to align with a class certification order or other order by the court. Below, I set forth potential methods for doing so.

### 11.1.     Allocation For Limitations or Among Multiple Owners

101.    Appendix B describes in some detail a proposed method to allocate the overpayment harm associated with a vehicle among multiple parties with economic interest in the vehicle (owners).

-38-

Additionally, **Tab 13** includes example calculations that illustrate the proposed method. The concepts underlying the proposed allocation method are not difficult. Essentially, I propose as one reasonable method of allocation to apportion the overall overpayment harm associated with the vehicle to the various parties with eligible interest in the vehicle based on their respective shares of consumption of the vehicle's value.

102.    Five data points are necessary to estimate a given owner's allocated share of overpayment:

(i)      Vehicle initial value;

Here, it is conservative and reliable to use the vehicle's invoice price. Invoice price is the amount that dealerships pay to manufacturers/OEMs to acquire vehicles, which dealerships eventually sell to end-using consumers. Since new vehicles typically sell for some amount higher than invoice price, it is somewhat conservative to use invoice price as the estimated initial vehicle value. However, differences between invoice prices and transaction prices are likely small, particularly as a percentage of the entire new vehicle price.[38] Moreover, this likely small percentage variation in prices is reduced again to relatively small percentages when allocating among owners, leaving any residual variation as a percentage of a percentage of a percentage of the vehicle's original price.

(ii)     Owner acquisition date;

This value is relevant for intermediate owners, e.g., second of three, rather than for original owners. In my experience, parties have gathered this information at the administration stage of a matter, either from self-reporting through the claims process, or from various registration information sources, such as Departments of Motor Vehicles or companies like S&P Global.

(iii)    Owner disposal date;

---

[38] For example, dealership gross profit margins on new vehicle sales averaged 3-6% for most of the 2010s. *See* NADA Average Dealership Profile, 2010-2019.

In my experience, parties have gathered this information at the administration stage of a matter, either from self-reporting through the claims process, or from various registration information sources, such as Departments of Motor Vehicles or companies like S&P Global. For current vehicle owners, no disposal date is necessary.

(iv)    Vehicle value at acquisition date;

This applies to subsequent vehicle owners. Here, I propose to estimate value at the vehicle's acquisition date using Clean Trade-In Value from J.D. Power. Clean Trade-In Value is the highest trade-in quality level, which results in the smallest difference between initial value and value at the acquisition date.

(v)    Vehicle value at disposal date;

This applies to original and subsequent vehicle owners. Here, I propose to estimate value at the vehicle's acquisition date using Clean Trade-In Value from J.D. Power. As stated above, Clean Trade-In Value results in the smallest difference between initial value and value at the acquisition date. The use of this value standard is generally conservative, because it may result in a lower estimate of the portion of the vehicle's value consumed, potentially resulting in a smaller share, all other things equal, of damages apportioned to claimants.

103.    Returning to **Tab 13**, I present illustrative calculations of damage allocation that follow the framework described earlier. A hypothetical claimant's share of damages is equal to the overpayment associated with the vehicle multiplied by the percentage of the vehicle's value consumed during the claimant's ownership of the vehicle.

### 11.1.1. Beginning or Termination of Damage Period

104.    As of the date of drafting, the court has not issued an order that certified any class, and I do not offer legal opinions regarding the appropriate definition of any class. However, an order

could, at least conceptually, limit the time period for which Class Members are eligible for some recovery to only a subset of the period of time that some or all Class Vehicles have been in operation. For example, FCA may issue a repair at some point in the future that remedies the Defect. Alternatively, a class certification order may require Class Members to have purchased their vehicles from franchised dealerships. The proposed allocation method described above could accommodate such a ruling.

105.    The method for doing so would be as set forth in the prior subsection. Essentially, if damages are determined to be unrecoverable for time periods outside of some date, the allocation method could simply treat the recovery-ineligible time period as an *ownership share*, where that ownership share is deemed unrecoverable. If, for example, that recovery-ineligible time period began on January 1, 2020, where some given vehicle's remaining value was 40% of its original value, then 40% of the damages for that vehicle would be excluded from eligible recovery.

106.    The information sources described in the prior subsection would support the allocation of damages, including a calculation whose effect was to limit the time period for eligible damage recovery. Calculations would be feasible to estimate on a Class-wide basis. While many individual vehicles make up a Class, those vehicles have common discrete characteristics, such as model year and series/trim level, which can be grouped, significantly reducing the number of calculations necessary for the Class. Other factors, like odometer reading or vehicle condition, that may differ for some given vehicles would likely have *de minimis* impact on aggregate allocation estimates. This is because data sources, like J.D. Power values, include information drawn from very large numbers of vehicles. For example, valuations have default mileage levels that are typical for vehicles of a given model and model year. Likewise, J.D. Power's valuation resources include both Average (typical across vehicles of a given age and model year) and Clean (the highest

condition quality level and an inherently conservative option). For Class-wide calculations, these typical or average values target the appropriate characteristics for estimates of average or overall damages or credits.

107.    As a broader economic point, allocating shares of overpayment recovery outside of the Class tends to be directionally beneficial to Defendant in many cases. This is because overpayment associated with the sale of a defective vehicle would not change, but factors outside of the original overpayment would prevent recovery of some of that overpayment.

### 11.1.2. Credit For Out-Of-Network Migration

108.    One specific case in which a damage period could terminate, at least conceptually, is upon sale of a vehicle to a subsequent owner where that sale occurs in a channel outside of the FCA dealer network, e.g., other brands' dealers or private party sales. If the court were to issue a class certification ruling limiting recovery in this fashion, it would be possible to estimate some portion of overall overpayment harm that could be allocated to owners deemed ineligible to recover and to do so on a Class-wide basis. In essence, this would estimate the aggregate amount of overpayment attributable to buyers who acquired Class Vehicles outside of the FCA dealer network and would amount to a credit to Defendant for out-of-network migration.

109.    Three data sources would be necessary to conduct this analysis. The first would be original sales of Class Vehicles.[39] The second would be data that identify the numbers and dates of first used vehicle sales of Class Vehicles where those sales occur through out-of-network channels. The third would be contemporaneous vehicle values, which I have discussed earlier. The objective would be to estimate the propensities of Class Vehicles to be sold outside of FCA dealer network

---

[39] It may be necessary to use a somewhat broader selection of original sales of Class Vehicles in order to conform subsequent (used vehicle) sales data to the new vehicle sales data.

channels at given ages and to match those propensities with the market values of those vehicles at the time of out-of-network ("OON") migration. I include a table of hypothetical values below, which illustrates the proposed calculations.

**Table 1: Illustration of Credit for OON Migration[40]**

| Vehicle Age | First OON Sales | Average Consumed /Remaining Portion of Original Market Value | Credit for OON Migration Assuming $5,000 Original Overpayment | Credit for OON Migration |
|---|---|---|---|---|
| 1 | 100 (1%) | 12% / 88% | $4,400 ($5,000*0.88) | $440,000 |
| 2 | 500 (5%) | 24% / 76% | $3,800 ($5,000*0.76) | $1,900,000 |
| 3 | 800 (8%) | 32% / 68% | $3,400 ($5,000*0.68) | $2,720,000 |
| 4 | 1,000 (10%) | 40% / 60% | $3,000 ($5,000*.60) | $3,000,000 |

110.     Data are available to conduct this analysis. The data source for OON migration is S&P Global, the successor (acquiring company) of The Polk Company and IHS Automotive. As discussed earlier, J.D. Power provides contemporaneous market value data. I briefly describe the expected OON migration data here.

111.     I have estimated OON migration propensities using customized data orders and through data queries executed by Fontana. S&P Global maintains data that document both original (new) vehicle sales and registrations as well as used vehicle registrations by location, model year, calendar year or month, and selling entity. FCA is known as a "participating" make, which enhances the reliability of selling entity or selling dealer data by way of the OEM's cooperation and data sharing.

112.     The used vehicle data include an indicator which identifies the first registrations of used vehicles in the resale market. By tracking first used registrations of Class Vehicles over time, this inherently identifies the portion of Class Vehicles that have never been sold and remain with first

---

[40] Assumed original new class vehicle sales = 10,000.

owners. Of those vehicles that first enter the resale market, some do so through sales by FCA network dealerships and some through other channels. As noted, the selling dealer data enable the estimation of the portion of these sales that did and did not occur through the FCA network.

113.    For a small portion of Class Vehicles, given that the earliest model year is 2017, multiple used vehicle sales may have occurred, i.e., some vehicles may be in the hands of third owners. For vehicles that have already migrated out of the FCA dealer network, this proportion of vehicles is not relevant to the calculations. However, it may be necessary to estimate the number of Class Vehicles that, within approximately 5-6 years or potentially less, had a first used vehicle sale through an FCA dealership and a subsequent used vehicle sale through another channel. To be clear, this calculation, if necessary, would apply to vehicles that were (a) approximately 5-6 years old at most, (b) not in the hands of the original owners, (c) not in the hands of the second owners, (d) not already identified in the data as previously migrated out of the FCA dealer network, and (e) not sold through FCA network dealers in subsequent sales, which the data identify. For those vehicles, I would expect to estimate the proportion of sales that occurred outside of the FCA dealer network by estimating from prior years' accumulated data the proportion of non-first used vehicle sales made outside the dealer network that were of Class Vehicles that had been in the hands of owners who acquired those vehicles from dealerships in the FCA network.

114.    I illustrate these calculations in **Tab 14**.[41] The illustrations presented there use an individual vehicle to demonstrate the effect of OON migration, though in practice the OON migration propensities would be calculated in aggregate as described above. Nonetheless, the illustrations are useful in demonstrating the principles behind the effect.

---

[41] Tab 15 and the next section of this Declaration describe a process to adjust resale values to account for abnormal market conditions.

### 11.1.3. Adjustment For Abnormal Resale Market Conditions

115.    Pandemic era conditions led to well-documented and unprecedented changes in the resale market.[42] Specifically, used vehicle prices reached abnormal levels in light of supply chain challenges and other factors. As a consequence, used vehicle prices over some time periods, particularly during 2021 and 2022, did not relate to corresponding original new vehicle prices in a manner that reflected the proportion of vehicle value that had been consumed, e.g., between 2018 and early 2022. However, high resale market prices attributable to external market conditions do not change the physical or technological proportion of a vehicle's useful life consumed over time. One way to address this is to apply a normalized schedule of resale market values to estimate the rate at which owners consume the value of their vehicles over time. In **Tab 15**, I include examples of market values over time of various model year 2017 and 2018 Chrysler Pacifica Hybrid vehicles, and ratios of how these values compare to the vehicles' original invoice prices. These pre-2021 ratios reflect normalized levels of the rate of consumption of vehicles' value over time.

### 11.2.   Money Factors

116.    I offer no opinion regarding the proper application of money factors to any estimates of economic harm. For example, it may be appropriate to present estimates of overpayment in contemporaneous (point of acquisition) dollar levels or to present those estimates in current dollars. Additionally, I understand that the application of money factors may be an issue addressed outside the presence of a jury or that multiple regimes regarding money factors may apply to various Class states. In any case, the application of money factors is a straightforward exercise. To this extent, I present a matrix of inflation adjustment factors in **Tab 16**. As can be seen on page

---

[42] See, e.g., "Inflation and the Auto Industry: When Will Car Prices Drop?" *J.P. Morgan Chase*, February 22, 2023, https://www.jpmorgan.com/insights/economy/economy/when-will-car-prices-drop.

two of **Tab 4**, application of the inflation adjustment factor is a simple matter and may be adjusted to whichever regime is deemed appropriate.

## 12.    SUMMARY OF FINDINGS

117.    Assuming that Plaintiffs' legal and factual allegations are proven to be correct, Class Members suffered economic harm at the point of acquisition as a result of the Defect. The repair cost model described above calculates a reliable and market-based estimate of the amount by which consumers overpaid for the Class Vehicles at the time of acquisition. To the extent that facts and legal principles support the application of a credit for the delivery of a competent repair at no expense to vehicle owners, I propose a method to calculate that credit. The value of the hybrid feature lost during the Idled Asset Period is measurable using the methods I consider herein.

## 13.    COMPENSATION

118.    For time spent working on this matter, the Plaintiff compensates my employer at the rate of $550 per hour. Travel time is subject to a 50% discount, while time spent in testimony is subject to a one-third premium. The Plaintiff compensates my employer at scheduled rates between $65 and $185 per hour for work performed by staff members.

## 14.    DATA & DOCUMENTS RELIED ON IN FORMING OPINIONS

119.    Reliance materials include those documents specifically referenced herein and those received from Class Counsel (see **Tab 17**), along with my education, training, and experience. **Tab 18** identifies materials that I have asked Class Counsel to seek from Defendants to assist in my analysis.

**15.    LIMITATIONS**

120.    This Declaration is intended for use only in this matter and is not to be used in any other proceedings.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: January 19, 2024

_Edward M. Stockton_

_____

Edward M. Stockton

## Quantification of Overpayment: Expected Utility and Indifference Curves

A prominent conceptual element of the overpayment model applied herein is its roots in expected utility theory.[1] Expected utility theory provides a model by which consumers assess in the present the value that a good or service will provide over its anticipated lifetime, whether that value is expressed as value in use or in its potential for resale. The consideration of these potential outcomes, described as *utility functions* or *expected utility functions*,[2] takes into account the expected lifetime of use or ownership of a product, the probabilities and timing of positive and negative potential outcomes, and the magnitude and direction of those potential outcomes.

**Figure 1**



---

[1] John Von Neumann and Oskar Morgenstern, *Theory of Games and Economic Behavior* (Princeton: Princeton University Press, 1953).

[2] Von Neuman and Morgenstern, *Theory of Games and Economic Behavior.*

In **Figure 1** above, each bar represents the value, assessed in the present, that the consumer expects the good to provide (i.e., its expected utility) in some future time period. Each value represented by a bar is a weighted average of possible outcomes (value provided), taking into account the expected probabilities that these outcomes will occur, and the risk introduced by the uncertain nature of each time period's outcome. This is not to say that consumers assess the future performance of durable goods with such clear sophistication. However, purchasing a good in the present based on that good's perceived ability to provide value in the future inherently requires consideration of the time horizon during which the good may provide value.

I note that the bars become smaller as time from the present increases. This is theoretically consistent. Also, in practice, vehicles deteriorate with use. Furthermore, since the value that the vehicle provides in the future is subject to some risk and uncertainty, the overall tendency of consumers is to discount the value of future performance for the risk that the expected performance level materializes.[3] While a certain amount of subjectivity applies to consumers' assessment of risk and the value that their assets may provide, I describe below the manner in which the overpayment model, quantified by cost of repair, addresses variation across individual consumers in order to provide an applicable common remedy across the Class.

Despite the subjective nature of expected utility schedules, the presence of a defect, if material, differentiates all expected utility schedules from those drawn from the baseline probabilities and expected value levels that would have existed absent the defect. The presence of a defect introduces the incremental probabilities of negative outcomes or reduction in the probabilities of positive outcomes, which lower the expected values of the benefits conveyed by the good in the future. Alternatively stated, a defect creates some non-zero probability of a negative

---

[3] Aswath Damodaran, *Strategic Risk Taking: A Framework for Risk Management* (New York: FT Press, 2008).

outcome or reduces the probability that the perceived most valuable outcomes will occur, mathematically lowering the good's expected value associated with each future time period. This leads to an incremental downward shift of the expected utility schedule, as displayed in **Figure 2** below. I depict the downward shift to the expected utility schedule by removing the top shading from each bar.

**Figure 2**



Expected utility theory expands on the well-known building block of decision theory known as the *indifference curve*.[4] An indifference curve represents the intersection of a discrete level of a consumer's perceived value or utility and the potential bundles of goods and services that would provide that level of value or utility to that consumer. For practical purposes, it is

---

[4] Browning and Browning, *Microeconomic Theory and Implications*, 2nd ed.

common to present the concept of indifference curves in two dimensions, where each dimension represents a quantity of a given good or service.

**Figure 3** below shows the hypothetical indifference curve associated with leisure activities, where the vertical axis represents the number of golf outings, and the horizontal axis represents the number of beach days. In this diagram, the consumer considers each combination of golf outings and beach days along the curve to be of equal value. In other words, the consumer is *indifferent* between any combination of leisure activities represented by the curve. These combinations include four golf outings and three beach days at point A, or ten golf outings and zero beach days at point B.[5]

<b>Figure 3</b>



---

[5] The indifference curves are not intended to depict scale or quantification of the scope of marginal rate of substitution.

Page 4 of 13

Indifference curves themselves do not establish the monetary value that a consumer assigns to a bundle of goods. Instead, they show a consumer's rank-order preferences for various bundles of goods. While it is not yet necessary to know the dollar value that the hypothetical consumer assigns to bundles of goods along a given indifference curve, it is necessary to consider the consumer's relative preferences for bundles of goods along one indifference curve versus the preferences for bundles of goods along a different indifference curve. These relative preferences form a central element of consumer choice theory, which is the relative preferability, or rank-ordering, of bundles of goods and services (which includes bundles with a single good or service).

**Figure 4** below displays this concept. It displays three discrete indifference curves, including the original curve, which is displayed as Curve I, and two more curves, Curve II and Curve III. To this diagram, I add levels of value or utility that consumers assign to the bundles of goods on each curve, where a higher number is preferable to a lower number. Given this convention, Curve I, which has an arbitrary value of six is preferable to Curve II, which has an arbitrary value of five. Curve I's value of six is the same for all points along Curve I, making it preferable to all points on Curve II, each of which has a value of five. All points along Curve III, with an assigned value of seven, are preferable to all points along Curve I and Curve II. In this illustration, and in practice generally, the indifference curves that are farther from the origin— farther to the right—represent higher-ranked bundles of goods or more preferable outcomes.

Figure 4



It is my understanding and experience that the standard for new vehicles sold in the United States is that they do not contain a material defect. This is not the same as an expectation that each vehicle delivered will be in perfect condition at the time of delivery. Rather, deviations from a defect-free standard are subject to remedy. An unrepaired material defect does not meet this standard and instead represents the insertion of an unexpected element in the transaction for Class Vehicles (for example, the injury introduced by the Defect, or alternatively the reduced value of Class Vehicle attributable to the absence of the repairs that mitigated the risk). Class Members who acquired the Class Vehicles did not merely acquire the Class Vehicles, they acquired bundles of goods that included the Class Vehicles and the Defect, the latter (negative) good unwittingly. The bundling of a negative characteristic—the Defect—with the Class Vehicles for which

consumers bargained makes the Class Vehicles, as delivered in a defective state, less valuable than its counterfactual vehicle—the non-defective Class Vehicle. It is possible to illustrate this point once more through indifference curves, which appear in **Figure 5**.

<strong>Figure 5</strong>



The figure above shows two indifference curves. The first, Curve I, includes as one bundle of goods (displaying only a single good, for simplicity), the Class Vehicle in a non-defective state. All other coordinates on Curve I represent hypothetical bundles of goods that are equal in perceived value but, for the moment, irrelevant to the analysis. Curve II includes the Class Vehicle in its defective state—as delivered. Curve II is to the left of Curve I, noting its less preferable outcome. The vehicle as represented, i.e., in a non-defective state, is represented by point A, while point B represents the Class Vehicle bundled with the Defect.

The difference in value between Curve I and Curve II is the increment introduced by the presence of the Defect, which is bundled with the Class Vehicle. In other words, it is the isolated overpayment attributable to the Defect at the point of purchase. Consequently, an action that removed the Defect, thereby returning the bundle of goods to only one item—the Class Vehicle in as-represented condition, or with the Defect fully mitigated—would cause the perceived values of the Class Vehicle and the counter-factual vehicle to align along Curve I.[6] This is the impact that the delivery of a competent repair immediately after the point of purchase would have on consumer outcomes. To illustrate this effect, I again rely upon consumer choice theory and indifference curves. While a competent repair would not have changed the fact that the vehicle was delivered in a defective state, the delivery of that repair would remove the impact of the Defect. In other words, the Class Vehicles as-delivered, if bundled with the competent repair, would become equivalent to the Class Vehicles in represented condition—the counter-factual vehicle.

---

[6] While consumers' preference for formerly defective, but repaired, vehicles may be degraded in relation to the defect, this illustration assumes that the introduction of a competent repair aligns the repaired vehicle with its counter-factual state. This also, in practice, may align with a standard by which the prompt delivery of a competent repair is assumed, in some cases, to terminate ongoing economic harm in relation to the defect.

Page 8 of 13

**Figure 6**



Figure 6 shows the same two curves as the prior figure. However, it adds a discrete bundle of goods to Curve I, where that bundle includes the Class Vehicle, the Defect, and the competent repair. Since this bundle of goods, represented by point C, resides upon the same indifference curve as point A, which includes only the Class Vehicle in represented condition, it is of equal value to the consumer—at least from the point of delivery forward. Curve II, which is lower-ranked than Curve I, includes the Class Vehicle in as-delivered condition.

The use of repair cost as a proxy for overpayment is that it calculates the market value of an action that would, at the time of purchase, return each consumer (provided certain conditions discussed later are met) to a position as good as that which would have existed had the Class Vehicles been delivered or promptly remedied to the represented Defect-free state. The mechanism

for doing so is to estimate the cost of an additional good, the competent repair, which could be bundled with the as-delivered Class Vehicles in order to make those vehicles as valuable as they would have been in as-represented condition. This cost, the cost of the competent repair, is the additional amount of money that would be necessary to add to the transaction, at the point of purchase that included only the Class Vehicle in as-delivered condition in order to make the consumer as well off as they would have been had the Class Vehicle been delivered in as-represented condition.

As expressed in **Figure 2**, the incremental shift to the expected utility schedule represents the incremental change in the present to the expected product performance in the future, where that incremental change is attributable to the defect. However, if the defect did not change expected future product performance, or if the incremental risk attributable to the defect were fully mitigated, then the expected utility schedule would revert to its baseline levels of expected performance, timing, and risk as shown as depicted in **Figure 7** below. To display this shift, I fill in the area in which the expected utility schedule shifted in response to the defect. This accounts for the delivery of an assumed competent repair, which eliminates incremental risk of negative performance changes from the defect and restores the expected utility schedule to its baseline level, along with the value of that schedule to consumers in the present. While expected utility schedules incorporate individual preferences, the delivery of a competent repair restores each individual expected utility schedule to the baseline levels that exist absent the defect.

Figure 7



The discussion of consumer choice theory and expected utility theory, as well as consideration of the baseline expectation that new vehicles are safe and materially free of defects, all illustrate a logical benchmark that restores consumers to the position they would have occupied absent overpayment from the defect. This is a position in which the affected vehicle is as valuable as a non-defective version of the same vehicle. The following derives the compensation necessary to restore consumers to that position.

Recall that the provision of a competent repair at the point of purchase restores consumers to the position they would have occupied absent the defect. Likewise, the absence of a competent repair reflects the degree to which the affected vehicles were less valuable at the point of purchase.

Page 11 of 13

One can conservatively determine the minimum amount of total negative utility attributable to the defect to be the hypothetical cost to the consumer of restoring the vehicle to its intended condition at the time of purchase or lease, were a fix available at that time. This is the amount of additional money that would have been necessary at the time of purchase to restore the terms of the transaction to its state that existed prior to the disclosure of the defect. Alternatively, the introduction of the defect to the as-represented affected vehicles creates the cost of repair as a necessary expenditure to return the affected vehicle to its as-represented state. Another way to explain this concept is that the repair cost represents the amount of money not spent by the seller where that expenditure would have been necessary to conform the affected vehicles to their negotiated conditions.

**Figure 8**



**Figure 8** illustrates this concept. This figure overlays the expected utility schedule of a vehicle that is expected to receive the competent repair after four periods without it. The first four periods reflect the incremental downward shift in expected utility because of the defect, whereas the expected utility values in subsequent periods are equivalent to their baseline levels after the delivery of the competent repair.

The expected utility schedule depicts the values that consumers place upon future expected performance of the good. In **Figure 8**, if the consumer assumed at the point of purchase that the competent repair would be provided at the end of period four, this would mean that the value assigned in the present to the good's expected future performance in periods one through four would be lower, whereas the value assigned in the present to periods five and later would reflect the full defect-free performance that the consumer perceived would exist, absent consideration for the risk that the repair would not be provided or would not be provided on-time. While simplified for illustrative purposes, another way to describe this concept is that the consumer would perceive in the present that the vehicle in periods one through four would be reduced in value by the defect, the provision of the competent repair at the end of period four, would be perceived in the present to restore the vehicle to its counter-factual expected value in periods five and onward.

## **Allocation of Damages**

On a class-wide basis, the proper aggregate overpayment amount is calculated at the vehicle level. However, if deemed necessary to do so, it is possible to allocate overpayment among multiple owners of a single vehicle using reliable, recognized, and feasible economic methods.

The method I propose to allocate overpayment damages is grounded in expected utility theory, described in Appendix A. To the extent that multiple interested parties claim damages on a given vehicle, it would be possible to estimate the portion of the vehicle's value consumed during each claimant's ownership or lease period by comparing market values at the beginning and end of each time period. Comparing the values at the beginning and end of ownership time periods to original value would yield the percentage of the vehicle's original value consumed during that time increment. While one could enhance the accuracy of the calculation of shares of a given award by seeking inputs on vehicle mileage at the time it traded hands, this would make little difference. The overpayment amount is likely a relatively small portion of the vehicle's original cost. If two parties claimed on the same vehicle, their shares would be percentages of percentages of the vehicle's original cost. While mileage inputs would provide somewhat more accuracy to the calculation, the result would be another slice of the many-times reduced award, relative to the vehicle's original price.

In my experience, I am aware of class action funds being distributed in two general ways. The first is a claims-made process in which stakeholders in a vehicle self-identify based on perceived eligibility for compensation. The second involves querying state records of registration histories associated with given VINs. Although I generally do not expect to participate in the execution of the allocation of any settlement or trial judgment proceeds, I note that reasonable methods exist to allocate proceeds among multiple claimants.

For multiple subsequent owners of a single vehicle, damage payments would be allocated based upon the share of the vehicle's value consumed based on each owner's or lessee's duration of ownership or lease. As noted in the prior paragraph, data regarding previous owners and their respective time of ownership over the vehicle are available without claimant input from state agencies and likely from data vendor S&P Global, which records and compiles registration data. It is my understanding that these data include names and addresses of previous owners.

The following simplified example of the foregoing is illustrative: if a hypothetical vehicle had an initial value of $30,000, and the first owner retained the vehicle until the time that its then-current value was $20,000, then the first owner would receive one-third of the damage payment. If the second owner acquired the vehicle at that time and sold it at a market value of $10,000, their share would also be one-third of the damage payment. The third owner, if current, would also receive a one-third share. The basis for this allocation is that the percentage of the vehicle's value consumed corresponds with the percentage of the value of the Defect in which each owner participated through ownership.

## Credit for Eventual Delivery of Competent Repair

I have been asked to assume that the presence of the Defect is common to all Class Vehicles. It follows that the Defect caused an overpayment of each Class Vehicle at the point of acquisition. However, the provision of a competent repair to any of the Class Vehicles would offer Class Members the opportunity to restore the values of their Class Vehicles to that which would have existed absent the Defect for the remaining portion of the vehicles' useful lives.

It is, thus, reasonable to credit Defendant with the restoration of the Class Vehicles' value for any instances in which a competent repair of the Defect was covered under warranty or recall. While Class Members' vehicles were less valuable because of the Defect prior to the provision of the competent repair, I assume that they will have normal value for the subsequent portion of their useful lives. I describe next the manner in which I account for the portions of the Class Vehicles' lives that are and are not subject to reduction in value.

Consider two hypothetical sets of circumstances. In the first, Defendant immediately applies the competent repair in very close proximity to the point of acquisition. Other than some inconvenience, the owner of the vehicle will then expect to receive value from the vehicle that is no longer differentiated by the Defect. In the alternative, Defendant offers the competent repair just as the vehicle enters the scrapyard, such that the overpayment has applied to all of the vehicle's functional life. In the first case, the net effect of the overpayment from the Defect is near zero; in the latter case, the net effect of the overpayment from the Defect is only negligibly offset by the provision of the competent repair.

This is a very manageable issue. Returning to the expected utility schedules displayed in the bar chart figures in the discussion of expected utility and indifference curves (Appendix A), the value that consumers place on durable goods that have been in service is based upon the value

that the goods are expected to provide for the portion of their lives that remains from that point forward. For example, a vehicle with an initial sale price of $50,000 when new that sells for $30,000 at some point in the future has value as assessed by the market equal to 60% of its remaining value.

I refer back to **Figure 8** in Appendix A to demonstrate this point visually. Assume that periods one through four correspond to a time period during which the consumer expects the vehicle's original value to depreciate by 40%. Equivalently, the consumer perceives that, after the end of period four, the Class Vehicle will provide another 60% of its original value. Since the Defect, when present, differentiates the Class Vehicle from its negotiated state at all times, the Defect reduces the value of the Class Vehicle in 40% of its life but no longer does so after period four, when the expected utility schedule associated with the Class Vehicle returns to normal for the remaining 60% of its life, which I measure as a function of the portion of the vehicle's original value that remains or is expected to remain at that time. Thus, 60% of the expected utility schedule (expected future value at the point of acquisition) is unchanged, whereas 40% is reduced by the Defect, when the vehicle is less valuable.

It is therefore logical to credit Defendant with the restoration of the vehicle's remaining value through the provision of a competent repair based on the portion of the vehicle's life, as assessed by its then-current market value as a percentage of its original value, at the time that the repair becomes available. By way of example, if as in the prior example, a vehicle that originally cost $50,000 has a market value of $30,000 at the time of the availability of the competent repair, then the vehicle's value is reduced by the repair cost for the 40% of its valuable life (($50,000-$30,000)/$50,000) and no longer reduced for the remaining 60% of its valuable life. Therefore, it is, in my opinion, reasonably accurate, although conservative, to apportion the overpayment as

determined by the repair cost model to the portion of the vehicle's life that is subject to the overpayment. By way of example, if the cost of a competent repair is $200, and Defendant provides a competent repair when the vehicle retains 60% of its original value, the net overpayment after the credit to Defendant would be $80 = $200 * 40% + $0 * 60% as the vehicle is lacking the $200 repair for 40% of its life and returned to its negotiated state (i.e., worth $0 less than represented) for the remaining 60% of its useful life. I describe this credit as conservative, since a consumer evaluating this prospective repair at the point of acquisition would discount its value. The $80 amount described above would be the amount of damages for this hypothetical vehicle, after the $120 is applied to the $200 overpayment.

The quantification of this credit on a Class-wide basis is manageable and reasonable. Motor vehicles are depreciating assets that are traded in relatively stable and well-studied markets. They are in a class of products called durable goods that are expected to provide value to owners over a period of time. My colleagues and I at Fontana have studied market values for literally millions of unique vehicles in the United States, Canada, and other countries. Abundant resources exist to do so.

Using data from the unique Vehicle Identification Number ("VIN") for each vehicle and market resources, such as data available from J.D. Power, it is possible to form reliable estimates of vehicle values at various points in the vehicles' life cycles. For example, J.D. Power publishes monthly estimates of vehicles' trade-in prices that can be matched to MSRP, or to a somewhat reduced figure that accounts for discounts that consumers receive at the point of acquisition, in order to estimate the vehicle's value in the resale market as a percentage of its original value. In this matter, data from service encounters during which consumers receive the competent repairs provide dates and odometer readings associated with those service encounters. This information

can be blended with the baseline J.D. Power value estimates in order to incorporate the impact of mileage on the vehicles' valuation, allowing for a refined estimation of resale market values.

Using this information, it is possible to estimate the portion of each vehicle's value that owners and lessees consumed during their tenure of ownership or lease. Using common and publicly available value resources, this would negate the need to acquire individual sale prices from consumers.

# EDWARD M. STOCKTON

## EDUCATION

University of Arizona, Tucson, AZ
M.S., Agriculture and Resource Economics (Applied Econometrics), 2010.
Western Michigan University, Kalamazoo, MI
B.A., Economics, 1998

## POSITIONS

The Fontana Group, Inc., Tucson, Arizona
*Vice President Economics Services: 2012 - present*
*Director of Economics Services: 2011 - 2012*
*Case Manager: 2005 - 2011*
*Senior Analyst: 2000 - 2005*
*Analyst: 1998 - 1999*
Old Ina Corporation Tucson, AZ
*Supervisor, Analyst, Manager: 1995 - 1998*

## RESEARCH AND CONSULTING EXPERIENCE

Mr. Stockton studies complex economic problems across multiple industries, including the retail automobile and other complex markets for durable goods. Additionally, he consults on matters involving conceptual foundations and calculation of economic harm. He has provided consultation for clients in numerous areas including:

• Retail automobile franchising, economics and marketing
• Economic impact of market malfunctions
• Allocation of new vehicles during shortages
• Franchise terminations and establishments
• Principles of customer satisfaction measurement
• Principles of sales performance measurement
• Financial forecasts and other analysis
• Applied econometrics
• Consumer credit markets
• Economic theory of competition and investment
• Competition in markets for durable, differentiated goods

Tab 1  Page 1

REPRESENTATIVE CLIENT ASSIGNMENTS

*Len Stoler, Inc. d/b/a Len Stoler Hyundai, v. Hyundai Motor America Corp. And Genesis Motor America LLC,* Glen Burnie, MD, 2024.

*Florida Automobile Dealers Association, v. Ford Motor Company,* Tallahassee, FL, 2024.

*W.N. Motors, Inc. d/b/a Coastal Nissan, v. Nissan North America, Inc.,* Norwell, MA, 2023.

*William Lessin and Carol Smalley, et al, on behalf of themselves and all others similarly situated, v. Ford Motor Company, a Delaware Corporation,* San Diego, CA, 2023.

*Universal Auto Group d/b/a Subaru of Glendale, a California Corporation, v. Subaru of America, Inc., a New Jersey Corporation,* Los Angeles, CA, 2023.
Provided deposition testimony.

*Marc Baus, Benjamin Bettelli, Richard Carter, David Flynn, Dana L. Herold, John P. Herold, Brian Janik, Judith Janik, Edward Rekemeyer, Thermon Stacy, Ronnie Swindell, Timothy Thuering, and John Wiley on behalf of themselves and all others similarly situated, v. Ford Motor Company,* Detroit, MI, 2023.

*Darling's d/b/a, Darling's Bangor Ford, and Darling's Brunswick Ford, LLC, v. Ford Motor Company, and Maine Automobile Dealers Association,* Bangor, ME, 2023.

*William D. Berluti, individually and directly, William D. Berluti, derivatively on behalf of 120 Universal Drive Associates, LLC, William D. Berluti, derivatively on behalf of R&W Real Estate, LLC, William D. Berluti, derivatively on behalf of Peterbilt of Connecticut, Inc., William D. Berluti, derivatively on behalf of REO Truck Rental, Inc., William D. Berluti, derivatively on behalf of Truck Center, Inc., v. Richard M. Berluti and Peterbilt of Massachusetts, LLC,* Old Saybrook, CT, 2023.
Provided deposition testimony.

*Robert Davis and Dr. Bruce Barton, on behalf of themselves and the Putative Class, v. BMW of North America, LLC, and Bayerische Motoren Werke Aktiengesellschaft T,* Newark, NJ, 2023.

*Airko, Inc. and Lisa Mae Jennings individually and on behalf of all other similarly situated, v. General Motors LLC,* Cleveland, OH, 2021.

*Dennis Vita and FXR Construction, Inc. individually and on behalf of all others similarly situated, v. General Motors LLC,* Brooklyn, NY, 2022.

Revised 1/12/2024

Tab 1  Page 2

*Tim Nauman, individually and on behalf of all others similarly situated, v. General Motors LLC, a Delaware limited liability company,* Seattle, WA, 2022.

*Roger Heater, individually and on behalf of all others similarly situated, v. General Motors LLC,* Clarksburg, WV, 2022.

*Roy White, individually and on behalf of all others similarly situated, v. General Motors LLC,* Denver, CO, 2022.

*Dominguez Hurry and Terry Wasdin, individually and on behalf of all others similarly situated, v. General Motors LLC,* Opelika, AL, 2023.

*Robert Awalt, individually and on behalf of all others similarly situated, v. General Motors LLC,* Boston, MA, 2023.

*Robert Riddell, individually and on behalf of all others similarly situated, v. General Motors LLC,* St. Louis, MO, 2023.

*Lucid Group USA, Inc., v. Monique Johnston, in Her Official Capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicle; Daniel Avitia, in His Official Capacity as Executive Director of the Texas Department of Motor Vehicles; and Corrie Thompson, in Her Official Capacity as Director of the Enforcement Division of the Texas Department of Motor Vehicles*, Austin, TX, 2023.

*Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Products Liability Litigation,* Encino, CA, 2023.

*Volkswagen Group Diesel Efficiency Foundation v. Volkswagen Aktiengesellschaft,* Utrecht, NL, 2023.

*Volkswagen Group Diesel Efficiency Stichting v. Volkswagen Aktiengesellschaft,* Groningen, NL, 2023.

*Aaron Gant, et al. v. Ford Motor Company,* Orlando, FL, 2023-2024.
Provided deposition testimony.

*Juliet Murphy, et al., v. Toyota Motor Corporation, et al.,* Sherman, TX, 2023.

*Cowin Equipment Company, Inc., v. CNH Industrial America LLC and Scott Moore,* Birmingham, AL, 2023.
Provided deposition testimony.

3

*Hyundai Subaru of Nashville, Inc. d/b/a Downtown Hyundai v. Hyundai Motor America, Inc.,* Nashville, TN, 2023.
Provided hearing testimony.

*Rusnak/Pasadena, a California Corporation v. Jaguar Land Rover North America, LLC,* Las Angeles, CA, 2023.
Provided deposition testimony.

*Shakopee Chevrolet, Inc., v. General Motors, LLC,* Shakopee, MN, 2023.

*CJ's Road to Lemans Corp dba Audi Fresno, a California Corporation, v. Volkswagen Group of America, Inc., a New Jersey Corporation, dba Audi of America, Inc.,* Fresno, CA, 2023.

*Ranbir Gujral and Danielle Emerson, on behalf of themselves and the Putative Class, v. BMW Of North America, LLC, and Bayerische Motoren Werke Aktiengesellschaft,* Cherry Hill, NJ, 2023.
Provided deposition testimony.

*Action Nissan, Inc. D/b/a Universal Hyundai for Itself and in the Name of the Department of Highway Safety and Motor Vehicle of the State of Florida, for its Use and Benefit v. Hyundai Motor America and Genesis Motor America, LLC,* Orlando, FL, 2023.
Provided deposition testimony.

*Al Piemonte Ford, Inc., at al v. Ford Motor Company,* Chicago, IL, 2023.
Provided deposition testimony and hearing testimony.

*Wasko Automotive, Inc. D/b/a St. Marys Chrysler Dodge Jeep Ram Fiat, Spitzer, v. FCA US LLC,* St. Marys, PA, 2023.

*Yandery Sanchez, Louise Knudson, Andrea Reiher-Odom, Derrick Smith, Amber Witt, and Mark Treston, on behalf of themselves and all others similarly situated, v. Kia Motors America, Inc.,* Central District of CA, 2023.
Provided deposition testimony.

*Larson Motors, Inc. v. General Motors LLC, et al.* Seattle, WA, 2023.
Provided deposition testimony.

*Kpauto, LLC, dba Putnam Ford of San Mateo v. Ford Motor Company,* Los Angelas, CA, 2023.
Provided hearing testimony.

*Durwin Hampton, individually and on behalf of all others similarly situated v. General Motors LLC,* Poteau, OK, 2023.

Revised 1/12/2024

Tab 1  Page 4

*Estate of William D. Pilgrim, et al., on behalf of themselves and all others similarly situated v. General Motors, LLC,* Detroit, MI, 2022-2023.
Provided deposition testimony.

*Hyundai Motor America Corporation v. EFN West Palm Motor Sales, LLC (Defendant/Counterclaim Plaintiff/Third-Party Plaintiff ) Gene Khaytin; Ernesto Revuelta; Edward W. Napleton; Geovanny Pelayo, Jorge Ruiz (Defendants), EFN West Palm Motor Sales, LLC; For Itself and in the Name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its Use and Benefit (Counterclaim-Plaintiff/Third-Party Plaintiff) v. Hyundai Motor America Corporation (Counterclaim-defendant) And Hyundai Motor Company (Third-party Defendant),* West Palm Beach, FL, 2021-2023.
Provided deposition and trial testimony.

*Sloan/Siqueiros, et al. v. General Motors LLC,* San Francisco, CA, 2019-2022.
Provided deposition and trial testimony.

*Spitzer Autoworld Akron, LLC, v. Fred Martin Motor Company,* Akron, OH, 2022-.
Provided deposition and trial testimony.

*Hyundai Motor American Corporation v. North American Automotive Services, Inc. Et al,* West Palm Beach, FL, 2021-2023.

*Jason Nuwer, Mark Minkowitz, Amarillis Gineris, Christina Vigoa, and Kevin Van Allen v. FCA US LLC f/k/a Chrysler Group LLC*, Miami, FL, 2021-2022.
Provided deposition testimony.

*Chapman, et al, v. General Motors, LLC.*, Detroit, MI, 2021-2023.
Provided deposition testimony.

*In Re: Duramax Diesel Litigation, Relating to: Nancy Anderton, et al., v. General Motors LLC, et al.*, Detroit, MI, 2020-2022.
Provided deposition testimony.

*Fox Hills Auto, Inc. D/b/a Airport Marina Ford v. Ford Motor Company, Central Ford Automotive, Inc., dba Central Ford v. Ford Motor Company and Los Feliz Ford, Inc., dba Star Ford Lincoln v. Ford Motor Company*, Los Angeles, CA, 2021-2022.
Provided deposition testimony.

*West Palm Beach Acquisitions, Inc. d/b/a Greenway Kia West Palm Beach and Florida Department of Highway Safety & Motor Vehicles, v. Kia Motors America, Inc.*, West Palm Beach, FL, 2020-2022.
Provided deposition testimony.

Revised 1/12/2024

Tab 1  Page 5

*Kenneth John Williams and Another Applicants v. Toyota Motor Corporation Australia Limited*, New South Wales, Australia, 2020-2022.
Provided trial testimony.

*Gabriel Patlan, Ryan Cornell, and La Della Levy, on behalf of themselves and all others similarly situated v. BMW of North America LLC; Wendy Vazquez, on behalf of herself and all individuals similarly situated v. BMW of North America, LLC; Vikkie Wilkinson, on Behalf of Herself and the Putative Class, v. BMW of North America, LLC and Bayersiche Motoren Werke Aktiengesellschaft*, Trenton, NJ. 2020-2023.
Provided deposition testimony.

*Peterson Motorcars, LLC et al v. BMW of North America, LLC*, Louisville, KY, 2019-2021.
Provided deposition testimony.

*James Bledsoe, Paul Chouffet, Martin Rivas, Jeremy Perdue, Michael Erben, Martin Witberg, Marty Ward, Alan Strange, James Forshaw, Matt Langworthy, Natalie Beight, Jordan Hougo, Dawn Roberts, and Marc Ganz, on Behalf of Themselves and All Others Similarly Situated, v FCA US LLC, a Delaware Corporation, and Cummins Inc., an Indiana Corporation*, Detroit, MI, 2021.
Provided deposition testimony.

*Ricardo R. Garcia, et al. v. Volkswagen Group of America, Inc., et al.*, Alexandria, VA, 2020-2022.
Provided deposition testimony.

*Paul Weidman, et al., v Ford Motor Company*, Detroit, MI, 2020-2022.
Provided deposition testimony.

*Milind Desai v. Geico Casualty Company*, Cleveland, OH, 2020-2021.
Provided deposition testimony.

*Eric Stevens, Christopher L. Rodriguez, Michael S. Frakes, Terry Pennell, Ray Moore, Kent Larry Bakken, Lynn E. Kirkpatrick, and Michael E. Stone v. Ford Motor Company.* Corpus Christi, TX, 2021-2022.
Provided deposition testimony.

*In the matter of  Luxury Cars of Bayside, Inc., v. BMW of North America, LLC,*  Long Island, NY, 2019-2022.
Provided hearing testimony.

Revised 1/12/2024

Tab 1  Page 6

*Clarence Simmons, Franklin Navas, Jorge Arroyave, Joseph Dabbs, Jennifer DeWitt, Anne Erdman, Mark James, Shand Jackson, Mike Tierney, Mark Van Bus Kirk, John Buczynski, Ilja Lopatik, Brian Yarborough, William MacSaveny, Ryan Marshall, Allyson Rogers, Peter Tulenko, and Greg Licktenberg, on behalf of themselves and all others similarly situated v. Ford Motor Company*, Miami, FL, 2021.
Provided deposition testimony.

*Kimberley Carter and Keith Halliday v. Ford Motor Company of Canada, Ltd., Ford Credit Canada Limited and Ford Motor Company,* Toronto, Canada, 2020-2022.
Provided cross-examination testimony.

*Braman Motors, Inc., d/b/a Braman BMW, for Itself and in the Name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its Use and Benefit, and Palm Beach Imports, Inc., d/b/a Braman Motorcars, for Itself and in the Name of the Department of Highway Safety and Motor Vehicles of The State of Florida, for its Use and Benefit, and The Department of Highway Safety and Motor Vehicles of the State of Florida, for the Use and Benefit of Braman Motors, Inc. and Palm Beach Imports, Inc. v. BMW of North America, LLC*. Miami, FL, 2021.
Provided deposition testimony.

*Gina Signor, Individually and on Behalf of All Those Similarly Situated v. Safeco Insurance Company of Illinois*, Ft. Lauderdale, FL, 2020-2021.
Provided deposition testimony.

*Between Barry Rebuck and Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited Proceeding under the Class Proceedings Act, 1992*, Toronto, Ontario, Canada, 2018-2020.
Provided cross-examination testimony.

*In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation Nemet v. Volkswagen Group of America, Inc.*, San Francisco, CA, 2019-2020.
Provided deposition testimony.

*William South, Individually and on Behalf of All Those Similarly Situated v. Progressive Select Insurance Company,* Tampa, FL, 2020-2021.
Provided deposition testimony.

*Biljana Capic v. Ford Motor Company of Australia Limited*, New South Wales, Australia, 2019-2020.
Provided trial testimony.

Revised 1/12/2024

Tab 1  Page 7

*Jason Counts, Donald Klein, Oscar Zamora, Derek Long, Bassam Hirmiz, Jason Silveus, John Miskelly, Thomas Hayduk, Christopher Hemberger, Individually and on Behalf of All Others Similarly Situated, v. General Motors, LLC, Robert Bosch GMBH, and Robert Bosch, LLC,* Detroit, MI, 2019-2023.
Provided deposition testimony.

*Alfredo's Foreign Cars, Inc., d/b/a Larchmont Chrysler Jeep Dodge v. FCA US LLC*, NY, NY 2019.
Provided hearing testimony.

*George Tershakovec, et al. v. Ford Motor Company,* Miami, FL, 2019-2022.
Provided deposition testimony.

*Continental Imports Inc.  d/b/a Mercedes Benz of Austin v Swickard Austin, LLC d/b/a Mercedes Benz of South Austin,* Austin, TX, 2019-2020.
Provided deposition and hearing testimony.

*Vista Ford Oxnard, LLC., d/b/a Vista Ford Lincoln of Oxnard v. Ford Motor Company and Ford of Ventura, Inc., d/b/a Ford of Ventura, Intervenor*, Oxnard, CA, 2019.
Provided deposition and hearing testimony.

*Colonial Chevrolet Co., Inc., et al.; Alley's of Kingsport, Inc., et al.; and Union Dodge, Inc., et al. v. The United States*, Washington, DC, 2011-2019.
Provided deposition and trial testimony.

*Barber Group, Inc., d/b/a Barber Honda v. American Honda Motor Co., Inc., Galpinsfield Automotive, LLC, Intervenor.* Bakersfield, CA, 2018-2021.
Provided deposition and hearing testimony.

*Association of Equipment Manufacturers, AGCO Corporation, CNH Industrial America LLC, Deere & Company, and Kubota Tractor Corporation, v. the Hon. Doug Burgum, Governor of the State of North Dakota, in His Official Capacity, and the Hon. Wayne Stenehjem, Attorney General of the State of North Dakota, in His Official Capacity, and North Dakota Implement Dealers Association, Intervenor-Defendant*, Bismarck, ND, 2018.
Provided deposition testimony.

*Napleton's Arlington Heights Motors, Inc. f/k/a Napleton's Palatine Motors, Inc. d/b/a Napleton's Arlington Heights Chrysler Dodge Jeep RAM, an Illinois Corporation; et. al, v FCA US LLC*, Chicago, IL, 2017-2019.
Provided deposition and hearing testimony.

Revised 1/12/2024

Tab 1  Page 8

*Star Houston, Inc. d/b/a Star Motor Cars v. Volvo Cars of North America, LLC,* Houston, TX, 2017-2020.
Provided deposition and hearing testimony.

*Sioux City Truck Sales, Inc. v. Peterbilt Motors Company*, Sioux City, IA, 2017.
Provided deposition and hearing testimony.

*Capitol Buick GMC, LLC v. General Motors LLC, Baltimore, MD,* 2017-2018.
Provided deposition and hearing testimony.

*Crown Chrysler Jeep, Inc. d/b/a Crown Kia v. Kia Motors America*, Columbus, OH, 2017-2018
Provided deposition and hearing testimony.

*Folsom Chevrolet, Inc. dba Folsom Chevrolet v. General Motors, LLC*, Folsom, CA, 2017-2018.
Provided deposition and hearing testimony.

*Sunnyvale Automotive Inc., dba Sunnyvale Ford Lincoln v. Ford Motor Company*, Sunnyvale, CA, 2017.
Provided deposition testimony.

*Omar Vargas, Robert Bertone, Michelle Harris, and Sharon Heberling, individually and on behalf of a class of similarly situated individuals v. Ford Motor Company*, Los Angeles, CA, 2017-2020.

*Charles Johnson, et al. individually and on behalf of all others similarly situated v. Ford Motor Company,* Huntington, WV, 2017.
Provided deposition testimony.

*Shawn Panacci v. Volkswagen Aktiengesellschaft, Volkswagen Group Canada, Inc., Audi Aktiengesellschaft, VW Credit Canada, Inc. and Audi Canada,* Toronto, Ontario, Canada, 2017.

*Rebecca Romeo and Joe Romeo v. Ford Motor Company and Ford Motor Company Canada, Limited,* Toronto, Ontario, Canada, 2017-2019.
Provided cross-examination testimony.

*Duncan McDonald v. Samsung Electronics Canada, Inc.* Toronto, Ontario, Canada, 2017.
Provided cross-examination testimony.

*The Estate of Richard C. Poe, Richard C. Poe II v. Paul O Sergent, Jr., et al.,* El Paso, TX, 2017-2018. Provided deposition testimony.

*Star Houston, Inc. d/b/a Star Motor Cars v. VCWH. LLC d/b/a Volvo Cars West Houston and Volvo Cars of North America, LLC,* Houston, TX, 2017.
Provided deposition testimony.

*Option Consommateurs et Francois GrondinPersonne Désignée C. Volkswagen Group Canada Inc. et al.(2L),* Montreal, Quebec, 2016-2018.

*Option Consommateurs et Francois GrondinPersonne Désignée C. Volkswagen Group Canada Inc. et al. (3L),* Montreal, Quebec, 2017-2018.

*John M. McIntosh v. Takata Corporation, TK Holdings, Toyota Motor Corporation, Toyota Motor Manufacturing, Canada Inc., and Toyota Motor Manufacturing Indiana, Inc.,* Toronto, Ontario Canada, 2017.

*Rick A. Des-Rosiers and Stephen Kominar v. Takata Corporation, TK Holdings, Honda Motor Co., LTD, Honda of America Manufacturing, Inc., and Honda Canada, Toronto,* Ontario, Canada 2017.

*Yogesh Kalra v. Mercedes-Benz Canada Inc., Daimler AG, Mercedes-Benz USA LLC and Mercedes-Benz Financial Services Canada Corporation*, Toronto, ON, Canada, 2017-2022.
Provided cross-examination (deposition) testimony.

*Lake Forest Sports Cars, LTD v. Aston Martin Lagonda of North America, Inc.,* Chicago, IL, 2017.
Provided deposition testimony.

*Shahriar Jabbari and Kaylee Heffelfinger on behalf of themselves and all others similarly situated v. Fargo Company and Wells Fargo Bank, N.A.* San Francisco, CA, 2016-2021.

*Matthew Robert Quenneville et al. v. Volkswagen Group Canada, Inc.,Volkswagen Aktiengesellschaft, Volkswagen Group of America, Inc., Audi Canada, Audi Aktiengesellschaft, Audi of America, Inc., Inc., and VW Credit Canada, Inc. (2L),* Ontario, Canada, 2016-2021.

*Matthew Robert Quenneville et al. v. Volkswagen Group Canada, Inc.,Volkswagen Aktiengesellschaft, Volkswagen Group of America, Inc., Audi Canada, Audi Aktiengesellschaft, Audi of America, Inc., Inc., and VW Credit Canada, Inc. (3L),* Ontario, Canada, 2017-2018.

*Fort Collins Nissan, Inc. d/b/a Tynan's Kia, v. Kia Motors America, Inc.*, Ft. Collins, CO, 2015-2018.
Provided deposition testimony.

*In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation, Napleton et al v. Volkswagen Group of America et al., No. 16-02086*, 2015-2019.

Above including *J. Bertolet, Inc. et al v. Robert Bosch, LLC and Robert Bosch GmbH.*, MDL No. 02672-CRB (JSC), 2016-2019.
Provided deposition testimony 8/2019.

*Northwest Hills Chrysler Jeep, LLC; Gengras Chrysler Dodge Jeep, LLC; Crowley Jeep Dodge, Inc.; Papa's Dodge, Inc. v. FCA US, LLC and Mitchell Dodge, Inc.,* Canton, CT, 2015-2017.
Provided deposition and hearing testimony.

*VMDT Partnership, LP, v. Thornbury Township,* Delaware County, Pennsylvania, 2015-2017.
Provided hearing testimony.

*John Deere Construction & Forestry Company v. Rudd Equipment Company, Inc.*, Houston, TX, 2015-2017.
Provided hearing testimony.

*Ball Automotive Group d/b/a Ball Kia, v. Kia Motors America, Inc.*, San Diego, CA, 2015-2017.
Provided deposition testimony.

*GB Auto Corporation d/b/a Frisco Kia, v. Corinth Automotive Plano, d/b/a Central Kia of Plano, Kia Motors America, Inc. Intervenor*, Dallas, TX, 2015-2017.
Provided deposition testimony.

*Walter  Enterprises, Inc., d/b/a Timmons Subaru v. Subaru of America, Inc.*, Long Beach, CA, 2016-2017.
Provided deposition testimony.

*Motor Werks Partners, LP, v. General Motors, LLC*, Chicago, IL, 2015-2017.
Provided deposition testimony.

*Jeff Looper et al., v. FCA US LLC, f/k/a Chrysler Group, LLC, et al.,* California and Texas, 2015-2016.
Provided deposition testimony.

*In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation,* San Francisco, CA*, 2015-2017.*

*Dependable Dodge, Inc. v. Fiat Chrysler Automobiles, Inc.*, Canoga Park, CA, 2015-2017.
Provided deposition and hearing testimony.

*Wayzata Nissan, LLC v. Nissan North America, Inc., et al.,* Wayzata, MN, 2015-2017.
Provided pre-filed trial testimony.

*Glick Nissan, Inc. v. Nissan North America, Inc.,* Westborough, MA, 2015-2016.

Revised 1/12/2024

Tab 1  Page 11

*Volvo Construction Equipment North America, LLC v. Clyde/West, Inc.,* Spokane, WA, 2015.

*General Motors, LLC v. Hall Chevrolet LLC dba Hall Chevrolet,* Virginia Beach, VA, 2015-2016.

*Long Beach Motors, Inc. dba Long Beach Honda v American Honda Motor Co., Inc.,* Long Beach, CA, 2015.

*Tom Matson Dodge Inc. v. FCA US LLC.,* Seattle, WA, 2015.

*Ferrari of Atlanta*, Atlanta, GA 2015.

*Grossinger Autoplex, Inc. v. General Motors, LLC*, Chicago, IL, 2015-2016.
Provided deposition and hearing testimony.

*Mathew Enterprise, Inc. v. Chrysler Group LLC*, San Jose, CA, 2015-2016.
Provided deposition and trial testimony.

*Navistar v. New Baltimore Garage*, Warrenton, VA, 2015-2016.
Provided hearing testimony.

*Mathew Enterprise, Inc., a California Corporation, and Mathew Zaheri, an individual v. Chrysler Group, LLC, a Delaware Liability Company; Chrysler Group Realty Company, LLC, a Delaware Limited Liability Company, and DOES 1-40*, San Jose, CA 2014-2015.
Provided trial and deposition testimony.

*CNH America, LLC n/k/a CNH Industrial America, LLC v. Quinlan's Equipment, Inc.,* Racine, WI, 2014-2015.
Provided deposition testimony.

*Grayson Hyundai, LLC and Twin City Hyundai, Inc., v. Hyundai Motor America*, Knoxville, TN, 2014-2015.
Provided deposition testimony.

*TrueCar, Inc. v. Sonic Automotive, Inc., and Sonic Divisional Operations, LLC, Los Angeles, CA*, 2015-2016.
Provided deposition testimony.

*TECC, Complainant v. GM Respondent before the California New Motor Vehicle Board,* Oakland, CA, 2014-15.

*US District Court Southern District of NY in re General Motors LLC Ignition Switch Litigation,* NY, NY, 2014-2018.

Revised 1/12/2024

Tab 1  Page 12

*Feldten, LLC, d/b/a Tennyson Chevrolet v. Keith Lang, Lang Auto Sales, Inc.,Gordon Chevrolet, Inc.,Stewart Management Group, Inc., Scott Rama, Susan Ianni, and Mike Meszaros, and Gordon Chevrolet, Inc.& Stewart Management Group, Inc.* Detroit, MI, 2014-2016.

*Canadian Toyota Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation,* 2014.

*Jim Hardman, Buick GMC*, Gainesville, GA, 2014-2016.

*Bates Nissan, Inc., v. Nissan North America Inc.,* Killeen, TX, October 2014-2017.
Provided deposition and hearing testimony.

*Recovery Racing, LLC d/b/a Maserati of Fort Lauderdale v. Maserati North America, Inc., and Rick Case Weston, LLC, d/b/a Rick Case Maserati*, Ft. Lauderdale, FL, 2014-2015.
Provided hearing testimony.

*Sweeten Truck Center, L.C. v. Volvo Trucks North America, a Division of Volvo Group North America, LLC*, Before the Texas Department of Motor Vehicles Motor Vehicle Division, Austin, TX, 2014-2015.
Provided deposition and hearing testimony.

Beck Chevrolet Co, Inc. v. General Motors LLC, New York, NY 2014-2016.
Provided trial testimony.

*BSAG Inc., and Bob Stallings Nissan of Baytown, Inc. v. Baytown Nissan, Inc., Burklein Family Limited Partnership, Nissan North America, Inc., and Frederick W. Burklein*, Harris County, TX 2014.
Provided deposition testimony.

*Richard C.B. Juca v. Larry H. Miller Corporation*, Peoria, AZ, 2014.

*General Motors, LLC v. Leep Chev, LLC, d/b/a Lujack's Chevrolet,* Scott County, IA. 2014-2015
Provided deposition testimony.

*Century Motors Corporation v. Chrysler Group, LLC et al.*, Wentzville, MO 2014-2015.
Provided deposition and trial testimony.

*Keyes European, LLC v. Encino Mercedes, LLC, Steve Zubieta, David Floodquist, Shimon Broshinsky and Does 1-20*, Los Angeles, CA, 2014.

*Ohio Auto Dealers Association*, 2014.

*Transteck, Inc. d/b/a Freightliner of Harrisburg v. Daimler Trucks North America, LLC (Freightliner Trucks Division)*, Harrisburg, PA, 2014-2015.

*Butler Toyota et al v. Toyota Motor Sales*, Indianapolis, IN, 2014.

*Wayzata Nissan, LLC v. Nissan North America, Inc., et al.,* Wayzata, MN, 2013-2017.

*Santa Cruz Nissan, Inc., dba Santa Cruz Nissan v. Nissan North America, Inc.*, Santa Cruz, CA 2013-2015.
Provided deposition and hearing testimony.

*Majid Salim v. Henry Khachaturian aka Hank Torian, Torian Holdings, Fremont Automobile Dealership, LLC., and Does 1-20,* Alameda County, CA, 2013-2014.
Provided deposition and trial testimony.

*GMAC v. Lloyd Belt, Lloyd Belt GM Center, Inc., and Lloyd Belt Chrysler, Inc.,* Eldon, MO 2013-2014.
Provided deposition testimony.

*General Motors v. Englewood Auto Group, LLC,* Englewood, NJ, 2012-2014.

*Bob Wade Autoworld v. Ford Motor Company*, Harrisonburg, VA, 2011-2012.
Provided hearing testimony.

*Van Wie Chevrolet, Inc. d/b/a Evans Chevrolet v. General Motors LLC and Sharon Chevrolet, Inc.,* Baldwinsville, NY, 2012-2017.
Provided deposition testimony.

*Midcon Compression L.L.C. v. Loving County Appraisal District,* Loving County, TX, 2013.
Provided deposition testimony.

*Texas Automobile Dealers Association,* Austin, TX, 2013.
Provided hearing testimony before Business and Industry Committee in Texas H.O.R.

*Tyler Automotive,* Niles, MI, 2013.
*Sutton Suzuki,* Matteson, IL 2013.

*Carson Toyota/Scion, Cabe Toyota/Scion, Norwalk Toyota/Scion and South Bay Toyota/Scion v. Toyota Motor Sales, U.S.A., Inc.,* Long Beach, CA, 2012-2013.
Provided deposition and hearing testimony.

*James T. Stone, individually, and on Behalf of JDJS Auto Center, Inc. v. Jacob A. DeKoker, Pro Financial, Inc., and JDJS Auto Center, Inc.,* Tyler, TX, 2012.

*New Country Automotive Group,* Saratoga Springs, NY, 2013-2017.

*Goold Patterson*, Las Vegas, NV, 2012.

*James Rist v. Denise Mueting and the Dominican Sisters of Peace*, Littleton, CO, 2012-2013.
*Law Office of Gary E. Veazey*, Memphis, TN, 2012.

*Randy Reed Nissan,* 2012.

*Arent Fox, LLP,* 2012.
*Chrysler Group, LLC v. Sowell Automotive, Inc. et al.*, 2012-2013.

*Morrie's European Car Sales, Inc. dba Morrie's Cadillac-Saab v. General Motors, LLC*,
Minneapolis, MN, 2012-2015.
Provided deposition testimony.

*Dulles Motorcars, Inc. d/b/a Dulles Subaru v. Subaru of America,* Leesburg, VA, 2012-2013.
Provided hearing testimony.

*Bowser Cadillac, LLC v. General Motors, LLC v. Rohrich Cadillac, Inc.,* McMurray, PA, 2012-.
Provided hearing testimony.

*In Re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Expert
Report of Products Liability Litigation,* Santa Ana, CA, 2010-2013.

*Planet Subaru, John P Morrill, and Jeffrey R. Morrill v. Subaru of New England,* Hanover, MA,
2011-2012.

*Hill Nissan v. Jenkins Nissan*, Winterhaven, FL, 2011-2012.

*Burns & Levinson,* Boston, MA 2011-.

*Brydon, Sweringen & England*, 2011.

*Napleton Automotive Group,* Chicago, IL, 2011.

*Orloff Imports,* Chicago, IL, 2011.

*Boas International Motors, dba San Francisco Honda,* San Francisco, CA, 2011-2012.

*Carson CJ, LLC and Kenneth Phillips v. Sonic Automotive, Inc., Sonic-Carson F, Inc, Avalon
Ford, Inc. dba Don Kott Chrysler Jeep, and Does 1 - 100,* Los Angeles, CA, 2010-2012.
Provided deposition and hearing testimony.

*First United, Inc. A California Corporation dba De La Fuente Cadillac v. General Motors,
Greiner Poway, Inc. and Does 1-50,* San Diego, CA, 2012.

15

*Ionia Automotive Management, LLC and Beverly Kelly v. Berger Motor Sales, Ned Berger, Jr, LC and Ned Berger Jr.*, Mason, MI, 2012-2013.

*Riverside Motorcycle, Inc. dba Skip Fordyce Harley-Davidson v. Harley-Davidson Motor Company,* Riverside, CA, 2011- 2012.
Provided deposition and hearing testimony.

*Leep Hyu, LLC, an Iowa Corporation also known as Lujack Hyundai v. Hyundai Motors America, Green Family Hyundai Inc., and Green Family Holdings LLC*, Davenport, Iowa, 2011.
Provided trial testimony.

*Royal Motor Sales,* San Francisco, CA, 2011-2012.

*Miller Baroness,* Los Angeles, CA, 2011.

*Brotherhood of Maintenance of Way Employee Division/IBT*, Washington, DC, 2011-.

*Star Houston, Inc., d/b/a Star Motor Cars v. Mercedes-Benz USA, LLC*, Houston, TX, 2010-2013.
Provided deposition testimony and hearing testimony.

*Chapman's Las Vegas Dodge, LLC and Prestige Chrysler Jeep Dodge, LLC v. Chrysler Group LLC,* Las Vegas, NV, 2011- 2012.
Provided deposition and hearing testimony.

*Laidlaw's Harley-Davidson Sales, Inc. dba Laidlaw's Harley-Davidson v. Harley-Davidson Motor Company,* Sacramento, CA, 2011- 2012.
Provided deposition and hearing testimony.

*Agrillo v. Martinez,* Tucson, AZ, 2011.

*Hyundai of Milford, LLC, d/b/a Key Hyundai v. Hyundai Motor America*, Milford, CT, 2011.

*Houston Mack Sales & Service d/b/a Houston Isuzu Truck, Inc. v. Hayes Leasing Company, Inc. d/b/a Hayes UD Trucks-Houston*, Houston, TX, 2011-2012.

*Bo Beuckmann Ford*, Ellisville, MO, 2011-2022.

*Boas International Motors dba San Francisco Honda v. American Honda Motor Co.*, San Francisco, CA, 2011.

*Life Quality BMW*, Brooklyn, NY, 2011-2012.

16

Revised 1/12/2024

Tab 1  Page 16

*Forrester Lincoln Mercury v. Ford Motor Company*, Chambersburg, PA, 2011-2013. Provided hearing testimony.

*North Palm Motors, LLC d/b/a Napleton's North Palm Lincoln Mercury v. Ford Motor Company*, West Palm Beach, FL, 2011.

*Mega RV Corp. v. Mike Thompson Recreational Vehicles*, Irvine, CA, 2010-2014. Provided deposition testimony.

*Harry W. Zanville, Esq.,* San Diego, CA, 2010-.

*Pond, Athey, Athey & Pond,* Front Royal, VA, 2010-2014.

*Daphne Automotive, LLC dba Eastern Shore Toyota and Shawn Esfahani v. Pensacola Motor Sales d/b/a Bob Tyler Toyota and Fred Keener,* Mobile, AL, 2010-2011.

*Gebhardt v. PCNA*, Boulder, CO, 2011.

*Laura Buick-GMC*, Collinsville, IL, 2011.

*Bredemann Family of Dealerships*, Park Ridge, IL, 2011.

*Transteck, Inc. d/b/a Freightliner of Harrisburg,* 2004-

*Bass Sox Mercer,* Tallahassee, FL, 2011-.

*The Collection*, Coral Gables, FL, 2011-2012.

*Manning, Leaver, Bruder & Berberich,* Los Angeles, CA, 2010-2012.

*Magic City Ford v. Ford Motor Company*, Roanoke, VA, 2010-2011.

*Bob Wade AutoWorld v. Ford Motor Company*, Harrisonburg, VA, 2010-2011.

*East West Lincoln Mercury*, Landover Hills, MD, 2010-2011.

*Stevens Love,* Longview, TX, 2010-2014.

*JP Chevrolet*, Peru, IL, 2010-2011.

*Bellavia & Gentile*, Mineola, NY, 2010-2011.

*Hayes Leasing v. Wiesner Commercial Truck Center*, Houston, TX, 2010.

Revised 1/12/2024

Tab 1  Page 17

*Link-Belt Construction Equipment Company v. Road Machinery & Supplies Co.*, Minneapolis, MN, 2010-2011.
Provided deposition testimony.

*Elliott Equipment Co., Inc. v. Navistar, Inc.*, Easton, Maryland, 2010.
Provided deposition testimony.

*Rally Auto Group, Inc. v. General Motors, LLC,* Palmdale, CA, 2010.
Provided hearing testimony.

*Ron Westphal Chevrolet v. General Motors, LLC,* Aurora, CO, 2010.

*Edmark Auto, Inc., v. General Motors, LLC,* Nampa, ID, 2010.

*Gurley-Leep Dodge, Inc. n/k/a Gurley Leep Dodge, LLC v. Chrysler Group, LLC,* Mishawaka, IN, 2010.

*Gurley-Leep Buick v. General Motors, LLC,* Mishawaka, IN, 2010.

*Leep Chev, LLC, v. General Motors, LLC,* South Bend, IN, 2010.

*Mike Finnin Motors, Inc., v. Chrysler Group LLC*, Dubuque, IA, 2010.
Provided hearing testimony.

*Sedars Motor Co., Inc. and Community Motors of Mason City, Inc. v. General Motors LLC,* Cedar Falls, IA, 2010.

*Burke, Warren, MacKay & Serritella, P.C.,* Chicago, IL, 2010-.

*First Family, Inc. d/b/a Bredemann Chevrolet v. General Motors, LLC,* Park Ridge, IL, 2010.

*Lou Bachrodt Chevrolet Co. d/b/a Lou Bachrodt Jeep v. Chrysler Group, LLC,* Rockford, IL, 2010.
Provided hearing testimony.

*Cape County Auto Park I, Inc. v. Chrysler Group, LLC,* Cape Girardeau, MO, 2010.
Provided hearing testimony.

*Fury Dodge, LLC v. Chrysler Group, LLC,* Lake Elmo, MN, 2010.
Provided hearing testimony.

*Midtown Motors, Inc., d/b/a John Howard Motors v. Chrysler Group LLC,* Morgantown, WV, 2010.
Provided hearing testimony.

Revised 1/12/2024

Tab 1  Page 18

*Deur Speet Motors, Inc. v. General Motors, LLC,* Fremont, MI, 2010.

*Village Chevrolet-Buick-Oldsmobile, Inc. v. General Motors LLC,* Carthage, MO, 2010.

*Arenson & Maas,* Cedar Rapids, IA, 2010-.

*Nyemaster, Goode, West, Hansell & O'Brien, PC,* Des Moines, IA, 2010-2013.

*C. Basil Ford, Inc. v. Ford Motor Company*, Buffalo, NY, 2010.

*Leonard, Street & Deinard,* Minneapolis, MN, 2010-2015.

*Dady & Gardner,* Minneapolis, MN, 2010.

*Star Houston, Inc., d/b/a Star Motor Cars v. Mercedes-Benz USA, LLC*, Houston, TX, 2009 - 2015.

*Mente Chevrolet Oldsmobile, Inc., F/K/A Mente Chevrolet, Inc. T/A Mente Chevrolet and Mente Chrysler Dodge, Inc. and Donald M. Mente v. GMAC,* Kutztown, PA, 2009-2011.

*Long-Lewis, Inc. v. Sterling Truck Corporation*, Besemer, AL, 2009-2011.

*Gossett Motor Cars, LLC v. Hyundai Motor America and Homer Skelton Auto Sales, LLC,* Memphis, TN, 2009-2010.

*In re: CHRYSLER LLC, et al. v. Debtors, Chapter 11,* New York, NY, 2009.

*Cooper and Walinski, LPA,* 2009.

*Jennings Motor Company, Inc., d/b/a Springfield Toyota v. Toyota Motor Sales USA, Inc.,* Springfield, VA, 2008-2010.

*General Motors v. Harry Brown's and (counterclaim) Harry Brown's and Faribault v. General Motors*, Faribault, MN, 2008.
Provided declaration.

*Nick Alexander Imports v. BMW of North America*, Beverly Hills, CA, 2008.

*Monroeville Chrysler v. DaimlerChrysler Motors Company*, Pittsburgh, PA, 2008.
*Bowser Cadillac, LLC v. General Motors Corporation and Saab Cars USA, Inc.,* Pittsburgh, PA, 2008-2009.

*Carlsen Subaru v. Subaru of America, Inc.,* San Francisco, CA, 2008.
Provided deposition and hearing testimony.

*Suburban Dodge of Berwyn, Inc., and Lepetomane XXII, Inc., v. DaimlerChrysler Motors Company, LLC and DaimlerChrysler Financial Services Americas LLC,* Chicago, IL, 2007-2008.
Provided deposition testimony.

*Wiggin & Nourie, P.A.,* Manchester, NH, 2007-2008.

*McCall-T LTD., a Texas limited partnership d/b/a Sterling McCall Toyota & Sterling McCall Scion, et al. v. Gulf States Toyota, Inc., McCall- T LTD., et al. v. Madison Lee Oden et al.,* Houston, TX, 2007-2009.

*Volkswagen of America, Inc., and Aristocrat Volkswagen East, Inc. v. Royal Automotive, Inc., d/b/a Royal Volkswagen,* Orlando, FL, 2007-2008.

*Ed Schmidt Pontiac-GMC Truck, Inc. v. DaimlerChrysler Motors Company, LLC*, Perrysburg, OH, 2006-2009.

*Fowler Motors, Inc. v. BMW of North America, LLC,* Conway, SC, 2006-2008.

*Serpa Automotive Group, Inc. v. Volkswagen of America, Inc.,* Visalia, CA, 2006.
Provided deposition and hearing testimony.

*Serra Chevrolet, Inc. d/b/a Serra Kia v. Kia Motors America, Inc., et al.,* Birmingham, AL, 2006-2009.

*Cardenas Enterprises, Inc., d/b/a Cardenas Toyota BMW v. Gulf States Toyota, Inc. and Toyota Motor Sales, USA, Inc.*, Harlingen, TX, 2006.

*North Avenue Auto, Inc., d/b/a Grand Honda v. American Honda Motor Co., Inc. a California Corporation,* Chicago, IL, 2006-2009.

*Saleen, Inc.,* Irvine, CA, 2006-2009.

*Golden Ears Chrysler Dodge Jeep,* Maple Ridge, BC, 2007-2009.

*Action Nissan, Inc. v. Nissan North America, Inc.,* Nyack, NY, 2005-2007.

*Harbor Truck Sales and Services, Inc. d/b/a Baltimore Freightliner v. DaimlerChrysler Motors Company, LLC,* Baltimore, MD, 2005-2007.

*PH Automotive Holding Corporation, d/b/a Pacific Honda, Cush Automotive Group, d/b/a Cush Honda San Diego, Tipton Enterprises, Inc., d/b/a Tipton Honda, Ball Automotive Group, d/b/a Ball Honda v. American Honda Motor Co., Inc.,* San Diego, CA, 2005-2007.
*Rusing & Lopez,* Tucson, AZ, 2005.

20

*Sonic Automotive, Inc. v. Rene R. Isip, Jr.; RRIJR Auto Group, Ltd., d/b/a Rene Isip Toyota of Lewisville, and John Eagle,* Lewisville, TX, 2005.

*Competitive Engineering, Inc. v. Honeywell International, Inc.,* Tucson, AZ, 2005.
*Century Motors Corporation v. DaimlerChrysler Motors Company, LLC.,* St. Louis, MO, 2005.

*Lone Star Truck Group,* Albuquerque, NM, 2005-2006.

*Thomas Bus Gulf Coast, Inc.*, Houston, TX, 2005.

*Stoops Freightliner*, Indianapolis, IN, 2005-2006.

*Cameron, Worley, Forham, P.C.,* Nashville, TN, 2004-2005.

*Around The Clock Freightliner Group, Inc.,* Oklahoma City, OK, 2004-2006.

*Alamo Freightliner,* San Antonio, TX, 2004-2005.

*GKG Motors, Inc. d/b/a Suzuki of San Antonio v. Cantwell Fielder, Ltd. d/b/a Quality Suzuki and American Suzuki Motor Corporation,* San Antonio, TX, 2004-2007.

*Maple Shade Motor Corporation v. Kia Motors America, Inc.,* Turnersville, NJ, 2004-2006.

*Star Houston, Inc. d/b/a Star Motor Cars, Inc. v. Mercedes-Benz-USA, LLC*, Austin, TX, 2004-2006.

*Perez Investments, Inc. d/b/a Rick Perez Autonet v. DaimlerChrysler Financial, L.L.C. d/b/a Chrysler Financial, L.L.C.; DaimlerChrysler Motors Corporation*, Austin, TX, 2004.

*Mazda Motors of America v. Maple Shade Motor Corporation, d/b/a Maple Shade Mazda et al.,* Maple Shade, NJ, 2004.

*Wickstrom Chevrolet-Pontiac-Buick-GMC. v. General Motors Corporation, Chevrolet Division*, Austin, TX, 2004.

*Sea Coast Chevrolet - Oldsmobile, Inc*. Belmar, NJ, 2004.

*Steve Taub, Inc. d/b/a Taub Audi v. Audi Of America, Inc.,* Santa Monica, CA, 2003.

*Toledo Mack Sales and Service, Inc. v. Mack Truck, Inc.,* Columbus, OH, 2003.

*Bayshore Ford Truck Sales, Inc., et al. v. Ford Motor Company,* New Castle, DE, 2003-2013.

Revised 1/12/2024

Tab 1  Page 21

*Maritime Ventures, LLC; Maritime Motors, Inc. v. City of Norwalk; Norwalk Redevelopment Agency*, Norwalk, CT, 2003.

*Cox Nuclear Pharmacy, Inc. and Accuscan, LLC v. CTI Molecular Imaging, Inc.*, Mobile, AL, 2002-2004.

*Mazda Motor of America, Inc. v. David J. Phillips Buick-Pontiac, Inc.,* Orange County, CA, 2002- 2003.

*Kimnach Ford*, Norfolk, VA, 2002-2008.

*Brown & Brown Chevrolet v. General Motors,* Phoenix, AZ, 2002.

*New Country Toyota,* Durango, CO, 2002-2003.

*ALCO Cadillac-Pontiac Sales, Inc. v. General Motors Corp. et al,* Englewood Cliffs, NJ, 2001-2003.

*Al Serra Chevrolet, Inc. v. General Motors Corp.,* Flint, MI, 2001.

*Bayou Ford Truck Sales, Inc. d/b/a Bayou City Ford-Sterling v. Sterling Truck Corp.,* Houston, TX, 2001-2002.

*Fred Lavery Company et al. v. Nissan North America, Inc., et al.,* Birmingham, MI, 2000-2002.

*Tamaroff Buick and Sunshine Automotive, Inc. v. American Honda,* Detroit, MI, 2000-2006.

*Applegate Chevrolet, Inc. v. General Motors Corporation* Flint, MI, 2000-2001.

*Anchorage Chrysler Center, Inc. v. DaimlerChrysler Motors Corporation,* Anchorage, AK, 2000-2003.

*Ford Motor Company v. Pollock Motor Co., Inc. f/k/a Pollock Ford Co., Inc., v. Ford Motor Credit,* Gadsden, AL, 1999-2001.

*Suzuki Motor Corporation Japan v. Consumers Union of United States, Inc.,* Orange County, CA, 1999.

*Arata Motor Sales v. American Honda Motor Co., et al.,* Burlingame, CA, 1999.

*Star Motor Cars v. Mercedes-Benz of North America, Inc.,* Houston, TX, 1998-1999.

*Dispatch Management Services Corp., in Aero Special Delivery, Inc. v. United States of America,* San Francisco, CA, 1999-2003 (est).

22

*Arnold Lincoln Mercury v. Ford Motor Co.,* Detroit, MI, 1999-2000.

*Landmark Chevrolet Corporation v. General Motors Corporation et al,* Houston, TX, 1998-2002.

*Ford Dealers of Greater Toronto,* Toronto, ONT, Canada 1998-2003.

*Volkswagen of America, Inc., et al. v. Pompano Imports, Inc., d.b.a. Vista Motor Company,* Pompano Beach, FL, 1998-1999.


PUBLICATIONS

Mark M. Leitner, Joseph S. Goode, and Ted Stockton, "Franchise and Dealership Litigation Damages" in *The Comprehensive Guide to Economic Damages*, ed. Nancy Fannon and Jonathan Dunnitz, 6th Edition, Business Valuation Resources, 2020.

Joseph S. Goode, Mark M. Leitner, and Ted Stockton, "Franchise and Dealership Litigation Damages" in *The Comprehensive Guide to Economic Damages*, ed. Jonathan Dunnitz and Nancy Fannon, 5th Edition, Business Valuation Resources, 2018.

"Understanding Sales Performance Measurements: How Average Became the New Minimum," *Dealer Law Review*, Issue 14.3, Winter 2014, pp. 1-2.

*White Paper: Customer Satisfaction Measurement,* co-authored with Dr. Ernest H. Manuel, Jr., 2012.

*White Paper: Generalized Retail Sales Effectiveness* [restricted distribution]*,* co-authored with Dr. Ernest H. Manuel, Jr., 2012.

*Time Inspection Study Report of the Brotherhood of Maintenance of Way Employee Division/IBT (BMWED)*, Submitted to The Committee on Transportation and Infrastructure of the House of Representatives and The Committee on Commerce, Science, and Transportation of the Senate, 2011.

*White Paper: Customer Satisfaction,* co-authored with Dr. Ernest H. Manuel, Jr., 2010.

*White Paper: Sales Effectiveness (RSI and MSR): Flaws in Manufacturers' Measurement of Dealers' Sales Performance,* co-authored with Dr. Ernest H. Manuel, Jr., 2010.


OTHER

Revised 1/12/2024

Tab 1  Page 23

*Developments in Sales Metrics*, presentation to AutoCPA Group, Sun Valley, Idaho, October 1, 2018.

*Conditional Margin, Tiered Margins, Market Stratification, and Project Pinnacle*, presentation to National Association of Dealer Counsel, with Harry Zanville, April 25, 2017.

*Business Cycles and Fraud,* presentation to AutoCPA Group, September 23, 2016.

*Trends in Franchise Economics and a Theory of Dealer Investment,* presented to CPA group, Oklahoma City, OK, 2014.

"Sales expectations vs Sales Expectations," presentation to AutoCPA Group, 2013.

Testimony before the Texas House of Representatives on behalf of the Texas Automobile Dealers Association regarding public policy issue related to franchise law, April 9, 2013.

"Navigating the Post-Slump Environment," presentation to Chief Financial Officers Group, Palm Springs, CA, April 2012.

"How Dealers Can Protect Themselves" presentation to AutoCPA Group, 2011.

Minnesota Auto Dealers, issues related to General Motors and Chrysler bankruptcies and dealer arbitrations, 2010.

Arizona Electric Power Cooperative, hourly load forecasting using econometric estimation, 2006.

24

**Cases in which Mr. Stockton gave deposition, hearing
or trial testimony during the past four years**

*William Lessin and Carol Smalley, et al, on behalf of themselves and all others similarly
situated, v. Ford Motor Company, a Delaware Corporation,* San Diego, CA.
Provided deposition testimony 12/2023.

*Universal Auto Group d/b/a Subaru of Glendale, a California corporation, v. Subaru of
America, Inc., a New Jersey corporation,* (State of California New Motor Vehicle Board)
Provided deposition testimony 12/2023.

*William D. Berluti, individually and directly, William D. Berluti, derivatively on behalf of 120
Universal Drive Associates, LLC, William D. Berluti, derivatively on behalf of R&W Real Estate,
LLC, William D. Berluti, derivatively on behalf of REO Truck Rental, Inc, William D. Berluti,
derivatively on behalf of Truck Center, Inc.; v. Richard M. Berluti and Peterbilt of
Massachussets, LLC,* (American Arbitration Association)
Provided hearing testimony 11/2023.

*Kpauto, LLC, dba Putnam Ford of San Mateo v. Ford Motor Company,* (The State of California
New Motor vehicle Board)
Provided hearing testimony 9/2023.

*Aaron Gant, et al. v. Ford Motor Company,* (United States District Court Eastern District of
Michigan Southern Division)
Provided deposition testimony 8/2023.

*Ranbir Gujral and Danielle Emerson, on behalf of themselves and the Putative Class, v. BMW
Of North America, LLC, and Bayerische Motoren Werke Aktiengesellschaft,* (United States
District Court For The District of New Jersey)
Provided deposition testimony 8/2023.

*Cowin Equipment Company, Inc., v. CNH Industrial America LLC and Scott Moore,* (In the
Circuit Court For Jefferson County, Alabama)
Provided deposition testimony 7/2023.

*Hyundai Subaru of Nashville, Inc. d/b/a Downtown Hyundai v. Hyundai Motor America, Inc.,*
(Before the Tennessee Motor Vehicle Commission)
Provided hearing testimony 7/2023.

*Rusnak/Pasadena, a California Corporation v. Jaguar Land Rover North America, LLC,* (United
States District Court Central District of California)
Provided deposition testimony 5/2023.

Tab 2  Page 1

*Action Nissan, Inc. d/b/a Universal Hyundai for Itself and in the Name of the Department of Highway Safety and Motor Vehicle of the State of Florida, for its Use and Benefit v. Hyundai Motor America and Genesis Motor America, LLC,* (United States District Court Middle District of Florida Orlando Division)
Provided deposition testimony 4/2023.

*Al Piemonte Ford, Inc., et al. v. Ford Motor Company,* (State of Illinois Motor Vehicle Review Board)
Provided deposition testimony 4/2023 and hearing testimony 7/2023.

*Yandery Sanchez, Louise Knudson, Andrea Reiher-Odom, Derrick Smith, Amber Witt, and Mark Treston, on behalf of themselves and all others similarly situated, v. Kia Motors America, Inc.,* (United States District Court Central District of California)
Provided deposition testimony 3/2023.

*Larson Motors, Inc v. General Motors LLC, et al.* (United States District Court Western District of Washington at Seattle)
Provided deposition testimony 2/2023.

*Estate of William D. Pilgrim, et al., on behalf of themselves and all others similarly situated v. General Motors, LLC,* (United States District Court Eastern District of Michigan)
Provided deposition testimony 2/2023.

*Hyundai Motor America Corporation v. EFN West Palm Motor Sales, LLC (Defendant/Counterclaim Plaintiff/Third-Party Plaintiff ) Gene Khaytin; Ernesto Revuelta; Edward W. Napleton; Geovanny Pelayo, Jorge Ruiz (Defendants), EFN West Palm Motor Sales, LLC; For Itself and in the Name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its Use and Benefit (Counterclaim-Plaintiff/Third-Party Plaintiff) v. Hyundai Motor America Corporation (Counterclaim-defendant) And Hyundai Motor Company (Third-party Defendant)* (United States District Court for the Southern District of Florida West Palm Beach Division)
Provided deposition testimony 10/2022 and trial testimony 1/2023.

*Sloan/Siqueiros, et al. v. General Motors LLC*, (United States District Court Northern District of California San Francisco Division)
Provided deposition testimony 10/2019 and trial testimony 9/2022.

*EFN West Palm Motor Sales, LLC d/b/a Napleton's West Palm Beach Hyundai, North Palm Hyundai, LLC d/b/a Napleton's North Palm Hyundai, and the Florida Department of Highway Safety and Motor Vehicles v. Hyundai Motor America Corporation*, (United States District Court for the Southern District of Florida West Palm Beach Division)
Provided deposition testimony 8/2022.

Revised 12/27/2023

Tab 2  Page 2

*Spitzer Autoworld Akron, LLC, v. Fred Martin Motor Company,* (Court of Common Pleas, Summit County, OH)
Provided deposition testimony 7/2022 and trial testimony 8/2022.

*Vivian Arevalo and Micah Simon v. USAA Casualty Insurance Company and Garrison Property & Casualty Insurance Company,* (District Court of Bexar County, TX)
Provided deposition testimony 6/2022.

*Jason Nuwer, Mark Minkowitz, Amarillis Gineris, Christina Vigoa, and Kevin Van Allen v. FCA US LLC f/k/a Chrysler Group LLC,* (United States District Court, Southern District of Florida)
Provided deposition testimony 5/2022.

*Chapman, et al, v. General Motors, LLC.,* (United States District Court for the Eastern District of Michigan)
Provided deposition testimony. 4/2022.

*James Bledsoe, et al, v. FCA US LLC, and Cummins Inc.,* (United States District Court for the Eastern District of Michigan)
Provided deposition testimony 1/2022.

*In Re: Duramax Diesel Litigation, Relating to: Nancy Anderton, et al., v. General Motors LLC, et al.,* (United States District Court for the Eastern District of Michigan)
Provided deposition testimony 1/2022.

*Fox Hills Auto, Inc. D/b/a Airport Marina Ford v. Ford Motor Company, Central Ford Automotive, Inc., dba Central Ford v. Ford Motor Company and Los Feliz Ford, Inc., dba Star Ford Lincoln  v. Ford Motor Company,* (State of California New Motor Vehicle Board)
Provided deposition testimony 12/2021.

*West Palm Beach Acquisitions, Inc. d/b/a Greenway Kia West Palm Beach and Florida Department of Highway Safety & Motor Vehicles, v. Kia Motors America, Inc.,* (United States District Court Southern District of Florida West Palm Beach Division)
Provided deposition testimony 12/2021.

*Kenneth John Williams and Another Applicants v. Toyota Motor Corporation Australia Limited,* (Federal Court of Australia District Registry: New South Wales Division: General)
Provided trial testimony 12/2021.

*Gabriel Patlan, Ryan Cornell, and La Della Levy, on behalf of themselves and all others similarly situated v. BMW of North America LLC; Wendy Vazquez, on behalf of herself and all individuals similarly situated v. BMW of North America, LLC; Vikkie Wilkinson, on Behalf of Herself and the Putative Class, v. BMW of North America, LLC and Bayersiche Motoren Werke Aktiengesellschaft,* (United States District Court for the District of New Jersey)
Provided deposition testimony 11/2021.

Revised 12/27/2023

Tab 2  Page 3

*Peterson Motorcars, LLC et al v. BMW of North America, LLC*, (United States District Court Western District of Kentucky Louisville Division)
Provided deposition testimony 9/2021.

*James Bledsoe, Paul Chouffet, Martin Rivas, Jeremy Perdue, Michael Erben, Martin Witberg, Marty Ward, Alan Strange, James Forshaw, Matt Langworthy, Natalie Beight, Jordan Hougo, Dawn Roberts, and Marc Ganz, on Behalf of Themselves and All Others Similarly Situated, v FCA US LLC, a Delaware Corporation, and Cummins Inc., an Indiana Corporation*, (U.S. District Court for the Eastern District of Michigan )
Provided deposition testimony 9/2021.

*Ricardo R. Garcia, et al. v. Volkswagen Group of America, Inc., et al.*, (United States District Court for the Eastern District of Virginia Alexandria Division)
Provided deposition testimony 9/2021.

*Paul Weidman, et al., v Ford Motor Company*, (U. S. District Court Eastern District of Michigan Southern Division)
Provided deposition testimony 5/2021.

*Milind Desai v. Geico Casualty Company*, (U.S. District Court Northern District of Ohio Eastern Division)
Provided deposition testimony 5/2021.

*Eric Stevens, Christopher L. Rodriguez, Michael S. Frakes, Terry Pennell, Ray Moore, Kent Larry Bakken, Lynn E. Kirkpatrick, and Michael E. Stone v. Ford Motor Company.* (United States District Court Southern District of Texas, Corpus Christi Division)
Provided deposition testimony 4/2021.

*In the matter of  Luxury Cars of Bayside, Inc., v. BMW of North America, LLC*  (State of New York Department of Motor Vehicles Safety and Business Hearing Bureau)
Provided hearing testimony 4/2021.

*Clarence Simmons, Franklin Navas, Jorge Arroyave, Joseph Dabbs, Jennifer DeWitt, Anne Erdman, Mark James, Shand Jackson, Mike Tierney, Mark Van Bus Kirk, John Buczynski, Ilja Lopatik, Brian Yarborough, William MacSaveny, Ryan Marshall, Allyson Rogers, Peter Tulenko, and Greg Licktenberg, on behalf of themselves and all others similarly situated v. Ford Motor Company* (United States District Court Southern District of Florida)
Provided deposition testimony 3/2021.

*Kimberley Carter and Keith Halliday v. Ford Motor Company of Canada, Ltd., Ford Credit Canada Limited and Ford Motor Company* (Ontario Superior Court Justice)
Provided cross-examination testimony 3/2021.

Revised 12/27/2023

Tab 2  Page 4

*Braman Motors, Inc., d/b/a Braman BMW, for Itself and in the Name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its Use and Benefit, and Palm Beach Imports, Inc., d/b/a Braman Motorcars, for Itself and in the Name of the Department of Highway Safety and Motor Vehicles of The State of Florida, for its Use and Benefit, and The Department of Highway Safety and Motor Vehicles of the State of Florida, for the Use and Benefit of Braman Motors, Inc. and Palm Beach Imports, Inc. v. BMW of North America, LLC.*
(United States District Court Southern District of Florida Miami Division)
Provided deposition testimony 2/2021.

*Gina Signor, Individually and on Behalf of All Those Similarly Situated v. Safeco Insurance Company of Illinois*, (U.S. District Court, Southern District of Florida, Fort Lauderdale Division)
Provided deposition testimony 11/2020 and 1/2021.

*Between Barry Rebuck and Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited Proceeding under the Class Proceedings Act, 1992*, (Ontario Superior Court of Justice)
Provided cross-examination testimony 10/2020.

*In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation Nemet v. Volkswagen Group of America, Inc.*, (U.S. District Court, Northern District of California)
Provided deposition testimony 8/2020.

*William South, Individually and on Behalf of All Those Similarly Situated v. Progressive Select Insurance Company,* (United States District Court Southern District of Florida Tampa Division)
Provided deposition testimony 7/2020.

*Biljana Capic v. Ford Motor Company of Australia Limited* (Federal Court of Australia, New South Wales)
Provided trial testimony 7/2020.

*Jason Counts, Donald Klein, Oscar Zamora, Derek Long, Bassam Hirmiz, Jason Silveus, John Miskelly, Thomas Hayduk, Christopher Hemberger, Individually And on Behalf of All Others Similarly Situated, v. General Motors, LLC, Robert Bosch GMBH, and Robert Bosch, LLC,* (United States District Court Eastern District of Michigan)
Provided deposition testimony 2/2020

*Barber Group, Inc., d/b/a Barber Honda v. American Honda Motor Co., Inc., Galpinsfield Automotive, LLC, Intervenor.* (State of California New Motor Vehicle Board)
Provided deposition testimony 1/2019.  Provided  hearing testimony 12/2019 and 1/2020.

Revised 12/27/2023

Tab 2  Page 5

# New Retail Registrations
# Chrysler Pacifica Hybrid
# 2016 - 2020

| State | Model Year 2017 Calendar Year | | | | Model Year 2018 Calendar Year | | | |
|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2017 | 2018 | 2019 | 2020 |
| Alabama | 0 | 7 | 4 | 0 | 11 | 45 | 18 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 |
| Arizona | 0 | 31 | 4 | 0 | 26 | 161 | 80 | 1 |
| Arkansas | 0 | 9 | 3 | 0 | 6 | 27 | 19 | 0 |
| California | 0 | 545 | 84 | 9 | 635 | 2,717 | 623 | 8 |
| Colorado | 0 | 45 | 1 | 0 | 34 | 162 | 66 | 1 |
| Connecticut | 0 | 15 | 3 | 0 | 16 | 49 | 15 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 3 | 20 | 11 | 0 |
| District of Columbia | 0 | 7 | 0 | 0 | 5 | 32 | 11 | 1 |
| Florida | 0 | 99 | 18 | 10 | 92 | 365 | 161 | 2 |
| Georgia | 0 | 48 | 7 | 2 | 56 | 185 | 89 | 5 |
| Hawaii | 0 | 6 | 2 | 1 | 2 | 43 | 14 | 0 |
| Idaho | 0 | 2 | 3 | 0 | 4 | 19 | 13 | 0 |
| Illinois | 0 | 92 | 5 | 6 | 103 | 293 | 123 | 3 |
| Indiana | 0 | 46 | 6 | 1 | 30 | 115 | 38 | 0 |
| Iowa | 0 | 22 | 3 | 1 | 24 | 76 | 29 | 0 |
| Kansas | 0 | 17 | 1 | 1 | 11 | 55 | 16 | 0 |
| Kentucky | 0 | 17 | 2 | 1 | 9 | 46 | 28 | 1 |
| Louisiana | 0 | 5 | 0 | 1 | 6 | 25 | 11 | 1 |
| Maine | 0 | 4 | 1 | 0 | 1 | 14 | 8 | 0 |
| Maryland | 0 | 77 | 3 | 1 | 68 | 201 | 78 | 0 |
| Massachusetts | 0 | 49 | 0 | 0 | 54 | 174 | 43 | 0 |
| Michigan | 2 | 119 | 5 | 2 | 76 | 147 | 70 | 1 |
| Minnesota | 0 | 53 | 4 | 3 | 43 | 147 | 55 | 0 |
| Mississippi | 0 | 4 | 1 | 0 | 3 | 15 | 9 | 1 |
| Missouri | 0 | 26 | 10 | 1 | 26 | 99 | 27 | 1 |
| Montana | 0 | 3 | 1 | 0 | 1 | 19 | 4 | 1 |
| Nebraska | 0 | 13 | 2 | 0 | 8 | 34 | 4 | 0 |
| Nevada | 0 | 9 | 2 | 1 | 12 | 59 | 43 | 0 |
| New Hampshire | 0 | 5 | 0 | 0 | 1 | 20 | 6 | 0 |
| New Jersey | 0 | 27 | 2 | 0 | 33 | 103 | 31 | 0 |
| New Mexico | 0 | 7 | 1 | 1 | 5 | 24 | 18 | 0 |
| New York | 0 | 59 | 8 | 5 | 38 | 188 | 48 | 0 |
| North Carolina | 0 | 61 | 6 | 1 | 62 | 185 | 85 | 1 |
| North Dakota | 0 | 2 | 0 | 0 | 1 | 9 | 3 | 0 |
| Ohio | 0 | 55 | 11 | 2 | 52 | 164 | 67 | 0 |
| Oklahoma | 0 | 4 | 1 | 0 | 4 | 31 | 21 | 0 |
| Oregon | 0 | 38 | 6 | 0 | 17 | 178 | 56 | 0 |

Tab 3  Page 1

# New Retail Registrations
# Chrysler Pacifica Hybrid
# 2016 - 2020

| | Model Year 2017 | | | | Model Year 2018 | | | |
| | Calendar Year | | | | Calendar Year | | | |
| State | 2016 | 2017 | 2018 | 2019 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Pennsylvania | 0 | 39 | 7 | 2 | 45 | 171 | 73 | 0 |
| Rhode Island | 0 | 2 | 0 | 0 | 2 | 8 | 2 | 0 |
| South Carolina | 0 | 14 | 9 | 2 | 19 | 63 | 40 | 0 |
| South Dakota | 0 | 3 | 0 | 0 | 4 | 18 | 5 | 0 |
| Tennessee | 0 | 18 | 4 | 0 | 13 | 90 | 45 | 0 |
| Texas | 0 | 105 | 9 | 1 | 88 | 410 | 155 | 1 |
| Utah | 0 | 20 | 1 | 0 | 9 | 65 | 34 | 2 |
| Vermont | 0 | 1 | 0 | 0 | 3 | 13 | 1 | 0 |
| Virginia | 0 | 67 | 5 | 1 | 82 | 266 | 86 | 2 |
| Washington | 0 | 85 | 12 | 2 | 49 | 384 | 116 | 1 |
| West Virginia | 0 | 3 | 0 | 0 | 2 | 20 | 10 | 0 |
| Wisconsin | 0 | 41 | 11 | 2 | 35 | 129 | 66 | 0 |
| Wyoming | 0 | 1 | 0 | 0 | 0 | 4 | 0 | 0 |
| Sum | 2 | 2,027 | 268 | 60 | 1,929 | 7,890 | 2,677 | 34 |

SOURCE: The Fontana Group, Inc.
  DATA: S&P Global Mobility New Summary Registration Data File, 2018-2020 (11/2023 Update).
            S&P Global Mobility New Summary Registration Data File, 2016-2017 (12/2021 Update).
F:\PACU: CLSSCNTS.XLSX:SNEW:69:THHOIK:RTHHDIK:69

# Vehicles in Operation
# Chrysler Pacifica Hybrid
# 10/1/2023

|  | Model Year | |
|---|---|---|
| **State** | **2017** | **2018** |
| Alabama | 12 | 84 |
| Alaska | 1 | 8 |
| Arizona | 123 | 313 |
| Arkansas | 11 | 40 |
| California | 646 | 3,354 |
| Colorado | 46 | 242 |
| Connecticut | 19 | 76 |
| Delaware | 1 | 36 |
| District of Columbia | 4 | 41 |
| Florida | 131 | 626 |
| Georgia | 64 | 329 |
| Hawaii | 10 | 60 |
| Idaho | 11 | 67 |
| Illinois | 123 | 552 |
| Indiana | 63 | 219 |
| Iowa | 32 | 155 |
| Kansas | 29 | 95 |
| Kentucky | 22 | 90 |
| Louisiana | 6 | 35 |
| Maine | 3 | 48 |
| Maryland | 63 | 307 |
| Massachusetts | 41 | 262 |
| Michigan | 105 | 376 |
| Minnesota | 76 | 280 |
| Mississippi | 1 | 21 |
| Missouri | 40 | 166 |
| Montana | 4 | 28 |
| Nebraska | 14 | 63 |
| Nevada | 19 | 109 |
| New Hampshire | 5 | 35 |
| New Jersey | 28 | 161 |
| New Mexico | 11 | 48 |
| New York | 58 | 298 |
| North Carolina | 69 | 321 |
| North Dakota | 5 | 7 |
| Ohio | 77 | 293 |
| Oklahoma | 9 | 60 |
| Oregon | 39 | 260 |
| Pennsylvania | 59 | 298 |

Tab 3  Page 3

# Vehicles in Operation
# Chrysler Pacifica Hybrid
# 10/1/2023

|  | Model Year | |
|---|---|---|
| **State** | **2017** | **2018** |
| Rhode Island | 2 | 15 |
| South Carolina | 24 | 120 |
| South Dakota | 5 | 25 |
| Tennessee | 36 | 167 |
| Texas | 112 | 697 |
| Utah | 28 | 166 |
| Vermont | 1 | 23 |
| Virginia | 80 | 429 |
| Washington | 100 | 575 |
| West Virginia | 9 | 22 |
| Wisconsin | 71 | 245 |
| Wyoming | 1 | 6 |
| Sum | 2,549 | 12,353 |

SOURCE:  The Fontana Group, Inc.
  DATA:  S&P Global Mobility Vehicles in Operation Data File, 10/2023.
F:\PACU\ CLSSVIOS.XLSX:SVIO:69:THHOIK:RTHHEIK:18

# Class State Aggregate Overpayment Calculation

*Statewide Aggregate Overpayment =*

$$[Parts\ Cost\ +\ (Labor\ Rate_{indexed\ to\ Class\ State} \times Labor\ Hours)] \times Class\ Count_{indexed\ to\ Class\ State}$$

**Recall Repair**

Parts Cost: Warranty Data

Labor Hours: Technical Service Bulletin

Labor Rate: Warranty Data

Class Count by State: S&P Global

**Proposed Repair**

Parts Cost: Technical Expert Declaration

Labor Hours: Technical Expert Declaration

Labor Rate: Technical Expert Declaration

Class Count by State: S&P Global

SOURCE: The Fontana Group, Inc.
F:\PACU\ RCMEQN.XLSX:SRCM:69-THHDIK

Tab 4  Page 1

# Class State Aggregate Overpayment Calculation
## With Inflation Adjustment

*Statewide Aggregate Overpayment =*

$$[Parts\ Cost + (Labor\ Rate_{indexed\ to\ Class\ State} \times Labor\ Hours)]$$
$$\times Inflation\ Adjustment\ Factor_{indexed\ to\ Point\ of\ Acquisition}$$
$$\times Class\ Count_{indexed\ to\ Class\ State}$$

**Recall Repair**

Parts Cost: Warranty Data

Labor Hours: Technical Service Bulletin

Labor Rate: Warranty Data

Class Count by State: S&P Global

**Proposed Repair**

Parts Cost: Technical Expert Declaration

Labor Hours: Technical Expert Declaration

Labor Rate: Technical Expert Declaration

Class Count by State: S&P Global

SOURCE: The Fontana Group, Inc.
F:\PACU: RCMEQN.XLSX\SADJ.69\THHDIK

Tab 4  Page 2

# Difference in Current Trade-In Value with Typical Mileage
## Non-Hybrid vs. Hybrid 2018 Chrysler Pacifica Touring L

| Clean Trade-In Value | | Difference in Non-Hybrid vs. Hybrid | |
|---|---|---|---|
| Non-Hybrid | Hybrid | Amount | % Amount |
| $15,225 | $17,925 | $2,700 | 17.7% |

SOURCE: The Fontana Group, Inc.
DATA: JD Power Internet Site, 1/2024.
F:\PACI\CURRENTCH1.XLSX\SCUR.22:THEHIK:RTHHLIK:22

Tab 5  Page 1

**Difference in Clean Trade-In Value *Using Typical Mileage***
**Non-Hybrid vs. Hybrid 2018 Chrysler Pacifica Touring L**
**2/1/2022 and 2/1/2023**

| Date | Typical Mileage | Clean Trade-In Value | | Difference in Non-Hybrid vs. Hybrid | |
|------|------|------|------|------|------|
| | | Non-Hybrid | Hybrid | Amount | % Amount |
| 2/1/2022 | 55,000 | $27,525 | $31,825 | $4,300 | 15.6% |
| 2/1/2023 | 66,000 | $18,950 | $22,225 | $3,275 | 17.3% |

SOURCE: The Fontana Group, Inc.
   DATA: JD Power Internet Site, 1/2024.
F:\PACU: CHANGEINVALUE.XLSX:STYP:13:THHEIK

Tab 6  Page 1

# Difference in Clean Trade-In Value With Mileage Held Constant *Using Typical Mileage*
## Non-Hybrid vs. Hybrid 2018 Chrysler Pacifica Touring L
### 2/1/2022 and 2/1/2023

| Date | Typical Mileage | Clean Trade-In Value | | Difference in Non-Hybrid vs. Hybrid | |
|------|------|------|------|------|------|
| | | Non-Hybrid | Hybrid | Amount | % Amount |
| 2/1/2022 | 55,000 | $27,525 | $31,825 | $4,300 | 15.6% |
| 2/1/2023 | 55,000 | $20,175 | $23,450 | $3,275 | 16.2% |

SOURCE: The Fontana Group, Inc.
DATA: JD Power Internet Site, 1/2024.
F:\PACU: CHANGEINVALUE.XLSX:STM[13:THHEIK

Tab 6  Page 2

# Difference in Clean Trade-In Value With Valuation Date Held Constant *Using Typical Mileage*
## Non-Hybrid vs. Hybrid 2018 Chrysler Pacifica Touring L
### 2/1/2023

| Date | Typical Mileage | Clean Trade-In Value | | Difference in Non-Hybrid vs. Hybrid | |
|------|-----------------|----------------------|--------|--------|--------|
| | | Non-Hybrid | Hybrid | Amount | % Amount |
| 2/1/2023 | 55,000 | $20,175 | $23,450 | $3,275 | 16.2% |
| 2/1/2023 | 66,000 | $18,950 | $22,225 | $3,275 | 17.3% |

SOURCE: The Fontana Group, Inc.
DATA: JD Power Internet Site, 1/2024.
F:\PACU: CHANGEINVALUE.XLSX:STDA:13:THHEIK

Tab 6  Page 3

# Difference in Clean Trade-In Value *Using Low Mileage*
## Non-Hybrid vs. Hybrid 2018 Chrysler Pacifica Touring L
### 2/1/2022 and 2/1/2023

| Date | Low Mileage | Clean Trade-In Value | | Difference in Non-Hybrid vs. Hybrid | |
|---|---|---|---|---|---|
| | | Non-Hybrid | Hybrid | Amount | % Amount |
| 2/1/2022 | 25,000 | $29,725 | $34,025 | $4,300 | 14.5% |
| 2/1/2023 | 36,000 | $21,325 | $24,600 | $3,275 | 15.4% |

SOURCE: The Fontana Group, Inc.
  DATA: JD Power Internet Site, 1/2024.
F:\PACU: CHANGEINVALUE-XLSX:SLO:13:TTHHEIK

Tab 7  Page 1

# Difference in Clean Trade-In Value With Mileage Held Constant *Using Low Mileage* Non-Hybrid vs. Hybrid 2018 Chrysler Pacifica Touring L 2/1/2022 and 2/1/2023

| Date | Low Mileage | Clean Trade-In Value | | Difference in Non-Hybrid vs. Hybrid | |
|---|---|---|---|---|---|
| | | Non-Hybrid | Hybrid | Amount | % Amount |
| 2/1/2022 | 25,000 | $29,725 | $34,025 | $4,300 | 14.5% |
| 2/1/2023 | 25,000 | $22,525 | $25,800 | $3,275 | 14.5% |

SOURCE:  The Fontana Group, Inc.
  DATA:  JD Power Internet Site, 1/2024.
F:PACU: CHANGEINVALUE.XLSX:SLM113:THHEIK

Tab 7  Page 2

# Difference in Clean Trade-In Value With Valuation Date Held Constant *Using Low Mileage*
## Non-Hybrid vs. Hybrid 2018 Chrysler Pacifica Touring L
### 2/1/2023

| Date | Low Mileage | Clean Trade-In Value | | Difference in Non-Hybrid vs. Hybrid | |
|------|-------------|-----------|-----------|-----------|-----------|
| | | Non-Hybrid | Hybrid | Amount | % Amount |
| 2/1/2023 | 25,000 | $22,525 | $25,800 | $3,275 | 14.5% |
| 2/1/2023 | 36,000 | $21,325 | $24,600 | $3,275 | 15.4% |

SOURCE: The Fontana Group, Inc.
    DATA: JD Power Internet Site, 1/2024.
F:PACU: CHANGEINVALUE:XLSX:SLDA:13:THEIK

Tab 7  Page 3

# Difference in Clean Trade-In Value *Using High Mileage*
## Non-Hybrid vs. Hybrid 2018 Chrysler Pacifica Touring L
### 2/1/2022 and 2/1/2023

| Date | High Mileage | Clean Trade-In Value | | Difference in Non-Hybrid vs. Hybrid | |
|---|---|---|---|---|---|
| | | Non-Hybrid | Hybrid | Amount | % Amount |
| 2/1/2022 | 85,000 | $25,875 | $30,175 | $4,300 | 16.6% |
| 2/1/2023 | 96,000 | $17,025 | $20,300 | $3,275 | 19.2% |

SOURCE: The Fontana Group, Inc.
  DATA: JD Power Internet Site, 1/2024.
  F:\PACU: CHANGEINVALUE.XLSX:SH13:1THHEIK

Tab 7  Page 4

# Difference in Clean Trade-In Value With Mileage Held Constant *Using High Mileage*
## Non-Hybrid vs. Hybrid 2018 Chrysler Pacifica Touring L
### 2/1/2022 and 2/1/2023

| Date | High Mileage | Clean Trade-In Value | | Difference in Non-Hybrid vs. Hybrid | |
| --- | --- | --- | --- | --- | --- |
| | | Non-Hybrid | Hybrid | Amount | % Amount |
| 2/1/2022 | 85,000 | $25,875 | $30,175 | $4,300 | 16.6% |
| 2/1/2023 | 85,000 | $18,025 | $21,300 | $3,275 | 18.2% |

SOURCE: The Fontana Group, Inc.
   DATA: JD Power Internet Site, 1/2024.
F:\PACU: CHANGEINVALUE.XLSX:SIM01:13:TIHHEIK

Tab 7  Page 5

# Difference in Clean Trade-In Value With Valuation Date Held Constant *Using High Mileage*
## Non-Hybrid vs. Hybrid 2018 Chrysler Pacifica Touring L
### 2/1/2023

| Date | High Mileage | Clean Trade-In Value | | Difference in Non-Hybrid vs. Hybrid | |
|---|---|---|---|---|---|
| | | Non-Hybrid | Hybrid | Amount | % Amount |
| 2/1/2023 | 85,000 | $18,025 | $21,300 | $3,275 | 18.2% |
| 2/1/2023 | 96,000 | $17,025 | $20,300 | $3,275 | 19.2% |

SOURCE: The Fontana Group, Inc.
DATA: JD Power Internet Site, 1/2024
F:\PACU: CHANGEINVALUE.XLSX.SHDA\13-THHEIK

Tab 7  Page 6

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Hybrid and Non-Hybrid Limited Trims Model Year 2018

ABS: 4-wheel
Active grille shutters
Air filtration
Airbag deactivation: occupant sensing passenger
Ambient lighting
Anti-theft system: alarm
Anti-theft system: anti-theft key
Anti-theft system: vehicle immobilizer
Armrests: dual front
Armrests: rear folding
Assist handle: front
Assist handle: rear
Auxiliary audio input: Bluetooth
Auxiliary audio input: iPod/iPhone
Auxiliary audio input: jack
Auxiliary audio input: USB
Auxiliary transmission fluid cooler
Body side moldings: chrome
Braking assist
Capless fuel filler system
Cargo area light
Center console: front console with storage
Clock
Compass
Connected in-car apps: Google POIs
Connected in-car apps: Google search
Connected in-car apps: SiriusXM Travel Link
Conversation mirror
Courtesy lights: door
Cruise control
Cupholders: front
Cupholders: rear
Cupholders: third row
Customizable instrument cluster
Daytime running lights
Digital odometer
Door handle color: chrome
Driver assistance app: roadside assistance
Driver seat power adjustments: 4-way power lumbar
Driver seat power adjustments: 8
Driver seat power adjustments: height
Driver seat power adjustments: reclining
Driver seat: heated
Driver seat: ventilated
Easy entry: manual rear seat
Electronic messaging assistance: voice operated
Electronic messaging assistance: with read function
Emergency braking preparation
Emergency locking retractors: front
Emergency locking retractors: rear
Emergency locking retractors: third row
Exterior entry lights: approach lamps

External temperature display
Floor mat material: carpet
Floor material: carpet
Floor mats: front
Floor mats: rear
Floor mats: third row
Front air conditioning zones: dual
Front air conditioning: automatic climate control
Front airbags: dual
Front bumper color: body-color
Front headrests: 2
Front headrests: adjustable
Front seatbelts: 3-point
Front stabilizer bar
Front struts: MacPherson
Front suspension classification: independent
Front wipers: variable intermittent
Fuel economy display: MPG
Fuel economy display: range
Gauge: tachometer
Grille color: black with chrome accents
Headlights: auto delay off
Headlights: auto on/off
Heated steering wheel
Hill holder control
Infotainment screen size: 8.4 in.
Infotainment: Uconnect
Instrument cluster screen size: 7 in.
Interior accents: chrome
Knee airbags: dual front
Laminated glass: acoustic
Liftgate window: fixed
Mirror color: chrome
Multi-function display
Multi-function remote: panic alarm
Multi-function remote: proximity entry system
Multi-function remote: trunk release
Navigation data: real time traffic
Navigation system: touch screen display
Navigation system: voice operated
OEM roof height: undefined
Overhead console: front
Passenger seat power adjustments: 4-way power lumbar
Passenger seat power adjustments: 8
Passenger seat power adjustments: height
Passenger seat power adjustments: reclining
Passenger seat: heated
Passenger seat: ventilated
Power door locks: auto-locking
Power outlet(s): 12V cargo area
Power outlet(s): 12V front
Power steering: variable/speed-proportional

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Hybrid and Non-Hybrid Limited Trims Model Year 2018

Power windows: lockout button
Power windows: safety reverse
Premium brand: Alpine
Push-button start
Radio data system
Radio: AM/FM
Radio: HD radio
Radio: touch screen display
Radio: voice operated
Reading lights: front
Reading lights: rear
Reading lights: third row
Rear air conditioning zones: single
Rear air conditioning: automatic climate control
Rear air conditioning: independently controlled
Rear bumper color: body-color
Rear headrests: 2
Rear headrests: adjustable
Rear seat folding: fold flat into floor
Rear seat manual adjustments: reclining
Rear seatbelts: 3-point
Rear spoiler color: body-color
Rear spoiler: roofline
Rear suspension classification: semi-independent
Rear trunk/liftgate: liftgate
Rear trunk/liftgate: power operated
Rear trunk/liftgate: sensor-activated
Rear vents: third row
Rear wiper: intermittent
Rear wiper: with washer
Rearview mirror: auto-dimming
Remote engine start
Rocker panel color: body-color
Roll stability control
Roof rack crossbars: chrome
Roof rails: chrome
Satellite radio: SiriusXM
Seatbelt pretensioners: front
Seatbelt warning sensor: front
Side airbags: front
Side curtain airbags: front
Side curtain airbags: rear
Side curtain airbags: third row
Side mirror adjustments: power
Side mirrors: heated
Side mirrors: integrated turn signals
Smart device app compatibility: SiriusXM Guardian
Smart device app function: horn/light operation
Smart device app function: lock operation

Smart device app function: vehicle location
Smartphone integration: Android Auto
Smartphone integration: Apple CarPlay
Solar-tinted glass
Spare tire kit: inflator kit
Speed sensitive volume control
Stability control
Steering wheel mounted controls: audio
Steering wheel mounted controls: cruise control
Steering wheel mounted controls: multi-function
Steering wheel mounted controls: phone
Steering wheel mounted controls: voice control
Steering wheel trim: leather
Steering wheel: tilt and telescopic
Storage: accessory hook
Storage: bin
Storage: door pockets
Storage: front seatback
Storage: grocery bag holder
Storage: in dash
Storage: rear seatback
Storage: sunglasses holder
Taillights: LED
Third row headrests: 3
Third row headrests: adjustable
Third row seat folding: fold flat into floor
Third row seat folding: split
Third row seatbelts: 3-point
Tire Pressure Monitoring System
Total speakers: 13
Traction control
Tray tables
Trip odometer
Universal remote transmitter: garage door opener
Upholstery accents: contrast stitching
Upholstery: leather-trimmed
Vanity mirrors: dual illuminating
Warnings and reminders: coolant temperature warning
Warnings and reminders: lamp failure
Warnings and reminders: low fuel level
Warnings and reminders: low oil pressure
Warnings and reminders: low washer fluid
Warnings and reminders: turn off headlights
Watts: 506
Wheels: polished aluminum alloy
Window defogger: rear
Window trim: chrome
Wireless data link: Bluetooth

SOURCE: The Fontana Group, Inc.
DATA: iSeeCars.com Internet Site, 1/2024.
F:\PACU: ISCFEAT.XLSX:SS8L:22:THHTIK

# List of Standard Features from iSeeCars.com that are Different on the Chrysler Pacifica Hybrid and Non-Hybrid Limited Trims Model Year 2018

| Feature Difference due to **Non-Hybrid Reasons** | **Trim** | Feature Difference due to **Hybrid-Related Reasons** | **Trim** |
|---|---|---|---|
| 3rd row moonroof / sunroof: fixed glass | Non-Hybrid | Regenerative braking system | Hybrid |
| Cupholders: illuminated | Non-Hybrid | Tuned suspension: heavy duty | Hybrid |
| Exterior entry lights: puddle lamps | Non-Hybrid | Tuned suspension: touring | Non-Hybrid |
| Footwell lights | Non-Hybrid | Warnings and reminders: low battery | Hybrid |
| Front fog lights | Hybrid | | |
| Front fog lights: LED | Non-Hybrid | | |
| Headlights: halogen | Hybrid | | |
| Headlights: HID/Xenon | Non-Hybrid | | |
| Headlights: quad headlights | Hybrid | | |
| Headlights: wiper activated | Non-Hybrid | | |
| Memorized settings: 2 driver | Non-Hybrid | | |
| Memorized settings: driver seat | Non-Hybrid | | |
| Memorized settings: side mirrors | Non-Hybrid | | |
| Moonroof / Sunroof: anti-trapping | Non-Hybrid | | |
| Moonroof / Sunroof: one-touch open/close | Non-Hybrid | | |
| Moonroof / Sunroof: power panoramic | Non-Hybrid | | |
| Moonroof / Sunroof: power sunshade | Non-Hybrid | | |
| One-touch windows: 2 | Hybrid | | |
| One-touch windows: 4 | Non-Hybrid | | |
| Rear seat: heated | Non-Hybrid | | |
| Rocker panel color: body-color | Non-Hybrid | | |
| Side mirror adjustments: manual folding | Hybrid | | |
| Side mirror adjustments: power folding | Non-Hybrid | | |
| Side mirror adjustments: reverse gear tilt | Non-Hybrid | | |
| Side mirrors: driver side auto-dimming | Non-Hybrid | | |
| Steering wheel trim: alloy | Non-Hybrid | | |
| Sunshade: power side window | Non-Hybrid | | |
| Sunshade: side window | Hybrid | | |
| Third row seat folding: power | Non-Hybrid | | |
| Vacuum | Non-Hybrid | | |

SOURCE: The Fontana Group, Inc.
DATA: iSeeCars.com Internet Site, 1/2024.
F:\PACU: ISCFEAT.XLSX:SD8L:22:THHTIK

Tab 8  Page 3

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Hybrid and Non-Hybrid Touring L Trims Model Year 2018

ABS: 4-wheel
Active grille shutters
Air filtration
Airbag deactivation: occupant sensing passenger
Ambient lighting
Anti-theft system: alarm
Anti-theft system: anti-theft key
Anti-theft system: vehicle immobilizer
Armrests: dual front
Armrests: rear folding
Assist handle: front
Assist handle: rear
Auxiliary audio input: Bluetooth
Auxiliary audio input: iPod/iPhone
Auxiliary audio input: jack
Auxiliary audio input: USB
Auxiliary transmission fluid cooler
Body side moldings: chrome
Braking assist
Capless fuel filler system
Cargo area light
Center console: front console with storage
Clock
Compass
Connected in-car apps: Google POIs
Connected in-car apps: Google search
Conversation mirror
Courtesy lights: door
Cruise control
Cupholders: front
Cupholders: rear
Cupholders: third row
Daytime running lights
Digital odometer
Door handle color: chrome
Driver assistance app: roadside assistance
Driver seat power adjustments: 4-way power lumbar
Driver seat power adjustments: 8
Driver seat power adjustments: height
Driver seat power adjustments: reclining
Driver seat: heated
Easy entry: manual rear seat
Electronic messaging assistance: voice operated
Electronic messaging assistance: with read function
Emergency braking preparation
Emergency locking retractors: front
Emergency locking retractors: rear
Emergency locking retractors: third row
Exterior entry lights: approach lamps

External temperature display
Floor mat material: carpet
Floor material: carpet
Floor mats: front
Floor mats: rear
Floor mats: third row
Front air conditioning zones: dual
Front air conditioning: automatic climate control
Front airbags: dual
Front bumper color: body-color
Front fog lights
Front headrests: 2
Front headrests: adjustable
Front seatbelts: 3-point
Front stabilizer bar
Front struts: MacPherson
Front suspension classification: independent
Front wipers: variable intermittent
Fuel economy display: MPG
Fuel economy display: range
Gauge: tachometer
Grille color: black with chrome accents
Headlights: auto delay off
Headlights: auto on/off
Headlights: halogen
Headlights: quad headlights
Hill holder control
Infotainment: Uconnect
Interior accents: chrome
Knee airbags: dual front
Liftgate window: fixed
Mirror color: body-color
Multi-function display
Multi-function remote: panic alarm
Multi-function remote: proximity entry system
Multi-function remote: trunk release
OEM roof height: undefined
One-touch windows: 2
Overhead console: front
Passenger seat manual adjustments: 4
Passenger seat manual adjustments: reclining
Passenger seat: heated
Power door locks: auto-locking
Power outlet(s): 12V cargo area
Power outlet(s): 12V front
Power steering: variable/speed-proportional
Power windows: lockout button
Power windows: safety reverse
Push-button start

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Hybrid and Non-Hybrid Touring L Trims
## Model Year 2018

Radio data system
Radio: AM/FM
Radio: touch screen display
Radio: voice operated
Reading lights: front
Reading lights: rear
Reading lights: third row
Rear air conditioning zones: single
Rear air conditioning: automatic climate control
Rear air conditioning: independently controlled
Rear bumper color: body-color
Rear headrests: 2
Rear headrests: adjustable
Rear seat folding: fold flat into floor
Rear seat manual adjustments: reclining
Rear seatbelts: 3-point
Rear spoiler color: body-color
Rear spoiler: roofline
Rear suspension classification: semi-independent
Rear trunk/liftgate: liftgate
Rear trunk/liftgate: power operated
Rear vents: third row
Rear wiper: intermittent
Rear wiper: with washer
Rearview mirror: manual day/night
Remote engine start
Rocker panel color: body-color
Roll stability control
Roof rack crossbars: chrome
Roof rails: chrome
Satellite radio: SiriusXM
Seatbelt pretensioners: front
Seatbelt warning sensor: front
Side airbags: front
Side curtain airbags: front
Side curtain airbags: rear
Side curtain airbags: third row
Side mirror adjustments: manual folding
Side mirror adjustments: power
Side mirrors: heated
Smartphone integration: Android Auto
Smartphone integration: Apple CarPlay
Solar-tinted glass
Spare tire kit: inflator kit
Speed sensitive volume control

Stability control
Steering wheel mounted controls: audio
Steering wheel mounted controls: cruise control
Steering wheel mounted controls: multi-function
Steering wheel mounted controls: phone
Steering wheel mounted controls: voice control
Steering wheel trim: leather
Steering wheel: tilt and telescopic
Storage: accessory hook
Storage: bin
Storage: door pockets
Storage: front seatback
Storage: grocery bag holder
Storage: in dash
Storage: rear seatback
Storage: sunglasses holder
Sunshade: side window
Taillights: LED
Third row headrests: 3
Third row headrest: adjustable
Third row seat folding: fold flat into floor
Third row seat folding: split
Third row seatbelts: 3-point
Tire Pressure Monitoring System
Total speakers: 6
Traction control
Tray tables
Trip odometer
Universal remote transmitter: garage door opener
Upholstery accents: perforated
Upholstery: leather-trimmed
Vanity mirrors: dual illuminating
Warnings and reminders: coolant temperature warning
Warnings and reminders: lamp failure
Warnings and reminders: low fuel level
Warnings and reminders: low oil pressure
Warnings and reminders: low washer fluid
Warnings and reminders: turn off headlights
Wheels: aluminum alloy
Window defogger: rear
Window trim: chrome
Wireless data link: Bluetooth

SOURCE: The Fontana Group, Inc.
DATA: iSeeCars.com Internet Site, 1/2024.
F:\PACU: ISCFEAT.XLSX:SS81:22:THHTIK

# List of Standard Features from iSeeCars.com that are Different on the Chrysler Pacifica Hybrid and Non-Hybrid Touring L Trims Model Year 2018

| **Feature Difference due to Non-Hybrid Reasons** | **Trim** | **Feature Difference due to Hybrid-Related Reasons** | **Trim** |
|---|---|---|---|
| Customizable instrument cluster | Hybrid | Regenerative braking system | Hybrid |
| Headlights: wiper activated | Non-Hybrid | Tuned suspension: heavy duty | Hybrid |
| Infotainment screen size: 7 in. | Non-Hybrid | Tuned suspension: touring | Non-Hybrid |
| Infotainment screen size: 8.4 in. | Hybrid | Warnings and reminders: low battery | Hybrid |
| Instrument cluster screen size: 3.5 in. | Non-Hybrid | | |
| Instrument cluster screen size: 7 in. | Hybrid | | |
| Radio: HD radio | Hybrid | | |
| Laminated glass: acoustic | Hybrid | | |

SOURCE:  The Fontana Group, Inc.
     DATA:  iSeeCars.com Internet Site, 1/2024.
     F:\PACU:  ISCFEAT.XLSX:SD81:22:THHTIK

Tab 8  Page 6

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Hybrid and Non-Hybrid Touring Plus Trims Model Year 2018

ABS: 4-wheel
Active grille shutters
Air filtration
Airbag deactivation: occupant sensing passenger
Ambient lighting
Anti-theft system: anti-theft key
Anti-theft system: vehicle immobilizer
Armrests: dual front
Armrests: rear folding
Assist handle: front
Assist handle: rear
Auxiliary audio input: Bluetooth
Auxiliary audio input: iPod/iPhone
Auxiliary audio input: jack
Auxiliary audio input: USB
Auxiliary transmission fluid cooler
Braking assist
Capless fuel filler system
Cargo area light
Center console: front console with storage
Clock
Compass
Connected in-car apps: Google POIs
Connected in-car apps: Google search
Conversation mirror
Courtesy lights: door
Cruise control
Cupholders: front
Cupholders: rear
Cupholders: third row
Daytime running lights
Digital odometer
Door handle color: chrome
Driver assistance app: roadside assistance
Driver seat power adjustments: 4-way power lumbar
Driver seat power adjustments: 8
Driver seat power adjustments: height
Driver seat power adjustments: reclining
Easy entry: manual rear seat
Electronic messaging assistance: voice operated
Electronic messaging assistance: with read function
Emergency braking preparation
Emergency locking retractors: front
Emergency locking retractors: rear
Emergency locking retractors: third row
Exterior entry lights: approach lamps
External temperature display
Floor mat material: carpet
Floor material: carpet

Floor mats: front
Floor mats: rear
Floor mats: third row
Front air conditioning zones: dual
Front air conditioning: automatic climate control
Front airbags: dual
Front bumper color: body-color
Front fog lights
Front headrests: 2
Front headrests: adjustable
Front seatbelts: 3-point
Front stabilizer bar
Front struts: MacPherson
Front suspension classification: independent
Front wipers: variable intermittent
Fuel economy display: MPG
Fuel economy display: range
Gauge: tachometer
Grille color: black with chrome accents
Headlights: auto delay off
Headlights: auto on/off
Headlights: halogen
Headlights: quad headlights
Hill holder control
Infotainment: Uconnect
Interior accents: chrome
Knee airbags: dual front
Liftgate window: fixed
Mirror color: body-color
Multi-function display
Multi-function remote: panic alarm
Multi-function remote: proximity entry system
Multi-function remote: trunk release
OEM roof height: undefined
One-touch windows: 2
Overhead console: front
Passenger seat manual adjustments: 4
Passenger seat manual adjustments: reclining
Power door locks: auto-locking
Power outlet(s): 12V cargo area
Power outlet(s): 12V front
Power steering: variable/speed-proportional
Power windows: lockout button
Power windows: safety reverse
Push-button start
Radio data system
Radio: AM/FM
Radio: touch screen display
Radio: voice operated

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Hybrid and Non-Hybrid Touring Plus Trims Model Year 2018

Reading lights: front
Reading lights: rear
Reading lights: third row
Rear air conditioning zones: single
Rear air conditioning: automatic climate control
Rear air conditioning: independently controlled
Rear bumper color: body-color
Rear headrests: 2
Rear headrests: adjustable
Rear seat folding: fold flat into floor
Rear seat manual adjustments: reclining
Rear seatbelts: 3-point
Rear spoiler color: body-color
Rear spoiler: roofline
Rear suspension classification: semi-independent
Rear trunk/liftgate: liftgate
Rear vents: third row
Rear wiper: intermittent
Rear wiper: with washer
Rearview mirror: manual day/night
Rocker panel color: body-color
Roll stability control
Satellite radio: SiriusXM
Seatbelt pretensioners: front
Seatbelt warning sensor: front
Side airbags: front
Side curtain airbags: front
Side curtain airbags: rear
Side curtain airbags: third row
Side mirror adjustments: manual folding
Side mirror adjustments: power
Side mirrors: heated
Smartphone integration: Android Auto
Smartphone integration: Apple CarPlay
Solar-tinted glass
Spare tire kit: inflator kit
Speed sensitive volume control
Stability control
Steering wheel mounted controls: audio
Steering wheel mounted controls: cruise control
Steering wheel mounted controls: multi-function
Steering wheel mounted controls: phone
Steering wheel mounted controls: voice control
Steering wheel trim: urethane
Steering wheel: tilt and telescopic
Storage: bin

Storage: door pockets
Storage: front seatback
Storage: in dash
Storage: rear seatback
Storage: sunglasses holder
Taillights: LED
Third row headrests: 3
Third row headrests: adjustable
Third row seat folding: fold flat into floor
Third row seat folding: split
Third row seatbelts: 3-point
Tire Pressure Monitoring System
Total speakers: 6
Traction control
Tray tables
Trip odometer
Upholstery: cloth
Vanity mirrors: dual illuminating
Warnings and reminders: coolant temperature warning
Warnings and reminders: lamp failure
Warnings and reminders: low fuel level
Warnings and reminders: low oil pressure
Warnings and reminders: low washer fluid
Warnings and reminders: turn off headlights
Wheels: aluminum alloy
Window defogger: rear
Window trim: chrome
Wireless data link: Bluetooth

SOURCE: The Fontana Group, Inc.
DATA: iSeeCars.com Internet Site, 1/2024.
F:\PACU: ISCFEAT.XLSX:SS82:22:THHTIK

# List of Standard Features from iSeeCars.com that are Different on the Chrysler Pacifica Hybrid and Non-Hybrid Touring Plus Trims Model Year 2018

| Feature Difference due to Non-Hybrid Reasons | Trim | Feature Difference due to Hybrid-Related Reasons | Trim |
|---|---|---|---|
| Anti-theft system: alarm | Hybrid | Regenerative braking system | Hybrid |
| Customizable instrument cluster | Hybrid | Tuned suspension: heavy duty | Hybrid |
| Headlights: wiper activated | Non-Hybrid | Tuned suspension: touring | Non-Hybrid |
| Infotainment screen size: 7 in. | Non-Hybrid | Universal remote transmitter: garage door opener | Non-Hybrid |
| Infotainment screen size: 8.4 in. | Hybrid | Warnings and reminders: low battery | Hybrid |
| Instrument cluster screen size: 3.5 in. | Non-Hybrid | | |
| Instrument cluster screen size: 7 in. | Hybrid | | |
| Radio: HD radio | Hybrid | | |
| Storage: accessory hook | Non-Hybrid | | |
| Sunshade: side window | Non-Hybrid | | |
| Laminated glass: acoustic | Hybrid | | |

SOURCE: The Fontana Group, Inc.
DATA: iSeeCars.com Internet Site, 1/2024.
F:\PACU: ISCFEAT.XLSX:SD82:22:THHTIK

Tab 8  Page 9

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Platinum Hybrid and Limited Non-Hybrid Trims Model Year 2017

ABS: 4-wheel
Active grille shutters
Air filtration
Airbag deactivation: occupant sensing passenger
Ambient lighting
Anti-theft system: alarm
Anti-theft system: anti-theft key
Anti-theft system: vehicle immobilizer
Armrests: dual front
Armrests: rear folding
Assist handle: front
Assist handle: rear
Auxiliary audio input: Bluetooth
Auxiliary audio input: jack
Auxiliary audio input: USB
Auxiliary transmission fluid cooler
Body side moldings: chrome
Braking assist
Cargo area floor mat
Cargo area floor mat: carpet
Cargo area light
Center console: front console with storage
Clock
Compass
Connected in-car apps: SiriusXM Travel Link
Conversation mirror
Courtesy lights: door
Cruise control
Cupholders: front
Cupholders: illuminated
Cupholders: rear
Cupholders: third row
Customizable instrument cluster
Daytime running lights
Digital odometer
Door handle color: chrome
Driver seat power adjustments: 4-way power lumbar
Driver seat power adjustments: 8
Driver seat power adjustments: height
Driver seat power adjustments: reclining
Driver seat: heated
Driver seat: ventilated
Easy entry: manual rear seat
Emergency braking preparation
Emergency locking retractors: front
Emergency locking retractors: rear
Emergency locking retractors: third row
Exterior entry lights: approach lamps
External temperature display

Floor mat material: carpet
Floor material: carpet
Floor mats: front
Floor mats: rear
Floor mats: third row
Front air conditioning zones: dual
Front air conditioning: automatic climate control
Front airbags: dual
Front bumper color: body-color
Front fog lights: LED
Front headrests: 2
Front headrest: adjustable
Front seatbelts: 3-point
Front stabilizer bar
Front struts: MacPherson
Front suspension classification: independent
Front wipers: variable intermittent
Fuel economy display: MPG
Fuel economy display: range
Gauge: tachometer
Grille color: black with chrome accents
Headlights: auto delay off
Headlights: auto on/off
Heated steering wheel
Hill holder control
Infotainment: Uconnect
Instrument cluster screen size: 7 in.
Interior accents: chrome
Knee airbags: dual front
Laminated glass: acoustic
Liftgate window: fixed
Mirror color: chrome
Multi-function display
Multi-function remote: panic alarm
Multi-function remote: proximity entry system
Multi-function remote: trunk release
Navigation data: real time traffic
Navigation system: DVD
Navigation system: touch screen display
Navigation system: voice operated
OEM roof height: undefined
Overhead console: front
Passenger seat power adjustments: 4-way power lumbar
Passenger seat power adjustments: 8
Passenger seat power adjustments: height
Passenger seat power adjustments: reclining
Passenger seat: heated
Passenger seat: ventilated
Power door locks: auto-locking

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Platinum Hybrid and Limited Non-Hybrid Trims Model Year 2017

Power outlet(s): 12V front
Power steering
Power windows: lockout button
Power windows: safety reverse
Push-button start
Radio data system
Radio: AM/FM
Radio: HD radio
Radio: touch screen display
Radio: voice operated
Reading lights: front
Reading lights: rear
Reading lights: third row
Rear air conditioning zones: single
Rear air conditioning: automatic climate control
Rear bumper color: body-color
Rear headrests: 2
Rear headrests: adjustable
Rear seat folding: fold flat into floor
Rear seat manual adjustments: reclining
Rear seatbelts: 3-point
Rear spoiler color: body-color
Rear spoiler: roofline
Rear suspension classification: semi-independent
Rear trunk/liftgate: liftgate
Rear trunk/liftgate: power operated
Rear trunk/liftgate: sensor-activated
Rear vents: third row
Rear wiper: intermittent
Rear wiper: with washer
Remote engine start
Rocker panel color: body-color
Roof rack crossbars: chrome
Roof rails: chrome
Satellite radio: SiriusXM
Seatbelt pretensioners: front
Seatbelt warning sensor: front
Side airbags: front
Side curtain airbags: front
Side curtain airbags: rear
Side curtain airbags: third row
Side mirror adjustments: power
Side mirrors: heated
Side mirrors: integrated turn signals
Solar-tinted glass

Spare tire kit: inflator kit
Speed sensitive volume control
Stability control
Steering wheel mounted controls: audio
Steering wheel mounted controls: cruise control
Steering wheel mounted controls: multi-function
Steering wheel mounted controls: voice control
Steering wheel trim: leather
Steering wheel: tilt and telescopic
Storage: accessory hook
Storage: door pockets
Storage: front seatback
Storage: in dash
Storage: in floor
Storage: rear seatback
Storage: sunglasses holder
Sunshade: side window
Third row headrests: 3
Third row seat folding: fold flat into floor
Third row seat folding: split
Third row seatbelts: 3-point
Tire Pressure Monitoring System
Traction control
Tray tables
Trip odometer
Upholstery accents: contrast stitching
Upholstery: leather-trimmed
Vanity mirrors: dual illuminating
Warnings and reminders: coolant temperature warning
Warnings and reminders: lamp failure
Warnings and reminders: low fuel level
Warnings and reminders: low oil pressure
Warnings and reminders: turn off headlights
Wheels: polished aluminum alloy
Window defogger: rear
Window trim: chrome
Wireless data link: Bluetooth

SOURCE: The Fontana Group, Inc.
DATA: iSeeCars.com Internet Site, 1/2024.
F:\PACU: ISCFEAT.XLSX:SS7L:22:THHTIK

# List of Standard Features from iSeeCars.com that are Different on the Chrysler Pacifica Platinum Hybrid and Limited Non-Hybrid Trims Model Year 2017

| Feature Difference due to **Non-Hybrid Reasons** | **Trim** | Feature Difference due to **Hybrid-Related Reasons** | **Trim** |
|---|---|---|---|
| Capless fuel filler system | Hybrid | Regenerative braking system | Hybrid |
| Headlights: halogen | Hybrid | Spare tire mount location: underbody | Non-Hybrid |
| Headlights: quad headlights | Hybrid | Spare tire size: temporary | Non-Hybrid |
| Headlights: wiper activated | Non-Hybrid | Tuned suspension: heavy duty | Hybrid |
| Infotainment screen size: 5 in. | Hybrid | Tuned suspension: touring | Non-Hybrid |
| Infotainment screen size: 8.4 in. | Non-Hybrid | Warnings and reminders: low battery | Hybrid |
| One-touch windows: 2 | Hybrid | | |
| One-touch windows: 4 | Non-Hybrid | | |
| Power outlet(s): 115V | Hybrid | | |
| Power outlet(s): 12V rear | Non-Hybrid | | |
| Premium brand: Alpine | Non-Hybrid | | |
| Rear seat: heated | Non-Hybrid | | |
| Rearview mirror: auto-dimming | Non-Hybrid | | |
| Rearview mirror: manual day/night | Hybrid | | |
| Side mirror adjustments: manual folding | Hybrid | | |
| Side mirror adjustments: reverse gear tilt | Non-Hybrid | | |
| Storage: bin | Hybrid | | |
| Subwoofer: 1 | Non-Hybrid | | |
| Taillights: LED | Hybrid | | |
| Total speakers: 13 | Non-Hybrid | | |
| Total speakers: 6 | Hybrid | | |
| Universal remote transmitter: garage door opener | Non-Hybrid | | |
| Watts: 506 | Non-Hybrid | | |
| 3rd row moonroof / sunroof: fixed glass | Non-Hybrid | | |
| Headlights: HID/Xenon | Non-Hybrid | | |
| Memorized settings: 2 driver | Non-Hybrid | | |
| Memorized settings: driver seat | Non-Hybrid | | |
| Memorized settings: side mirrors | Non-Hybrid | | |
| Moonroof / Sunroof: power panoramic | Non-Hybrid | | |
| Moonroof / Sunroof: power sunshade | Non-Hybrid | | |
| Side mirror adjustments: power folding | Non-Hybrid | | |
| Third row seat folding: power | Non-Hybrid | | |
| Tuned suspension: touring | Non-Hybrid | | |
| Vacuum | Non-Hybrid | | |

SOURCE: The Fontana Group, Inc.
DATA: iSeeCars.com Internet Site, 1/2024.
F:\PACU: 1SCFEAT.XLSX:SD7L:22:THHTIK

Tab 8  Page 12

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Premium Hybrid and Touring L Non-Hybrid Trims Model Year 2017

ABS: 4-wheel
Active grille shutters
Air filtration
Airbag deactivation: occupant sensing passenger
Ambient lighting
Anti-theft system: alarm
Anti-theft system: anti-theft key
Anti-theft system: vehicle immobilizer
Armrests: dual front
Armrests: rear folding
Assist handle: front
Assist handle: rear
Auxiliary audio input: Bluetooth
Auxiliary audio input: jack
Auxiliary audio input: USB
Auxiliary transmission fluid cooler
Braking assist
Cargo area floor mat
Cargo area floor mat: carpet
Cargo area light
Center console: front console with storage
Clock
Compass
Conversation mirror
Cruise control
Cupholders: front
Cupholders: rear
Cupholders: third row
Daytime running lights
Digital odometer
Door handle color: chrome
Driver seat power adjustments: 4-way power lumbar
Driver seat power adjustments: 8
Driver seat power adjustments: height
Driver seat power adjustments: reclining
Driver seat: heated
Easy entry: manual rear seat
Emergency braking preparation
Emergency locking retractors: front
Emergency locking retractors: rear
Emergency locking retractors: third row
Exterior entry lights: approach lamps
External temperature display
Floor mat material: carpet
Floor material: carpet
Floor mats: front
Floor mats: rear
Floor mats: third row
Front air conditioning zones: dual

Front air conditioning: automatic climate control
Front airbags: dual
Front bumper color: body-color
Front headrests: 2
Front headrests: adjustable
Front seatbelts: 3-point
Front stabilizer bar
Front struts: MacPherson
Front suspension classification: independent
Front wipers: variable intermittent
Fuel economy display: MPG
Fuel economy display: range
Gauge: tachometer
Grille color: black with chrome accents
Headlights: auto delay off
Headlights: auto on/off
Headlights: halogen
Headlights: quad headlights
Hill holder control
Infotainment screen size: 5 in.
Infotainment: Uconnect
Interior accents: chrome
Knee airbags: dual front
Liftgate window: fixed
Mirror color: body-color
Multi-function display
Multi-function remote: panic alarm
Multi-function remote: proximity entry system
Multi-function remote: trunk release
OEM roof height: undefined
One-touch windows: 2
Overhead console: front
Passenger seat manual adjustments: 4
Passenger seat manual adjustments: reclining
Passenger seat: heated
Power door locks: auto-locking
Power outlet(s): 12V front
Power outlet(s): 12V rear
Power steering
Power windows: lockout button
Power windows: safety reverse
Push-button start
Radio data system
Radio: AM/FM
Radio: touch screen display
Radio: voice operated
Reading lights: front
Reading lights: rear
Reading lights: third row

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Premium Hybrid and Touring L Non-Hybrid Trims Model Year 2017

Rear air conditioning zones: single
Rear air conditioning: automatic climate control
Rear bumper color: body-color
Rear headrests: 2
Rear headrests: adjustable
Rear seat folding: fold flat into floor
Rear seat manual adjustments: reclining
Rear seatbelts: 3-point
Rear spoiler color: body-color
Rear spoiler: roofline
Rear suspension classification: semi-independent
Rear trunk/liftgate: liftgate
Rear trunk/liftgate: power operated
Rear vents: third row
Rear wiper: intermittent
Rear wiper: with washer
Rearview mirror: manual day/night
Remote engine start
Rocker panel color: body-color
Roof rails: black
Satellite radio: SiriusXM
Seatbelt pretensioners: front
Seatbelt warning sensor: front
Side airbags: front
Side curtain airbags: front
Side curtain airbags: rear
Side curtain airbags: third row
Side mirror adjustments: manual folding
Side mirror adjustments: power
Side mirrors: heated
Solar-tinted glass
Spare tire kit: inflator kit
Speed sensitive volume control
Stability control
Steering wheel mounted controls: audio
Steering wheel mounted controls: cruise control
Steering wheel mounted controls: multi-function
Steering wheel mounted controls: voice control
Steering wheel trim: leather
Steering wheel: tilt and telescopic
Storage: accessory hook
Storage: door pockets
Storage: front seatback
Storage: in dash
Storage: in floor

Storage: rear seatback
Storage: sunglasses holder
Sunshade: side window
Taillights: LED
Third row headrests: 3
Third row seat folding: fold flat into floor
Third row seat folding: split
Third row seatbelts: 3-point
Tire Pressure Monitoring System
Total speakers: 6
Traction control
Tray tables
Trip odometer
Upholstery: leather-trimmed
Vanity mirrors: dual illuminating
Warnings and reminders: coolant temperature warning
Warnings and reminders: lamp failure
Warnings and reminders: low fuel level
Warnings and reminders: low oil pressure
Warnings and reminders: turn off headlights
Wheels: aluminum alloy
Window defogger: rear
Window trim: chrome
Wireless data link: Bluetooth

SOURCE: The Fontana Group, Inc.
DATA: iSeeCars.com Internet Site, 1/2024.
F:\PACU: ISCFEAT.XLSX:SS71:22:THHTIK

# List of Standard Features from iSeeCars.com that are Different on the Chrysler Pacifica Premium Hybrid and Touring L Non-Hybrid Trims Model Year 2017

| Feature Difference due to Non-Hybrid Reasons | Trim |
|---|---|
| Body side moldings: chrome | Non-Hybrid |
| Capless fuel filler system | Hybrid |
| Courtesy lights: door | Hybrid |
| Customizable instrument cluster | Hybrid |
| Front fog lights | Non-Hybrid |
| Front fog lights: LED | Hybrid |
| Headlights: wiper activated | Non-Hybrid |
| Instrument cluster screen size: 3.5 in. | Non-Hybrid |
| Instrument cluster screen size: 7 in. | Hybrid |
| Roof rack crossbars: black | Hybrid |
| Side mirror adjustments: reverse gear tilt | Non-Hybrid |
| Storage: bin | Hybrid |
| Storage: grocery bag holder | Non-Hybrid |
| Universal remote transmitter: garage door opener | Non-Hybrid |
| Laminated glass: acoustic | Hybrid |

| Feature Difference due to Hybrid-Related Reasons | Trim |
|---|---|
| Regenerative braking system | Hybrid |
| Run flat tires: puncture sealing compound with electric compressor | Hybrid |
| Spare tire mount location: underbody | Non-Hybrid |
| Spare tire size: temporary | Non-Hybrid |
| Tuned suspension: heavy duty | Hybrid |
| Warnings and reminders: low battery | Hybrid |

SOURCE: The Fontana Group, Inc.
DATA: iSeeCars.com Internet Site, 1/2024.
F:\PACU: ISCFEAT.XLSX:SD71:22:THHTIK

Tab 8  Page 15

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Hybrid and Non-Hybrid Touring Plus Trims Model Year 2017

ABS: 4-wheel
Active grille shutters
Air filtration
Airbag deactivation: occupant sensing passenger
Ambient lighting
Anti-theft system: alarm
Anti-theft system: anti-theft key
Anti-theft system: vehicle immobilizer
Armrests: dual front
Armrests: rear folding
Assist handle: front
Assist handle: rear
Auxiliary audio input: Bluetooth
Auxiliary audio input: jack
Auxiliary audio input: USB
Auxiliary transmission fluid cooler
Braking assist
Cargo area floor mat
Cargo area floor mat: carpet
Cargo area light
Center console: front console with storage
Clock
Compass
Conversation mirror
Cruise control
Cupholders: front
Cupholders: rear
Cupholders: third row
Daytime running lights
Digital odometer
Door handle color: chrome
Driver seat power adjustments: 4-way power lumbar
Driver seat power adjustments: 8
Driver seat power adjustments: height
Driver seat power adjustments: reclining
Easy entry: manual rear seat
Emergency braking preparation
Emergency locking retractors: front
Emergency locking retractors: rear
Emergency locking retractors: third row
Exterior entry lights: approach lamps
External temperature display
Floor mat material: carpet
Floor material: carpet
Floor mats: front
Floor mats: rear
Floor mats: third row
Front air conditioning zones: dual
Front air conditioning: automatic climate control

Front airbags: dual
Front bumper color: body-color
Front headrests: 2
Front headrests: adjustable
Front seatbelts: 3-point
Front stabilizer bar
Front struts: MacPherson
Front suspension classification: independent
Front wipers: variable intermittent
Fuel economy display: MPG
Fuel economy display: range
Gauge: tachometer
Grille color: black with chrome accents
Headlights: auto delay off
Headlights: auto on/off
Headlights: halogen
Headlights: quad headlights
Hill holder control
Infotainment screen size: 5 in.
Infotainment: Uconnect
Interior accents: chrome
Knee airbags: dual front
Liftgate window: fixed
Mirror color: body-color
Multi-function display
Multi-function remote: panic alarm
Multi-function remote: proximity entry system
Multi-function remote: trunk release
OEM roof height: undefined
One-touch windows: 2
Overhead console: front
Passenger seat manual adjustments: 4
Passenger seat manual adjustments: reclining
Power door locks: auto-locking
Power outlet(s): 12V front
Power steering
Power windows: lockout button
Power windows: safety reverse
Push-button start
Radio data system
Radio: AM/FM
Radio: touch screen display
Radio: voice operated
Reading lights: front
Reading lights: rear
Reading lights: third row
Rear air conditioning zones: single
Rear air conditioning: automatic climate control
Rear bumper color: body-color

# List of Standard Features from iSeeCars.com that are the Same on the Chrysler Pacifica Hybrid and Non-Hybrid Touring Plus Trims Model Year 2017

Rear headrests: 2
Rear headrests: adjustable
Rear seat folding: fold flat into floor
Rear seat manual adjustments: reclining
Rear seatbelts: 3-point
Rear spoiler color: body-color
Rear spoiler: roofline
Rear suspension classification: semi-independent
Rear trunk/liftgate: liftgate
Rear trunk/liftgate: power operated
Rear vents: third row
Rear wiper: intermittent
Rear wiper: with washer
Rearview mirror: manual day/night
Rocker panel color: body-color
Roof rails: black
Satellite radio: SiriusXM
Seatbelt pretensioners: front
Seatbelt warning sensor: front
Side airbags: front
Side curtain airbags: front
Side curtain airbags: rear
Side curtain airbags: third row
Side mirror adjustments: manual folding
Side mirror adjustments: power
Side mirrors: heated
Solar-tinted glass
Spare tire kit: inflator kit
Speed sensitive volume control
Stability control
Steering wheel mounted controls: audio
Steering wheel mounted controls: cruise control
Steering wheel mounted controls: multi-function
Steering wheel mounted controls: voice control
Steering wheel trim: urethane
Steering wheel: tilt and telescopic
Storage: door pockets
Storage: front seatback
Storage: in dash
Storage: in floor
Storage: rear seatback
Storage: sunglasses holder
Taillights: LED
Third row headrests: 3
Third row seat folding: fold flat into floor

Third row seat folding: split
Third row seatbelts: 3-point
Tire Pressure Monitoring System
Total speakers: 6
Traction control
Tray tables
Trip odometer
Upholstery: cloth
Vanity mirrors: dual illuminating
Warnings and reminders: coolant temperature warning
Warnings and reminders: lamp failure
Warnings and reminders: low fuel level
Warnings and reminders: low oil pressure
Warnings and reminders: turn off headlights
Wheels: aluminum alloy
Window defogger: rear
Window trim: chrome
Wireless data link: Bluetooth

SOURCE: The Fontana Group, Inc.
DATA: iSeeCars.com Internet Site, 1/2024.
F:\PACU: ISCFEAT.XLSX:SS72:22:THHTIK

# List of Standard Features from iSeeCars.com that are Different on the Chrysler Pacifica Hybrid and Non-Hybrid Touring Plus Trims Model Year 2017

| **Feature Difference due to Non-Hybrid Reasons** | **Trim** | **Feature Difference due to Hybrid-Related Reasons** | **Trim** |
|---|---|---|---|
| Capless fuel filler system | Hybrid | Regenerative braking system | Hybrid |
| Courtesy lights: door | Hybrid | Spare tire mount location: underbody | Non-Hybrid |
| Customizable instrument cluster | Hybrid | Spare tire size: temporary | Non-Hybrid |
| Driver seat: heated | Non-Hybrid | Tuned suspension: heavy duty | Hybrid |
| Front fog lights | Non-Hybrid | Warnings and reminders: low battery | Hybrid |
| Front fog lights: LED | Hybrid | | |
| Headlights: wiper activated | Non-Hybrid | | |
| Instrument cluster screen size: 3.5 in. | Non-Hybrid | | |
| Instrument cluster screen size: 7 in. | Hybrid | | |
| Passenger seat: heated | Non-Hybrid | | |
| Power outlet(s): 115V | Hybrid | | |
| Power outlet(s): 12V rear | Non-Hybrid | | |
| Side mirror adjustments: reverse gear tilt | Non-Hybrid | | |
| Storage: accessory hook | Non-Hybrid | | |
| Storage: bin | Hybrid | | |
| Sunshade: side window | Non-Hybrid | | |
| Universal remote transmitter: garage door opener | Non-Hybrid | | |
| Remote engine start | Non-Hybrid | | |
| Laminated glass: acoustic | Hybrid | | |

SOURCE: The Fontana Group, Inc.
   DATA: iSeeCars.com Internet Site, 1/2024.
   F:\PACU: ISCFEAT.XLSX:SD72:22:THHT1K

Tab 8  Page 18

# JD Power Retail Stand-Alone Option Values
## (Selectable Valued Features) on Chrysler Pacificas*
## Model Years 2017 & 2018
## February 1, 2022 and 2023

### 2017

| Option | February 1, 2022 | February 1, 2023 | Change | % Change |
|---|---|---|---|---|
| Adaptive Cruise Control | $150 | $125 | ($25) | -16.7% |
| Advanced SafetyTec Pkg. | $750 | $750 | $0 | 0.0% |
| Alpine Stereo System | $250 | $225 | ($25) | -10.0% |
| Blind Spot Monitor | $125 | $75 | ($50) | -40.0% |
| Collision Avoidance System | $125 | $75 | ($50) | -40.0% |
| Fixed Running Boards | $50 | $50 | $0 | 0.0% |
| Harman Kardon Stereo | $375 | $375 | $0 | 0.0% |
| Lane Departure Warning | $75 | $75 | $0 | 0.0% |
| Luggage Rack | $50 | $50 | $0 | 0.0% |
| Navigation System | $250 | $200 | ($50) | -20.0% |
| Power Liftgate | $150 | $125 | ($25) | -16.7% |
| Rear Entertainment System | $375 | $325 | ($50) | -13.3% |
| Rear Parking Sensors | $125 | $75 | ($50) | -40.0% |
| Remote Engine Starter | $125 | $75 | ($50) | -40.0% |
| Towing/Camper Pkg | $375 | $325 | ($50) | -13.3% |
| W/out Power Sunroof | ($400) | ($375) | $25 | -6.3% |
| **Sum with All Options as Additive:** | **$3,750** | **$3,300** | **($450)** | **-12.0%** |

### 2018

| Option | February 1, 2022 | February 1, 2023 | Change | % Change |
|---|---|---|---|---|
| Adaptive Cruise Control | $175 | $150 | ($25) | -14.3% |
| Advanced SafetyTec Pkg. | $775 | $775 | $0 | 0.0% |
| Alpine Stereo System | $275 | $250 | ($25) | -9.1% |
| Collision Avoidance System | $125 | $125 | $0 | 0.0% |
| Fixed Running Boards | $50 | $50 | $0 | 0.0% |
| Harman Kardon Stereo | $425 | $425 | $0 | 0.0% |
| Lane Departure Warning | $125 | $75 | ($50) | -40.0% |
| Luggage Rack | $50 | $50 | $0 | 0.0% |
| Navigation System | $275 | $250 | ($25) | -9.1% |
| Power Liftgate | $150 | $150 | $0 | 0.0% |
| Rear Entertainment System | $425 | $375 | ($50) | -11.8% |
| S Pkg. | $325 | $325 | $0 | 0.0% |
| Towing/Camper Pkg | $400 | $375 | ($25) | -6.3% |
| W/out Blind Spot Monitor | ($125) | ($125) | $0 | 0.0% |
| W/out Power Liftgate | ($175) | ($175) | $0 | 0.0% |
| W/out Power Sunroof | ($450) | ($400) | $50 | -11.1% |
| W/out Rear Parking Sensors | ($125) | ($125) | $0 | 0.0% |
| W/out Remote Engine Starter | ($125) | ($125) | $0 | 0.0% |
| **Sum with All Options as Additive:** | **$4,575** | **$4,325** | **($250)** | **-5.5%** |

\* Options may not be available on all trims, but prices are constant across trims where offered.

SOURCE: The Fontana Group, Inc.
DATA: J.D. Power Internet Site, 1/2024.
F:\PACU\ OPTION$.XLSX:SPAC:22:THHDIK

Tab 9  Page 1

## JD Power Retail Stand-Alone Option Values
## (Selectable Valued Features) on Dodge Grand Caravans*
## Model Years 2017 & 2018
## February 1, 2022 and 2023

### 2017

| Option | February 1, 2022 | February 1, 2023 | Change | % Change |
|---|---|---|---|---|
| Aluminum/Alloy Wheels | $225 | $200 | ($25) | -11.1% |
| Automatic Climate Control | $125 | $75 | ($50) | -40.0% |
| Back Up Camera | $75 | $50 | ($25) | -33.3% |
| Blind Spot Monitor | $125 | $75 | ($50) | -40.0% |
| Bluetooth Connection | $50 | $50 | $0 | 0.0% |
| Fixed Running Boards | $50 | $50 | $0 | 0.0% |
| Heated Front Seats | $275 | $250 | ($25) | -9.1% |
| Leather Seats | $425 | $375 | ($50) | -11.8% |
| Luggage Rack | $50 | $50 | $0 | 0.0% |
| Navigation System | $250 | $200 | ($50) | -20.0% |
| Power Driver's Seat | $200 | $175 | ($25) | -12.5% |
| Rear Entertainment System | $375 | $325 | ($50) | -13.3% |
| Rear Parking Sensors | $125 | $75 | ($50) | -40.0% |
| Towing/Camper Pkg | $375 | $325 | ($50) | -13.3% |
| Univ Garage Door Opener | $25 | $25 | $0 | 0.0% |
| W/o Rear Air Conditioning | ($175) | ($175) | $0 | 0.0% |
| W/o Rear Bucket Seats | ($150) | ($125) | $25 | -16.7% |
| **Sum with All Options as Additive:** | **$3,075** | **$2,600** | **($475)** | **-15.4%** |

### 2018

| Option | February 1, 2022 | February 1, 2023 | Change | % Change |
|---|---|---|---|---|
| Aluminum/Alloy Wheels | $250 | $225 | ($25) | -10.0% |
| Automatic Climate Control | $125 | $125 | $0 | 0.0% |
| Blind Spot Monitor | $125 | $125 | $0 | 0.0% |
| Bluetooth Connection | $50 | $50 | $0 | 0.0% |
| Dual Power Sliding Doors | $275 | $225 | ($50) | -18.2% |
| Fixed Running Boards | $50 | $50 | $0 | 0.0% |
| Fog Lights | $50 | $50 | $0 | 0.0% |
| Heated Front Seats | $300 | $275 | ($25) | -8.3% |
| Leather Seats | $450 | $425 | ($25) | -5.6% |
| Luggage Rack | $50 | $50 | $0 | 0.0% |
| Navigation System | $275 | $250 | ($25) | -9.1% |
| Power Driver's Seat | $225 | $200 | ($25) | -11.1% |
| Power Liftgate | $150 | $150 | $0 | 0.0% |
| Rear Entertainment System | $425 | $375 | ($50) | -11.8% |
| Rear Parking Sensors | $125 | $125 | $0 | 0.0% |
| Remote Engine Starter | $125 | $125 | $0 | 0.0% |
| Towing/Camper Pkg | $400 | $375 | ($25) | -6.3% |
| Univ Garage Door Opener | $25 | $25 | $0 | 0.0% |
| W/o Rear Air Conditioning | ($200) | ($175) | $25 | -12.5% |
| W/o Rear Bucket Seats | ($175) | ($150) | $25 | -14.3% |
| **Sum with All Options as Additive:** | **$3,850** | **$3,550** | **($300)** | **-7.8%** |

\* Options may not be available on all trims, but prices are constant across trims where offered.

SOURCE:  The Fontana Group, Inc.
DATA:  J.D. Power Internet Site, 1/2024.
F:\PACU\ OPTION$.XLSX:SGCC:22:THHDIK

Tab 9  Page 2

# Illustration of Damage Calculation for Loss of Hybrid Feature During Idled Asset Period

**Start of Idled Asset Period**
Pacifica Hybrid Clean Trade-In Value

*less*   Pacifica Non-Hybrid Clean Trade-In Value
*less*   Value of Differing Feature 1
*less*   Value of Differing Feature 2
       ⋮
*less*   Value of Differing Feature $n$

*equals*   Hybrid Feature Value as of
        Start of Idled Asset Period

**End of Idled Asset Period**
Pacifica Hybrid Clean Trade-In Value

*less*   Pacifica Non-Hybrid Clean Trade-In Value
*less*   Value of Differing Feature 1
*less*   Value of Differing Feature 2
       ⋮
*less*   Value of Differing Feature $n$

*equals*   Hybrid Feature Value as of
        End of Idled Asset Period

**Damage Attributable to Loss of Hybrid Feature During Idled Asset Period**
Hybrid Feature Value as of Start of Idled Asset Period   *less*   Hybrid Feature as of End of Idled Asset Period

SOURCE: The Fontana Group, Inc.
F:\PACU: DER\VEXAMP.XLSX:SDRV-69\THHDIK

Tab 10  Page 1

# Hedonic Regression
# Candidate Independent Variables

**Dependent Variables**

Clean Trade-In Value

**Candidate Independent Variables**

| | **Description** |
|---|---|
| | J.D. Power listed values for Clean Trade-In of observed vehicle. |
| Fuel Type | Fuel type of observed vehicle, e.g., gas, diesel, hybrid (type), electric, or natural gas. |
| Segment | Segment in which the observed vehicle competes. |
| Horsepower | Horsepower of observed vehicle. |
| Model Year | Model year of observed vehicle. |
| Line Make | Manufacturer of observed vehicle. |
| Vehicle Length | Length of observed vehicle. |
| Vehicle Width | Width of observed vehicle. |
| Vehicle Height | Height of observed vehicle. |
| Curb Weight | Curb Weight of observed vehicle. |
| Fuel Price | Average price of gasoline in observed month. |

**Used Vehicle Registrations**
**Model Year 2017 & 2018 Chrysler and S&P Competitive**
**U.S.**
**2/2022 - 2/2023**

| S&P Segment | Make | Model | Series | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Sum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MID SIZE CAR | BUICK | LACROSSE | AVR | 6 | 5 | 5 | 2 | 7 | 5 | 6 | 5 | 5 | 4 | 1 | 1 | 3 | 55 |
| MID SIZE CAR | BUICK | LACROSSE | ESS | 174 | 209 | 184 | 184 | 186 | 188 | 180 | 151 | 180 | 159 | 164 | 181 | 188 | 2,328 |
| MID SIZE CAR | BUICK | LACROSSE | PFR | 39 | 45 | 32 | 32 | 40 | 42 | 29 | 29 | 41 | 22 | 26 | 38 | 34 | 449 |
| MID SIZE CAR | BUICK | LACROSSE | PRE | 125 | 137 | 134 | 128 | 143 | 127 | 105 | 124 | 130 | 97 | 115 | 134 | 139 | 1,638 |
| MID SIZE CAR | BUICK | LACROSSE | UND | 2 | 4 | 3 | 2 | 3 | 0 | 2 | 1 | 0 | 2 | 2 | 1 | 1 | 24 |
| MID SIZE CAR | BUICK | REGAL | ISV | 1 | 4 | 0 | 0 | 2 | 2 | 0 | 1 | 0 | 1 | 3 | 1 | 1 | 16 |
| MID SIZE CAR | BUICK | REGAL | ESS | 82 | 79 | 67 | 70 | 76 | 63 | 62 | 70 | 83 | 67 | 48 | 76 | 63 | 906 |
| MID SIZE CAR | BUICK | REGAL | GS | 23 | 25 | 29 | 28 | 22 | 22 | 27 | 21 | 27 | 22 | 21 | 22 | 14 | 303 |
| MID SIZE CAR | BUICK | REGAL | PF2 | 17 | 23 | 18 | 24 | 21 | 14 | 12 | 13 | 23 | 18 | 15 | 21 | 15 | 234 |
| MID SIZE CAR | BUICK | REGAL | PFR | 47 | 63 | 48 | 67 | 49 | 63 | 48 | 54 | 55 | 32 | 38 | 65 | 56 | 685 |
| MID SIZE CAR | BUICK | REGAL | PRM | 23 | 40 | 47 | 33 | 36 | 33 | 19 | 26 | 33 | 27 | 32 | 27 | 29 | 405 |
| MID SIZE CAR | BUICK | REGAL | SPT | 100 | 135 | 121 | 116 | 111 | 120 | 89 | 107 | 111 | 79 | 86 | 105 | 98 | 1,378 |
| MID SIZE CAR | BUICK | REGAL | UND | 12 | 9 | 6 | 8 | 15 | 11 | 4 | 11 | 8 | 8 | 8 | 10 | 12 | 122 |
| MID SIZE CAR | CHEVROLET | MALIBU | HYB | 100 | 129 | 83 | 107 | 97 | 92 | 63 | 68 | 58 | 65 | 52 | 71 | 82 | 1,067 |
| MID SIZE CAR | CHEVROLET | MALIBU | L | | 4 | 4 | 2 | 2 | 2 | 3 | 5 | 3 | 0 | 1 | 2 | 2 | 29 |
| MID SIZE CAR | CHEVROLET | MALIBU | LS | 1,374 | 1,492 | 1,321 | 1,343 | 1,272 | 1,343 | 1,153 | 1,167 | 1,207 | 993 | 952 | 1,169 | 1,192 | 15,978 |
| MID SIZE CAR | CHEVROLET | MALIBU | LT | 3,455 | 3,944 | 3,338 | 3,343 | 3,160 | 3,377 | 2,806 | 2,676 | 2,766 | 2,453 | 2,385 | 2,611 | 2,802 | 39,116 |
| MID SIZE CAR | CHEVROLET | MALIBU | PRE | 269 | 290 | 247 | 250 | 228 | 255 | 204 | 216 | 247 | 160 | 191 | 213 | 240 | 3,010 |
| MID SIZE CAR | CHRYSLER | 200 | C | | | | | | | | | | | | | | 0 |
| MID SIZE CAR | CHRYSLER | 200 | LTD | 121 | 122 | 101 | 111 | 83 | 105 | 99 | 103 | 90 | 71 | 78 | 89 | 137 | 1,310 |
| MID SIZE CAR | CHRYSLER | 200 | LX | 53 | 46 | 41 | 36 | 44 | 44 | 43 | 33 | 28 | 21 | 42 | 29 | 32 | 303 |
| MID SIZE CAR | CHRYSLER | 200 | S | 5 | 5 | 5 | 1 | 6 | 0 | 2 | 2 | 2 | 0 | 2 | 0 | 0 | 27 |
| MID SIZE CAR | FORD | FUSION | S | 360 | 441 | 346 | 391 | 330 | 362 | 324 | 278 | 353 | 281 | 261 | 321 | 381 | 4,429 |
| MID SIZE CAR | FORD | FUSION | SE | 3,964 | 4,512 | 3,855 | 3,986 | 3,693 | 3,885 | 3,328 | 3,055 | 3,329 | 2,861 | 2,708 | 3,131 | 3,335 | 45,642 |
| MID SIZE CAR | FORD | FUSION | SPT | 101 | 135 | 144 | 103 | 116 | 110 | 122 | 94 | 97 | 77 | 83 | 88 | 88 | 1,358 |
| MID SIZE CAR | FORD | FUSION | TTN | 600 | 699 | 624 | 667 | 626 | 659 | 538 | 511 | 520 | 459 | 484 | 516 | 536 | 7,439 |
| MID SIZE CAR | HONDA | ACCORD | EX | 1,150 | 1,290 | 1,062 | 1,153 | 990 | 1,107 | 918 | 862 | 876 | 792 | 766 | 1,006 | 926 | 12,898 |
| MID SIZE CAR | HONDA | ACCORD | EXL | 663 | 765 | 597 | 576 | 518 | 500 | 437 | 408 | 432 | 363 | 389 | 461 | 456 | 6,565 |
| MID SIZE CAR | HONDA | ACCORD | HYB | 363 | 401 | 325 | 371 | 292 | 282 | 223 | 255 | 266 | 206 | 266 | 282 | 292 | 3,824 |
| MID SIZE CAR | HONDA | ACCORD | LX | 1,711 | 1,889 | 1,554 | 1,569 | 1,420 | 1,501 | 1,301 | 1,192 | 1,225 | 1,100 | 1,078 | 1,232 | 1,204 | 17,976 |
| MID SIZE CAR | HONDA | ACCORD | SPT | 2,960 | 3,291 | 2,997 | 2,952 | 2,518 | 2,769 | 2,260 | 2,215 | 2,205 | 1,967 | 1,843 | 2,261 | 2,303 | 32,541 |
| MID SIZE CAR | HONDA | ACCORD | TRG | 732 | 801 | 717 | 717 | 599 | 654 | 513 | 505 | 463 | 422 | 418 | 505 | 538 | 7,584 |
| MID SIZE CAR | HONDA | CLARITY | TRG | 147 | 185 | 134 | 121 | 95 | 88 | 74 | 71 | 71 | 67 | 66 | 99 | 87 | 1,305 |
| MID SIZE CAR | HONDA | CLARITY | UND | 158 | 180 | 120 | 121 | 87 | 73 | 52 | 67 | 49 | 51 | 57 | 67 | 77 | 1,159 |
| MID SIZE CAR | HYUNDAI | SONATA | ECO | 23 | 42 | 28 | 37 | 42 | 36 | 29 | 25 | 26 | 26 | 31 | 28 | 28 | 401 |
| MID SIZE CAR | HYUNDAI | SONATA | HYB | 61 | 81 | 55 | 59 | 58 | 71 | 47 | 41 | 52 | 45 | 58 | 58 | 69 | 755 |
| MID SIZE CAR | HYUNDAI | SONATA | MTL | 950 | 1,075 | 1,010 | 1,030 | 887 | 909 | 840 | 762 | 766 | 737 | 688 | 835 | 799 | 11,288 |
| MID SIZE CAR | HYUNDAI | SONATA | PLU | 12 | 11 | 14 | 10 | 11 | 8 | 8 | 5 | 6 | 6 | 4 | 11 | 9 | 115 |
| MID SIZE CAR | HYUNDAI | SONATA | SE | 1,598 | 1,864 | 1,558 | 1,670 | 1,580 | 1,624 | 1,476 | 1,367 | 1,475 | 1,211 | 1,197 | 1,397 | 1,488 | 19,505 |

Page 1 of 4

Tab 12  Page 1

**Used Vehicle Registrations**
**Model Year 2017 & 2018 Chrysler and S&P Competitive**
**U.S.**
**2/2022 - 2/2023**

| S&P Segment | Make | Model | Series | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Sum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MID SIZE CAR | HYUNDAI | SONATA | SPO | 618 | 676 | 582 | 680 | 630 | 640 | 564 | 546 | 576 | 471 | 459 | 570 | 580 | 7,592 |
| MID SIZE CAR | KIA | OPTIMA | EX | 310 | 337 | 286 | 290 | 271 | 304 | 247 | 199 | 259 | 209 | 186 | 242 | 230 | 3,370 |
| MID SIZE CAR | KIA | OPTIMA | HYB | 97 | 153 | 90 | 99 | 76 | 85 | 66 | 73 | 69 | 60 | 64 | 82 | 77 | 1,091 |
| MID SIZE CAR | KIA | OPTIMA | LX | 1,453 | 1,695 | 1,461 | 1,495 | 1,376 | 1,560 | 1,332 | 1,237 | 1,254 | 1,055 | 1,059 | 1,245 | 1,273 | 17,495 |
| MID SIZE CAR | KIA | OPTIMA | PLU | 23 | 23 | 34 | 47 | 25 | 23 | 13 | 21 | 16 | 16 | 17 | 24 | 14 | 303 |
| MID SIZE CAR | KIA | OPTIMA | SX | 53 | 66 | 57 | 60 | 49 | 67 | 38 | 37 | 47 | 34 | 46 | 40 | 47 | 641 |
| MID SIZE CAR | KIA | OPTIMA | SXL | 44 | 44 | 59 | 48 | 28 | 38 | 46 | 39 | 39 | 35 | 45 | 42 | 38 | 545 |
| MID SIZE CAR | KIA | OPTIMA | GRV | 44 | 75 | 77 | 64 | 62 | 47 | 51 | 40 | 33 | 43 | 30 | 33 | 27 | 626 |
| MID SIZE CAR | MAZDA | 6 | GTR | 197 | 218 | 171 | 195 | 181 | 169 | 115 | 135 | 129 | 95 | 110 | 148 | 132 | 1,995 |
| MID SIZE CAR | MAZDA | 6 | SIG | 46 | 40 | 48 | 49 | 37 | 40 | 25 | 31 | 29 | 31 | 40 | 26 | 30 | 472 |
| MID SIZE CAR | MAZDA | 6 | SPT | 221 | 248 | 256 | 230 | 204 | 202 | 130 | 149 | 140 | 114 | 105 | 132 | 134 | 2,265 |
| MID SIZE CAR | MAZDA | 6 | TUR | 422 | 447 | 388 | 428 | 387 | 345 | 315 | 293 | 313 | 255 | 263 | 294 | 279 | 4,429 |
| MID SIZE CAR | NISSAN | ALTIMA | MTL | 5,932 | 6,442 | 5,846 | 5,925 | 5,162 | 5,637 | 4,832 | 4,593 | 4,814 | 3,980 | 3,901 | 4,533 | 4,705 | 66,302 |
| MID SIZE CAR | SUBARU | LEGACY | 25I | 594 | 721 | 697 | 701 | 683 | 702 | 634 | 583 | 633 | 529 | 519 | 573 | 600 | 8,169 |
| MID SIZE CAR | SUBARU | LEGACY | 36R | 51 | 58 | 50 | 64 | 65 | 70 | 55 | 70 | 60 | 52 | 46 | 54 | 55 | 750 |
| MID SIZE CAR | SUBARU | LEGACY | SPT | 77 | 104 | 105 | 82 | 101 | 102 | 81 | 76 | 89 | 91 | 74 | 69 | 71 | 1,122 |
| MID SIZE CAR | TOYOTA | CAMRY | HYB | 229 | 241 | 223 | 257 | 230 | 199 | 163 | 158 | 179 | 179 | 173 | 192 | 192 | 2,615 |
| MID SIZE CAR | TOYOTA | CAMRY | LE | 73 | 70 | 58 | 63 | 63 | 63 | 32 | 47 | 47 | 42 | 49 | 55 | 53 | 715 |
| MID SIZE CAR | TOYOTA | CAMRY | MTL | 5,603 | 6,477 | 5,599 | 5,915 | 5,501 | 5,883 | 4,741 | 4,438 | 4,645 | 3,963 | 3,907 | 4,651 | 4,366 | 65,689 |
| MID SIZE CAR | TOYOTA | CAMRY | XSE | 445 | 492 | 402 | 455 | 369 | 365 | 355 | 350 | 317 | 273 | 305 | 329 | 283 | 4,740 |
| MID SIZE CAR | TOYOTA | MIRAI | ELE | 112 | 70 | 62 | 55 | 41 | 40 | 25 | 40 | 47 | 30 | 31 | 51 | 51 | 655 |
| MID SIZE CAR | VOLKSWAGEN | CC | EXE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| MID SIZE CAR | VOLKSWAGEN | CC | MTL | 16 | 13 | 13 | 7 | 5 | 9 | 4 | 7 | 6 | 6 | 8 | 2 | 8 | 93 |
| MID SIZE CAR | VOLKSWAGEN | CC | SPO | 16 | 19 | 20 | 18 | 11 | 10 | 15 | 8 | 12 | 7 | 9 | 11 | 11 | 167 |
| MID SIZE CAR | VOLKSWAGEN | PASSAT | GT | 72 | 52 | 63 | 50 | 59 | 60 | 54 | 41 | 45 | 40 | 37 | 40 | 27 | 640 |
| MID SIZE CAR | VOLKSWAGEN | PASSAT | RLN | 281 | 341 | 284 | 278 | 272 | 282 | 237 | 234 | 211 | 191 | 190 | 224 | 224 | 3,249 |
| MID SIZE CAR | VOLKSWAGEN | PASSAT | S | 147 | 164 | 139 | 167 | 147 | 174 | 142 | 107 | 119 | 109 | 92 | 129 | 137 | 1,773 |
| MID SIZE CAR | VOLKSWAGEN | PASSAT | SE | 487 | 598 | 504 | 557 | 439 | 491 | 430 | 370 | 391 | 347 | 328 | 399 | 374 | 5,715 |
| MID SIZE CAR | VOLKSWAGEN | PASSAT | SEL | 74 | 82 | 79 | 77 | 83 | 81 | 58 | 69 | 64 | 55 | 53 | 58 | 53 | 886 |
| MID SIZE CAR | VOLKSWAGEN | PASSAT | SPR | 13 | 6 | 9 | 12 | 9 | 12 | 5 | 4 | 8 | 7 | 2 | 5 | 13 | 105 |
| MID SIZE CAR | VOLKSWAGEN | PASSAT | SRL | 244 | 333 | 268 | 301 | 258 | 279 | 242 | 225 | 236 | 147 | 191 | 196 | 200 | 3,120 |
| FULL SIZE CAR | CHEVROLET | CAPRICE | POL | 0 | 0 | 2 | 1 | 2 | 2 | 0 | 2 | 0 | 3 | 1 | 2 | 1 | 16 |
| FULL SIZE CAR | CHEVROLET | IMPALA | LS | 109 | 170 | 133 | 138 | 116 | 158 | 115 | 118 | 115 | 111 | 107 | 117 | 140 | 1,647 |
| FULL SIZE CAR | CHEVROLET | IMPALA | LT | 929 | 1,069 | 889 | 898 | 814 | 930 | 819 | 753 | 796 | 671 | 678 | 748 | 834 | 10,828 |
| FULL SIZE CAR | CHEVROLET | IMPALA | PRE | 402 | 465 | 398 | 400 | 385 | 418 | 337 | 335 | 355 | 288 | 299 | 361 | 365 | 4,808 |
| FULL SIZE CAR | CHEVROLET | SS | UND | 31 | 42 | 55 | 53 | 52 | 49 | 46 | 50 | 49 | 39 | 31 | 42 | 43 | 582 |
| FULL SIZE CAR | CHRYSLER | 300 | 30C | 47 | 73 | 50 | 55 | 50 | 54 | 52 | 44 | 45 | 50 | 55 | 50 | 68 | 693 |
| FULL SIZE CAR | CHRYSLER | 300 | 30S | 446 | 501 | 393 | 445 | 388 | 428 | 381 | 417 | 413 | 307 | 308 | 297 | 348 | 5,072 |
| FULL SIZE CAR | CHRYSLER | 300 | C | 107 | 88 | 99 | 89 | 99 | 93 | 74 | 70 | 77 | 50 | 55 | 87 | 75 | 1,063 |

Tab 12  Page 2

## Used Vehicle Registrations
## Model Year 2017 & 2018 Chrysler and S&P Competitive
## U.S.
## 2/2022 - 2/2023

| S&P Segment | Make | Model | Series | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Sum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FULL SIZE CAR | CHRYSLER | 300 | LTD | 309 | 320 | 273 | 315 | 283 | 284 | 279 | 265 | 255 | 237 | 188 | 238 | 259 | 3,505 |
| FULL SIZE CAR | CHRYSLER | 300 | TOU | 218 | 283 | 234 | 236 | 210 | 222 | 206 | 174 | 186 | 167 | 174 | 200 | 172 | 2,682 |
| FULL SIZE CAR | DODGE | CHARGER | GT | 246 | 285 | 264 | 215 | 202 | 211 | 193 | 187 | 202 | 160 | 170 | 145 | 167 | 2,647 |
| FULL SIZE CAR | DODGE | CHARGER | POL | 81 | 124 | 117 | 100 | 100 | 110 | 115 | 125 | 103 | 123 | 98 | 117 | 118 | 1,451 |
| FULL SIZE CAR | DODGE | CHARGER | R/T | 1,018 | 1,178 | 1,055 | 1,029 | 874 | 866 | 796 | 766 | 761 | 659 | 582 | 698 | 692 | 10,974 |
| FULL SIZE CAR | DODGE | CHARGER | SE | 176 | 211 | 183 | 184 | 150 | 198 | 152 | 141 | 151 | 132 | 92 | 148 | 134 | 2,052 |
| FULL SIZE CAR | DODGE | CHARGER | SRT | 117 | 137 | 124 | 125 | 128 | 134 | 104 | 116 | 109 | 93 | 73 | 90 | 85 | 1,435 |
| FULL SIZE CAR | DODGE | CHARGER | SXT | 831 | 978 | 876 | 889 | 753 | 896 | 759 | 653 | 733 | 573 | 541 | 660 | 653 | 9,795 |
| FULL SIZE CAR | FORD | TAURUS | LTD | 127 | 166 | 160 | 139 | 129 | 177 | 126 | 137 | 152 | 128 | 111 | 141 | 144 | 1,837 |
| FULL SIZE CAR | FORD | TAURUS | POL | 29 | 35 | 32 | 37 | 27 | 29 | 36 | 42 | 31 | 41 | 28 | 33 | 35 | 435 |
| FULL SIZE CAR | FORD | TAURUS | SE | 84 | 127 | 124 | 119 | 123 | 120 | 105 | 105 | 105 | 80 | 94 | 108 | 96 | 1,390 |
| FULL SIZE CAR | FORD | TAURUS | SEL | 236 | 254 | 249 | 267 | 218 | 258 | 204 | 201 | 215 | 175 | 191 | 195 | 220 | 2,883 |
| FULL SIZE CAR | FORD | TAURUS | SHO | 54 | 67 | 66 | 46 | 46 | 49 | 52 | 41 | 62 | 37 | 47 | 40 | 41 | 641 |
| FULL SIZE CAR | HYUNDAI | AZERA | LTD | 10 | 10 | 11 | 12 | 13 | 21 | 11 | 4 | 10 | 8 | 7 | 10 | 11 | 138 |
| FULL SIZE CAR | HYUNDAI | AZERA | UND | 20 | 10 | 16 | 12 | 18 | 15 | 9 | 8 | 12 | 13 | 7 | 10 | 8 | 158 |
| FULL SIZE CAR | KIA | CADENZA | MTL | 113 | 141 | 123 | 119 | 88 | 118 | 105 | 92 | 86 | 70 | 70 | 100 | 105 | 1,330 |
| FULL SIZE CAR | KIA | CADENZA | PRE | 24 | 31 | 29 | 28 | 40 | 39 | 22 | 23 | 22 | 13 | 19 | 12 | 32 | 334 |
| FULL SIZE CAR | NISSAN | MAXIMA | MTL | 1,833 | 1,983 | 1,787 | 1,805 | 1,568 | 1,740 | 1,507 | 1,389 | 1,426 | 1,157 | 1,143 | 1,385 | 1,491 | 20,214 |
| FULL SIZE CAR | TOYOTA | AVALON | HYB | 55 | 56 | 50 | 67 | 53 | 45 | 34 | 30 | 36 | 27 | 31 | 56 | 52 | 592 |
| FULL SIZE CAR | TOYOTA | AVALON | MTL | 228 | 266 | 233 | 274 | 269 | 272 | 223 | 225 | 228 | 185 | 171 | 242 | 204 | 3,020 |
| MID SIZE VAN | CHRYSLER | PACIFICA | L | 31 | 40 | 42 | 29 | 34 | 35 | 30 | 26 | 25 | 28 | 13 | 22 | 27 | 382 |
| MID SIZE VAN | CHRYSLER | PACIFICA | LTD | 577 | 672 | 636 | 642 | 666 | 655 | 531 | 480 | 516 | 426 | 499 | 508 | 554 | 7,362 |
| MID SIZE VAN | CHRYSLER | PACIFICA | LX | 158 | 141 | 155 | 130 | 119 | 120 | 98 | 99 | 98 | 92 | 106 | 130 | 119 | 1,565 |
| MID SIZE VAN | CHRYSLER | PACIFICA | PLT | 21 | 16 | 16 | 21 | 15 | 17 | 19 | 14 | 9 | 23 | 6 | 14 | 17 | 208 |
| MID SIZE VAN | CHRYSLER | PACIFICA | PRE | 4 | 2 | 1 | 1 | 3 | 0 | 1 | 1 | 3 | 4 | 3 | 4 | 2 | 29 |
| MID SIZE VAN | CHRYSLER | PACIFICA | TRG | 2,141 | 2,516 | 2,093 | 2,165 | 2,083 | 2,096 | 1,792 | 1,735 | 1,789 | 1,627 | 1,571 | 1,837 | 1,880 | 25,325 |
| MID SIZE VAN | DODGE | CARAVAN | GT | 23 | 34 | 20 | 36 | 20 | 25 | 22 | 35 | 15 | 30 | 24 | 33 | 24 | 341 |
| MID SIZE VAN | DODGE | CARAVAN | GRC | 1,607 | 1,726 | 1,563 | 1,805 | 1,541 | 1,661 | 1,581 | 1,518 | 1,556 | 1,298 | 1,265 | 1,454 | 1,550 | 20,125 |
| MID SIZE VAN | DODGE | CARAVAN | GT | 641 | 737 | 650 | 680 | 575 | 616 | 571 | 537 | 605 | 525 | 448 | 577 | 575 | 7,737 |
| MID SIZE VAN | HONDA | ODYSSEY | ELT | 148 | 207 | 201 | 177 | 166 | 171 | 152 | 187 | 173 | 156 | 169 | 184 | 198 | 2,289 |
| MID SIZE VAN | HONDA | ODYSSEY | EX | 607 | 737 | 725 | 718 | 618 | 633 | 543 | 540 | 574 | 499 | 548 | 622 | 677 | 8,041 |
| MID SIZE VAN | HONDA | ODYSSEY | LX | 28 | 41 | 35 | 42 | 44 | 37 | 33 | 30 | 25 | 24 | 26 | 27 | 35 | 427 |
| MID SIZE VAN | HONDA | ODYSSEY | MTL | 22 | 23 | 24 | 34 | 17 | 24 | 28 | 20 | 30 | 22 | 28 | 32 | 33 | 337 |
| MID SIZE VAN | HONDA | ODYSSEY | SE | 51 | 47 | 29 | 36 | 44 | 45 | 26 | 42 | 44 | 32 | 43 | 40 | 38 | 517 |
| MID SIZE VAN | HONDA | ODYSSEY | TOU | 98 | 106 | 93 | 84 | 88 | 93 | 83 | 82 | 75 | 76 | 87 | 100 | 94 | 1,159 |
| MID SIZE VAN | KIA | SEDONA | L | 30 | 31 | 31 | 26 | 34 | 29 | 33 | 30 | 37 | 25 | 15 | 15 | 26 | 362 |
| MID SIZE VAN | KIA | SEDONA | LX | 284 | 285 | 295 | 301 | 267 | 265 | 232 | 234 | 229 | 206 | 213 | 249 | 244 | 3,304 |
| MID SIZE VAN | KIA | SEDONA | MTL | 103 | 100 | 80 | 94 | 100 | 92 | 82 | 70 | 79 | 58 | 89 | 53 | 77 | 1,077 |
| MID SIZE VAN | KIA | SEDONA | SXL | 20 | 28 | 27 | 37 | 34 | 27 | 25 | 17 | 22 | 24 | 22 | 21 | 26 | 330 |

Page 3 of 4

Tab 12 Page 3

**Used Vehicle Registrations**
**Model Year 2017 & 2018 Chrysler and S&P Competitive**
**U.S.**
**2/2022 - 2/2023**

| S&P Segment | Make | Model | Series | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Sum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MID SIZE VAN | MERCEDES-BENZ | METRIS | UND | 91 | 81 | 95 | 89 | 73 | 93 | 82 | 86 | 82 | 77 | 69 | 84 | 113 | 1,115 |
| MID SIZE VAN | NISSAN | QUEST | MTL | 45 | 38 | 56 | 41 | 54 | 51 | 54 | 52 | 40 | 38 | 41 | 42 | 40 | 592 |
| MID SIZE VAN | TOYOTA | SIENNA | L | 6 | 28 | 24 | 36 | 30 | 38 | 29 | 34 | 20 | 23 | 17 | 25 | 27 | 337 |
| MID SIZE VAN | TOYOTA | SIENNA | LE | 434 | 519 | 473 | 503 | 422 | 434 | 373 | 322 | 356 | 350 | 361 | 338 | 356 | 5,241 |
| MID SIZE VAN | TOYOTA | SIENNA | MTL | 271 | 356 | 311 | 366 | 286 | 307 | 259 | 243 | 276 | 234 | 241 | 276 | 246 | 3,672 |
| MID SIZE VAN | TOYOTA | SIENNA | SE | 170 | 210 | 180 | 208 | 175 | 175 | 151 | 141 | 131 | 144 | 111 | 147 | 125 | 2,068 |
| MID SIZE VAN | TOYOTA | SIENNA | UND | 55 | 67 | 50 | 55 | 53 | 67 | 44 | 53 | 48 | 37 | 46 | 53 | 38 | 666 |
| MID SIZE VAN | TOYOTA | SIENNA | XLE | 493 | 538 | 471 | 601 | 514 | 545 | 486 | 405 | 484 | 433 | 406 | 496 | 450 | 6,322 |
| Sum | | | | 55,603 | 63,177 | 55,303 | 57,142 | 51,562 | 54,813 | 46,715 | 44,364 | 46,213 | 39,546 | 38,829 | 45,328 | 46,245 | 644,840 |

SOURCE:  The Fontana Group, Inc.
DATA:  S&P Global Mobility Used Summary Registration Data File, 2/2022-2/2023 (11/2023 Update).
F:\PACU_USEDREGS.XLSX.SUBG 69-THEDIK.

Page 4 of 4

Tab 12  Page 4

**Illustration of Damage Allocation**
**With Two Owners and Transfer of Ownership in 2021**
**2018 Chrysler Pacifica Hybrid Touring Plus**

| | | |
|---|---|---|
| **(1)** | 2018 Invoice Price (2018 dollars) | $39,895 |
| **(2)** | Normalization Factor for 3-year old vehicle | 51.5% |
| **(3)** (1) * (2) | 2021 Normalized Clean Trade-In (2021 dollars) | $20,546 |
| **(4)** | 2021 to 2018 Inflation Adjustment Factor | 0.928 |
| **(5)** (3) * (4) | Normalized Clean Trade-In in 2018 Dollars | $19,067 |
| **(6)** 1 - (5)/(1) | Percent Use by First Owner | 52.2% |
| **(7)** | Estimated Competent Repair | $5,000 |
| **(8)** (6) * (7) | Competent Repair Allocated to First Owner | $2,610 |
| **(9)** (7) - (8) | Competent Repair Allocated to Second Owner | $2,390 |

SOURCE: The Fontana Group, Inc.
DATA: Bureau of Economic Analysis Internet Site, 12/21/2023.
J.D. Power Internet Site, 1/2024.
iSeeCars.com Internet Site, 1/2024.
F:\PACU: EXDAM.XLSX:SARA:21:THHEIK

Tab 13  Page 1

# Illustration of Damage Allocation
# With Out-of-Network Migration in 2021
# 2018 Chrysler Pacifica Hybrid Touring Plus

| | | |
|---|---|---:|
| **(1)** | 2018 Invoice Price (2018 dollars) | $39,895 |
| **(2)** | Normalization Factor for 3-year old vehicle | 51.5% |
| **(3)**<br>(1) * (2) | 2021 Normalized Clean Trade-In (2021 dollars) | $20,546 |
| **(4)** | 2021 to 2018 Inflation Adjustment Factor | 0.928 |
| **(5)**<br>(3) * (4) | Normalized Clean Trade-In in 2018 Dollars | $19,067 |
| **(6)**<br>1 - (5)/(1) | Percent Use by First Owner | 52.2% |
| **(7)** | Estimated Competent Repair | $5,000 |
| **(8)**<br>(6) * (7) | Competent Repair Allocated to First Owner | $2,610 |
| **(9)**<br>(7) - (8) | Credit Due to Out-of-Network Migration | $2,390 |

SOURCE: The Fontana Group, Inc.
    DATA: Bureau of Economic Analysis Internet Site, 12/21/2023.
        J.D. Power Internet Site, 1/2024.
        iSeeCars.com Internet Site, 1/2024.
    F:\PACU: EXDAM.XLSX:SORA:21:THHEIK

Tab 14  Page 1

# Normalization Factor based on Clean Trade-In as a Percent of Invoice Price
## 2017 & 2018 Chrysler Pacifica Hybrid
## One to Three Years of Age

| Age | Model Year | | Average |
|-----|------|------|---------|
| | **2017** | **2018** | |
| 1 yr. | 66.6% | 67.8% | 67.2% |
| 2 yrs. | 62.4% | 55.6% | 59.0% |
| 3 yrs. | 51.5% | | 51.5% |

SOURCE: The Fontana Group, Inc.
    DATA: J.D. Power Internet Site, 1/2024.
          iSeeCars.com Internet Site, 1/2024.
F:\PACU: CTI%INV.XLSX:SNRM:69:THHDIK

Tab 15  Page 1

**Clean Trade-In Values as a Percent of Invoice Price**
**2017 & 2018 Chrysler Pacifica Hybrid**
**2018 - 2020**

| Model Year | Make | Model | Trim | Clean Trade-In Year | | |
|---|---|---|---|---|---|---|
| | | | | **2018** | **2019** | **2020** |
| 2017 | Chrysler | Pacifica Hybrid | Touring Plus 4dr Mini-Van | 64.4% | 61.6% | 50.3% |
| 2017 | Chrysler | Pacifica Hybrid | Platinum 4dr Mini-Van | 69.8% | 64.1% | 53.3% |
| 2017 | Chrysler | Pacifica Hybrid | Premium 4dr Mini-Van | 65.5% | 61.5% | 51.0% |
| 2018 | Chrysler | Pacifica Hybrid | Touring Plus 4dr Mini-Van | | 66.0% | 54.2% |
| 2018 | Chrysler | Pacifica Hybrid | Touring L 4dr Mini-Van | | 65.8% | 54.5% |
| 2018 | Chrysler | Pacifica Hybrid | Limited 4dr Mini-Van | | 71.6% | 58.1% |

SOURCE: The Fontana Group, Inc.
    DATA: J.D. Power Internet Site, 1/2024.
          iSeeCars.com Internet Site, 1/2024.
    F:\PACU: CTP4INV-XLSX.SPRC.69.THHDIK

Tab 15  Page 2

# Invoice Price and Clean Trade-In Values
## 2017 & 2018 Chrysler Pacifica Hybrid
## 2018 – 2020

| Model Year | Make | Model | Trim | Invoice Price | Clean Trade-In Year | | |
|---|---|---|---|---|---|---|---|
| | | | | | **2018** | **2019** | **2020** |
| 2017 | Chrysler | Pacifica Hybrid | Touring Plus 4dr Mini-Van | $39,900 | $25,700 | $24,575 | $20,050 |
| 2017 | Chrysler | Pacifica Hybrid | Platinum 4dr Mini-Van | $44,895 | $31,350 | $28,800 | $23,925 |
| 2017 | Chrysler | Pacifica Hybrid | Premium 4dr Mini-Van | $41,895 | $27,425 | $25,775 | $21,350 |
| 2018 | Chrysler | Pacifica Hybrid | Touring Plus 4dr Mini-Van | $39,895 | | $26,325 | $21,625 |
| 2018 | Chrysler | Pacifica Hybrid | Touring L 4dr Mini-Van | $41,895 | | $27,575 | $22,850 |
| 2018 | Chrysler | Pacifica Hybrid | Limited 4dr Mini-Van | $44,895 | | $32,150 | $26,075 |

SOURCE: The Fontana Group, Inc.
DATA: J.D. Power Internet Site, 1/2024.
iSeeCars.com Internet Site, 1/2024.
F:\PACU: CTT%9NV.XLSX\VAL.69:TIHHDIK

Tab 15  Page 3

# Inflation Adjustment Factor*
## (Base = 2017 - 2023)
### 2017 - 2023

| | Implicit Price Deflator (GDP) | Inflation Adjustment Factor* (Base = 2017) | Inflation Adjustment Factor* (Base = 2018) | Inflation Adjustment Factor* (Base = 2019) | Inflation Adjustment Factor* (Base = 2020) | Inflation Adjustment Factor* (Base = 2021) | Inflation Adjustment Factor* (Base = 2022) | Inflation Adjustment Factor* (Base = 2023) |
|---|---|---|---|---|---|---|---|---|
| 2017 | 100.000 | 1.000 | 1.023 | 1.040 | 1.054 | 1.102 | 1.180 | 1.223 |
| 2018 | 102.291 | 0.978 | 1.000 | 1.017 | 1.030 | 1.077 | 1.153 | 1.195 |
| 2019 | 104.008 | 0.961 | 0.983 | 1.000 | 1.013 | 1.060 | 1.134 | 1.176 |
| 2020 | 105.381 | 0.949 | 0.971 | 0.987 | 1.000 | 1.046 | 1.119 | 1.160 |
| 2021 | 110.213 | 0.907 | 0.928 | 0.944 | 0.956 | 1.000 | 1.070 | 1.109 |
| 2022 | 117.973 | 0.848 | 0.867 | 0.882 | 0.893 | 0.934 | 1.000 | 1.036 |
| 2023 ** | 122.264 | 0.818 | 0.837 | 0.851 | 0.862 | 0.901 | 0.965 | 1.000 |

* Inflation Adjustment Factor = Base Year Implicit Price Deflator / Implicit Price Deflator.

** Implicit Price Deflator for 2023 is calculated as the average of Q2 and Q3.

SOURCE:  The Fontana Group, Inc.
   DATA: Bureau of Economic Analysis Internet Site, 12/21/2023.
   F:\PACU: INFADJ.XLSX\SIAF-69\THHMIK

Tab 16  Page 1

# Data/Documents Received, Reviewed, or Considered

Consolidated Master Complaint, November 4, 2022.

Part 573 Safety Recall Report, 22V-077.

Aswath Damodaran, *Strategic Risk Taking: A Framework for Risk Management* (New York: FT Press, 2008).

John Von Neumann and Oskar Morgenstern, *Theory of Games and Economic Behavior* (Princeton: Princeton University Press, 1953).

Edgar K. Browning and Jacqueline M. Browning, *Microeconomic Theory and Implications*, 2nd ed. (Boston: Little, Brown, 1986).

Michael Waldman, "Durable Goods Theory for Real World Markets," *Journal of Economic Perspectives* 17, no. 1 (2003): 131-54.

George Casella and Roger L. Berger, *Statistical Inference*, 2nd ed. (Pacific Grove, CA: Wadsworth Group, 2002), 89-90.

"Home | S&P Global Mobility," *S&P Global*, https://www.spglobal.com/mobility/en/index.html, accessed September 6, 2023.

https://www.jdpower.com/jd-power-pricing-and-values.

https://www.jdpower.com/cars/2018/chrysler/pacifica/wagon-4d-limited-hybrid/optional-equipment.

"Inflation and the Auto Industry: When Will Car Prices Drop?" *J.P. Morgan Chase*, February 22, 2023, https://www.jpmorgan.com/insights/economy/economy/when-will-car-prices-drop.

https://www.iseecars.com/.

https://www.iseecars.com/research.

Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in *The Reference Guide on Scientific Evidence*, 3rd ed. (Washington DC: National Academies Press, 2011).

Damodar N. Gujarati and Dawn C. Porter, *Basic Econometrics*, 5th ed. (New York: McGraw-Hill Higher Education, 2009), 15.

Allen Goodman, "Andrew Court and the Invention of Hedonic Price Analysis," *Journal of Urban Economics* 44, no. 2, (September 1998): 291-8.

NADA Average Dealership Profile, 2010-2019.

S&P Global Mobility New Summary Registration Data File, 2018-2020 (11/2023 Update).

S&P Global Mobility New Summary Registration Data File, 2016-2017 (12/2021 Update).

S&P Global Mobility Vehicles in Operation Data File, 10/2023.

J.D. Power Internet Site, 1/2024.

iSeeCars.com Internet Site, 1/2024.

Bureau of Economic Analysis Internet Site, 12/21/2023.

Tab 17  Page 1

## Data/Documents Received, Reviewed, or Considered

S&P Global Mobility Used Summary Registration Data File, 2/2022-2/2023 (11/2023 Update).

J.D. Powers Frequently Asked Questions.

Dist.E.D.Mich._2-22-cv-03040_combined (3).pdf

FCA_Pacifica_MDL-068279.pptx

RCLQRT-22V077-0618.pdf

RCLQRT-22V077-6799.pdf

RCLRPT-22V077-7442.pdf

RCMN-22V077-2129.pdf

RMISC-22V077-7440.pdf

F:\PACU:DOCSRELC.DOCX:18:THHDIK

## Materials Requested from FCA

1) For each item identified below, identify:
   - a. Part(s) numbers or Kit number if sold as a kit
   - b. Invoice price of each part/kit
   - c. MSRP of each part/kit

## 2018 Pacifica Limited Hybrid and Non-Hybrid

- 3rd row moonroof / sunroof: fixed glass
- Cupholders: illuminated
- Exterior entry lights: puddle lamps
- Footwell lights
- Front fog lights
- Front fog lights: LED
- Headlights: halogen
- Headlights: HID/Xenon
- Headlights: quad headlights
- Headlights: wiper activated
- Memorized settings: 2 driver
- Memorized settings: driver seat
- Memorized settings: side mirrors
- Moonroof / Sunroof: anti-trapping
- Moonroof / Sunroof: one-touch open/close
- Moonroof / Sunroof: power panoramic
- Moonroof / Sunroof: power sunshade
- One-touch windows: 2
- One-touch windows: 4
- Rear seat: heated
- Side mirror adjustments: manual folding
- Side mirror adjustments: power folding
- Side mirror adjustments: reverse gear tilt
- Side mirrors: driver side auto-dimming
- Steering wheel trim: alloy
- Sunshade: power side window
- Sunshade: side window
- Third row seat folding: power
- Vacuum
- Regenerative braking system
- Tuned suspension: heavy duty
- Tuned suspension: touring
- Warnings and reminders: low battery

1

Tab 18  Page 1

### **2018 Pacifica Touring L Hybrid and Non-Hybrid**

- Customizable instrument cluster
- Headlights: wiper activated
- Infotainment screen size: 7 in.
- Infotainment screen size: 8.4 in.
- Instrument cluster screen size: 3.5 in.
- Instrument cluster screen size: 7 in.
- Radio: HD radio
- Laminated glass: acoustic
- Regenerative braking system
- Tuned suspension: heavy duty
- Tuned suspension: touring
- Low Battery Sensor (Warnings and reminders low battery)

### **2018 Pacifica Touring Plus Hybrid and Non-Hybrid**

- Anti-theft system: alarm
- Customizable instrument cluster
- Headlights: wiper activated
- Infotainment screen size: 7 in.
- Infotainment screen size: 8.4 in.
- Instrument cluster screen size: 3.5 in.
- Instrument cluster screen size: 7 in.
- Radio: HD radio
- Storage: accessory hook
- Sunshade: side window
- Laminated glass: acoustic
- Regenerative braking system
- Tuned suspension: heavy duty
- Tuned suspension: touring
- Universal remote transmitter: garage door opener
- Warnings and reminders: low battery

Tab 18  Page 2

## 2017 Pacifica Platinum Hybrid and Limited Non-Hybrid

- Capless fuel filler system
- Headlights: halogen
- Headlights: quad headlights
- Headlights: wiper activated
- Infotainment screen size: 5 in.
- Infotainment screen size: 8.4 in.
- One-touch windows: 2
- One-touch windows: 4
- Power outlet(s): 115V
- Power outlet(s): 12V rear
- Premium brand: Alpine
- Rear seat: heated
- Rearview mirror: auto-dimming
- Rearview mirror: manual day/night
- Side mirror adjustments: manual folding
- Side mirror adjustments: reverse gear tilt
- Storage: bin
- Subwoofer: 1
- Taillights: LED
- Total speakers: 13
- Total speakers: 6
- Universal remote transmitter: garage door opener
- Watts: 506
- 3rd row moonroof / sunroof: fixed glass
- Headlights: HID/Xenon
- Memorized settings: 2 driver
- Memorized settings: driver seat
- Memorized settings: side mirrors
- Moonroof / Sunroof: power panoramic
- Moonroof / Sunroof: power sunshade
- Side mirror adjustments: power folding
- Third row seat folding: power
- Tuned suspension: touring
- Vacuum
- Regenerative braking system
- Spare tire mount location: underbody
- Spare tire size: temporary
- Tuned suspension: heavy duty
- Warnings and reminders: low battery

3

Tab 18  Page 3

## 2017 Pacifica Premium Hybrid and Touring L Non-Hybrid

- Body side moldings: chrome
- Capless fuel filler system
- Courtesy lights: door
- Customizable instrument cluster
- Front fog lights
- Front fog lights: LED
- Headlights: wiper activated
- Instrument cluster screen size: 3.5 in.
- Instrument cluster screen size: 7 in.
- Roof rack crossbars: black
- Side mirror adjustments: reverse gear tilt
- Storage: bin
- Storage: grocery bag holder
- Universal remote transmitter: garage door opener
- Laminated glass: acoustic
- Regenerative braking system
- Run flat tires: puncture sealing compound with electric compressor
- Spare tire mount location: underbody
- Spare tire size: temporary
- Tuned suspension: heavy duty
- Low Battery Sensor: Warnings and reminders: low battery

4

Tab 18  Page 4

### 2017 Pacifica Touring Plus Hybrid and Non-Hybrid

- Capless fuel filler system
- Courtesy lights: door
- Customizable instrument cluster
- Driver seat: heated
- Front fog lights
- Front fog lights: LED
- Headlights: wiper activated
- Instrument cluster screen size: 3.5 in.
- Instrument cluster screen size: 7 in.
- Passenger seat: heated
- Power outlet(s): 115V
- Power outlet(s): 12V rear
- Side mirror adjustments: reverse gear tilt
- Storage: accessory hook
- Storage: bin
- Sunshade: side window
- Universal remote transmitter: garage door opener
- Remote engine start
- Laminated glass: acoustic
- Regenerative braking system
- Spare tire mount location: underbody
- Spare tire size: temporary
- Tuned suspension: heavy duty
- Low Battery Sensor: Warnings and reminders: low battery

5

Tab 18  Page 5

2) For each Model Year 2017 and 2018 Pacifica, produce order guides/option guides sufficient to identify the invoice price and MSRP of each feature that dealerships could specifically add or remove from the new vehicle order.

3) For each state and for each year, 2017-present, produce the average labor rate paid by FCA/Stellantis to dealerships for billable hours expended in providing approved warranty work.

4) For each state and for each year, 2017-present produce the average mark-up over invoice price paid by FCA/Stellantis to dealerships for parts used in warranty work.

5) Produce all Technical Service Bulletins used to describe the Recall Repair.

6) Identify for each trim/model year of Class Vehicle, the parts numbers used in the Recall Repair.

7) Identify the Invoice Price and MSRP of each parts number used in the Recall Repair.

8) To the extent not already provided in the TSB, provide for each trim/model year of Class Vehicle the allowable labor hours to perform the Recall Repair.

9) Produce a warranty/recall data file including the following fields for each Recall Repair performed:

   a. VIN
   b. Open Date
   c. Dealer Code
   d. Dealer Name
   e. Dealer ZIP Code
   f. Dealer State
   g. Close Date
   h. Notice Date
   i. Labor Hours
   j. Labor Reimbursement
   k. Parts Reimbursement
   l. Total Reimbursement.

6

Tab 18  Page 6

 

NADAguides.com is becoming part of JDPower.com. Learn more.  

# NADAguides FAQ

Search NADAguides FAQ by keyword

**Search**

**Popular Topics**

JDP

Boats

Car Options

Certified Vehicles (CPO)

Classic Cars

CONNECT

Electric Vehicles

Finance and Insurance

Kelley Blue Book

Manufactured Home Value Reports

Mileage

NADA

NADAguides.com

Print Guidebooks/Priceguides

Private Party Sales

RVs

Technical Questions

Values and Pricing

VIN Numbers

# NADAguides Frequently Asked Questions

## Car Options

Why aren't the options for my vehicle listed?

Why do I see options listed that do not apply to my vehicle? Example: I have a 1957 Bel Air 2 Dr Convertible. Why do I have the option to select "Add-Corvette Both Tops"?

Why can't I find the value of my car based upon a conversion, specific engine or option such as rear back-up system with camera?

Why do some vehicles have engine and/or feature package options missing?

Is it reasonable to add for leather option if the leather is synthetic?

### Why aren't the options for my vehicle listed?

NADAguides only attempts to quantify options that we believe add real value to a vehicle. There are hundreds of thousands of possible options in the used market for which we make no value distinction. That is not to say that because an option is not specifically mentioned by NADAguides it does not add value to a particular vehicle, it simply means that NADAguides makes no attempt to quantify

Appendix  Page 1

Case 2:22-cv-03040-DML-EAS   ECF No. 131-4, PageID.5157   Filed 06/10/24   Page 156 of 168

its value.

**Why do I see options listed that do not apply to my vehicle? Example: I have a 1957 Bel Air 2 Dr Convertible. Why do I have the option to select "Add-Corvette Both Tops"?**

Unfortunately, due to programming limitations we cannot specify which options appear for each individual car. Therefore, we list the most popular options for vehicles within in a particular manufacturer for a particular year. It is not broken down further than that.

**Why can't I find the value of my car based upon a conversion, specific engine or option such as rear back-up system with camera?**

All of our data is VIN driven, meaning all transactions are represented by the vehicle VIN. Special option packages and features cannot be determined by VIN alone. For current year models, our editors classify some engines under one umbrella such as V-6 or V-8 simply because the vehicle is newer and have not been valued for a long enough period yet. Our editors are constantly adding options and revising values to reflect these options. When a vehicle is a year or less old, there is a lack of data to support an accurate added value and options such as the back-up system with camera cannot be identified when decoding the VIN, so tracking the value is very difficult. It takes at least one year to collect data so that our editors can properly value a vehicle with these newer options. Sun roofs are a perfect example of an option that still is not coded in a vehicle VIN, so it took our editors some time to properly add this option and its value to the vehicle. Also, if you are looking up an older car model and cannot find a specific option for that vehicle such as leather seats, it's usually because the dealership added that option, not the manufacturer. Sometimes options can add or deduct value depending on the year of the model. With regard to conversions, we do not provide consumers with conversion values because they differ in value from one company to the next. There is not an MSRP value available. We only publish values for dealers, lenders and insurance companies when dealing with modified vans.

**Why do some vehicles have engine and/or feature package options missing?**

NADAguides valuates vehicles and our editors determine if an option adds value. If there is virtually no price difference when it was new, there is no additional value as used. In some cases one option may be worth more because of condition and mileage. If the production numbers were small/limited for the vehicle that included the option you are looking for, it does not affect the vehicle value which is what the NADAguides values represent. Our editors review over one million total transactions each month to produce the NADAguides values, and if there had been a significant difference it would have been displayed as an addition. In some cases, feature or appearance packages are a regional offering and was not offered nationwide. As a result, NADAguides makes no attempt to track sales or value that specific vehicle package.

**Is it reasonable to add for leather option if the leather is synthetic?**

Our add for leather was in intended for true leather, the hide of a cow, not synthetic leather no matter how good a manufacturer may be in reproducing the look and feel of the genuine article

Back to Top

© 2022 J.D. Power. All rights reserved. ® A registered trademark of the National Automobile Dealers Association, under license to J.D. Power.

Appendix  Page 2

# List of Standard Features from JD Power on Chrysler Pacifica Platinum Hybrid and Limited Non-Hybrid Trims Model Year 2017

**Features Included on Both Hybrid and Non-Hybrid Trims**

| Category | Standard Features | Category | Standard Features |
|---|---|---|---|
| Safety | Air Bag-Frontal-Driver | Comfort & Convenience | Seat-Adjustable Lumbar-Driver |
| Safety | Air Bag-Frontal-Passenger | Comfort & Convenience | Seat-Adjustable Lumbar-Passenger |
| Safety | Air Bag-Side Body-Front | Comfort & Convenience | Seat-Power Driver |
| Safety | Air Bag-Side Head-Front | Comfort & Convenience | Seat-Power Passenger |
| Safety | Air Bag-Side Head-Rear | Comfort & Convenience | Seats-Front-Bucket |
| Safety | Brakes-ABS | Comfort & Convenience | Seats-Rear Bucket |
| Safety | Brakes-Type-4-Wheel DISC | Comfort & Convenience | Steering Wheel-Adjustable |
| Safety | Child Safety Rear Door Locks | Comfort & Convenience | Steering Wheel-Audio Controls |
| Safety | Daytime Running Lights | Comfort & Convenience | Steering Wheel-Leather |
| Safety | Headlights-Automatic | Comfort & Convenience | Steering-Power |
| Safety | Immobilizer | Comfort & Convenience | Trip Computer |
| Safety | Parking Aid | Comfort & Convenience | Trunk-Release-Remote |
| Safety | Security System | Comfort & Convenience | Universal Garage Door Opener |
| Safety | Traction Control | Comfort & Convenience | Windows-Power |
| Comfort & Convenience | Air Conditioning-Auto Climate Control | Music & Entertainment | Audio-MP3 Player |
| Comfort & Convenience | Air Conditioning-Front | Music & Entertainment | Audio-Satellite Radio |
| Comfort & Convenience | Air Conditioning-Multi-Zone | Interior | Floor Mats |
| Comfort & Convenience | Air Conditioning-Rear | Interior | Seat-3rd Row |
| Comfort & Convenience | Auto-Dimming Rearview Mirror | Exterior | Doors: 4 |
| Comfort & Convenience | Cruise Control | Exterior | Fog Lamps |
| Comfort & Convenience | Keyless Entry | Exterior | Luggage Rack/Roof Rack |
| Comfort & Convenience | Max Seating Capacity: 7 | Exterior | Mirror(s)-Heated |
| Comfort & Convenience | Mirror(s)-Power | Exterior | Mirrors-Integrated Turn Signals |
| Comfort & Convenience | Mirrors-Vanity-Driver | Exterior | Rear Spoiler |
| Comfort & Convenience | Mirrors-Vanity-Driver Illumination | Exterior | Rear Window Defogger |
| Comfort & Convenience | Mirrors-Vanity-Passenger | Exterior | Windows-Deep Tinted |
| Comfort & Convenience | Mirrors-Vanity-Passenger Illumination | Exterior | Wipers-Intermittent |
| Comfort & Convenience | Navigation System | Exterior | Wipers-Variable Speed Intermittent |
| Comfort & Convenience | Power Locks | Wheels | Aluminum |
| Comfort & Convenience | Seat Trim-Leather | Wheels | 18x7.5 |
| Comfort & Convenience | Seat(s)-Heated Front | | |

Page 1 of 2

# List of Standard Features from JD Power on
# Chrysler Pacifica Platinum Hybrid and Limited Non-Hybrid Trims
# Model Year 2017

### Features Only Included on the Non-Hybrid Trim

| Category | Standard Features |
|---|---|
| Safety | Headlights-High Intensity Discharge |
| Comfort & Convenience | Mirrors-Memory |
| Comfort & Convenience | Seat-Memory |
| Music & Entertainment | Audio-Upgrade Sound System |
| Exterior | Roof-Generic Sun/Moon |
| Exterior | Roof-Sun/Moon |
| Exterior | Roof-Dual Moon |
| Exterior | Roof-Panoramic |

SOURCE:  The Fontana Group, Inc.
    DATA:  JD Power Internet Site, 1/2024.
F:\PACU:  JDPFEAT.XLSX:STL.22:THHOIK

Page 2 of 2

## List of Standard Features from JD Power on Chrysler Pacifica Premium Hybrid and Touring L Non-Hybrid Trims Model Year 2017

### Features Included on Both Hybrid and Non-Hybrid Trims

| Category | Standard Features | Standard Features | Category |
|---|---|---|---|
| Safety | Air Bag-Frontal-Driver | Steering Wheel-Adjustable | Comfort & Convenience |
| Safety | Air Bag-Frontal-Passenger | Steering Wheel-Audio Controls | Comfort & Convenience |
| Safety | Air Bag-Side Body-Front | Steering Wheel-Leather | Comfort & Convenience |
| Safety | Air Bag-Side Head-Front | Steering-Power | Comfort & Convenience |
| Safety | Air Bag-Side Head-Rear | Trip Computer | Comfort & Convenience |
| Safety | Brakes-ABS | Trunk-Release-Remote | Comfort & Convenience |
| Safety | Brakes-Type-4-Wheel DISC | Universal Garage Door Opener | Comfort & Convenience |
| Safety | Child Safety Rear Door Locks | Windows-Power | Comfort & Convenience |
| Safety | Daytime Running Lights | Audio-MP3 Player | Music & Entertainment |
| Safety | Headlights-Automatic | Audio-Satellite Radio | Music & Entertainment |
| Safety | Immobilizer | Floor Mats | Interior |
| Safety | Traction Control | Seat-3rd Row | Interior |
| Comfort & Convenience | Air Conditioning-Auto Climate Control | Doors: 4 | Exterior |
| Comfort & Convenience | Air Conditioning-Front | Door-Sliding-Rear Driver Side | Exterior |
| Comfort & Convenience | Air Conditioning-Multi-Zone | Door-Sliding-Rear Passenger Side | Exterior |
| Comfort & Convenience | Air Conditioning-Rear | Fog Lamps | Exterior |
| Comfort & Convenience | Cruise Control | Luggage Rack/Roof Rack | Exterior |
| Comfort & Convenience | Keyless Entry | Mirror(s)-Heated | Exterior |
| Comfort & Convenience | Max Seating Capacity: 7 | Rear Spoiler | Exterior |
| Comfort & Convenience | Mirror(s)-Power | Rear Window Defogger | Exterior |
| Comfort & Convenience | Mirrors-Vanity-Driver | Windows-Deep Tinted | Exterior |
| Comfort & Convenience | Mirrors-Vanity-Driver Illumination | Wipers-Intermittent | Exterior |
| Comfort & Convenience | Mirrors-Vanity-Passenger | Wipers-Variable Speed Intermittent | Exterior |
| Comfort & Convenience | Mirrors-Vanity-Passenger Illumination | Aluminum | Wheels |
| Comfort & Convenience | Power Locks | 17x7 | Wheels |
| Comfort & Convenience | Seat Trim-Leather | | |
| Comfort & Convenience | Seat(s)-Heated Front | | |
| Comfort & Convenience | Seat-Adjustable Lumbar-Driver | | |
| Comfort & Convenience | Seat-Power Driver | | |
| Comfort & Convenience | Seats-Front-Bucket | | |
| Comfort & Convenience | Seats-Rear Bucket | | |

# List of Standard Features from JD Power on
# Chrysler Pacifica Premium Hybrid and Touring L Non-Hybrid Trims
# Model Year 2017

**Features Only Included on the Hybrid Trim**

| Category | Standard Features |
|---|---|
| Safety | Parking Aid |
| Safety | Security System |
| Comfort & Convenience | Auto-Dimming Rearview Mirror |
| Comfort & Convenience | Seat-Power Passenger |

SOURCE: The Fontana Group, Inc.
DATA: JD Power Internet Site, 1/2024.
F:\PACU: JDPFEAT.XLSX.S71:22:TTHHOIK

Page 2 of 2

# List of Standard Features from JD Power on
# Chrysler Pacifica Hybrid and Non-Hybrid Touring Plus Trims
# Model Year 2017

## Features Included on Both Hybrid and Non-Hybrid Trims

| Category | Standard Features | Category | Standard Features |
|---|---|---|---|
| Safety | Air Bag-Frontal-Driver | Comfort & Convenience | Steering-Power |
| Safety | Air Bag-Frontal-Passenger | Comfort & Convenience | Trip Computer |
| Safety | Air Bag-Side Body-Front | Comfort & Convenience | Universal Garage Door Opener |
| Safety | Air Bag-Side Head-Front | Comfort & Convenience | Windows-Power |
| Safety | Air Bag-Side Head-Rear | Music & Entertainment | Audio-MP3 Player |
| Safety | Brakes-ABS | Music & Entertainment | Audio-Satellite Radio |
| Safety | Brakes-Type-4-Wheel DISC | Interior | Floor Mats |
| Safety | Child Safety Rear Door Locks | Interior | Seat-3rd Row |
| Safety | Daytime Running Lights | Exterior | Doors: 4 |
| Safety | Headlights-Automatic | Exterior | Door-Sliding-Rear Driver Side |
| Safety | Immobilizer | Exterior | Door-Sliding-Rear Passenger Side |
| Safety | Traction Control | Exterior | Fog Lamps |
| Comfort & Convenience | Air Conditioning-Auto Climate Control | Exterior | Mirror(s)-Heated |
| Comfort & Convenience | Air Conditioning-Front | Exterior | Rear Spoiler |
| Comfort & Convenience | Air Conditioning-Multi-Zone | Exterior | Rear Window Defogger |
| Comfort & Convenience | Air Conditioning-Rear | Exterior | Windows-Deep Tinted |
| Comfort & Convenience | Cruise Control | Exterior | Wipers-Intermittent |
| Comfort & Convenience | Keyless Entry | Exterior | Wipers-Variable Speed Intermittent |
| Comfort & Convenience | Max Seating Capacity: 7 | Wheels | Aluminum |
| Comfort & Convenience | Mirrors-Vanity-Driver | Wheels | 17x7 |
| Comfort & Convenience | Mirrors-Vanity-Driver Illumination | | |
| Comfort & Convenience | Mirrors-Vanity-Passenger | | |
| Comfort & Convenience | Mirrors-Vanity-Passenger Illumination | | |
| Comfort & Convenience | Power Locks | | |
| Comfort & Convenience | Seat-Adjustable Lumbar-Driver | | |
| Comfort & Convenience | Seat-Power Driver | | |
| Comfort & Convenience | Seats-Front-Bucket | | |
| Comfort & Convenience | Seats-Rear Bucket | | |
| Comfort & Convenience | Steering Wheel-Adjustable | | |
| Comfort & Convenience | Steering Wheel-Audio Controls | | |

Page 1 of 2

# List of Standard Features from JD Power on
# Chrysler Pacifica Hybrid and Non-Hybrid Touring Plus Trims
# Model Year 2017

## Features Only Included on the Hybrid Trim

| Category | Standard Features |
|---|---|
| Safety | Security System |
| Comfort & Convenience | Auto-Dimming Rearview Mirror |
| Comfort & Convenience | Mirror(s)-Power |
| Comfort & Convenience | Seat-Power Passenger |
| Comfort & Convenience | Seat Trim-Cloth |

## Features Only Included on the Non-Hybrid Trim

| Category | Standard Features |
|---|---|
| Comfort & Convenience | Trunk-Release-Remote |
| Exterior | Luggage Rack/Roof Rack |

SOURCE: The Fontana Group, Inc.
  DATA: JD Power Internet Site, 1/2024.
  F:\PACU: JDPFEAT.XLSX.S72:22.THHOIK

Page 2 of 2

Appendix  Page 8

# List of Standard Features from JD Power on
# Chrysler Pacifica Hybrid and Non-Hybrid Limited Trims
# Model Year 2018

### Features Included on Both Hybrid and Non-Hybrid Trims

| Category | Standard Features | Category | Standard Features |
|---|---|---|---|
| Safety | Air Bag-Frontal-Driver | Comfort & Convenience | Seat-Adjustable Lumbar-Driver |
| Safety | Air Bag-Frontal-Passenger | Comfort & Convenience | Seat-Adjustable Lumbar-Passenger |
| Safety | Air Bag-Side Body-Front | Comfort & Convenience | Seat-Power Driver |
| Safety | Air Bag-Side Head-Front | Comfort & Convenience | Seat-Power Passenger |
| Safety | Air Bag-Side Head-Rear | Comfort & Convenience | Seats-Front-Bucket |
| Safety | Brakes-ABS | Comfort & Convenience | Seats-Rear Bucket |
| Safety | Brakes-Type-4-Wheel DISC | Comfort & Convenience | Steering Wheel-Adjustable |
| Safety | Child Safety Rear Door Locks | Comfort & Convenience | Steering Wheel-Audio Controls |
| Safety | Daytime Running Lights | Comfort & Convenience | Steering Wheel-Leather |
| Safety | Headlights-Automatic | Comfort & Convenience | Steering-Power |
| Safety | Immobilizer | Comfort & Convenience | Trip Computer |
| Safety | Parking Aid | Comfort & Convenience | Trunk-Release-Remote |
| Safety | Security System | Comfort & Convenience | Universal Garage Door Opener |
| Safety | Traction Control | Comfort & Convenience | Windows-Power |
| Comfort & Convenience | Air Conditioning-Auto Climate Control | Music & Entertainment | Audio-MP3 Player |
| Comfort & Convenience | Air Conditioning-Front | Music & Entertainment | Audio-Upgrade Sound System |
| Comfort & Convenience | Air Conditioning-Multi-Zone | Music & Entertainment | Audio-Satellite Radio |
| Comfort & Convenience | Air Conditioning-Rear | Interior | Floor Mats |
| Comfort & Convenience | Auto-Dimming Rearview Mirror | Interior | Seat-3rd Row |
| Comfort & Convenience | Cruise Control | Exterior | Doors: 4 |
| Comfort & Convenience | Keyless Entry | Exterior | Fog Lamps |
| Comfort & Convenience | Max Seating Capacity: 7 | Exterior | Luggage Rack/Roof Rack |
| Comfort & Convenience | Mirror(s)-Power | Exterior | Mirror(s)-Heated |
| Comfort & Convenience | Mirrors-Vanity-Driver | Exterior | Mirrors-Integrated Turn Signals |
| Comfort & Convenience | Mirrors-Vanity-Driver Illumination | Exterior | Rear Spoiler |
| Comfort & Convenience | Mirrors-Vanity-Passenger | Exterior | Rear Window Defogger |
| Comfort & Convenience | Mirrors-Vanity-Passenger Illumination | Exterior | Windows-Deep Tinted |
| Comfort & Convenience | Navigation System | Exterior | Wipers-Intermittent |
| Comfort & Convenience | Power Locks | Exterior | Wipers-Variable Speed Intermittent |
| Comfort & Convenience | Seat Trim-Leather | Wheels | Aluminum |
| Comfort & Convenience | Seat(s)-Heated Front | | |

Page 1 of 2

Appendix  Page 9

# List of Standard Features from JD Power on
# Chrysler Pacifica Hybrid and Non-Hybrid Limited Trims
# Model Year 2018

## Features Only Included on the Non-Hybrid Trim

| Category | Standard Features | Category | Standard Features |
|---|---|---|---|
| Safety | Headlights-High Intensity Discharge | Exterior | Roof-Generic-Sun/Moon |
| Comfort & Convenience | Mirrors-Memory | Exterior | Roof-Sun/Moon |
| Comfort & Convenience | Seat-Memory | Exterior | Roof-Dual Moon |
| Music & Entertainment | Audio-AM/FM Stereo | Exterior | Roof-Panoramic |
| Exterior | Roof-Generic Sun/Moon | Exterior | Wipers-Rain Sensing |
| | | Wheels | 18x7.5 |

## Features Only Included on the Hybrid Trim

| Category | Standard Features |
|---|---|
| Wheels | 17x7 |

SOURCE: The Fontana Group, Inc.
   DATA: JD Power Internet Site, 1/2024.
F:\PACU: JDPFEAT.XLSX:S8L.22:THH0IK

Page 2 of 2

Appendix  Page 10

# List of Standard Features from JD Power on Chrysler Pacifica Hybrid and Non-Hybrid Touring L Trims Model Year 2018

## Features Included on Both Hybrid and Non-Hybrid Trims

| Category | Standard Features | Category | Standard Features |
|---|---|---|---|
| Safety | Air Bag-Frontal-Driver | Comfort & Convenience | Seats-Front-Bucket |
| Safety | Air Bag-Frontal-Passenger | Comfort & Convenience | Seats-Rear Bucket |
| Safety | Air Bag-Side Body-Front | Comfort & Convenience | Steering Wheel-Adjustable |
| Safety | Air Bag-Side Head-Front | Comfort & Convenience | Steering Wheel-Audio Controls |
| Safety | Air Bag-Side Head-Rear | Comfort & Convenience | Steering Wheel-Leather |
| Safety | Brakes-ABS | Comfort & Convenience | Steering-Power |
| Safety | Brakes-Type-4-Wheel DISC | Comfort & Convenience | Trip Computer |
| Safety | Child Safety Rear Door Locks | Comfort & Convenience | Trunk-Release-Remote |
| Safety | Daytime Running Lights | Comfort & Convenience | Universal Garage Door Opener |
| Safety | Headlights-Automatic | Comfort & Convenience | Windows-Power |
| Safety | Immobilizer | Music & Entertainment | Audio-MP3 Player |
| Safety | Parking Aid | Music & Entertainment | Audio-Satellite Radio |
| Safety | Security System | Interior | Floor Mats |
| Safety | Traction Control | Interior | Seat-3rd Row |
| Comfort & Convenience | Air Conditioning-Auto Climate Control | Exterior | Doors: 4 |
| Comfort & Convenience | Air Conditioning-Front | Exterior | Door-Sliding-Rear Driver Side |
| Comfort & Convenience | Air Conditioning-Multi-Zone | Exterior | Door-Sliding-Rear Passenger Side |
| Comfort & Convenience | Air Conditioning-Rear | Exterior | Fog Lamps |
| Comfort & Convenience | Cruise Control | Exterior | Luggage Rack/Roof Rack |
| Comfort & Convenience | Keyless Entry | Exterior | Mirror(s)-Heated |
| Comfort & Convenience | Max Seating Capacity: 7 | Exterior | Rear Spoiler |
| Comfort & Convenience | Mirror(s)-Power | Exterior | Rear Window Defogger |
| Comfort & Convenience | Mirrors-Vanity-Driver | Exterior | Windows-Deep Tinted |
| Comfort & Convenience | Mirrors-Vanity-Driver Illumination | Exterior | Wipers-Intermittent |
| Comfort & Convenience | Mirrors-Vanity-Passenger | Exterior | Wipers-Variable Speed Intermittent |
| Comfort & Convenience | Mirrors-Vanity-Passenger Illumination | Wheels | 17x7 |
| Comfort & Convenience | Power Locks | Wheels | Aluminum |
| Comfort & Convenience | Seat Trim-Leather | | |
| Comfort & Convenience | Seat(s)-Heated Front | | |
| Comfort & Convenience | Seat-Adjustable Lumbar-Driver | | |
| Comfort & Convenience | Seat-Power Driver | | |

Page 1 of 2

# List of Standard Features from JD Power on Chrysler Pacifica Hybrid and Non-Hybrid Touring L Trims Model Year 2018

## Features Only Included on the Non-Hybrid Trim

| Category | Standard Features |
|---|---|
| Music & Entertainment | Audio-AM/FM Stereo |
| Exterior | Wipers-Rain Sensing |

SOURCE: The Fontana Group, Inc.
DATA: JD Power Internet Site, 1/2024.
F:\PACU: JDPFEAT.XLSX:S81:22:THHOIK

Page 2 of 2

# List of Standard Features from JD Power on Chrysler Pacifica Hybrid and Non-Hybrid Touring Plus Trims Model Year 2018

## Features Included on Both Hybrid and Non-Hybrid Trims

| Category | Standard Features | Category | Standard Features |
|---|---|---|---|
| Safety | Air Bag-Frontal-Driver | Comfort & Convenience | Steering Wheel-Adjustable |
| Safety | Air Bag-Frontal-Passenger | Comfort & Convenience | Steering Wheel-Audio Controls |
| Safety | Air Bag-Side Body-Front | Comfort & Convenience | Steering-Power |
| Safety | Air Bag-Side Head-Front | Comfort & Convenience | Trip Computer |
| Safety | Air Bag-Side Head-Rear | Comfort & Convenience | Windows-Power |
| Safety | Brakes-ABS | Music & Entertainment | Audio-MP3 Player |
| Safety | Brakes-Type-4-Wheel DISC | Music & Entertainment | Audio-Satellite Radio |
| Safety | Child Safety Rear Door Locks | Interior | Floor Mats |
| Safety | Daytime Running Lights | Interior | Seat-3rd Row |
| Safety | Headlights-Automatic | Exterior | Doors: 4 |
| Safety | Immobilizer | Exterior | Door-Sliding-Rear Driver Side |
| Safety | Security System | Exterior | Door-Sliding-Rear Passenger Side |
| Safety | Traction Control | Exterior | Fog Lamps |
| Comfort & Convenience | Air Conditioning-Auto Climate Control | Exterior | Mirror(s)-Heated |
| Comfort & Convenience | Air Conditioning-Front | Exterior | Rear Spoiler |
| Comfort & Convenience | Air Conditioning-Multi-Zone | Exterior | Rear Window Defogger |
| Comfort & Convenience | Air Conditioning-Rear | Exterior | Windows-Deep Tinted |
| Comfort & Convenience | Cruise Control | Exterior | Wipers-Intermittent |
| Comfort & Convenience | Keyless Entry | Exterior | Wipers-Variable Speed Intermittent |
| Comfort & Convenience | Max Seating Capacity: 7 | Wheels | 17x7 |
| Comfort & Convenience | Mirror(s)-Power | Wheels | Aluminum |
| Comfort & Convenience | Mirrors-Vanity-Driver | | |
| Comfort & Convenience | Mirrors-Vanity-Driver Illumination | | |
| Comfort & Convenience | Mirrors-Vanity-Passenger | | |
| Comfort & Convenience | Mirrors-Vanity-Passenger Illumination | | |
| Comfort & Convenience | Power Locks | | |
| Comfort & Convenience | Seat Trim-Cloth | | |
| Comfort & Convenience | Seat-Adjustable Lumbar-Driver | | |
| Comfort & Convenience | Seat-Power Driver | | |
| Comfort & Convenience | Seats-Front-Bucket | | |
| Comfort & Convenience | Seats-Rear Bucket | | |

Page 1 of 2

# List of Standard Features from JD Power on
## Chrysler Pacifica Hybrid and Non-Hybrid Touring Plus Trims
## Model Year 2018

### Features Only Included on the Non-Hybrid Trim

| Category | Standard Features |
|---|---|
| Safety | Parking Aid |
| Comfort & Convenience | Trunk-Release-Remote |
| Comfort & Convenience | Universal Garage Door Opener |
| Music & Entertainment | Audio-AM/FM Stereo |

Page 2 of 2

SOURCE: The Fontana Group, Inc.
  DATA: JD Power Internet Site, 1/2024.
  F:\PACU. JDPFEAT.XLSX:S82:22:THHOIK

Appendix  Page 14