UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CHRYSLER PACIFICA FIRE RECALL
PRODUCTS LIABILITY LITIGATION

MDL No. 3040

Case Number 22-md-03040
Honorable David M. Lawson
Magistrate Judge Elizabeth S. Stafford

_____/

## OPINION AND ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY OF BRADLEY ZIGLER, EDWARD STOCKTON, DENISE MARTIN, AND ELDON LEAPHART AT THE CLASS CERTIFICATION STAGE

The plaintiffs in this multidistrict litigation allege that defendant FCA US LLC (known also as Chrysler or Chrysler Corporation) manufactured and sold Chrysler Pacifica Plug-in Hybrid minivans that were defective because they had been known to spontaneously combust. The deadline for filing a motion to certify a class is forthcoming. In anticipation, the parties have filed motions to exclude opinion testimony by several of their respective experts as they pertain to the anticipated class certification motion. The defendant has moved to exclude the opinions of Bradley Zigler, the plaintiffs' engineering expert who opined about the nature of the high voltage battery pack defect, and Edward Stockton, who proposed two potential models for valuation of class-wide damages based on either projected repair cost or compensation for the loss of use of the vehicles as "idled assets." The plaintiffs moved to exclude testimony by Denise Martin, whose opinion is offered to rebut Mr. Stockton's report via Martin's principal conclusion that potential class members suffered "no damages" caused by the alleged defect unless they experienced actual "manifestation" of the defect in the form of a catastrophic vehicle fire, and Eldon Leapheart, who opined based on his analysis of engineering design documents and reports of 14 class vehicle fire incidents that all of the incidents were caused by "manufacturing anomalies" and that the class vehicles do not have any class-wide "common defect" that could sustain the plaintiffs' claims.

The motions are fully briefed, and the parties have consented to determination of the motions without oral argument.  *See* E.D. Mich. LR 7.1(f)(2).  For the reasons set forth below, the motions to exclude the testimony of Bradley Zigler and Denise Martin will be granted in part and denied in part.  The motion to exclude the testimony of Edward Stockton will be denied.  The motion to exclude the testimony of Eldon Leapheart will be granted.

I.

The factual background of the case is discussed extensively in the Court's opinion granting in part and denying in part the defendant's motion to dismiss, *In re Chrysler Pacifica Fire Recall Prod. Liab. Litig.*, 706 F. Supp. 3d 746 (E.D. Mich. 2023).

The plaintiffs bring claims of deceptive practices and warranty breaches against defendant FCA, which is the manufacturer of the Chrysler Pacifica Plug-in Hybrid minivan.  The plaintiffs say that, either due to defects in their design or problems during the manufacturing process, the large battery plant incorporated into the powertrain of the vehicles has a tendency spontaneously to enter a "thermal runaway" state resulting in combustion or explosion of the vehicle.  The spontaneous ignition of the batteries, the plaintiffs say, may occur unpredictably at any time, even when the vehicles are parked and the ignition is off.  Due to the risk of spontaneous fires, the plaintiffs say that they are unable to drive or leave the vehicles unattended with peace of mind, and they are forced to seek parking locations far removed from structures or other vehicles due to the risk of damage to any nearby property if the vehicles suddenly burst into flames.  The plaintiffs acknowledge that FCA has initiated two voluntary recalls of the class vehicles based on the fire risk, but they allege that the measures implemented by the recalls are insufficient to cure the problem, because the remedy consists merely of software patches meant to "monitor" the battery system for conditions that may lead to thermal runaway, and no repair or replacement of the battery

pack is offered unless Chrysler deems it "necessary" after an inspection. It appears that the

defendant did not determine that replacement was a necessary measure for any of the plaintiffs'

vehicles (or, apparently, for most of the thousands of class vehicles currently in service).

After the case was commenced and following the Court's ruling on the defendant's initial

pleading challenge, it came to light during an extensive period of discovery that the National

Highway Traffic Safety Administration (NHTSA) had opened a recall query to examine the

efficacy of the original voluntary recall, based on reports of post-recall fires in class vehicles.

NHTSA's public notice of the new investigation stated as follows:

> From December 2022 through December 2023, NHTSA has received four
> consumer complaints (VOQs) alleging vehicle thermal events involving recalled
> 2017 and 2018 Chrysler Pacifica PHEVs. Additional information collected from
> complainants confirmed a thermal event originating near or at the HV battery pack
> after the Recall 22V077 remedy had been applied to the vehicle. Follow-up
> meetings with FCA and suppliers in November and December 2023 to discuss the
> ongoing root cause investigation and post-recall remedy incidents indicated a recent
> increase in HV battery thermal events. Furthermore, a review of NHTSA complaint
> data indicated the post-recall HV battery thermal event complaint rate now exceeds
> pre-recall levels.
>
> The Office of Defects Investigation (ODI) is opening this Recall Query (RQ) to
> review the effectiveness of the original recall remedy, understand the root cause of
> the battery fires, investigate additional reports of Pacifica PHEV HV battery fires,
> and to increase monitoring of the manufacturer root cause investigation.

NHTSA, Recall Query RQ24001 (Jan. 16, 2024), https://static.nhtsa.gov/odi/inv/2024/INOA-

RQ24001-10139.pdf. That recall inquiry eventually prompted a second voluntary recall, which

was initiated by the defendant on July 18, 2024. NHTSA, Safety Recall Report (Jul. 18, 2024),

https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V536-8355.PDF. The description of the defect

in the second recall notice reads: "A folded or torn anode tab may result in the generation of lithium

by-product over time. This defect, along with a second unidentified factor, may lead to an internal

short within the pack and may result in a vehicle fire." *Ibid.* The notice further states that the

defendant will offer a second recall remedy described as follows:

- 3 -

> FCA US will conduct a voluntary safety recall on all affected vehicles to update the HV Battery Pack Control Module ("BPCM") with revised software to monitor battery pack assembly operational status for conditions that could lead to a fire in the battery pack assembly. FCA US will inspect and, if necessary, replace the battery pack assembly. Until the remedy is complete, FCA US is advising owners of these hybrid vehicles to refrain from recharging them, and to park them away from structures and other vehicles.

*Ibid.*

This multidistrict litigation was initiated on August 3, 2022 by an order of the Judicial Panel on Multidistrict Litigation (JPML) transferring to this Court for pretrial proceedings four civil actions pending in various districts for consolidation with three cases filed in this district. Subsequent orders by the JPML transferred more cases raising the same claims, which altogether comprises 11 putative class actions with 67 named plaintiffs who, in an amended CMA, have pleaded cumulatively more than 164 counts under the laws of 31 states. On October 17, 2022, the Court consolidated the related cases and established initial deadlines for filing and challenging consolidated pleadings. The plaintiff's first CMC was filed on November 3, 2022. On December 19, 2022, the defendant filed a motion under Federal Rule of Civil Procedure 12(b)(6) challenging the viability of all of the claims pleaded in the CMC. The Court granted that motion in part on December 11, 2023, but the majority of the pleaded claims were allowed to proceed. However, the Court struck from the CMC several counts in which the plaintiffs had attempted to plead common law fraud and unjust enrichment causes of action on a "nationwide" basis. The defendant later filed a motion to compel arbitration, which was denied on February 5, 2024. The defendant's appeal of the arbitration ruling, which implicates the claims of 18 individual plaintiffs, remains pending. The plaintiffs filed a motion for leave to amend the CMC for the purpose of re-pleading their common law counts on a state-by-state basis. That motion was granted on June 14, 2024, and the amended CMC was filed on June 18, 2024. The defendant responded with a second motion

to dismiss challenging the re-pleaded common law claims on various grounds. The second MTD was granted in part and for the most part denied in a ruling issued on January 21, 2025.

Early in the litigation, the Court established a timeline for discovery and motion practice relating to class certification and the merits of the claims. The case management benchmarks subsequently were revised at the parties' joint request. The Court recently granted the defendant's request to suspend the deadlines relating to class certification pending the outcome of an *en banc* rehearing in the ongoing appeal of the Court's class certification ruling in a similar auto defect class action, *Speerly v. General Motors, LLC*, No. 19-11044. The class certification motion now is due 21 days after the conclusion of the *Speerly* appeal. The parties timely filed the pending motions addressing expert testimony relevant to the class certification phase, and the defendant supplemented its motions after supplemental expert reports were served by the plaintiffs, by agreement of the parties, addressing recent developments including the second recall.

In a 1,450-paragraph CMC, which spanned more than 430 pages, including attached exhibits, the plaintiffs pleaded 81 causes of action sounding in breaches of express and implied warranties and violations of various state laws governing consumer sales, deceptive marketing, and unfair trade practices. After the Court granted leave for the plaintiffs to file an amended CMC, the initial master pleading was superseded by an expanded version which frames 164 counts spanning 626 pages. After the amended CMC was filed, the parties stipulated to the dismissal of claims brought by several of the individual plaintiffs. Those dismissals resulted in the elimination of claims by proposed Nevada and Tennessee sub-classes (previously represented respectively by dismissed plaintiffs Rickey Butler and Scott Lewandowski). As it presently stands, the amended CMC asserts causes of action under the laws of 29 states.

II.

As highlighted by the defendant in a notice of supplemental authority, the Sixth Circuit recently settled the question whether district courts must conduct a *Daubert* analysis before considering expert testimony offered to inform a ruling on class certification under Federal Rule of Civil Procedure 23, answering in the affirmative.   *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253 (6th Cir. 2024).  In that case, the panel stated that "[i]f challenged expert testimony is material to a class certification motion, the district court must demonstrate the expert's credibility under *Daubert*."  *Ibid.*  That is a curious pronouncement, since under *Daubert*, trial judges do not determine an expert's "credibility."   Evidence Rule 702 requires trial judges to determine *admissibility*, and that task calls for finding whether the proponent of the expert's opinion has satisfied the qualification, reliability, and relevancy components of that opinion by a preponderance of the evidence.  Fed. R. Evid. 702.  "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008).

As a general matter, "expert" testimony consists of opinions or commentary grounded in "specialized knowledge," that is, knowledge that is "beyond the ken of the average juror."  *See United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016); Fed. R. Evid. 702.  Such testimony is governed by Evidence Rule 702, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge.  Before expert witness testimony may be received, the

- 6 -

proponent must demonstrate that, more likely than not, the testimony is "(a) helpful to the trier of fact, (b) 'based on sufficient facts or data,' and (c) 'the product of reliable principles and methods' that (d) have been 'reliably applied' to the 'facts of the case.'" *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prod. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024) (quoting Fed. R. Evid. 702 (2011)).

Rule 702 was amended in 2023 to reinforce the idea, sidestepped sometimes by some courts, that Evidence Rule 104(a) entrusts the court with deciding whether the admissibility criteria have been satisfied, rather than treating them as "questions of weight" to be determined by the factfinder. Fed. R. Evid. 702 Advisory Committee Notes to 2023 Amendments; *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."). However, "nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The Rule 104(a) standard does not require perfection." Rule 702 Advisory Committee Notes to 2023 Amendments.

"Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." Fed. R. Evid. 702, advisory committee's note, 2000 amend. In fact, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, advisory committee's note, 2000 amend.; *see*, *e.g.*, *Wood v. Wal-Mart Stores East, LP*, 576 F. App'x 470, 472 (6th Cir. 2014) (holding that there was "ample reason" to conclude that a non-scientific expert's testimony was reliable and would assist the jury where witness had professional experience dealing with building codes as a commercial architect); *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 296 (6th Cir. 2007) (holding that the district court

properly admitted testimony from expert regarding experience designing driver's enclosures for transit buses).

An expert witness's testimony also must be relevant and reliable. *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017) (citing *Daubert*, 509 U.S. at 589). However, the 2000 Amendments to Rule 702 did "not alter the venerable practice of using expert testimony to educate the factfinder on general principles." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments. Rule 702 allows an expert to "testify in the form of an opinion *or otherwise*," (emphasis added), which means that the expert may share his or her special knowledge with the factfinder in areas that might extend beyond the information known to the average person. *See, e.g.*, *Redmond v. United States*, 194 F. Supp. 3d 606, 615 (E.D. Mich. 2016) (stating that an expert's testimony could be helpful to the jury if the information is "beyond the ken of common knowledge") (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994)). When an expert's testimony does not take the form of an opinion, but rather focuses on "educat[ing] the factfinder on general principles," application of the foundational elements in Rule 702 takes on a different cast.

An expert witness's opinion also must be based on record facts "as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citing Fed. R. Evid. 702) (explaining that expert testimony must be based on "sufficient facts or data" and the "product of reliable principles and methods"). However, "it is not an abuse of discretion to admit expert opinion based on allegedly erroneous facts when there is some support for those facts in the record." *In re Kirvan*, No. 21-1250, 2021 WL 4963363, at *5 (6th Cir. Oct. 26, 2021) (quotation marks and citation omitted). "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record"; but "mere 'weaknesses in the

factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'"  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)).

"Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *United States v. Gordon*, 493 F. App'x 617, 626-27 (6th Cir. 2012).

A.  Bradley Zigler

Bradley Zigler is an automotive engineer.  The plaintiffs hired him to "review available information about the 2017-2018 [] Chrysler Pacifica Plug-In Hybrid Electric (PHEV) vehicles [] related to possible defects [in] the high-voltage (HV) battery pack and vehicle system[s] resulting in fires."  Expert Report, ECF No. 130-2, PageID.4825.

Zigler is a Senior Director at 44 Energy Technologies in Oakland, California, where he has been a principal of the firm for the past 11 years.  The firm consults with clients in the auto industry, focusing on technology development, engine emissions and performance testing, advanced technology including electric and hybrid drive systems, and regulatory compliance.  He obtained a Ph.D. in Mechanical Engineering from the University of Michigan in 2008, and he holds other graduate credentials in the same field.  Before his current job, Zigler worked as a researcher at the National Renewable Energy Laboratory, with the U.S. Department of Energy, and at Ford Motor Company for more than a decade.  While at Ford, his work included product development and quality assurance, design verification, and failure mode analysis.  His resume lists numerous publications in academic and industry journals; notably, however, the publications all focus on the optimization of fuel efficiency and performance for internal combustion engines.  Ziegler's resumé

does not disclose any apparent specialized experience in the area of electric or hybrid powertrain design.

Zigler's report and supplemental report indicate that he reviewed documents obtained through discovery and from public sources including product manuals for the class vehicles, the defendant's recall notices, and internal engineering design documents and failure mode analysis reports produced by the defendant. The leading conclusion of the report, which the defendant seeks to exclude, is Zigler's opinion that the high voltage battery pack used in the class vehicles in model years 2017 and 2018 "is a common design and interchangeable part," based on his observation that "the same service part number (6488189AA) for the HV battery pack" was used throughout the model years 2017 through 2024. *Id.* at PageID.4826-27. In a supplemental report, Zigler elaborated on the significance of the "service part number" designation, explaining that in automotive manufacturing the use of the same service part number (SPN) would mean that the "form, fit, and function" of a part remained the same, and that the part could be used interchangeably in any model originally equipped with the same SPN, regardless of internal engineering revisions in the component. Supp. Report, ECF No. 184-2, PageID.8068-70.

At his deposition, Zigler conceded that he was not retained to perform a root cause analysis for the class vehicle fire incidents, and he did not form any opinion on that topic. Bradley Zigler dep., ECF No. 130-3, PageID.4861. He also conceded that none of the materials he reviewed expressed any finding on the root cause for the battery pack thermal runway condition that was determined to be the genesis of reported vehicle fires. *Id.* at PageID.4867. He never performed any analysis or investigation of his own to determine the root cause of any fires. *Id.* at 4869. Zigler conceded that he could not identify any particular component part of the battery pack that was the cause of the fires. *Id.* at 4898. Despite asserting in his report that the high voltage battery pack in

the class vehicles shared a common "service part number" from 2017 through 2024, Zigler testified that his review of FCA's engineering documents indicated that more than 19 design changes were made in the battery pack in 2017 and six more revisions were made in 2018, and as a result FCA had reported to NHTSA a range of 25 distinct "engineering part numbers" for the battery pack as being involved in the recall. *Id.* at 4885. Zigler also admitted that he did not know what the reason was for any of the design changes. *Id.* at 4887. Zigler stated that in his experience 19 design changes in a single model year was a "very large number." *Ibid.*

The defendant argues that Zigler is not qualified to opine on the design or features of hybrid powertrain high voltage battery packs because he is a mechanical engineer, and all of his engineering practice has been in the field of internal combustion engine design, with no experience in the area of hybrid or electric vehicle powerplant design. The defendant is mistaken.

Although Zigler concededly does not have particular experience with design of electric or hybrid vehicle powertrain components, his resume does disclose extensive experience in automotive engineering, quality assurance, and failure mode analysis. He certainly is qualified based on that generalized engineering and manufacturing process experience to opine on such things as industry custom and practice for the use of engineering and service part numbers, and their significance in design and manufacturing process. Notably, Zigler disclaims any opinion about the internal workings of the battery pack or the root cause of the vehicle fires, and he was not asked to develop conclusions on either topic. His lack of experience with technical aspects of battery pack design therefore is not fatal to his opinions about the practice of engineering design and part revisions in general, and his application of general engineering principles to the facts following generally accepted principles of engineering practice is sufficient to make his opinion reliable. *See Zuzula v. ABB Power T&D Co.*, 267 F.Supp.2d 703, 714 (E.D. Mich. 2003) ("[The

- 11 -

expert] arrived at his conclusions that the DD module in Unit 14 was defective by the application of general electrical and mechanical engineering principles, together with his conclusions which flowed from his investigation of the facts of the accident. . . . There is no suggestion that the engineering principles utilized by Professor Fagan in arriving at his conclusions were novel, unique, or not generally accepted by the engineering community.").

The defendant also argues that Zigler's opinion that the hybrid battery pack in all class vehicles shares a "common design" and is an "interchangeable part" is based solely on his observation that the battery packs were identified by the defendant with the same service part number for all of the identified class vehicles made in model years 2017 through 2024, and, moreover, the entire factual basis of that opinion is drawn solely from defendant's recall notice. The plaintiffs respond that Zigler's opinion that the battery pack design has a common defect is adequately supported by his review of the defendant's documents indicating that the battery packs for all class vehicles used the same common part number for model years 2017 through 2024, along with other documents supplied by defendant to NHTSA detailing a list of 25 specific battery part numbers, which defendant indicated "were all involved" in the battery recall. They contend that it is appropriate to permit expert testimony where, as here, it is based on "synthesis" of sources of technical information in a way that makes them easier for the Court to understand and analyze, where review of a large volume of technical documents would be difficult for the Court on its own. Furthermore, they assert that Zigler's opinion supports a common, class-wide remedy, when he opines that, because the SPN designation remained the same not only during the model years at issue in this litigation, but even continuing on through 2024 (after the battery pack fire risk problem was cured), the common part number designation suggests that a remedy for the fire risk can be

accomplished by a drop-in replacement of older model year batteries with the (presumably revised) current design that eliminates the fire risk.

The record does not support the plaintiffs' argument or Zigler's opinion. The factual basis for Zigler's opinion that the battery pack for all of the class vehicles shares a "common design" that likely has a "common defect" lacks credible substance. The sole expressed factual basis for this conclusion is Zigler's observation that the battery pack was identified with the same "service part number" from 2017 through 2024. However, Zigler's conclusion that this alone indicates the use of a common design and the existence of a common defect is undermined by other facts disclosed in his report and admitted in his testimony.

First, Zigler explained that the "service part number" merely identifies a component having the same "form, fit, and function," which would perform the same in any compatible installation, regardless of internal engineering details. Second, Zigler determined that a "very large number" of design changes were made to the battery pack in 2017 and 2018, resulting in 25 distinct "engineering part numbers" for the battery pack assembly. Third, Zigler admitted that he has no idea why any of the changes were made, and, moreover, that he has no opinion on what parts of the battery pack were changed, or on what component or feature might have caused the thermal runaway events. Moreover, Zigler's assertion that the design is "common" for all model years is flatly contradicted by the disclosure in his report that the 2024 model year Pacifica continued to use the same "service part number" for the battery pack, which he opined is an indication that older vehicles may be retrofitted with the updated 2024 model year component, *which allegedly has eliminated the fire ris*k. *See* Supp. Report, ECF No. 184-2, PageID.8070-73. The fact that Zigler's own report contradicts the primary factual premise of his opinion on the commonality of the defect

is fatal to the reliability and admissibility of that opinion, rendering the opinion unsubstantiated by any sufficient factual basis.

In its role as a gatekeeper for expert testimony, the Court is "not a factfinder," but, nevertheless, "an expert whose methodology is otherwise reliable [must be] excluded [where] the facts upon which his or her opinions are predicated are . . . 'indisputably wrong.'" *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 967 (N.D. Cal. 2018) (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996)).  In this instance, the factual premise for Zigler's conclusion is indisputably wrong because his own analysis indicates both that the existence of a common "service part number" has no relation to the use of numerous "engineering part numbers" indicating variant internal designs for a component, and because Zigler himself asserts that later iterations of the battery pack having the same "backward compatible" SPN designation are safe and suitable for replacement in class vehicles, while earlier versions of the same SPN assembly are fatally defective.

Because Zigler's opinion is lacking a sufficiently credible factual basis, the defendant's motion to exclude his testimony will be granted.

### B.  Edward Stockton

Edward Stockton is an economist who was retained by the plaintiffs to testify that there are economic models that would allow for damages to be calculated on a class-wide basis.

Stockton is a Vice President and Director of Economics Services with The Fontana Group, Inc., in Tucson, Arizona.  He also serves on the board of directors of the firm's parent company. He holds a bachelor's degree in economics from Western Michigan University and a master's degree in applied econometrics from the University of Arizona.  He has practiced as an economist with Fontana Group since 1998, starting as an analyst and advancing to his current senior position

over nearly 30 years with the firm.  During his tenure, he has produced expert reports and testified in connection with hundreds of consumer product defect suits where he has opined on methods for estimating economic injuries to consumers using various methods.  *See* List of Client Assignments, ECF No. 132-2, PageID.5305-5326.

Stockton opined in his report that at least two reliable and widely recognized economic methods exist for the calculation of consumer damages on a class-wide basis.  First, if the battery pack is determined to be defective, and if the defendant's recall remedies are found to be ineffective to cure the defect, then the fair market value of the cost to repair the class vehicles by replacing the battery packs with non-defective components could be applied to compensate for the expense of restoring the vehicles to a safe and reliable state.  Second, if either the first or second recall remedy is found to fully repair the alleged defect, then an estimate of the lost value resulting from a period when the premium cost plug-in hybrid charging feature could not be used due to recall restrictions could be prepared by following the so-called "idled asset" model.  Stockton explained that a widely used model for conducting such an analysis would be to compute the decline in value of the premium plug-in hybrid feature over the time period from the issuance of the first recall notice to the date when an effective recall remedy became available, using that depreciation as a conservative proxy for the loss of value that consumers incurred as a result of being unable to use the premium feature due to recall restrictions.  Stockton opined that there are widely available sources of data to inform such an analysis, such as the JD Power survey of used car sale prices, and that other methods to estimate the value of the feature also could be employed, such as hedonic regression on results of a survey to gauge consumer preferences for and valuation of the plug-in hybrid feature.  Stockton opined that all of his proposed methods are widely

- 15 -

recognized by practicing economists as valid means of estimating economic injuries to consumers in the context of product defect litigations.

The defendant argues that Stockton's "repair cost" damage estimate is flawed because he assumes that a hypothetical "cost of repair" can be estimated for all class vehicles based on a calculation of the cost to repair the alleged defect at the point of sale, ignoring the fact that the defendant already has offered a repair remedy for free via the two voluntary recalls (one of which was initiated before this litigation was commenced). It also contends that the repair cost model is flawed because Stockton failed to account for the many complex factors that bear on a consumer's valuation of a vehicle, he has not conducted any survey or analysis of consumer preferences in the relevant car buying market, and he failed to account for the extremely low incidence of the alleged defect or how the rate of manifestation would bear on consumer valuations. The defendant maintains that Stockton's "idled asset model" is based on hypothetical use of methods such as hedonic regression and reliance on unspecified "conservative assumptions" that he says could be used to compute a value for lost use of the hybrid powertrain feature of the vehicles from the initiation of the first voluntary recall through the present (since the second recall is ongoing). The defendant also argues that Stockton's report and supplemental report are flawed because, despite opining that a damages computation could be carried out, Stockton admitted that he has to date performed no such analysis, because he has not been provided all of the required information, nor has he developed a finalized model for computation. Finally the defendant criticizes Stockton's opinion as failing to explain how computation of both "repair cost" and "loss of use" damages would be appropriate where awarding both types of damages would amount to an impermissible double recovery for plaintiffs who already received a recall repair, and such duplicative damages are barred by the prevailing case law.

The defendant's arguments for exclusion of Stockton's opinion are immaterial to the task presently before the Court, which is simply to determine whether practical methods may exist for computation of damages remedy based on class-wide common proofs. Most of the defendant's criticisms pertain to a merits issue, not a class certification question. Stockton has proposed at least two viable methods for the estimation of class-wide damages.

### 1. Repair Cost Model

Stockton's proposal to use the fair market value of the cost of repair for class vehicles as a proxy for damages sustained at the point of sale resulting from purchase of defective vehicles is straightforward and uncontroversial. Stockton's expert testimony on damage estimates using the cost of repair methodology has been accepted by numerous other federal district courts in consumer product defect suits. *See Hampton v. Gen. Motors LLC*, No. 21-250, 2024 WL 718197, at *16 (E.D. Okla. Jan. 4, 2024) ("Stockton's own use of the cost of repair as the proxy for the benefit of the bargain has been admitted as reliable in other courts.") (collecting cases). The defendant's critique of Stockton's opinion for its reliance on assumed facts drawn from the allegations of the pleadings is unavailing, since an expert's method is not invalidated by reliance on assumed facts. "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record"; but "mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)); *see also Hampton*, 2024 WL 718197, at *15 ("As a damage expert, it is acceptable for Stockton to assume liability to calculate damages [since] [t]he role of a damages expert is to calculate hypothetical damages given an assumed set of facts; so

long as those assumed facts are reasonably based on the evidence in the record, such assumptions are permissible.") (cleaned up).

This Court previously reviewed in extensive detail the facts, substantiated by specific documents and information disclosed in the consolidated class complaint, which certainly lend "some support" to Stockton's premise that the class vehicles are defective due to an uncured fire risk. *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 706 F. Supp. 3d 746, 785, 2023 WL 8602971 (E.D. Mich. 2023) ("The defendant argues that the limited vehicle warranty 'does not warrant a defect-free vehicle,' but instead merely 'promises repair of certain defects,' and none of the plaintiffs alleged that their vehicles were presented for repair within the warranty period and found to be 'defective in material, workmanship, or factory preparation.' That position is belied by facts, discussed above, which plausibly suggest that a primary feature of the class vehicles' powertrain system, for which a substantial price premium was paid, is nearly or entirely useless in all of the class vehicles due to the serious fire hazard presented by its continued use. The complete failure of a primary vehicle system expressly touted and sold at a premium price, which renders the vehicle unsuitable even for the purpose of routine transportation, certainly renders the vehicles 'defective' by any sensible meaning of that term.").

The defendant insists that Stockton's "repair cost" damage model would result in a "windfall" because class members already received a recall repair for free. But that argument overlooks the hotly disputed central issue in this litigation, which is whether the first or second recall remedy were in fact effective to cure the defect. Moreover, the defendant ignores the fact that Stockton proposed an alternative model for estimating loss-of-use damages only to be used if it is determined that either the first or second recall remedy were effective.

As this Court previously has recognized based on surveys of the law in various jurisdictions, "it has been held in several relevant jurisdictions that plaintiffs' entitlement to 'benefit of the bargain' damages is eliminated where it is shown that an alleged defect fully has been remedied by a recall." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 4011225, at *4 (E.D. Mich. Sept. 2, 2022) (citing *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 225, 230-31 (S.D.N.Y. 2019) (applying New York and California law)). But the defendant's insistence on this point is impertinent because it assumes the premise (as yet unproven and hotly in dispute) that its recall remedy has in fact been effective at curing the alleged defect. The tenuous nature of that premise is strongly suggested at a minimum by the existence of the still ongoing second voluntary recall, which was undertaken when reports of more vehicle fires were received in cars subjected to the first recall remedy.

## 2. Loss of Use Model

The defendant also criticizes Stockton's loss-of-use model for its reliance on assumptions that class vehicle owners actually complied with recall restrictions and abstained from use of the plug-in charging system, and that in the absence of such restrictions they uniformly would have used the feature, pointing to published studies indicating that many owners of plug-in hybrid vehicles do not use the charging feature even when it is safely available. These criticisms do not undermine the admissibility of Stockton's opinion about the suitability of the loss-of-use model for estimating damages. It is well settled, and has been so for decades, that under the permissive framework established by *Daubert* and Rule 702, "'rejection of expert testimony is the exception, rather than the rule.'" *Good v. BioLife Plasma Servs., L.P.*, 834 F. App'x 188, 198 (6th Cir. 2020) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530; Fed. R. Evid. 702 Adv. Comm. Note to 2000 amends.). "The question on the table is whether a method can be 'assessed for reliability,'

not whether it always gets it right.  Disputes about the . . . accuracy of a theory's results, generally speaking, provide grist for adversarial examination, not grounds for exclusion." *United States v. Gissantaner*, 990 F.3d 457, 464 (6th Cir. 2021) (cleaned up).  Challenges to the relevance and reliability of expert testimony merely prompt the Court to engage in a "'preliminary inquiry as to whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.'" *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 445 (6th Cir. 2012) (quoting *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002)).  "[I]t is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).  "[T]he Advisory Committee note to Rule 702 is instructive in this regard: 'When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *Ibid.* "Indeed, as the Supreme Court stated in *Daubert*: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Ibid.* (quoting 509 U.S. at 595).  The defendant takes issue with the credibility of certain factual premises, such as whether class vehicle owners would have used the plug-in charge feature in the absence of the recall restrictions, but such matters are grist for cross-examination, not a basis for wholesale exclusion of opinion testimony derived from an otherwise acceptable methodology.

The defendant has not established that Stockton's proposed methodology using the depreciation of an "idled asset" over the time frame of lost use is categorically invalid or not widely

recognized as an appropriate method for estimating damages to consumers in the context of a product defect suit.  Moreover, Stockton proposed alternative measures to place a value on the lost utility of the crippled vehicles, such as using "hedonic regression" to gauge the valuation placed on the availability of the feature.  *Won v. Gen. Motors, LLC*, No. 19-11044, 2022 WL 3010886, at *7 (E.D. Mich. July 28, 2022) ("That method of gauging the value placed on a feature by consumers has been recognized by this and other federal courts as a sound and widely accepted method in the field of consumer economics. Other federal courts have rejected in other cases all of the same criticisms leveled by the defendant, and Eichmann's testimony based on his espoused market simulation and hedonic regression methods regularly has been accepted as admissible evidence demonstrating class-wide damages in product defect cases.") (collecting cases).

### 3. Focus of the Methodologies

Finally, as to both of his methods for estimating consumer damages, the question before the Court is not whether the expert's opinion reliably proves a particular quantum of damages sought, but only whether viable methods exist by which an estimate of damages reliably may be computed, based on principles widely accepted in the field of consumer economics.  For that purpose, the opinion is sufficiently reliable and relevant to aid the Court in determining whether a viable means of computing class-wide damages may exist.  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687, 698-99 (E.D. Mich. 2019) ("Dr. Hastings's testimony is offered at this stage of the case for the limited purpose of assessing whether a common question of fact exists that can be answered in the context of this collective litigation, which questions whether the plaintiffs suffered damages due to overpaying for defective and unsafe cars. Dr. Hastings has supported her testimony with sufficient authority to proffer an opinion that common damages were sustained and can be estimated by reliable and accepted methods.") (citing *In re*

*Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008)) (denying mot to exclude damages expert at class certification stage).

Stockton has presented opinions based on sufficient factual substance and proposing reliable and widely recognized methods for estimating losses in a consumer product defect case. The plaintiffs have shown by a preponderance of evidence that Stockton's opinions satisfy the requisites of Evidence Rule 702.  The motion to exclude his opinion will be denied.

### C.  Denise Martin

Denise Martin is an economist hired by the defendant to rebut the opinions of Edward Stockton on the availability of methods to calculate class-wide damages.  She is a Senior Managing Director at NERA Economic Consulting in White Plains, New York.  She has held that position since 2001, and joined the firm in 1991, working her way up from her starting role as a senior analyst to her current executive position.  She holds a B.A. in Economics from Wellesley College and M.A. and Ph.D. degrees in the same field from Harvard University.  She has provided expert reports and testimony in more than two dozen matters in various courts within the past four years.

Martin produced a report in which she leveled various criticisms against the economic models proposed by plaintiff's expert Edward Stockton.  The plaintiffs take issue with two of her conclusions, which are that (1) all class members who have not experienced a thermal runaway fire incident are "undamaged" and should receive no compensation, because they received "full value" and had "full use" of their vehicles since purchase, and (2) Stockton's loss-of-use model is inherently unreliable because it fails to account for individualized aspects of the valuation that consumers would place on the plug-in hybrid charging feature, which would be expected to vary widely based on individual circumstances such as whether class members may have bought the vehicles with no intention of ever using the plug-in feature, or how often the vehicles were operated

in full electric mode rather than in gas-electric hybrid mode, leading to variances in the extent of cost savings realized from the fuel conserving benefits of electric mode.

The defendant responds that Martin's opinion that Stockton's model for estimating point of purchase damages is unreliable is appropriate and valid, regardless of her estimate of the "manifestation rate" of the risk.  It also insists that Martin's opinion that class members who have not experienced a vehicle fire suffered "no damages" is consistent with the case law and relevant to the defendant's defense in the case, based on its assertion that the recall remedy fully cured the alleged defect.  The defendant also says that the publications cited by Martin in her report support her opinion that "idled asset period" damages valuation is inappropriate and may be unreliable due to variations in individual usage of products, and one of the studies cited examined vehicle usage by Chrysler Pacifica owners.

The plaintiffs correctly point out that Martin's opinion that class members who have not had vehicles catch on fire suffered "no damages" ignores the plain allegations of the consolidated pleading, which are that the primary loss suffered was loss of use of the premium plug-in hybrid feature for lengthy periods due to restrictions on parking situations and plug-in hybrid charging recommended by the recall notices — which to this day apparently remain in force due to the second voluntary recall.  As discussed above, the Court previously concluded that the allegations of the consolidated pleading are sufficient to suggest that the class vehicles are defective due to the crippling of a major premium feature by the recall restrictions.  Moreover, based on the recommendation that the vehicles not be parked near any other vehicle or structure, they are of questionable utility even for general transportation, disregarding the loss of use of the plug-in charge feature to mitigate fuel consumption.  This Court previously has confronted and rejected

the same specious argument that consumers who have not suffered any direct injury as a result of

a defect risk have suffered "no loss" and are entitled to no recovery:

> When a manufacturer sells a product that is defective, which causes consumers to be misled at the point of sale into paying more and getting less than they believed they were purchasing, the consumers suffer an injury in fact, even if that defect does not manifest itself in every individual unit. . . . That is why the defendant's argument that plaintiffs who have not been injured personally, or who have not yet sold their vehicles for a nominal loss, is a non-starter.  As the district court aptly observed in *Toyota*, "this argument succeeds only if one assumes that a plaintiff who has not experienced a safety defect does not have a safety defect . . . . [A]ll Plaintiffs suffered an economic loss at the time of purchase because they received a defective vehicle . . . . The economic loss was present from the beginning."  *In re Toyota Motor Corp.*, 790 F. Supp. 2d at 116

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 1382297, at

*5 (E.D. Mich. Apr. 18, 2017) (citing *In re Whirlpool Corp. Front-Loading Washer Prod. Liab.

Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) ("Because all Duet [front-loading clothes washer] owners

were injured at the point of sale upon paying a premium price for the Duets as designed, even those

owners who have not experienced a mold problem are properly included within the certified class.

Moreover, under the negligent failure-to-warn theory of liability, the plaintiffs need not prove that

mold manifested in every Duet owned by class members because the injury to all Duet owners

occurred when Whirlpool failed to disclose the Duets' propensity to develop biofilm and mold

growth."); *In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1162 (C.D. Cal. 2011) ("Just as the

California Supreme Court in Kwikset held that locks that were falsely advertised as being made in

the United States were worth less to a consumer even if the locks were fully functional, so too have

Plaintiffs alleged here that the alleged safety defects make Plaintiffs' vehicles worth less even if

[the improper acceleration] has not yet occurred.")).  In this instance, Martin's opinion that all but

a handful of class members suffered "no loss" because they have not experienced vehicle fires

does nothing to inform the Court's consideration of class certification issues, because the premise

from which she proceeds is contrary to the prevailing law.  That opinion will be rejected for want of a valid factual premise.  *See* Fed. R. Evid. 702(b), (d).

The plaintiffs also criticize Martin for her opinion that Stockton's proposed loss-of-use model is invalid because it fails to account for individual variations in intended and actual usage of the plug-in hybrid charging feature.  Martin conceded at her deposition that her assumption that some class members never used the plug-in charge feature even in the absence of recall restrictions was merely "theoretical" and not based on any data concerning actual use of the feature in the field.  In her report, Martin supported this conclusion by citing in a footnote a single published study that concluded, among other things, that use of plug-in hybrid charging features varies widely among consumers due to several factors, including relative cost of gasoline versus electric power rates, and local availability of charging stations.  Expert Report, ECF No. 131-2, PageID.3953 n.2 (citing Isenstadt, Aaron et al., Real World Usage of Plug-In Hybrid Vehicles in the United States, International Council on Clean Transportation (December 2022)).  The plaintiffs point to deposition testimony by Martin where she admits that she has no data concerning actual usage of the plug-in charging feature by potential class members in this case.  Nevertheless, Martin has identified some factual support for her criticism of Stockton's failure to account for individual differences in plug-in hybrid usage.  So far as it goes, her opinion is adequately substantiated to be informative to the Court on the question of whether Stockton's proposed methods are sufficiently reliable to allow computation of sound damage estimates on a collective basis.  As discussed above, questions about the adequacy of the proffered basis for Martin's opinion on this point are proper topics for cross-examination, not grounds for exclusion of her opinion.

Martin's opinion that potential class members suffered "no damages" if they have not experienced a vehicle fire is contrary to the law and will be excluded.  Her criticism of the

methodology of Stockton's loss-of-use damage computation model is admissible for whatever persuasive value it may have through illumination of difficulties in the proposed model.

### D.  Eldon Leapheart

Eldon Leapheart is an automotive engineer retained by the defendant to give an opinion on whether the class vehicles share a common design feature that might be amenable to an alleged defect claim that could be addressed on a class-wide basis.

Leapheart represents that he has more than 35 years of industry experience including system engineering and engineering management roles at General Motors and Delphi Automotive. He presently is employed by Carr Engineering, Inc. in Houston, Texas, where he has worked as a principal engineer since 2016.  He holds undergraduate and master's degrees in electrical engineering from Ohio State University.

Leapheart's report indicates that he reviewed comprehensive discovery materials produced during the course of this litigation.  He expressed several opinions based on his review of those materials, which the plaintiffs challenge in their motion.  First, he opined that "there is no common design [among the class vehicle battery packs], no common manufacturing process, and no common failure mode in the population of NHTSA Recall No. 22V077 vehicles."  Expert Report, ECF No. 133-6, PageID.5536.  He based that conclusion on his survey of dozens of documented hardware and software changes made to the battery pack design by both GM and the battery supplier during the relevant model years.  *See id.* at PageID.5532-35.  Second, Leapheart opined that observable variations in the circumstances of the reported battery pack fires (e.g., temperature, geographic location, charging duration, variations in damage patterns to internal components, different points of fire origin) rule out the possibility of any finding that a single common defect is responsible for the thermal runaway fire risk.  *Id.* at 5536.  Third, in an attempt to bolster those

opinions, Leapheart testified during his deposition that a finding of a common defect requires that there be "no variations" in any detail of the battery pack design and manufacturing process. Finally, Leapheart opined that the defendant's refusal to replace battery packs for most class vehicles is prudent because "the HV battery is part of a complex system where all system interfaces must be considered." *Id.* at 5537.

At his deposition, Leapheart admitted that he did not perform any inspections of class vehicles including those vehicles involved in fire incidents. Eldon Leapheart dep., ECF No. 133-7, PageID.5550-51. He also did not perform any testing in connection with his work on the case. *Id.* at PageID.5551. Leapheart conceded that it is his understanding based on information published by the defendant, including the recall notices, that all of the class vehicles have a fire risk. *Id.* at 5552. However, Leapheart admitted that he was not asked to determine whether or how any of the engineering changes that he identified in the battery pack design had any impact on the thermal runaway fire risk. *Id.* at 5557 ("I'm not offering an opinion about these changes for using [sic] the fire risk. I have not studied that. That wasn't what I was asked to do. I'm merely looking at it from a diversity standpoint, in that the design is not constant, and because vehicles are being manufactured across time, not all the changes are in all the vehicles."); *see also id.* at 5560 ("Q. Do you know which versions of the [battery pack software] eliminated the risk of fire here in these recall vehicles? A. So that was — that's similar to the question that's asked before. It's kind of outside of my scope to evaluate the effectiveness of these various changes. I am merely highlighting that software is a moving target."); *id.* at 5562 ("I'm not opining at all on the effectiveness of fire risk [sic] because, again, that is — that's a separate exercise, and because of the complexity of this issue, that has to be looked at over time in addition to what other analysts — you know, analysis that is being done to [try] to seek [a] root cause."). Leapheart also

emphatically disclaimed that he reached any conclusion concerning the root cause of the reported fires in any of the 16 reported class vehicle incidents. *Id.* at 5569 ("Q. You are not providing a root cause opinion in this report, right, for this — for these fires, or for even the fire risk; is that correct? A. Absolutely, that is correct.").

The plaintiffs argue that Leapheart's opinion that there is "no common defect" in the class vehicle battery packs is not supported by sufficient facts or data or any reliable analysis because he conceded at deposition that, despite observing numerous specific design changes in the battery hardware and software over the years, and despite noting anecdotal circumstantial differences in the situations of the vehicles that had reported fire incidents, he admitted that he did not undertake any analysis to determine the significance of any of those distinctions or how they would impact the magnitude of the fire risk. They also contend that Leapheart's opinion that all of the reported class vehicle fires were caused by "manufacturing anomalies" and not any common defect is unreliable because he admitted that he did not inspect any of the vehicles, conducted no investigation to determine the cause or origin of any of the fires, and relied entirely on reports authored by the defendant to identify circumstantial distinctions which he says compel a conclusion that no common defect exists in the vehicles. They point out that the causation opinion also is counter-factual in that Leapheart purports to have concluded that there is no common cause for the fires, when the defendant stated in its recall communications that a root cause for the fires has not yet been determined, and Leapheart admitted that he did not undertake any root cause analysis himself.

The defendant responds that the opinion that no common defect may be identified is adequately supported by Leapheart's documentation of numerous software and hardware design alterations over the years when battery packs were made and installed in the class vehicles, along

with circumstantial distinctions in the observed fire events.  It also argues that Leapheart's compilation of the numerous documented differences in iterations of the battery pack design through the years and variegated circumstances of the fire-affected vehicles is relevant to rebut the plaintiffs' expert's opinion that a "common defect" exists merely because a single common service part number was used for all of the class vehicle battery packs during the relevant time period.

Leapheart's conclusions challenged by the plaintiffs are inadmissible because, by his own admission, they are unsupported by any reliable methodology or factual basis.  First, despite itemizing numerous hardware and software revisions, Leapheart admitted that he undertook no effort to classify any of those changes in terms of their relation to the thermal runaway fire risk. His opinion is irrelevant to the determination whether a common defect responsible for the fire risk may exist, because Leapheart concedes that he has no idea whether any of the dozen design variations that he noted have any relationship to the fire risk.  Instead, Leapheart's assertion is a graphic example of an opinion based "only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 346 (6th Cir. 2024); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (observing that "[t]he '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion" even though the expert is well qualified) (quoting *Joiner*, 522 U.S. at 146).

Second, Leapheart admitted that he made no effort to make any determination about the cause and origin of the reported vehicle fires.  Similarly, his opinion that there is no common cause of the fires is unsubstantiated and irrelevant, because he admits that he has no idea what caused any of the fires.  In the absence of any cognizable methodology to relate the observed variations

in product design and circumstances to the fire risk, the opinion is of no use to the Court in determining whether any of the cataloged variances has any causative bearing on the risk.

Leapheart also opined that the existence of a common defect requires that there be "no variations" in a product design during the relevant time period.  Leapheart dep. at PageID.5576 ("Q. And so common to you means no variations at all in design or manufacturing, correct? A. That is correct.").  That conclusion is irrelevant because it is contrary to the prevailing law, which requires that the plaintiffs demonstrate only that the population of class vehicles is similar in relevant respects implicating the alleged failure condition, not that every instance of the product sold is indistinguishable in every minute detail.  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d at 854 ("Whirlpool claims that commonality is defeated because the Duets were built over a period of years on two different platforms, resulting in the production of twenty-one different models during the relevant time frame. While the trial evidence may concern different Duet models built on two different platforms, the common question of whether design defects cause mold growth remains across the manufacturing spectrum Whirlpool describes. Plaintiffs' evidence—some of which comes directly from internal documents authored by Whirlpool's own Lead Engineer of Advance Chemistry Technology, Andrew Hardaway— confirms that the two platforms are nearly identical, the design issues concerned various models, and most of the differences in models were related to aesthetics, not design. Whether the alleged design defects caused biofilm and mold to accumulate in the Duets is a common issue for all members of the certified class."); *see also Speerly v. Gen. Motors, LLC*, 343 F.R.D. 493, 525 (E.D. Mich. 2023), *aff'd*, 115 F.4th 680 (6th Cir. 2024), *reh'g en banc granted, opinion vacated*, 123 F.4th 840 (6th Cir. 2024) ("The defendant argues that 'design variations' among class models preclude class certification. However, the plaintiffs have argued persuasively that the problematic

elements of the 8L design are universal and inherent despite any such variations. The question is not whether every single aspect of the design is common — only those aspects that allegedly caused the problems.") (citing *Quackenbush v. Am. Honda Motor Co., Inc.*, No. 20-05599, 2021 WL 6116949, at *4 (N.D. Cal. Dec. 27, 2021); *Brummett v. Skyline Corp.*, 1984 WL 262559, at *3 (W.D. Ky. 1984) ("As to meeting the prerequisites of Fed. R. Civ. P. 23(a), the plaintiffs assert that their claim is typical of that of the class. The basic design defect claimed by the plaintiffs is allegedly present in all of the defendant's mobile homes. The fact that different models are involved is of no consequence here. The plaintiffs' claim for economic harm is typical of the claim of any other purchasers of these mobile homes.")).  Moreover, the opinion is unsubstantiated because Leapheart admits that he has no idea how any of the cataloged variations relate to the thermal runaway fire risk, so he has no reliable basis to derive to any conclusion about which of the identified variations may be related to the alleged defect.

Finally, Leapheart's opinion that replacement of battery packs on a large scale is impractical or unnecessary is immaterial at this stage of the case, where the Court is not called upon to fashion a remedy, but merely to determine if collective litigation may be an efficient means for resolving questions about whether the class vehicles are defective.  The determination of what remedies may be available or appropriate if the vehicles are found to be defective is a question for another day, likely many days from now.

Leapheart's challenged opinions are unhelpful, unsupported by any reliable methodology or sufficient factual basis, and contrary to the prevailing law.  Therefore, the plaintiffs' motion to exclude his opinions concerning the existence of design variations and various circumstances accompanying the reported vehicle fires, whether or not the class vehicles have a common defect

contributing to thermal runaway fire risk, and whether replacement of the allegedly defective battery packs is an appropriate remedy will be granted.

### III. Conclusion

The plaintiffs' automotive engineering expert Bradley Zigler is qualified to render an opinion on common defects, but his opinion to that effect does not satisfy the requirements of Evidence Rule 702.  The opinions of Edward Stockton on a method of calculating class-wide damages are admissible.  The opinion of Denise Martin to the effect that the plaintiffs suffered "no damages" if they have not yet experienced a catastrophic vehicle fire does not satisfy the requirements of Evidence Rule 702, but her opinion that Edward Stockton's loss-of-use damages model is unreliable for various reasons is admissible.  The opinions of Eldon Leapheart on the question of a common defect in the class vehicles and a remedy of replacing the battery pack do not satisfy the requirements of Evidence Rule 702.

Accordingly, it is **ORDERED** the defendant's motions to exclude the opinions of Bradley Zigler at the class certification phase of the case (ECF Nos. 130, 184) are **GRANTED**.

It is further **ORDERED** the defendant's motions to exclude the opinions of Edward Stockton at the class certification phase of the case (ECF Nos. 132, 185) are **DENIED**.

It is further **ORDERED** the plaintiffs' motion to exclude the opinions of Denise Martin at the class certification phase of the case (ECF No. 131) is **GRANTED IN PART AND DENIED IN PART**.  Dr. Martin's opinion that potential class members suffered "no damages" if they have not experienced a vehicle fire is excluded.  Her criticism of the methodology of Stockton's loss-of-use damage computation model is admissible.

It is further **ORDERED** that the plaintiffs' motion to exclude the opinions of Eldon Leapheart at the class certification phase of the case (ECF No. 133) is **GRANTED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  February 18, 2025